# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF VIRGINIA

 3                    LYNCHBURG DIVISION

 4    _____

 5    COREY J. OSBORNE,

 6            Plaintiff,

 7        v.                              Civil Action No.

 8    WAL-MART STORES EAST, LP, et al.,  6:20-cv-0079-NKM

 9            Defendants.

10    _____

11                    CONFIDENTIAL

12            VIDEOCONFERENCE DEPOSITION OF

13                  COREY J. OSBORNE

14    DATE:          Thursday, November 18, 2021

15    TIME:          1:29 p.m.

16    LOCATION:      Remote Proceeding

17                   James River Legal Associates

18                   7601 Timberlake Road

19                   Lynchburg, VA 24502

20

21

22

23

24

25
```

Confidential

```
 1                 A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF COREY J. OSBORNE:

 3        M. PAUL VALOIS, ESQUIRE

 4        James River Legal Associates

 5        7601 Timberlake Road

 6        Lynchburg, VA 24502

 7        mvalois@vbclegal.com

 8        (434) 845-4529

 9

10   ON BEHALF OF DEFENDANTS WAL-MART STORES EAST, LP, et

11   al.:

12        G. BETHANY INGLE, ESQUIRE

13        Littler Mendelson, P.C.

14        1650 Tysons Boulevard, Suite 700

15        Tysons Corner, VA 22102

16        gingle@littler.com

17        (703) 442-8425

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X
 2   EXAMINATION:                              PAGE
 3        By Ms. Ingle                           5
 4        By Mr. Valois                         127
 5
 6                    E X H I B I T S
 7   NO.            DESCRIPTION                 PAGE
 8   Exhibit 1      Corey J. Osborne's Answers to  13
 9                  Interrogatories
10   Exhibit 2      Resume of Corey J. Osborne   18
11   Exhibit 3      Was skipped in proceeding    XX
12   Exhibit 4      Wal-Mart Job Description      29
13   Exhibit 5      Investigation and Detention of  36
14                  Shoplifters Policy (AP-09)
15   Exhibit 6      Compliance                   38
16   Exhibit 7      List of Wal-Mart Training courses  41
17   Exhibit 8      Wal-Mart Statement of Ethics  44
18                  (Global Ethics contact information,
19                  p. 8)
20   Exhibit 9      Wal-Mart Discrimination and   58
21                  Harassment Prevention Policy
22   Exhibit 10     Wal-Mart Disciplinary Action Policy  59
23   Exhibit 11     Disciplinary Action #22588631  64
24   Exhibit 12A    Disciplinary Action #20999489  68
25   //
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                        Corey J. Osborne on 11/18/2021

```
 1                        E X H I B I T S (cont'd.)

 2    Exhibit 12B     Video 1 - Customer Exit JAM GR-04;    77

 3                    Video 2 -- Exterior Front

 4    Exhibit 13      Video 1 - Customer Exit JAM GR-04;    82

 5                    Video 2 -- Exterior Front

 6    Exhibit 14      Video 4 - Customer Entrance           82

 7    Exhibit 15      Video 4 - Customer Service            83

 8    Exhibit 16      Video 4 - Checkout camera,            84

 9                    (GM-SCO-3-OUT)

10    Exhibit 17      Written Statement, May 15, 2020       96

11    Exhibit 18      Corey J. Osborne Exit Interview      103

12    Exhibit 19      Witness Statement (Typed up)         104

13    Exhibit 20      Charge of Discrimination             110

14    Exhibit 21      Complaint                            113

15    Exhibit 22      Section 600 Document                 119

16    Exhibit 23      Post-Termination Employment and      126

17                    Applications

18

19                    (Exhibits retained.)

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2   WHEREUPON,

 3                        COREY J. OSBORNE,

 4   called as a witness, and having been first duly sworn

 5   to tell the truth, the whole truth and nothing but the

 6   truth, was examined and testified as follows:

 7                              EXAMINATION

 8   BY MS. INGLE:

 9        Q    Good afternoon, Mr. Osborne.  My name is

10   Bethany Ingle I represent Wal-Mart in the lawsuit that

11   you have filed against them.  I'm going to be asking

12   you a series of questions here today.  I'm sure you've

13   talked to your attorney about the process a little

14   bit, but I just did want to go over some of the ground

15   rules.  First, could you state your name for the

16   record?

17        A    Corey Osborne.

18        Q    Do you have a middle name?

19        A    Corey Jamiel Osborne.

20        Q    Okay.  And how do you spell, "Corey?"

21        A    C-O-R-E-Y.

22        Q    How do you spell your last -- I'm sorry,

23   your middle name?

24        A    J-A-M-I-E-L.

25        Q    And how do you spell your last name?
```

Confidential

```
 1       A    O-S-B-O-R-N-E.

 2       Q    Thank you.  And have you ever gone by any

 3   other names?

 4       A    No, ma'am.

 5       Q    Have you ever had your deposition taken

 6   before?

 7       A    Probably with other cases for, like,

 8   shoplifting, but -- for anything outside of work, no.

 9       Q    Okay.  So you think you've had one taken

10   before for a shoplifting case?

11       A    Yes.

12       Q    Okay.  And are you questioned by an attorney

13   before you actually had to testify in court?

14       A    No.  I just -- I testified in court.

15       Q    Okay.  Okay.  So I'm sure you've been told

16   this by your attorney, but -- and you understand the

17   process of having to raise your right hand, swear to

18   tell the truth, the whole truth, and nothing but the

19   truth, so it's similar to being in court.  You're

20   under oath, just like you would be in court and, just

21   like if you were in court, it's important that we

22   don't talk over one another, because there's a court

23   reporter, and she needs to hear every word I say as

24   well as every word you say, so that she can make a

25   transcript of what we say for the record.  I'm sure
```

```
 1   they did that sometimes when you testified in court
 2   for shoplifting cases.  That may very well have
 3   happened.  So you -- you know the process pretty well,
 4   then, I'm sure.  Also, too, you will need to give
 5   verbal answers to all the questions.  You know, I see
 6   you nodding your head and that's fine for now.  I
 7   haven't really asked you a question, but if I ask you
 8   a question, you'll need to say, "Yes," or "No," or
 9   give a verbal rather than, you know, make a gesture or
10   nod your head, because the court reporter won't
11   necessarily record that and put that in the
12   transcript.
13        If you don't understand something I've asked,
14   just ask me to clarify.  I'll rephrase.  If you think
15   I'm going too fast, just let me know.  I can slow
16   down.  You know, if there's any reason you need to
17   take a break, let us know.  We'll go off the record.
18   I just suggest that if there's a question pending,
19   please do answer the question before we go off the
20   break -- or go off the record and take a break.
21        But are you on any medications today that could
22   impair your ability to remember?
23        A    No.
24        Q    Do you have any medical conditions that
25   could impair your ability to understand my questions
```

Confidential

```
 1   or remember?

 2        A    No.

 3        Q    Did you review any documents to prepare for

 4   your deposition today?

 5        A    Yes.

 6        Q    What did you review?

 7        A    The video.

 8        Q    Okay.  And were those videos of events that

 9   occurred at Wal-Mart?

10        A    Two of them, I guess, yes.  They all

11   occurred at Wal-Mart.  Two of the videos, I don't

12   understand why they recorded, but they was on the

13   actual thing that I marked.

14        Q    So, it's two of the videos that -- you

15   believe that the videos were produced by Wal-Mart --

16        A    Yes.

17        Q    -- as discovery in this case?

18        A    Yes.

19        Q    And besides the videos, did you review any

20   other items to prepare for the deposition?

21        A    No.

22        Q    And besides your attorney, did you discuss

23   the deposition with anyone before today?

24        A    No.

25        Q    Besides your attorney have you discussed the
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

```
 1   case with anyone?

 2        A    My wife.

 3        Q    So, where do you currently live?  What's

 4   your address?

 5        A    It's 246 Sherbrooke Drive, Lynchburg,

 6   Virginia, 24502.

 7        Q    How long have you lived at that address?

 8        A    Since February, 2019.

 9        Q    So, where did you live before that house?

10        A    64 Maybrook Drive, Lynchburg, Virginia,

11   24502.

12        Q    How long have you lived in Lynchburg?

13        A    Basically, all my life since I got home from

14   the military.

15        Q    And were you living in Lynchburg before you

16   joined the military?

17        A    Madison Heights.

18        Q    So are you from Madison Heights?

19        A    Yes, ma'am.

20        Q    And who do you live with at your current

21   address?

22        A    My wife, Tiffany Osborne, and my three

23   children; Aaliyah, Caleb and Eric.

24        Q    Now, are your three children, are they all

25   under the age of 18?
```

```
 1      A    No.  Just two of them are.
 2      Q    And what are your children's ages?
 3      A    Aaliyah is 20, Caleb is 17, and Eric is 13.
 4      Q    And is your oldest child -- is she employed?
 5      A    She goes to school full-time.
 6      Q    And is your wife employed?
 7      A    She owns her own daycare.
 8      Q    What's your date of birth?
 9      A    Excuse me?
10      Q    What's your date of birth?
11      A    ███████████████████.
12      Q    And you mentioned that you're currently
13   married.  Have you ever been married before?  Have you
14   just been married once?
15      A    No.  Just once.
16      Q    What's the highest level of education you've
17   obtained?
18      A    Got some college.  So, basically, like a
19   Associate's degree.
20      Q    Where did you get that from?
21      A    Liberty University.
22      Q    And what's your degree in?
23      A    Criminal justice.
24      Q    And did you get that degree?
25      A    No, ma'am.  I didn't finish.
```

COREY J. OSBORNE vs WAL-MART STORES EAST

Corey J. Osborne on 11/18/2021

```
 1       Q    Okay.  What's your current -- or what are
 2   your current sources of income?
 3       A    I work for a security company out of
 4   Waynesboro, Virginia.
 5       Q    What's the company called?
 6       A    Arrow Solutions, LTD.
 7       Q    What do you do at Arrow Solutions?
 8       A    I am the Security Manager.
 9       Q    How long have you worked for Arrow
10   Solutions?
11       A    Since July the 27th of this year.
12       Q    And you already said this, the Security
13   Manager --
14       A    No, ma'am.  I just got -- I just got
15   promoted to Security Manager.
16       Q    -- congratulations.
17       A    Thank you.
18       Q    What was your role when you initially
19   started working for Arrow Solutions?
20       A    Initial, I was a Shift Supervisor.
21       Q    How much did you earn as a Shift Supervisor?
22       A    I was making $20.00 an hour.
23       Q    How much do you make now as a Security
24   Manager?
25       A    $30.00 an hour.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1      Q    You mentioned you were recently promoted.
 2   When did you get your promotion?
 3      A    This past Monday, started.
 4      Q    That would have been November 15th?
 5      A    15th.  Yes, ma'am.
 6      Q    And what are your job duties as Security
 7   Manager at Arrow Solutions?
 8      A    I am to go out and get contracts for the
 9   company, all sites.  I am the Manager of all security
10   sites.  So, if they need any kind of equipment,
11   vehicle maintenance, if somebody calls out I have to
12   replace them on the shift -- try to find people to
13   replace them.  So, I basically run the whole security
14   department.
15      Q    And so, you mentioned there were different
16   sites.  Does Arrow Solutions provide security to
17   different businesses?
18      A    Yes, ma'am.  Right now, just in Lynchburg,
19   we have one site.  It is called James Crossing, but
20   they have other sites in Waynesboro, and one in
21   Charlottesville.
22      Q    Okay.  And what types of businesses are
23   these sites?
24      A    One of them's a school and the rest of them
25   are apartment complexes, and they usually are Housing
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1   Authority complexes; low income families.
 2       Q    And how many people would you say you
 3   supervise as a Security Manager?
 4       A    There's about 17 or maybe 20.
 5       Q    When you were Shift Supervisor, about how
 6   many people did you supervise in that role?
 7       A    One.
 8       Q    Other than this lawsuit against Wal-Mart,
 9   have you ever filed any other lawsuits?
10       A    No.
11       Q    Have you ever been a party to a lawsuit?
12       A    No.
13       Q    Bear with me.  I'm going to share my screen
14   here -- share this document in the chat feature.  You
15   all see my screen?
16       A    Yes, ma'am.
17       Q    Mr. Osborne, do you recognize this document
18   as your Answers to Interrogatories?
19       A    Yes, ma'am.
20                 MS. INGLE:  Enter this is Exhibit 1.
21                 (Exhibit 1 was marked for
22                 identification.)
23                 MS. INGLE:  Okay.  Mr. Osborne, I'm
24   going to scroll.  Okay.  Here we -- jump to the answer
25   you gave for number 12.  We asked if you had ever been
```

Confidential

1    party in a lawsuit or other judicial proceeding, other

2    than the present matter, and to list those lawsuits or

3    proceedings, whether you had been plaintiff or

4    defendant, and the general nature of the action.

5    There were some unlawful detainer actions here.

6    BY MS. INGLE:

7        Q    Do you recognize these case numbers listed

8    here?

9        A    I don't recognize the case numbers.  I do -

10   knew that I did have a few unlawful detainers where

11   they were dismissed.

12       Q    Okay.  So you believe these are cases that

13   were filed against you, it looks like?

14       A    Yeah.  It was for rent being late and then,

15   when I went to court and everything, you know, they

16   threw it out of court because the rent was caught up.

17       Q    Okay.  And then, also to -- there are some

18   warrants and get listed.  Do you know what these are

19   in reference to?

20       A    I think it was the same thing.  And when we

21   moved, one of them was -- I was in a car accident and

22   we moved and I was unable to work.  So I had -- I was

23   late with the rent and they did that, and they get a

24   warrant for the debt that was received, because it

25   wasn't -- the rent wasn't paid still on time.

Confidential

```
 1       Q    Okay.  You mentioned something about before

 2   you moved, you were in a car accident.  Was that in

 3   2019?

 4       A    No.  It was before then.  I think it was

 5   2012 or '11, I believe.

 6       Q    Okay.  So, did you bring a lawsuit against

 7   the driver of the other vehicle or was there any legal

 8   action as a result of that accident?

 9       A    It was -- what happened?  We did have to go

10   to court.  He paid for the damages and then, I guess,

11   for the injuries that we had.  And then -- what?  We

12   did have a lawyer for that.  Randall Trost was the

13   lawyer.  But we --

14       Q    Then you said, you were injured and couldn't

15   work.  How were you injured?

16       A    -- it was just back problems.  We got rear

17   ended, but we never actually went to, like, court, you

18   know, like, testified or anything like that.  I talked

19   to Mr. Trost.  He did this, did that and -- because my

20   son was in the vehicles as well, and he basically come

21   back saying, "This is what we get.  This is -- this

22   and the other," and then, of course, you know, he gets

23   his cut out of it.

24       Q    So you got a settlement out of it.  Is that

25   what's your understanding was?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

Confidential

```
 1        A     Yeah.  I guess that's what you call it.  It
 2    wasn't much, but yeah, a settlement.
 3        Q     Okay.  And did you continue to have any
 4    problems with your back after that accident?
 5        A     Not as terrible.  I did have -- continued to
 6    have problems, but eventually they, I guess, say they
 7    worked its way out.  I had to go to -- metaphysical,
 8    but there's some kind of like, deep tissue massage,
 9    and then, some kind of electric shocks on my back and
10    then, did that for maybe about, I want to say maybe,
11    two or three months.
12        Q     And you said you were unable to work for
13    some time after the accident.  Do you recall how long
14    that was?
15        A     Probably, about 30 days.
16        Q     And what were you working in at the time?
17    What was your job at the time?
18        A     Asset Protection for Kmart.
19        Q     And since that accident that -- it just
20    sounds like you received a settlement in and these
21    actions listed here in response to your answer to
22    Interrogatory 12.  Can you think of any other legal
23    actions you may have been involved in besides this
24    particular lawsuit?
25        A     No, ma'am.
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1        Q     Have you ever filed a charge of
 2   discrimination against any other employers, besides
 3   Wal-Mart?
 4        A     No, ma'am.
 5        Q     What about workers' compensation claims?
 6   Have you ever felt any of those?
 7        A     No, ma'am.
 8        Q     And I understand working in asset
 9   protection, you've likely been a witness in legal
10   actions several times.  Is that accurate to say?
11        A     Yes.
12        Q     And did you do that both for Kmart and Wal-
13   Mart?
14        A     Yes, ma'am.
15        Q     Are there any other businesses where you
16   worked in asset protection?
17        A     No, ma'am.
18        Q     And have you ever filed for bankruptcy?
19        A     No, ma'am.
20        Q     Have you ever been convicted of a crime?
21        A     No ma'am.
22        Q     Document.  Mr. Osborne, can you see this
23   document on the screen?
24        A     Yes, ma'am.
25        Q     And is this a resume that you may have
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1    submitted to Wal-Mart?

 2        A     Mm-hmm.

 3        Q     Is that a, "Yes?"

 4        A     I believe it is.  Yes.

 5              MS. INGLE:  If we could mark this as

 6    Exhibit 2.

 7              (Exhibit 2 was marked for

 8              identification.)

 9              MR. VALOIS:  Did the other exhibit --

10    marked as marked?

11    BY MS. INGLE:

12        Q     Mr. Osborne, I see that you were in the

13    United States Army, beginning in 1992?

14        A     Yes, ma'am.

15        Q     How old were you when you enlisted in the

16    Army?

17        A     Just turned 18.

18        Q     Okay.  And you served for six years?  Is

19    that correct?

20        A     It was Army, then the National Guard.

21        Q     And were you stationed anywhere during your

22    service in the Army?

23        A     Fort Benning, Georgia.

24        Q     And how long were you in Fort Benning?

25        A     For about three -- about two years.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1      Q    And, beside Fort Benning, did you ever move

 2   anywhere else when you were in the Army?

 3      A    No.  No, ma'am.

 4      Q    How long did you remain in the National

 5   Guard?

 6      A    Until August of 1998.

 7      Q    And I see it looks like you started working

 8   at the River Ridge Mall Security after that.  Is that

 9   correct?

10      A    Yes, ma'am.

11      Q    And is it correct that you worked as the

12   Assistant Director of Security in that position?

13      A    I start -- I started as a regular Security

14   Officer and, when I left there, I was Assistant

15   Director.

16      Q    And you worked there for approximately five

17   years?

18      A    Yes, ma'am.

19      Q    Is that accurate?

20      A    Yes, ma'am.

21      Q    Where is the River Ridge Mall?

22      A    It's here in Lynchburg.  It's 3405 Candlers

23   Mountain Road.

24      Q    Then, I see you -- you became a correctional

25   officer?  Is that correct?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1       A    Yes, ma'am.

 2       Q    You were at the Blue Ridge Regional Jail.

 3       A    Yes, ma'am.

 4       Q    And did you have to go through any special

 5   training to become a correctional officer?

 6       A    Yes, ma'am.  You had to go through the

 7   Academy for Basic Jailer.

 8       Q    And how long did that training last?

 9       A    It was four months.

10       Q    And why did you leave your position as a

11   correctional officer?

12       A    Conflict of interest.

13       Q    What was the conflict of interest?

14       A    What they -- said that I did a round that I

15   didn't do.  When they -- they called me down to the

16   intake and when I was down there, the other officer

17   marked me down is doing a round, and I wasn't there to

18   do a round.  So they questioned me about it and I told

19   them, and then, the Lieutenant was like, "Well, you

20   wrote it in," and I'm like, "No, I was down in

21   intake."  So I've resigned from jail.

22       Q    Did they threaten to terminate your

23   employment before you resigned?

24       A    Yes.

25       Q    Did you receive any sort of severance or
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1    settlement as a result of your resignation?

 2         A    No.

 3         Q    And then, I see that you worked as a paper

 4    carrier.  Is that correct?

 5         A    Yes.

 6         Q    Then you started working in loss prevention

 7    for Kmart.  Is that accurate?

 8         A    Yes, ma'am.

 9         Q    And what was your job title when you worked

10    at Kmart?

11         A    Just a Loss Prevention Associate.

12         Q    So, what were your job duties as a Loss

13    Prevention Associate at Kmart?

14         A    Apprehend shoplifters; I was also in charge

15    of the inspection of the fire extinguishers.  I

16    monitored the cameras.  And that was pretty much it.

17    Like I said, apprehend shoplifters, monitor the

18    cameras.  I was in charge of all fire extinguishers;

19    make sure they would get -- they were certified and

20    still -- in good working conditions.

21         Q    So, when you said you were responsible for

22    apprehending shoplifters, did you receive training on

23    that topic at Kmart?

24         A    Yes.

25         Q    And did they have particular rules about who
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1    could apprehend shoplifters?

 2         A    Yes.

 3         Q    Did they have particular rules about what

 4    you must observe before you could apprehend a

 5    shoplifter?

 6         A    Yes.

 7         Q    And so why did you leave the loss prevention

 8    position at Kmart?

 9         A    Because they went from part -- full-time to

10    part-time.

11         Q    And is that Kmart still in operation?  Is it

12    still open?

13         A    No, ma'am.

14         Q    I see that you work, as well, for Sweet

15    Briar College as a Safety Officer.  Is that correct?

16         A    Yes, ma'am.

17         Q    And was that full-time employment?

18         A    Yes, ma'am.

19         Q    What were your duties as a Safety Officer at

20    Sweet Briar College?

21         A    Enforce all rules and regulations, perimeter

22    checks, vehicle patrol, safety, fire extinguisher

23    inspections, escorts, and monitor the entryway of the

24    college.

25         Q    And then, I see, it looks like you went from
```

Confidential

```
 1   there to Randolph College.  Is that correct?

 2        A    Yes, ma'am.

 3        Q    And you were a Safety Officer there as well?

 4        A    Yes, ma'am.

 5        Q    Now, were your job duties any different at

 6   Randolph College than they had been at Sweetbriar

 7   College?

 8        A    No.  It was the same.

 9        Q    So, when did you start working for Wal-Mart?

10        A    November the 14th, 2017.

11        Q    And how did you come to learn about the job

12   opportunity at Wal-Mart?

13        A    They somehow got my number and contacted me.

14   And then, they asked me -- the manager at the time,

15   Mike Berry, was a -- was a friend of mine.  He was the

16   Loss Prevention Manager for Macy's at the mall.  So I

17   knew him from there, plus, we both went to the same

18   high school.  So I knew Mike Berry for a long time.  I

19   guess that's how they got in contact, because me and

20   Mike were friends on Facebook, and they contacted me

21   and said, "Hey, we had a position for you out in the

22   Wal-Mart, if you are interested.  And they said, you

23   know, send a resume.  So, I filled out the

24   application, sent the resume, and then, James Hornsby

25   and Mike Berry called me in for interview.  And then,
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1  they hired me that day where I had the interview.

2      Q    And what was James Hornsby's position?

3      A    He was Store Manager at the time.

4      Q    And then, Mike Berry, who you were already

5  friends with at the time --

6      A    Mm-hmm.

7      Q    -- and he was at Wal-Mart?

8      A    He was the -- yeah.  He was the Asset

9  Protection Manager of Wal-Mart.

10     Q    And what was store number was this that you

11 came to work for?

12     A    What is the stupid number?  I want to say,

13 1305.  I'm not sure.  I think that's the store number.

14     Q    And so, you were you were hired as an Asset

15 Protection Associate.  Is that correct?

16     A    Yes, ma'am.

17     Q    And you always worked at the same store

18 location in the time you worked at Wal-Mart, correct?

19     A    Yes.  Yes, ma'am.

20     Q    And what were your job duties as an Asset

21 Protection Associate?

22     A    Apprehend shoplifters.  I was in charge of

23 the emergency doors, the emergency lights, the fire

24 extinguishers, review any kind of footage on the

25 cameras of the Managers or LPD, and that's pretty much

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1    the same, like, Kmart.

 2        Q    Okay.  So it was really -- you think it was

 3    the same as Kmart?

 4        A    Yeah.

 5        Q    Another document on this.  I'll share it in

 6    the chat feature as well.  Are you able to see this

 7    document?

 8        A    Yes.

 9        Q    Were you given a job description like this

10    when you started working for Wal-Mart?  I can make the

11    font bigger if that helps.

12        A    Yeah.  Yeah.  Yes.

13        Q    I know this is a pretty long list of duties

14    here.  Do you think this accurately describes the

15    duties performed as an Asset Protection Associate at

16    Wal-Mart?

17        A    Yeah, and more.

18        Q    Okay.  And who is your direct supervisor

19    when you work as an Asset Protection Associate?

20        A    And Wal-Mart or Kmart?

21        Q    Oh, at Wal-Mart.

22        A    It was Mike Berry.

23        Q    Now, I note on the job description, it talks

24    about complying with company policies, procedures,

25    standards of ethics and integrity.  Were Asset
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

1   Protection Associates responsible for ensuring

2   compliance with what's called an AP-09 policy at Wal-

3   Mart?

4         A     Mm-hmm.   Yes.

5         Q     Is that a, "Yes?"

6         A     Yes.

7         Q     And so, what is AP-09?

8         A     Basically, it's like the rules that a Asset

9   Protection Associate had to go by.  The -- your steps

10  and getting your shoplifters, your boundaries, and you

11  know, make sure the price range of everything that you

12  actually prosecute for, when can you call the police,

13  how long you can detain them, so forth and so on.

14        Q     The policy then cover steps you take to

15  investigate shoplifting?

16        A     Yes.

17        Q     And detaining shoplifters?

18        A     Yes.

19        Q     Does it talk about when you can approach

20  somebody that you suspect is shoplifting?

21        A     Mm-hmm.

22        Q     Is that a, "Yes?"

23        A     Yes.

24        Q     And does it define who at Wal-Mart -- which

25  Associates at Wal-Mart are essentially allowed to

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   approach or apprehend shoplifters?

 2       A    Yes.  The only ones that could approach any

 3   shoplifters and actually apprehend them, was only the

 4   AP Department.  It stated, if I'm not -- well, I was

 5   told that any Associate can do a receipt check.  We

 6   could not do that, because if we do a receipt check

 7   it's saying, like, we actually stopping them for a

 8   shoplift.

 9       Q    Okay.  So, was it your understanding a

10   receipt check is not actually a apprehension or

11   detention of a shoplifter?

12       A    Yeah.  That's -- the shoplifter has to

13   actually have the merchandise on them.  We have to

14   keep 100 percent observation of them.  If somebody --

15   if a Associate comes up to me and say, "This girl put

16   this in her purse," there's nothing I can do about it,

17   because I did not see it.  I got to maintain 100

18   percent observation of her selecting it, concealing

19   it, going past the last point of sales.

20       Q    So, somebody could come up to you and say,

21   "Hey, I think this person might be shoplifting," and

22   then, you could go watch the person, but unless you

23   actually see them taking something, concealing it,

24   and --

25       A    Yeah.  Yes.  I cannot stop.  Yeah.  I cannot
```

```
 1    stop.
 2         Q    -- okay.  So, you have to witness it.  If
 3    you go to court --
 4         A    Yeah -- exactly.
 5         Q    -- the attorney is going to say, "Well, you
 6    didn't actually see it.  Did you?"
 7         A    Exactly.
 8                   MR. VALOIS:  Objection to form.
 9                   MS. INGLE:  I used to be a public
10    defender, by the way.  I used to defend so many
11    shoplifting cases.  I'll show you another document
12    here.  I put it in chat feature, as well.
13    BY MS. INGLE:
14         Q    Okay.  Can you see my screen now?
15         A    Yes.
16         Q    Okay.  Does this look like the AP-09 policy
17    or a version of it?
18         A    A version of it.  It is newer than what we
19    had.
20         Q    Was it made available in different formats?
21         A    And -- yeah.  Yeah.  It was -- basically,
22    the one we had was hanging up in the office, it was
23    Xerox copy, but it's -- it didn't -- it was in a
24    different format.
25         Q    Did you go on Wal-Mart's intranet, and look
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1    it up if you needed to?

2        A    I could, if I needed to.  Yeah.

3        Q    And do you know if all Wal-Mart Associates

4    could get access to it?

5        A    I'm not sure.  I believe they could, but I'm

6    not sure.

7                    MS. INGLE:  So I wanted to talk about a

8    few provisions so, if we could mark this as Exhibit 3

9    -- or, I'm sorry.  We're on Exhibit 4.

10                    (Exhibit 4 was marked for

11                    identification.)

12                    MS. INGLE:  It talks about making

13    safety a priority.  It looks like you're not supposed

14    to approach somebody if you think they have a weapon.

15    BY MS. INGLE:

16        Q    Is that accurate?

17        A    That's right.  Yes.  That's right.

18        Q    And you're not supposed to pursue fleeing

19    suspects?

20        A    That's correct.

21        Q    So what does that mean, you can't chase

22    somebody in the store --

23        A    If they -- no.  If they --

24        Q    -- what does that mean?

25        A    -- if they step off the sidewalk.

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1      Q      **Step off the sidewalk?**

2      A      Yes.  So, if they're on the sidewalk, we can

3   talk to them, try and get them to come back in store.

4   We can't make nobody come back in the store, but

5   they're still on the sidewalk, we can, you know,

6   introduce ourselves, tell them who we are.  Tell them,

7   say, "Hey, you know, come back and talk to us.  Let's

8   talk about the items you got in your purse, on your

9   person."  But once they step off the sidewalk, we

10  can't do anything, but call the police.

11     Q      **And you mentioned only certain Associates**

12  **could make apprehensions of shoplifters.**

13     A      Yes, ma'am.

14     Q      **Is that what this, "Authorized Associates,"**

15  **term means?**

16     A      It can mean a lot of things.  You know,

17  authorized to do certain things in the store.  Like,

18  you know, do the jewelry counter, work in the meat

19  department in a deli.  So, "Authorize," could go so

20  many different ways.

21             MR. VALOIS:  I think she means it's

22  authorized in terms...

23  BY MS. INGLE:

24     Q      **In terms of this AP-09 policy, though, did**

25  **authorized Associates have these specific --**

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1        A     Yeah.  Only -- yes.  Yes, ma'am.  Only

 2   authorized Associates could make official stops.

 3        Q     Okay.  So you mentioned Asset Protection

 4   could --

 5        A     Yes.

 6        Q     -- and it looks like salaried Managers

 7   could, as well.  Is that your understanding?

 8        A     Yes.  Salaried Managers, Asset Protection

 9   could make stops.  Anybody else in the store can

10   actually do a receipt check.

11        Q     Okay.  Now, what's the difference between

12   just approaching somebody that you suspect maybe

13   shoplifting and then actually detaining.  What is the

14   difference?  I guess, in Wal-Mart AP-09 terminology,

15   when does it become detaining a suspect?

16        A     When we actually stop them and they are

17   escorted back to the Loss Prevention -- or Asset

18   Protection office, and we start our paperwork and

19   notify LPD that we have one in custody.

20        Q     The, "LPD?"  Is that the Lynchburg Police

21   Department?

22        A     Yes ma'am.

23        Q     And was there any sort of time limit on how

24   long you could detain them in the Asset Protection

25   office?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1        A    Up to an hour, but by order of the police,
 2   if they are enroute -- and it might be a little bit
 3   longer than an hour -- we can detain, because we're
 4   getting a lawful order from a police officer.
 5        Q    Do you know what the term, "Five elements,"
 6   means?
 7        A    Yes.
 8        Q    And what is that?
 9        A    You get an alert signal, you got to say,
10   "I'm selected," seal it, keep it on their person at
11   all times and then, pass all points of sales.
12        Q    And at that point, it's considered --
13        A    Shop --
14        Q    -- shoplifting?
15        A    Yes, because you can have somebody shoplift
16   something, you see him conceal it, walk around the
17   corner and they ditch it.  So, if they ditch it and
18   then, you stop them, they don't have it on them, then
19   you are at fault.
20        Q    So, they could walk around with it in their
21   pocket for a while and just toss it before they leave
22   the store.  So --
23        A    Yeah.  Yes.  So, that's why -- yeah.  That's
24   why we have to maintain all -- maintain 100 percent
25   observation of...
```

Confidential

```
 1       Q    -- so that's why they get caught, once they
 2   get past the cash registers.
 3       A    Yes.
 4       Q    Now, when you did this job, were you usually
 5   in plainclothes so people didn't know --
 6       A    Yes, ma'am.
 7       Q    -- you were Asset Protection?
 8       A    Yes, ma'am.
 9       Q    The five elements you mentioned, did you
10   have to have all of those in place, then, before you
11   could make an apprehension?
12       A    Yes, ma'am.
13       Q    Now, you mentioned you could approach people
14   on the sidewalk of the store.
15       A    Mm-hmm.
16       Q    Is that your understanding?
17       A    Yes.
18       Q    So, once they're off the sidewalk --
19       A    Yes.
20       Q    -- that's it.
21       A    Yeah.
22       Q    You can't --
23       A    Yeah.  We cannot try to apprehend them or we
24   just have to let them go.  And then, like I said, try
25   to get a license plate and then, notify the police
```

Confidential

```
 1   department.
 2       Q    So, really, the only -- you watch them in
 3   the store if you think they're going to shoplift, but
 4   then your opportunities to make apprehensions is
 5   pretty limited to -- past point of sales.  So you've
 6   got that alleyway from cash register to exit a store
 7   and then --
 8       A    To the side --
 9       Q    -- sidewalk.
10       A    -- to the sidewalk.  Yes.
11       Q    That's it?
12       A    Yes.
13       Q    Now, if you didn't personally witness the
14   concealment or any of these five elements, or all five
15   -- have all five of the elements in place, are you
16   able to approach the suspected shoplifter?
17       A    No.
18       Q    Are you ever able to approach people in
19   their cars outside of Wal-Mart, if you suspect they've
20   taken something?
21       A    We can -- if their car is down in the
22   parking lot, we cannot go there.  If they are outside
23   of their car and it's parked right there on the curb,
24   technically they are still on the sidewalk.
25       Q    Mr. Osborne, have you ever seen part of the
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

1    AP-09 guidelines that, let's see -- called the, "Key

2    term?"  Or, I'm sorry.  Let me share my screen.  I

3    don't think it -- through.  Can you see the document,

4    now?

5         A    Mm-hmm.

6         Q    Okay.  Does this look familiar, the Key

7    Terms document?

8         A    Yes.

9         Q    And here, it does talk about this authorized

10   Associates, term?

11        A    Mm-hmm.  Yes, ma'am.

12        Q    So, it looks like Managers, Asset Protection

13   Managers, Asset Protection Associates.  Is this your

14   understanding of all the people who are considered to

15   be authorized Associates?

16        A    Yes.

17        Q    Then, is that the term, "Detention," --

18        A    Mm-hmm.

19        Q    -- listed here, your understanding of what a

20   detention would mean?

21        A    Yes.

22        Q    Then, here are the five elements.  So --

23   what we talked about earlier?

24        A    Yes.

25                   MS. INGLE:  Mark this Exhibit 5.

Confidential

```
 1                  (Exhibit 5 was marked for

 2                  identification.)

 3   BY MS. INGLE:

 4        Q    Can you see the document, Mr. Osborne?

 5        A    Yes.  I can see it.

 6        Q    Did you ever review the Supplemental

 7   Investigation and Detention Guide?

 8        A    I believe I have.

 9        Q    Do you know if there was a copy of something

10   like this in the Asset Protection office?

11        A    Yes.

12        Q    Did you understand that failure to comply

13   with the AP-09 policy or this guide, could result in

14   pretty serious disciplinary action?

15        A    Yes.

16        Q    For you guys working in Asset Protection,

17   were you informed that, really, your job could open

18   either you or the company up to a lot of liability, if

19   it's not followed correctly?

20        A    Yes.

21        Q    And it could certainly open, not only you,

22   but other customers, other employees up to safety

23   risks if all measures in the policy aren't followed

24   correctly.  Is that accurate?

25        A    Yes.
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

1      Q    I understand; sometimes I get there were
2  shoplifters who might have weapons or -- did you ever
3  have to respond to situations like that?
4      A    Yes.  What we do, we have a shoplifter and
5  he still has the merchandise on him, we notify the
6  local law enforcement say, "Subject is -- has a weapon
7  on him."  That we cannot stop them, because they have
8  a weapon, and we would just continue observation on
9  them and try to get the license plate of the vehicle
10 that that subject gets it, if PD is not -- excuse me?
11     Q    Oh, I'm sorry.  Go ahead.
12     A    I said, if PD is not already enroute or in
13 our formal property.  Usually, when we call that
14 somebody has a weapon, PD usually responds pretty
15 quick and, by the time they go out the door, PD is out
16 there.  The police department is out there and the
17 police officer approaches him, stops him and then, we
18 come in and say, you know, "They have this and that.
19 They shoplifted this or that."
20     Q    When you say, "Weapon," does it tend to be a
21 gun or a knife?  What kind of --
22     A    It could be -- knife, gun.  Yeah.  Usually,
23 it's a knife or a gun.
24     Q    -- so, open carry into the Wal-Mart there?
25     A    Yeah.  They do open carry there and, like I

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   said, if we see them conceal something and they have a

 2   weapon on the side, we just maintain observation of

 3   them and notify the police department.

 4                   MS. INGLE:  I'm going to enter this as

 5   Exhibit 6.

 6                   (Exhibit 6 was marked for

 7                   identification.)

 8   BY MS. INGLE:

 9       Q    And did you receive training on the AP-09

10   policy, when you started working at Wal-Mart?

11       A    Yeah.  We had to get certified through Wal-

12   Mart and then, we had to go to --

13       Q    What -- I'm sorry.  Go ahead.

14       A    -- we had to go to what they -- the Wal-Mart

15   Academy, and we had to go through all the training

16   through to them as well.

17       Q    When you say, "Wal-Mart Academy," where was

18   that held?

19       A    I had to go to two of them.  One was in

20   Fredericksburg and then, the other one was in Roanoke.

21       Q    When did the first one occur?

22       A    Maybe three months after I started working

23   there.

24       Q    And then, when did you go to the academy in

25   Roanoke?
```

Confidential

```
 1      A    Maybe about a year or two -- it's like --
 2  the Academy in Roanoke was, like, a "refresher
 3  course."  Like, an in-service.
 4      Q    Did you also complete any sort of computer-
 5  based training as well?
 6      A    Some of it was.  Yeah.  It was -- a lot of
 7  it was about inventory, because usually Asset
 8  Protection Associates would handle all the inventory.
 9  So a lot of that on the second time I went to Roanoke,
10  was about inventory.
11      Q    When you say, "Handled the inventory," what
12  does that entail?
13      A    Make sure everything's in the correct bins,
14  everything's counted, how to use the -- I forget the
15  name of it, but how to use the heldhand count and put
16  in the number that you -- that you counted.  So you
17  had to put a sticker up when the inventory group come
18  in, they know that that bin has already been counted
19  and they can scan it with their handheld.
20      Q    So, make sure that works correctly,
21  essentially?
22      A    Yeah.
23      Q    I'm going to pull up another document here
24  and my computer's being really slow.  I'll show you
25  the screen, Mr. Osborne.  Let me know if you need me
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

 1   to make the font bigger.  Did you have to take a lot

 2   of training courses when you worked for Wal-Mart?

 3        A    Yes.

 4        Q    Would you believe me if I told you this was

 5   a list of all the courses you had to take when you

 6   worked for Wal-Mart?

 7        A    Yes.

 8        Q    I just kept scrolling through all of these

 9   courses in the spreadsheet.

10        A    Yeah.  Yes, ma'am.

11        Q    I do see here there's some courses that do

12   have AP-09 in the name.  For example, there's one

13   called, "AP-09 Authorized Associates."

14        A    Yes, ma'am.

15        Q    Would you have taken a course that was just

16   for or about authorized Associates, when you -- right

17   around the time you started; it looks like November

18   20, 2017?

19        A    Yes.  A lot of it was on the computer.  So,

20   a lot of the classes that we had to take, like, the

21   blood borne pathogens, all that stuff was a -- you had

22   to go back to the Human Resources office where they

23   had computers set up and you had to take these

24   courses.

25        Q    Okay.  So, it looks like you took a couple

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1   of those when you started, and then, it looks like

2   there was more AP-09 two days later.  It looks like

3   you -- would you say you took multiple computer

4   courses on AP-09?

5        A    Yes.

6        Q    There's some courses called, "Academy Skill

7   Builder."  Would that have been going to Academy --

8        A    Yes.

9        Q    -- the academies we talked about?

10       A    Yes, ma'am.

11                 MS. INGLE:  Going to mark this as

12  Exhibit 7.

13                 (Exhibit 7 was marked for

14                 identification.)

15  BY MS. INGLE:

16       Q    And, Mr. Osborne, where did Wal-Mart

17  employees typically locate Wal-Mart policies?

18       A    In the HR Department.  Back in their -- I

19  guess, conference room back there where they have all

20  computers setup.

21       Q    Was there something called, "A Wire?"

22       A    Yes.

23       Q    What is that?

24       A    You had to log in -- into the Wire and it

25  pulls up whatever, like, you need; pay stub, a course

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

Confidential

```
 1   that you needed to take.  Once you put in your ID, it
 2   -- it pops up on the screen what courses you have to
 3   take.
 4        Q    Okay.  And was the Wire available on any of
 5   these computers in the HR office?
 6        A    Yes.
 7        Q    When you worked for Wal-Mart, did it ever
 8   become available through, I guess, something called,
 9   "Wal-Mart One?"
10        A    I believe so.  I'm not 100 percent sure.
11   Everything I did was, I believe, was on the Wire.
12        Q    Did you ever read the Global -- Wal-Mart's
13   Global Statement of Ethics?
14        A    I might have.  I'm -- like I said, I can't
15   remember, but I believe I did, but I'm not 100 percent
16   sure.  I might have glanced it.
17        Q    Do you generally know what it is?
18        A    [No audible response.]
19        Q    Do you generally know what the Global
20   Statement of Ethics is?
21        A    Excuse me?
22        Q    Do you generally know what the Global
23   Statement of Ethics is?
24        A    Right off my head, no.  If I were to read
25   it, it might refresh a memory, but...
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

```
 1       Q    I have it here on the screen; pretty long.

 2   Table of Contents, per the CEO, Statement of Ethics.

 3   How --

 4       A    I might have seen something like this, but

 5   it didn't look like this.

 6       Q    -- okay.  I'm going to scroll through.  Did

 7   you understand there is a process for making ethics

 8   complaints when you work for Wal-Mart?

 9       A    Yes.

10       Q    And how could you do that?

11       A    I think it was called, "The Open Door."  You

12   have to -- you can call -- you can go into the

13   management office first, I believe, if I'm not

14   mistaken.  Go to the management, talk to him about it

15   and, if you didn't agree with his decision or if it

16   was about the manager, something -- you can call The

17   Open Door.

18       Q    And could you really choose who you talk to

19   in terms of going through this Open Door process?

20       A    No, just a phone call, so just whoever's on

21   the other end will take the -- I guess, the Complaint.

22       Q    Okay.  So, it's a phone number you call?

23       A    Yes ma'am.

24       Q    Here we go.  So on this page that I'm

25   showing you right here, it says, "Global Ethics
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1    Contact Information."

2         A    Mm-hmm.

3         Q    And there's a phone number, 1-800-WMETHICS.

4         A    Mm-hmm.  Yes, ma'am.

5         Q    And that's the phone number you would call

6    to report ethics concerns?

7         A    I never called it until after I got

8    terminated so, like, I'm assuming that is the number.

9                   MS. INGLE:  If we could mark this

10   document as Exhibit 8.

11                  (Exhibit 8 was marked for

12                  identification.)

13   BY MS. INGLE:

14        Q    So you never called it until you were

15   terminated, but did you understand that you could have

16   called it when you were employed by Wal-Mart?

17        A    Yeah.  Didn't have a reason to -- well, I

18   had a reason to, but I just never did.

19        Q    You said you had a reason to -- the -- well,

20   tell me what that reason was that you thought you

21   needed to call this number when you worked for Wal-

22   Mart.

23        A    Basically, like, the racial slurs I heard

24   from management.  Basically, that's pretty much it,

25   you know, racial slurs, racial related jokes.

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1        Q    When you say, "Racial slurs from
 2   management," who made racial slurs?
 3        A    It was, like, Mike Hildreth, Ryan Fischer --
 4   those were, really, the only two.  I had an incident
 5   with James Hornsby when he made a comment that was
 6   inappropriate.
 7        Q    So, you said, "Mr. Hildreth."
 8        A    Yes.
 9        Q    Is that correct?
10        A    Yes.  He --
11        Q    What was his position?
12        A    -- Co-Manager.
13        Q    And what did he say?
14        A    Basically, like, "Hey, your people out there
15   -- these, you know, these niglets, and all that, you
16   need to go ahead and control your people."
17        Q    So, he said that "N" word?
18        A    Oh, yeah.
19        Q    When did he say that?
20        A    Several times.  Whenever a group of black
21   teens come in, they were doing something stupid, they
22   would call me on the radio, I would meet them, "Hey,
23   got a bunch of niggers over there.  Get your people --
24   get your people.  Go get your cousin," and Ryan
25   Fischer, the same way.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

Confidential

| | | |
|---|---|---|
| 1 | Q | What was Ryan Fisher's position? |
| 2 | A | He was the Store Manager. |
| 3 | Q | **You said he was the same way?  What did he** |
| 4 | **say?** | |
| 5 | A | Exactly.  Basically, the same comments. |

6  Whenever somebody is acting dumb or you had teens in

7  there, something, same comments.  And basically, I

8  just like brushed it off.  Goes, "Hey guys, you all

9  can't be on the motorized wheelchairs.  You need to

10 put them back," and then, I had James Hornsby make a

11 comment in front of me and the guy I was training,

12 which was another black male, "I'm glad I got you two,

13 because now, you two can start catching some of your

14 people."

15      Q    And what was Mr. Hornsby's position?

16      A    District Manager.

17      Q    **So, the comments that you have attributed to**

18 **Mr. Hildreth, what are the approximate dates when**

19 **these comments were made?**

20      A    Ever since he became, like, a Manager.  He

21 was Manager over -- he was Assistant Manager, then, he

22 -- to a Manager of OGP, then, he became the Co-

23 Manager.  So, most of it was in this time that he's a

24 Co-Manager.  Timeframe, I couldn't tell you, but it

25 was -the -- most of the time when he was a Co-Manager.

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1      Q     And were there any witnesses to the comments
2    he made to you?

3      A     It was Associates around, but I don't think
4    they could hear it.

5      Q     Which Associates were around?

6      A     Just people working on the floor.

7      Q     So, where would you be when he said these
8    things?

9      A     He could be out on the store, out on one of
10   the -- what we call, "The Action Alleys."  He would
11   come back to the office where I'm at, like, if I'm
12   watching something on the camera, he would knock on
13   the door and tell me, or he would radio and tell me to
14   come out to the floor.  I'd meet him out on the floor,
15   he'd say it out there.

16     Q     Would he say it to your face?

17     A     Oh, yeah.

18     Q     And Mr. Fisher, you said he basically said
19   the same comment.  How would he say them, to your
20   face, or?

21     A     He's, like, "Your -- your people out here
22   are acting stupid.  Come get to come get your
23   niglets."

24     Q     When did he say that?

25     A     Like I said, it's all the time.  Whenever

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

```
 1   they had a group of black males come in -- black
 2   teens, they were all -- and they were doing stupid
 3   stuff; throwing balls in the store, running, yelling
 4   or something like that.  They would always, "AP Corey,
 5   need you to step out on the sales floor.  Come to
 6   shoes.  AB Corey, come to automotive.  AB Corey, come
 7   here."  So I would go out there and meet them, and
 8   like, "What's going on?"  "Hey, your people over
 9   there, you need to get them out of here."  I'm like,
10   "Okay."  So, I go say, "Hey, guys, you all got in
11   here.  This is not a playground.  You all need to go
12   ahead and leave," because, you know, and I'd tell
13   them, you know, "It's not a playground.  You all want
14   to go play, go to the park.  This is a business," and,
15   you know, they would leave.
16        Q    So, would Mr. Fisher actually say that "N"
17   word?
18        A    He would hint around.  He wouldn't say the
19   actual word.  Just like Mike Hildreth wouldn't say the
20   actual -- they would beat around the word.  Like, they
21   wouldn't say, "Nigger," they would say, "Niglets."
22        Q    But -- so, they actually said that word?
23        A    The "Niglet?"
24        Q    Mr. Hildreth actually said that word?
25        A    Oh, yeah.  The niglets word, yeah, but they
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1  never actually came out and said the actual racial

2  slur to it.

3      Q    So, do you know approximately how many times

4  Mr. Hildreth said that "N" word?

5      A    Oh.  All the time to me, because, I mean,

6  I'm really didn't -- I guess they could see it didn't

7  bother me.  And it didn't.  I mean, I just, like,

8  throw it off my shoulder.  I've got called worse.

9  But, you know, as coming -- as me being a black man

10  I'm, like, "Okay.  I got it.  I'll take care of it."

11  So basically, like I said, I'd go take care of it.

12  It's said and done.  So, times?  Well, here and there,

13  stuff.  Far between, but I mean, it wasn't like a

14  everyday thing.  But whenever we had a group of black

15  male teens acting stupid, I was first one they call.

16      Q    And, Mr. Fisher, did he actually use that

17  "N" word?

18      A    Like I said, they never said the hard "N"

19  word.  They --

20      Q    So the one you're using.

21      A    -- yeah, exactly.

22      Q    Did they -- did Mr. Fisher ever say it?

23      A    Which the -- which word?  The hard one or

24  the supplemental word?

25      Q    The softer one.

Confidential

```
 1      A    Oh, yeah.  The softer ones?  Yep.  Yes.

 2      Q    And when did he say it?

 3      A    Several times.

 4      Q    Approximately, when did he first say it?

 5      A    Honestly -- I couldn't tell you.  There's so

 6   many times.  I couldn't tell you exactly the first

 7   time he said it.

 8      Q    So you said it was, "So many times." How

 9   often was it?

10      A    Well, Mr. Fisher wasn't there, maybe -- he

11   was there maybe a year and a half before I left, so I

12   will say maybe about four or five times.  And

13   basically, the same thing with Mike Hildreth.  Just

14   about four or five times.  And they -- I guess, I

15   could say that they didn't say it, like, being the "A"

16   word towards me.  They said it in a joking manner

17   like, "Hey, go get them, you know, blah blah blah,"

18   but I just don't think they realized that, "Hey, you

19   know, you're talking to a black man," you know?

20      Q    And you mentioned that they would tell you

21   this -- how many other Asset Protection Associates

22   worked for that particular Wal-Mart store in this time

23   frame?

24      A    Let's see.  Maybe, two.  I want to say --

25   because I pretty much worked there by myself the
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   entire time.  They would hire somebody and they would

 2   quit within 30 days -- within two months.  Excuse me.

 3   They had one girl, she worked with me for about a

 4   year, and then, they transferred her out of the

 5   department, because she wasn't catching anybody.  We

 6   had one girl that worked for about 45 days -- about 40

 7   -- she was employed for 45 days.  She probably worked

 8   10 days out of 45 days, because she kept having

 9   seizures.  Then, I had a guy work with me for about, I

10   want to say three, four months, and then, Jaylin was

11   with me for about four -- about three months before I

12   was terminated.

13       Q    Now, backing up to the first person you

14   talked about, what was her race?

15       A    Ma'am?

16       Q    What was her race?  The first person you

17   mentioned that you worked --

18       A    Oh, she was a white -- white female.

19       Q    -- and then, the next person.  What was her

20   race?

21       A    White female.

22       Q    And then, the next person, what was their

23   race?

24       A    A white male.

25       Q    And then, so really, I mean, did you work
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1   with any other African Americans in Asset Protection?

 2        A    Except for when I -- right before they

 3   terminated me.

 4        Q    So, Jaylin that you mentioned, what was his

 5   race?

 6        A    African American.

 7        Q    You mentioned that there was a comment Mr.

 8   Hornsby made.

 9        A    Yes, ma'am.

10        Q    You said that -- was it Jaylin that was with

11   you when that was made?

12        A    Yes.  Yes.

13        Q    And, specifically, what was that comment Mr.

14   Hornsby --

15        A    He -- me and Jaylin was on our way back to

16   the office.  He was in the Management office with Mr.

17   Fisher.  He stopped us, "Hey guys, I want to say you

18   all doing a good job."  We said, "Thank you."  And he

19   says, "And yeah, I need you all to catch some of your

20   people."  So, I'm like, "Okay. Thank you."  Me and

21   Jaylen walk into the AP office and Jaylen turns

22   around, looks at me like, "What the hell he mean by

23   'Some of your people?'"  I'm like, "Dude, I get it all

24   the time."  We told Mike Berry when he said -- Mike

25   Berry was, like, "I got nothing to do with it."  You
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1    know, you're supposed to report it to your Manager?

2    We reported it, that he said that, to Mike Berry.  He

3    walked out and said, "I didn't hear nothing.  I got

4    nothing to do with that."  And his face just dropped

5    when we told him that, because Jaylin was -- I guess I

6    was so used to it, it didn't bother me.  It kind of

7    upset Jaylin when he said that.

8        Q    Did you ever talk to Jaylin after you were

9    terminated?

10       A    Oh, yes.  I have.

11       Q    When did you talk to him after you were

12   terminated?

13       A    I still do.  Like, when I go into store

14   shopping.  He'll say hi to me and stuff.  Yeah, he's

15   no longer --

16       Q    Do you talk to him about -- I'm sorry.  Go

17   ahead.

18       A    -- yeah.  He's no longer with AP.

19       Q    What does he -- or does he still work for

20   Wal-Mart?

21       A    Yes.  He still works for Wal-Mart.

22       Q    Have you talked to him about this case?

23       A    Yes.  We have talked.  I told him, you know

24   -- he knew I got terminated.  He's like, "You know,

25   that's wrong. The way they fired you."  I'm like,

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

 1   "Yeah.  That's the way it goes," and that's pretty

 2   much it.  Everybody in the store knows why I was

 3   terminated.

 4        **Q    So, you said everybody in the store knows**

 5   **why you were terminated?**

 6        A    Mm-hmm.

 7        **Q    How does everybody in the store knows why**

 8   **you were terminated?**

 9        A    It's Lynchburg.  It's -- what?  I mean, it's

10   like a soap opera.  They know, "Corey, got fired.

11   What?  Blah, blah, blah."  And they knew, you know,

12   basically, that was it.  I mean, I told, you know --

13        **Q    [Inaudible.]**

14        A    -- I -- what?  When I got fired, that day, I

15   was leaving and it was and it was some at the smoke

16   area, and I was telling them, "Hey guys, I'm gone.

17   Bye.  Blah, blah, blah."  They was like, "What?"  I

18   said, "Yeah.  They just fired me over some BS that I

19   had nothing to do with."  And they was like, "What?"

20   and they said -- I told them, "You know, the stop."

21   And they was like, "What?"  Then I told them, "You

22   know.  Hey, they said I stopped somebody that I didn't

23   stop and there it is," and you know, dang, you tell

24   one person one thing in their ear, by the time it get

25   to the last person, it's a totally different story.

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1    Q    Do you understand Wal-Mart had policies

2    against termination based on race?

3    A    Yes.

4    Q    Did you ever think to make a complaint about

5    it -- like, the statements you've made, did you ever

6    think to make a complaint about those statements?

7    A    No, because I won't thinking I was getting

8    fired.

9    Q    Why did you think you would get fired?

10   A    Because.  They say there's no retaliation.

11   Wal-Mart retaliates.

12   Q    Why do you say that?

13   A    If you're not doing this good of a job at

14   something, they have moved -- they will move you to

15   somewhere else, or they'll give you a workload that

16   will make you quit.

17   Q    How do you know that?

18   A    I've seen it.  I've seen where one person

19   wasn't doing such a good job in his department, they

20   move him to another department and put a load on it,

21   where they just like, "I can't do this.  I quit."

22   Q    Do you think that has anything to do with

23   making complaints about unfair treatment at work?

24   A    I don't think that they -- they don't let

25   the employees know that.  I mean, it's an employee's

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1    job to do that, but I think more, they are more scared

2    of losing their job than anything.  So they just bite

3    the bullet and don't make a complaint.  Just take it

4    with a grain of salt.  Like with me.  I take it with a

5    grain of salt.  I don't care.  I've been in the

6    military, been doing law enforcement stuff.  I've been

7    called everything in the book.  So I didn't take it,

8    you know, serious, you know?  I'm like, "Okay.

9    Whatever."

10        Q    Have you ever read Wal-Mart's Discrimination

11   and Harassment Prevention Policy?

12        A    I might have.  I'm sure I have.

13        Q    You understand it prohibits harassment or

14   discrimination based on race?

15        A    Yeah.  Yes, ma'am.

16        Q    Do you know of anybody who's ever made a

17   complaint of racial harassment or discrimination while

18   working for Wal-Mart?

19        A    I've heard people say it to me, but haven't

20   made a report about it.

21        Q    Did you know anybody who worked for Wal-Mart

22   who said, "Hey, I made a complaint about

23   discrimination?"

24        A    No.

25        Q    Anybody ever tell you they did that?

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1       A     Excuse me?

 2       Q     Did anybody --

 3       A     No.  They didn't --

 4       Q     -- that worked for Wal-Mart did they tell

 5   you they made a --

 6       A     -- they -- no.  They told me -- they never

 7   made a complaint.  I did make a complaint before I go

 8   terminated, when I told Mike Berry about, "Hey, the

 9   joke that Hornsby made," and all that.  Like I said,

10   when we told Mike, because Jaylin was there, Mike's

11   like, "Oh.  I didn't hear it.  Blah, blah, blah."  He

12   closes -- because Mike was afraid of retaliation too,

13   probably.

14       Q     But you don't know if Mike was afraid of

15   retaliation.  Do you?

16       A     I can't say that.  I can't say that I know.

17       Q     So the incident you mentioned you told Mr.

18   Berry about, you're speaking about statements Mr.

19   Hornsby made to you and Jaylin?

20       A     That's correct.  Yes.

21       Q     When did you say anything to Mr. Berry about

22   that?

23       A     Right after he said it.  That day that he

24   said it, me and Jaylin went into the office.  Mike

25   comes in and I was like, "You can't believe what James
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

```
 1   just said to us."  And we told him, and he's like,

 2   "Oh.  I ain't got nothing to do with that, you all."

 3   And he walks -- turns around and walks right out the

 4   office.

 5        Q    Do you know, approximately, what date that

 6   would have been?

 7        A    I don't know the exact date.  It was the

 8   time that -- I left on May the 21st.  Jaylin didn't

 9   come to AP until probably April.  So, somewhere

10   between, I think, April the -- I would say April the

11   1st until May the 21st.

12                    MS. INGLE:  Going to enter this

13   document is Exhibit 9.

14                    (Exhibit 9 was marked for

15                    identification.)

16   BY MS. INGLE:

17        Q    So you don't know anybody who worked for

18   Wal-Mart who has actually made a complaint of racial

19   discrimination or harassment in the time they've

20   worked for Wal-Mart?

21        A    No.

22        Q    Are you familiar with Wal-Mart's

23   Disciplinary Action policy?

24        A    I've read it, but I'm not familiar with it.

25                    MS. INGLE:  I've marked as Exhibit 10.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1                      (Exhibit 10 was marked for
 2                      identification.)
 3   BY MS. INGLE:
 4        Q    And what does, "First Written," or "Yellow,"
 5   mean?  Does that sound familiar?
 6        A    Was -- say that again, please.
 7        Q    What does, "First Written," or "Yellow,"
 8   mean in terms of levels of coaching?
 9        A    I think if you have as -- I know about the
10   coaching.  I don't know about the color codes to the
11   coaching.  I know what the coaching is, but the color
12   codes I could not tell you.
13        Q    I put a document on the screen here, Mr.
14   Osborne.  Cursor here -- so have you read the
15   Disciplinary Action policy?
16        A    I probably have, when I first started.  Yes.
17        Q    On this page here, it talks about, "First
18   Written/Yellow, Second Written/Orange, and
19   Third/Written, Red."
20        A    Mm-hmm.
21        Q    Do you understand these to be different
22   levels of disciplinary action at Wal-Mart?
23        A    Yes.
24        Q    Was yellow the first level?
25        A    [No audible response.]
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1        Q     Did you understand yellow to be the first

2     level?

3        A     Yes.  Yes.  I see it right here.  Yes.

4        Q     And then, did you understand red to be final

5     written warning?  You could be terminated if you get

6     any more warnings?

7        A     Yes.  I see that.  Yes.  I see that here.

8        Q     Did you understand too, that if you've got a

9     disciplinary action, that it could have stayed active

10    in the system for a period of time?

11       A     I believe so.  Yes.

12       Q     In your time at Wal-Mart, did you receive

13    any levels of disciplinary action?

14       A     Yes.  I did.

15       Q     And which levels did you receive?

16       A     I believe I got the yellow and then, I got a

17    orange for two people saying I said something and --

18    which come out not to be true, but they still wrote me

19    up.

20       Q     Do you remember when that was, that incident

21    that you mentioned?

22       A     No, ma'am.  The first one -- the first one,

23    it was a Associate that used to work for AP, when we

24    have the AP Host at the door.  She moved into the

25    actual grocery side.  I was watching a shoplifter and

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1  I tapped her on the shoulder and I asked her to move

2  to the side, to get out the area, so I could see this

3  person concealing the merchandise.  I tapped her again

4  and she got, "Don't touch me," something.  She yelled.

5  Ms. Edna Coleman was standing right there and she

6  said, "Hey.  He's watching a shoplifter.  Move."  And

7  she like, "Oh.  Okay."  So the Assistant Store Manager

8  hears us make the comment.  He comes up to me and say,

9  "Hey, I need to talk to you in the office now," and

10  I'm like, "Okay.  I got a shoplifter.  As soon as I

11  get done with this."  He's like, "Now."  So I had to

12  pull off the shoplifter and he said, "Hey, you can't

13  blah, blah, blah."  Come to find out, him and the girl

14  were dating.  They liked each other.  And I think he -

15  - to me, he got jealous, because I told her she needed

16  to move and I tapped her on the shoulder.  So that was

17  the first incident, which that girl got fired two

18  weeks later.

19      So -- and then, I have -- like I said, I got a

20  witness, Edna Coleman, for that one.  Then, we had

21  another guy said that I said something about his ex-

22  girlfriend that -- he stopped me while I was going to

23  the HBA department of the store and he spoke to me,

24  "Hey, Corey."  And I'm like, "Hey.  How you doing?

25  Blah, blah, blah."  And I was like, "Do you still date

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   such and such?"  He's like, "No," because I don't even

 2   know the girl's name.  He's like, "No, but I knocked

 3   dirt off of it."  I'm like, "Okay."  I said, "All

 4   right then, buddy," and I kept going.  He goes back

 5   and tells the Manager that I said that -- and then, he

 6   got her to make a complaint saying that she was scared

 7   of me.  And I never spoke to her.

 8                    MS. INGLE:  Saved my screen here, Mr.

 9   Osborne.  This is what looks to be a Disciplinary

10   Action with a yellow level issued on February 22nd,

11   but it talks about the time you were -- this is issued

12   for inappropriate conversations --

13                    THE WITNESS:  Yes.

14                    MS. INGLE:  -- not balancing

15   appropriate interaction with employees as Asset

16   Protection to maximize productivity.

17                    THE WITNESS:  Yes.

18   BY MS. INGLE:

19        Q    Is that what you were just talking about?

20   These conversations that --

21        A    Yes, ma'am.  Yeah.  That the guy stopped me

22   and had about his ex-girl.

23        Q    -- okay.  So this was issued in 2020?

24        A    Mm-hmm.

25        Q    It looks like here, it says, "The expiration
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   date of the Disciplinary Action may be extended

 2   beyond --

 3        A    202220.

 4        Q    -- February 22, 2021.

 5        A    Mm-hmm.

 6        Q    Associate -- okay.  So is it your

 7   understanding that this could stay active for a year

 8   and then, you --

 9        A    I didn't know how long it was active.  I

10   just know -- that's why I made the comment there, "I

11   won't plan to talk to nobody or trust anybody, or keep

12   to myself.  Speak only when I'm spoken to by

13   Management only, and only to respond if I'm called by

14   Mitch.  I am not -- if I am needed by an Associate,

15   they must have to call a Manager to get the Manager to

16   call me, because that right there, I don't trust

17   nobody.  For what that guy did right there to me.

18   Like I said, I spoke to him maybe two or three times

19   in the store, the whole time I worked there, and then,

20   him to do me?  That's why I said, "You know what?  I

21   don't trust nobody now, because that's just throwing

22   me under the bus for something I didn't do," to keep

23   it clean when he's the one who made the comments.

24             MS. INGLE:  I'm going to mark this as

25   Exhibit 11.
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1                    (Exhibit 11 was marked for

 2                    identification.)

 3   BY MS. INGLE:

 4        Q    Did you get any other disciplinary actions

 5   before this one?

 6        A    It was supposed to been one I told you about

 7   when I tapped the -- what was her name?  I can't think

 8   of her name -- when I tapped her on the shoulder and

 9   said, "Hey, I need you to move the area.  Go that

10   way."  And she basically tried to ignore me and Ms.

11   Edna was my female witness.  I'm like, "I'm watching a

12   shoplifter.  I need you to go."  "Don't touch me."

13   I'm like, "You need to go over there."  So she goes

14   over there, that's when Jacob heard -- which Jacob is

15   no longer with Wal-Mart either.  He was a Manager and

16   -- what?  That's when they called me back in the

17   office.  I don't know if they've written anything up

18   on that, but they talked to me about that, and that's

19   when I explained to him like, "Hey, she was in a way.

20   I had a shoplifter."  And I said, then Jacob calls me

21   back here, jumps down my throat saying, "You can't

22   touch her.  Blah, blah, blah."  I said, "I tapped her

23   on the shoulder and said, 'Go that way.'"  I said,

24   "Ms. Edna's my witness.  She's right there.  She's

25   seen and heard everything."  And then, like I said, I
```

Confidential

```
 1   come to find out that Jacob and her had a little thing

 2   together, because I also got a video of them making

 3   out in the back room.  Store's Managers are not

 4   supposed to have any kind of relationship with

 5   Associates and I think that's one reason why Jacob

 6   didn't like me.

 7        Q    So, was that a separate written action?

 8        A    I don't know if they wrote anything up or

 9   not.  I know I talked to the Store Manager about it.

10        Q    When did that occur?

11        A    It happened before that.

12        Q    Okay.  I'm going to show you another --

13   Exhibit -- chat feature.  There's another document

14   here, Mr. Osborne, this one -- I think it should be

15   this one.  This document looks like it was that issued

16   in October of 2018 --

17        A    Mm-hmm.

18        Q    -- and it says you approached or stopped a

19   shoplifter that was in possession of a concealed knife

20   that she stole, ripping it out of the package, and --

21        A    Yes.  Okay.

22        Q    -- this is a violation of AP-09.  Do you

23   remember this incident?

24        A    Actually it's not a violation, because when

25   I stopped her, she did not have the knife on her
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   anymore.  So she did not have a weapon on her when I
 2   stopped her.  Once she got rid of the weapon then, she
 3   does not have -- she still had the concealed
 4   merchandise on her, but she did not have the weapon
 5   anymore.  So therefore, it is not a violation of AP-
 6   09, because she does not have a concealed weapon
 7   anymore.
 8        Q    Okay.  So did she conceal something besides
 9   the knife?
10        A    Oh, yes.  She concealed two shirts, a hat, a
11   case of beer and -- and then, she had the knife.
12   Then, she got rid of the knife over in the -- over the
13   produce section.  The Store Manager, Anthony Ware was
14   with me when I stopped her and he can also confirm
15   that she did not have the knife with her anymore.  So
16   that's why I stopped her.  PD -- because I already
17   called PD and told them that she had a knife.  So PD
18   was enroute.  She ditched the knife over in the
19   produce section, so I went to go ahead and stopped her
20   when she was in the vestibule of the store.  She goes
21   out -- she comes out.  PD stops her.  She actually
22   fights PD.  They lock her up, take her to jail.
23        Q    So, I'm curious.  You said she concealed a
24   case of beer?
25        A    Yeah.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1       Q    And how does one do that?  In a very large

2   bag or?

3       A    Oh, I'll see people walk out with TVs under

4   their dress and you would -- never could tell.

5   Because when she pulled the knife out, about six beer

6   cans fell out of -- fell out her hand and the knife

7   fell on the floor.  So, I'm like, "Yep.  She's fair

8   game now."

9       Q    Okay.  And that was in the produce section?

10      A    Yes, ma'am.

11      Q    Okay.  All right.  So once the -- you say

12  once the knife fell on the floor, she was fair game to

13  approach?

14      A    She's fair game.  She has no more concealed

15  weapon.

16      Q    Was the knife still within arm's reach,

17  though?

18      A    No.  There's video of everything.  You can

19  see her drop the knife.  You can see me kick the knife

20  away from her.  She walks out the store.  She walks

21  out the store.  I'm still behind her asking her,

22  "Please come back in the store."  She turns around,

23  she takes a swing at me, she missed.  PD actually seen

24  her take a swing.  They come get her.  They walk down

25  the sidewalk and try to talk to her.  They put hands

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   on her.  She kicks the LPD officer in the groin.  He
 2   goes down to the ground.  They get her in handcuffs.
 3   Not even 30 seconds later, she comes out the
 4   handcuffs.  They put her handcuffs again and then,
 5   they put her in the vehicle.
 6        Q    And did you have to go testify in a case
 7   involving her criminal charges?
 8        A    Yes.  Yes.  Yes, ma'am.  Yes, ma'am.
 9             MS. INGLE:  If we can, enter this as
10   Exhibit 12.
11             (Exhibit 12A was marked for
12             identification.)
13   BY MS. INGLE:
14        Q    So I understand there was an incident in May
15   of 2021 that led to your termination.  Is that
16   correct?
17        A    Yes, ma'am.
18        Q    And can you tell me what happened?
19        A    I was outside doing -- when they had that
20   pandemic and we had to stand outside and count people
21   coming in and count them coming out.  I had a Customer
22   Service Manager comes up to me and said one of her
23   Associates said that a young lady didn't pay for her
24   items, and gave a description of a girl in a pink coat
25   with two small kids.  So, when I told -- Stephanie
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Corey J. Osborne on 11/18/2021

Confidential

```
 1   comes out, I said, "Well, they're -- the only
 2   description there."  I said, "I can't get involved,
 3   because I did not witness it."  So, she like -- I told
 4   her, she can do a receipt check, but I cannot get
 5   involved at all.  So she walks down.  I walk down with
 6   her.  I step back.  She asked the ladies for a
 7   receipt.  Lady produced the receipt.  Stephanie checks
 8   her stuff, gives the lady back her receipt; she did
 9   pay for all the stuff and we walked back to the
10   building.  We walked back to the door.  I stood
11   outside, because I was counting and Stephanie goes
12   inside.
13        Q    And what was Stephanie's job?
14        A    She was a Customer Service Manager.
15        Q    What are the job duties as Customer Service
16   Managers?
17        A    They basically run the whole front end where
18   the cash registers are at.
19        Q    And do they frequently check receipts?
20        A    Mm-hmm.
21        Q    Is that a, "Yes?"
22        A    Yes, ma'am.
23        Q    Do they help people at the self-checkout
24   area?
25        A    Yes, ma'am.  They do.
```

Confidential

```
 1        Q     And they're not AP-090 authorized.  Is that
 2   correct?
 3        A     I -- as a Customer Service Manager, they can
 4   do -- like I said, anybody can do a receipt check.
 5   They can't stop nobody.
 6        Q     So, can they do -- or sorry.  Can they do
 7   receipt checks outside of Wal-Mart?
 8        A     What do you mean, "Outside of Wal-Mart?"
 9   You talking about on the sidewalk?
10        Q     Or -- yeah.  Outside of the store?
11        A     Yeah.  I mean, as long as they are not off
12   the sidewalk, yes.  I've seen the Store Manager do it.
13        Q     So, you've seen the Store Manager do it.
14   Are you talking about Mr. Fisher?
15        A     Yes.  Mr. Fisher, Mike Berry, Mike Hildreth,
16   other managers, like, Kendra, Mr. McHomes.  She was a
17   Manager at the time.  I don't know Josh' last name,
18   but he was a Manager at the time.  When Jacob was
19   there, when he was a manager at the time.  They can
20   check any receipt up to the sidewalk's end.  Once they
21   stepped off the sidewalk, can't nobody, even
22   management, do anything.
23        Q     Okay.  What's the purpose of checking
24   receipts?
25        A     To make sure all -- basically, what they
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1 doing -- make sure all big ticket items are on a

2 receipt. TVs, Xboxes. Little stuff, they don't care,

3 but anything that's not in a bag, they check the

4 receipts to see if it's still -- if it's on the

5 receipt and if it matches.

6     **Q   So, it wouldn't be appropriate to go digging**

7 **through people's bags looking to make sure the items**

8 **all match the receipt?**

9     A   It depends on the items. Like I said, a big

10 ticket -- it could be an Xbox game, but it's 60 bucks

11 and they put it down in the bag. So, they can

12 actually -- they can't dig through it, but they can

13 look down in the bag.

14     **Q   Do you -- would you typically do a receipt**

15 **check if someone just bought groceries?**

16     A   They have, because a lot of people won't

17 scan, like, meats and stuff. They won't scan it, so

18 they just -- we call it free bagging.

19     **Q   Now, when you go through self-checkout,**

20 **there's a camera right above you correct?**

21     A   That's correct.

22     **Q   And so, it watches these scans --**

23 **everything. Is that correct?**

24     A   It can watch you go through the motions, but

25 that doesn't mean that it scanned. You can have

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   something and you can put your finger on the barcode

 2   and look like you going across the register.  Look

 3   like you've scanned it, but it doesn't mean you've

 4   scanned it.

 5        Q    Do you know if different stores have

 6   different cameras --

 7        A    Yes, ma'am.

 8        Q    -- operating over their self-checkout areas?

 9        A    Yes, ma'am.

10        Q    So you mentioned that Stephanie gave you a

11   description of a person leaving the store that --

12        A    Yes.

13        Q    -- but didn't pay for items.

14        A    Yes.

15        Q    Did you point that person out to Stephanie?

16        A    I said the only person that fits that

17   description is the lady that's right down there on the

18   sidewalk.  So, I guess Stephanie, she goes back inside

19   and talks to one of the care -- one of the cashiers

20   and, I assume, the cashier told her, "Yes.  That's the

21   person."  So, that's when Stephanie's like, "That's

22   them there."  And I was like, "Well, you can go do a

23   receipt check, but I can't get involved at all."

24        Q    And so, did you walk over to the person with

25   Stephanie?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                           Corey J. Osborne on 11/18/2021

```
 1        A     No.  I walked down the sidewalk with

 2   Stephanie.  Stephanie walked to the person.

 3        Q     Was the person getting in their car?

 4        A     No.  She was standing outside of a car

 5   putting stuff in the trunk.

 6                    MS. INGLE:  Okay.  Trying to play this

 7   video.  It's, like, having technical difficulties.  It

 8   was working just fine this morning.  If we can take a

 9   quick break, I'll try to get this working.  Go off the

10   record.

11                    MR. VALOIS:  What time do you want to

12   come back on?

13                    MS. INGLE:  [No audible response.]

14                    MR. VALOIS:  What time would you like

15   to come back on the record?

16                    THE REPORTER:  Is she muted?  I didn't

17   mute her.

18                    MR. VALOIS:  Can she hear you?  Looks

19   like she muted.

20                    (Off the record.)

21                    MS. INGLE:  Can you guys hear me?

22                    MR. VALOIS:  We can hear you.

23                    THE WITNESS:  Yes.

24                    THE REPORTER:  Okay.  You ready?

25                    MR. VALOIS:  Yes.
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1                  MS. INGLE:  Yeah.

 2                  THE REPORTER:  Okay.  We are back on.

 3   BY MS. INGLE:

 4       Q    All right.  I'm going to show you this

 5   video.  Can you see my screen?

 6       A    Yes.

 7       Q    Do you -- at any point, do you see yourself

 8   in the video at all?

 9       A    Yes.  I do.

10       Q    Are you standing outside the store in the

11   yellow vest?

12       A    Yes.  I am.

13       Q    I think there was mentioned that the

14   customer that was stopped was wearing a pink jacket.

15   Was that her that just exited the store --

16       A    Yes, ma'am.

17       Q    -- in this video?

18       A    Yes, ma'am.

19       Q    Now, you mentioned earlier that you were

20   counting people.  Was that to count, I guess, how many

21   people came into the Wal-Mart during the pandemic?

22       A    Yes.

23       Q    Were there occupancy limits during the

24   pandemic?

25       A    Yes.  I think it was 900, I believe.  And I
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1   was up there relieving somebody.
 2       Q    Was the other person you were relieving, was
 3   that -- what position was that person in?
 4       A    They would just -- they have -- they would
 5   have anybody come up there to what I'm doing there,
 6   but we have to give them a break.
 7       Q    And is this Stephanie that's walking up now?
 8       A    Yes.  That's Stephanie that's walking up,
 9   now.  And that's what I'm saying, the only one that
10   fits that description is that lady down there.
11       Q    Okay.  So you're -- where you kind of lifted
12   your arm.  Now, it looks like she's kind of running.
13   Stephanie's kind of running back into the store.
14       A    Yes.
15       Q    Have you seen this video before?
16       A    Yes.  I did.
17       Q    Did you view it at all when you still worked
18   for Wal-Mart?
19       A    I was the one that made this video.
20       Q    When you say, "Made this video," do you mean
21   had the --
22       A    Burned it.
23       Q    -- cameras --
24       A    Yeah.  I have -- I was one that have all
25   access to the cameras and they asked me to put this on
```

COREY J. OSBORNE vs WAL-MART STORES EAST

Corey J. Osborne on 11/18/2021

Confidential

```
 1  a disk for them.
 2      Q    -- so you put this on a disk for who?
 3      A    For Mike Berry, Tony Morris, and Seth
 4  Harris, I think his last name.
 5      Q    And the reason you put it on disk?
 6      A    Mike asked me to.  When Mike told me that
 7  this lady wrote a letter and made a complaint, he
 8  actually read the letter to me.  He said, "To cover
 9  your tail," he said, "Put this on a disk."  I'm like,
10  "Okay."  He's -- and Mike Barry said, "I don't see
11  where you did anything wrong."  I'm like, "I know I
12  didn't.
13      Q    When you say a lady wrote a letter, do you
14  understand that to be the lady that was in the pink --
15      A    Yes.
16      Q    -- sweater or jacket, earlier in the video?
17      A    Yes.  Yes.
18      Q    Stephanie coming back in now?
19      A    Yes.
20      Q    You're still outside the store?
21      A    Yes.
22      Q    With the -- outside of this video?
23      A    Yes, ma'am.
24           MS. INGLE:  We can mark this video as
25  Exhibit 12.
```

Confidential

```
 1                    (Exhibit 12B was marked for
 2                    identification.)
 3                    MR. VALOIS:  This is Paul.  I do have
 4   an objection to the exhibit, in that we've never
 5   received a copy of that video that actually works.
 6   The -- you've sent us several times and you sent us a
 7   player, but each time the player doesn't actually --
 8   it doesn't actually open the files.
 9                    MS. INGLE:  I thought your client
10   testified earlier that he viewed the videos before the
11   deposition today.
12                    MR. VALOIS:  Yeah.  He had -- we had --
13   we were able to alter the video by actually editing
14   some of the headers in it to make it play, but it
15   plays in a very jumpy -- it doesn't play anywhere near
16   with the clarity that video that you just played
17   plays.  It plays in a really jumpy --
18                    MS. INGLE:  I'm sorry, Paul.  I'm
19   having -- I can't really hear what you're saying.
20                    MR. VALOIS:  -- well, let me see.  Is
21   that better?
22                    MS. INGLE:  Yes.  Mm-hmm.
23                    MR. VALOIS:  Hello.  I'm sorry.  We
24   were able to take the raw files from the video that
25   you sent us and we were able to edit some of the
```

```
 1   header files in them, and get them to play on another
 2   player, but not -- in a much jumpier, less resolution,
 3   and less clear format than the video you just played.
 4   And it also altered the aspect radio to -- aspect
 5   ratio of the player to make it really stretched out
 6   and weird looking.  And we'd really like to get a copy
 7   of whatever format you just played or whatever you're
 8   using right there.  We'd really like to get a copy of
 9   it in that -- and whatever you just played, because we
10   don't have it.  That's my only objection.
11                MS. INGLE:  Yeah.  Yeah.  We've sent
12   you the video instructions that we use to -- program
13   to be downloaded in order to play these on our
14   computers.  So I'm not sure if it's something
15   different with your computers.
16                MR. VALOIS:  Well -- yeah.  We talk
17   about it later.  We don't need to use up a deposition,
18   but there's a problem.  If you look back at the file
19   you sent, you'll see one of the programs you sent us,
20   it purports to be a program, but it actually has zero
21   kilobytes in its memory.  It's an empty file.  If you
22   look at your sent, you'll see what I'm talking about
23   or maybe your tech guy will.
24                MS. INGLE:  Okay.  We can try to resend
25   that after the deposition and so, hopefully, it'll
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1  come through, because there are a couple of different

2  things that have to be downloaded in order to get this

3  to work.

4              MR. VALOIS:  All right.

5              MS. INGLE:  I'm showing another video

6  on the screen now.  Can you all see this okay?

7              THE WITNESS:  Yes.

8              MR. VALOIS:  Mm-hmm.  Yes.

9              THE WITNESS:  I'm still way up here.

10  You see, I'm way up here and there she is right there.

11  So, she's putting stuff into the car there.

12              MR. VALOIS:  Excuse me.  Bethany?  I'm

13  sorry.  We have a little problem.  Let me see if I can

14  move this window out right.  The little sidebar window

15  was in the way of where he's there -- I'll put it over

16  here.

17              MS. INGLE:  Do you need me to rewind

18  the video at all?

19              MR. VALOIS:  Yeah.  Is that you?

20              THE WITNESS:  Yeah.

21              MR. VALOIS:  Yeah.  If you could rewind

22  it about -- yeah.  A little bit.  Maybe, a few -- a

23  minute or so.

24              THE WITNESS:  Okay.

25              MS. INGLE:  That's good?

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1                    THE WITNESS:  Yeah.  That's pulled up
 2   right there.
 3                    MR. VALOIS:  So that's the lady?
 4                    THE WITNESS:  No.  That's her boyfriend
 5   -- it's her right there.
 6                    MR. VALOIS:  All right.  That's the
 7   lady opening the -- okay.
 8                    THE WITNESS:  Yeah.  So, he's standing
 9   there, waiting.
10   BY MS. INGLE:
11        Q    When you say, "That's the lady.  That's
12   her," are we looking at the vehicle that took the --
13   raised the it's back door to load items into the back
14   of the SUV?
15        A    Yes.  Yes, ma'am.  That's me standing up
16   there.
17        Q    And you say that's you standing up there --
18   and we see a person in a yellow vest.  Is that you?
19        A    Yeah.  That's -- yeah.  The big one right
20   there.  And there's Stephanie talking to me right
21   there.  She goes back inside.  I'm assuming she goes
22   back inside to get another description of the girl.  I
23   don't know, but I stand there and then Stephanie comes
24   back and I tell her, "Well, you can do a receipt
25   check, but no, I can't get involved."  And there's
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

```
 1   Stephanie coming out.  I'm walking down with her.  She
 2   goes up and she talks to them, and I stand back there,
 3   right there.
 4        Q    When you say you, "Stand back there, right
 5   there," is the passenger side vehicle door open?
 6        A    I believe so.
 7        Q    So, when Stephanie approached the woman was
 8   the woman's back turned to Stephanie?
 9        A    I'm not sure.
10        Q    What was the woman's demeanor when Stephanie
11   approached her?
12        A    It wasn't -- I guess, pleasant.  I'm not
13   sure, but once Stephanie spoke to her and asked to see
14   her receipt, and then, checked the few things, I
15   guess, on the receipt, that's when the lady got upset.
16   And she like, you know, "I didn't -- you know, I
17   didn't steal nothing.  I didn't -- I pay for all
18   mine."  I don't know exactly what she said, but you
19   know, I go back to where I'm standing.  That's it with
20   me.
21        Q    Get out of the driver's side of the vehicle,
22   the woman who Stephanie's talking to?
23        A    Yeah.  Either the driver or the back
24   passenger -- on the back driver's passenger.
25                   MS. INGLE:  Going to mark this as
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1    Exhibit 13.

 2                    (Exhibit 13 was marked for

 3                    identification.)

 4                    MR. VALOIS:  Oh, Bethany, let me just

 5    raise a standing objection to the videos until we

 6    straighten those out, okay?

 7                    MS. INGLE:  Okay.

 8                    MR. VALOIS:  Thanks.

 9    BY MS. INGLE:

10        Q    Okay.  You should be able to see this video.

11        A    Yes.  Yes.

12        Q    This the woman that woman that Stephanie

13    approached?

14        A    Mm-hmm.

15        Q    You understand she came back into the store

16    after Stephanie approached her?

17        A    Yeah.  Yes.

18                    MS. INGLE:  Going to mark this as

19    Exhibit 14.

20                    (Exhibit 14 was marked for

21                    identification.)

22    BY MS. INGLE:

23        Q    Do -- this video?

24                    MR. VALOIS:  Well, Bethany?  Let me

25    move.  I've got to move that a little window out of
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1    the way on this one.  One second.  All right.  I think
 2    we're in good shape.
 3    BY MS. INGLE:
 4         Q    Is this the customer that Stephanie
 5    approached?
 6         A    Mm-hmm.
 7         Q    Is this the Customer Service area of the
 8    store?
 9         A    Yes.
10         Q    Do you know, is she talking to Stephanie
11    right now?
12         A    I am not sure.  I'm assuming, because it
13    looked like they both having hand gestures or stuff.
14    Might have been talking to both of them.
15                   MS. INGLE:  This marked as Exhibit 15.
16                   (Exhibit 15 was marked for
17                   identification.)
18    BY MS. INGLE:
19         Q    Do you see this video?
20         A    Yes.
21         Q    Do you recognize the woman that Stephanie
22    approached in this video?
23         A    Yes.
24         Q    This is the only camera angle you will have
25    over the self-checkout lanes at this particular Wal-
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
1    Mart store, so that they -- were these the only
2    cameras that --
3         A    When I --
4         Q    -- you worked there?
5         A    -- yeah.  But I thought there was one over
6    the top of the registers, but I could be wrong.  I
7    think they might have been just at the other check --
8    self-checkout instead of the -- we call those the
9    conveyor belt self-checkouts, but I thought that was -
10   - there was cameras over top of those, but I'm -- I
11   can't remember if there was or not.  Yep.  Mm-hmm.
12                  MR. VALOIS:  Yeah.  That's not there
13   anymore.  That's not there anymore.
14                  THE WITNESS:  They were making sure
15   everybody got their stuff.
16                  (Exhibit 16 was marked for
17                  identification.)
18   BY MS. INGLE:
19        Q    Looking at this video and the items -- what
20   we can see on the screen here --
21        A    Mm-hmm.
22        Q    -- everything on the conveyor belt, do you
23   see anything that strikes you as a big ticket item?
24        A    Maybe that first -- was it scooter or
25   something like that, might be considered a big ticket
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

Confidential

```
 1   item.  Well see, like, some of this, I don't know what
 2   the price is on it.  If anything, it would be the
 3   scooter, because it's not in a bag, but then, you got
 4   all these toys.  I don't know, because some of those
 5   toys could be expensive.  So, I don't know what
 6   alerted them to it or not.
 7        Q     When you say you don't what "alerted" --
 8        A     Yeah.  I don't have nothing to do what they
 9   doing up here.
10        Q     -- do you know if Stephanie saw anything
11   herself or someone told Stephanie they saw something?
12        A     I -- I have no idea if -- I mean, all I
13   remember Stephanie saying, one of her cashiers told
14   her and I'm like, "Well," like I said, "I don't have
15   nothing to do with it."  I'm out front so I don't see
16   anything.
17        Q     After this incident with Stephanie, did you
18   do anything to report what had happened with this
19   customer?
20        A     No, because I didn't think it was nothing to
21   report.  I mean, I had -- basically, I just went out
22   there -- if there's any kind of confrontation with an
23   employee and a customer, I -- they use me, because I'm
24   the big black scary man to calm the customers down.
25   Anytime that they have a customer being rude, loud,
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   they always call me up front and I -- my job is to
 2   observe to make sure that the employee is in a safe
 3   manner; if they have a customer being rude, loud to
 4   them.
 5        Q    Did you choose to go over to the vehicle
 6   with Stephanie after pointing out the customer to her?
 7        A    Say what, now?
 8        Q    Did you choose to go over to the vehicle
 9   with Stephanie after pointing the customer out to her?
10        A    Yeah.  I made -- I had to observe to make
11   sure that the employee is safe.  When she went to the
12   car, I told her I cannot get involved and I can't say
13   anything, but I can be here just in case she tries to
14   get loud, unruly with her.  I am there, but that's --
15   my job is to observe and -- protection of the store
16   and customers, and employees.
17        Q    Did Stephanie ever ask you to come with her?
18        A    Yes.  She did.
19        Q    You said they ask you to be there whenever
20   customers are being upset, because you're the big
21   black scary man, but has anybody ever told you that?
22        A    Yeah.  Actually, as in what customers or
23   employees?  Because every time -- they never told me -
24   - they never told me that, but every time that there's
25   something going on with anybody of color in the store,
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   they always called me.  If there's -- there has been
 2   multiple times where I'm actually following a
 3   shoplifter -- a white male or female, if the Manager
 4   see somebody they don't like, they'll call me and say,
 5   "Hey, I got one for you."  I'm like, "I'm already on
 6   something," you know, because I'm the only AP guy.
 7   "I'm on a sure thing."  They will pull me off of that
 8   person to go follow the black people and then, guess
 9   what?  The black people pay for everything.  The
10   person that I was watching, the white female, or the
11   white male, walks out with a bag full of stuff.  They
12   do it all the time.
13        Q    Okay.  You say, "They do it all the time."
14   Who is they?
15        A    Every -- Store Managers.  Like I said, Mike
16   Hildreth.  Because Mike Hildreth used to be AP.  He
17   worked AP for maybe about three months, then he went
18   into management.  Mike Berry does it.  Ryan Fisher
19   does it.  When Mr. Hornsby was there, he did it.  If
20   they saw somebody that looked like -- that were black,
21   they looked like they were going to steal, they would
22   call me to go follow them.  And if I'm on somebody
23   that I know that's stealing, that I've actually got
24   all the elements, they will pull me off of that one,
25   just to follow the black man.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021
Confidential

1      Q     How do you know that's what they were doing?

2      A     It was obvious.  I mean --

3      Q     How is it obvious?

4      A     -- I'm following a white person.  They call

5   me.  "AP Corey.  I got two black females over here in

6   electronics."  "Okay.  I'm on somebody right now."

7   "No.  I know these people are going to get something.

8   I know.  You need to get on them, now.  Let that --

9   don't worry about -- get on this one."  So I go follow

10  the black females, for example.  They didn't steal

11  nothing.  They paid for everything they had, but the

12  white girl I was watching, purse was full of stuff

13  that I seen her conceal.  And she goes out the --

14      Q     Did you tell them that --

15      A     -- as --

16      Q     -- "I'm watching a white woman with a purse

17  full of stuff steal stuff?"

18      A     -- no.  I tell -- I don't tell them I'm

19  watching a white woman.  I tell them, "I'm watching

20  somebody.  I got a sure thing.  I got concealment.  I

21  got everything.  I'm just waiting for her to go to the

22  front of the store."  They will tell me, "No.  This is

23  a sure thing. Come out here.  Come watch them.  Come

24  watch them," when they know that I got -- got this

25  person dead to rights.  All I got to do is wait for

**COREY J. OSBORNE vs WAL-MART STORES EAST**

1  them to go to the last point of sales and I stop them.

2  They would pull me off of that to follow people of

3  color in the store.

4      **Q    But how do you know that they didn't see**

5  **somebody conceal something?**

6      A    Because they walking in there with an empty

7  basket.  They just walked in the store.  I see how --

8      **Q    How do you know that?**

9      A    -- because -- because there's been time,

10  I've watched somebody in the woman's department where

11  I can see the entrance of the door, and I can -- seen

12  somebody comes in and I knew -- I know, they would

13  call, "Hey, AP Corey, we got this one person," when I

14  seen that person walk by and I'm like, "They don't

15  have nothing in they hands.  They just walked in the

16  store."  I said, "I'm watching somebody right now."

17  "No.  They going to get -- it's a sure thing.  Trust

18  me.  Go follow them."  That's my boss, my manager, so

19  I got to do what he tells me to do.

20      **Q    So, when you say your boss, your manager,**

21  **who are you talking about?**

22      A    Mike Hildreth, Mike Berry, Ryan Fisher.

23      **Q    Okay.  So give me an example of Mike**

24  **Hildreth -- is that the name you're saying?**

25      A    Yes.

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1      Q    Mike Hildreth?

 2      A    Yes.

 3      Q    Just give me an example of specific time

 4  when he did that.

 5      A    There's a time when all three of them -- I

 6  can give you a perfect example with all three of them

 7  together.  They all three --

 8      Q    The date.  Can you give me a date when --

 9      A    -- I have no date.

10      Q    -- they did any of these things?

11      A    I have no dates.  They do it all the time.

12  There's no way possible I could give you a specific

13  date.

14      Q    I need -- I need any dates.  I need to know

15  exactly when this happened.  Because this is the first

16  time we're hearing about this.

17      A    Well --

18           MR. VALOIS:  Well, objection to the

19  form of the question.  He's not here to give you all

20  you need.  He's here to -- truth, so -- but he can

21  answer your question, he just -- I believe he's

22  already said that he doesn't -- that he can't give you

23  exact dates.

24           THE REPORTER:  Sir, I cannot hear your

25  objection.
```

COREY J. OSBORNE vs WAL-MART STORES EAST

1            MR. VALOIS:  Oh, I'm sorry.  The

2    microphone on this laptop is bad.  I said the

3    objection is is that he can't testify to give you what

4    you need.  He's can give you the truth and, if the

5    truth is that he doesn't remember the dates, that's

6    the truth.

7            MS. INGLE:  So, there's got to be a

8    date if it actually happened.  I need to know the date

9    it actually happened, if it actually happened.

10           THE WITNESS:  -- I can give you -- I

11   mean, it happened on a Tuesday.  I don't know the

12   exact date.  It happened so many times, so many

13   different incidents, I cannot give you an exact date

14   of when it happened.

15   BY MS. INGLE:

16       Q    So, can you give me a approximate number of

17   times it happened?

18       A    My goodness.  A lot.  I'll just say, in a

19   two-month span, I've got -- I'm watching, let's say

20   about, 60 people in a two-month span.  Out of that 60

21   people, probably about half.

22       Q    So, I'm sorry.  You're saying you're

23   watching 60 people in two-month span, and about half.

24   What do you mean by that?

25       A    I'll be watching 60 people, and out of the

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

Confidential

```
 1   30 -- out of the 60, they will pull me off of 30 of
 2   them when I know I got a sure thing, somebody
 3   stealing, to go follow people of color.
 4        Q    When you say, "People of color," what do you
 5   mean by that?
 6        A    African Americans.
 7        Q    And when you say, "They," can you give me an
 8   approximate number of times Mike Hildreth did this?
 9        A    If it was, let's say, 30 times, he would do
10   it maybe 17 out of the 30.  Mike Berry would do
11   probably eight out of that, then, Brian Fisher would
12   call me and do -- I'll get eight out of that.  So
13   anywhere that adds up to 30.  Mostly it's -- because
14   Mike Berry would let me do me, but it was always --
15        Q    Okay.  What was that?
16        A    Mike berry let me do my job.  He
17   micromanaged a little bit, but he knew I could catch
18   shoplifters.  I've got -- if you ask anybody in
19   Lynchburg, I am the number one Asset Protection guy in
20   Lynchburg.  That's what I do.  And Mike left me alone,
21   but whenever Mike got around Fisher or Hildreth, he
22   falls in with that little group, with them and then,
23   "Hey, I got one over here in HBA."  I've had, like --
24        Q    Could you give me any other --
25        A    -- excuse me?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1      Q    -- can you tell us, like, what they actually
 2   observed --
 3      A    Oh, they just, like --
 4      Q    -- personally?
 5      A    -- I have a guy that comes in.  It's a black
 6   guy, comes in, there's something mentally wrong with
 7   him.  Every time he comes in the store, they call me
 8   to follow this guy.  He hasn't -- I don't know if it's
 9   a disease or anything, but he just busts out laughing.
10   Every time he comes in the store, they call me to
11   follow him and he never steals a thing.  He pays for
12   everything he gets, every time he walks in the store
13   and he comes in the store probably three times a week.
14      Q    Anytime though, that these managers called
15   you to follow people of color as you say, did you
16   catch anybody shoplifting?
17      A    Sometimes, but most the time, no.  Let's say
18   out of that 60 that I'm following and then, they bring
19   off the watch those 30, I'll probably catch two out of
20   those 30 people that are African Americans.
21      Q    And is this just a hypothetical you're
22   giving me?
23      A    Yeah.
24      Q    Now, any of these Asset -- or I'm sorry, any
25   of these managers, they're AP-09 authorized
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1   associates, correct?

 2        A    Yes.  All managers are.

 3        Q    Now, after the incident with the woman in

 4   the pink jacket that we watched on videos, did you

 5   have to write up any sort of report?

 6        A    I did write a statement after it happened.

 7   Yes.  When she wrote a letter to corporate of a

 8   complaint, I had to write a statement.

 9        Q    Did anybody -- or let me ask you this.  Did

10   Mike Berry ask you to write the statement?

11        A    Yes.

12        Q    Did you understand that there was an

13   investigation after she made the complaint?

14        A    Yes.  He called me in the office.  He asked

15   me to pull it up on video.  I did.  He actually reads

16   the complaint letter to me.  We both watched the

17   video.  He's like, "Well, I just need you to write a

18   statement."  He said, "You didn't do nothing wrong, so

19   I don't see what the problem is, but write a statement

20   anyway.  So I wrote a statement and then, he asked me

21   to burn the footage.  I burned the footage and then,

22   that was it.

23        Q    Going back to the screen again, here.  Are

24   you --

25        A    Yes.
```

Confidential

```
 1       Q    Is this the statement that you provided
 2   about the incident --
 3       A    Yes.
 4       Q    -- with the customer on the --
 5       A    Yes.
 6       Q    -- reading through it here.  Did you ever
 7   tell Stephanie that you didn't think she had anything
 8   to worry about after the incident?
 9       A    I might have.  I don't think so, but I might
10   have, because I didn't see where anything was wrong,
11   because, like I say again, I didn't stop her.  But
12   Stephanie is a Customer Service Manager.  She can do a
13   receipt check.  There's been many times when people
14   did a receipt check, just -- and they, like, "Well,
15   thank you.  Have a good day."  Same thing.  Stephanie
16   never said the girl was -- stole anything.  Stephanie
17   asked to do a receipt check.
18       Q    But here it says, "The female comes back in
19   the store being loud, trying to make a scene."  Did
20   you actually observe her in person when she came back
21   into the store?
22       A    I was standing outside.  She walks by me,
23   she goes in, like, they show -- when you showed the
24   video.  She was talking out loud and stuff outside,
25   and she walks in the store.  I didn't see her once --
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

 1  after she walks into the store until she walks back

 2  out.  So what she did inside the store, I can't tell

 3  you what she said or what she did, but when she walked

 4  into the store at that time, she was being -- she was

 5  upset.  She was loud and she was upset.

 6      **Q    Do you know what her allegations against**

 7  **Wal-Mart were in the letter she wrote?**

 8      A    I just know bits and pieces, what Mike Berry

 9  read to me and, one thing that I knew for good, that

10  she said that it was a big black man standing back

11  there.  He didn't say anything, but he looked very,

12  very intimidating.  That's what Mike Berry read to me.

13      **Q    Do you know the customer's race?**

14      A    Yes.  She was an African American.

15      **Q    Did you find it offensive that she said that**

16  **about you in the complaint?**

17      A    No, because I hear it all the time.  My wife

18  says I'm big and scary.

19                  MS. INGLE:  If we could enter this

20  statement as Exhibit 17.

21                  (Exhibit 17 was marked for

22                  identification.)

23  BY MS. INGLE:

24      **Q    At work, did Stephanie ever tell you that a**

25  **cashier had told her the description of the lady?**

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1       A    Yes.  That's what -- that's what -- when she

2   first approached me, Stephanie said one of her

3   cashier's said, "A lady in a pink shirt with two small

4   kid, a pink jacket, two small kids, didn't pay for all

5   their stuff."  That's when I looked and said, "That's

6   the only one I've seen with a pink coat on with two

7   small kids."  So, I assume Stephanie went back inside

8   and asked the cashier a better -- gave her a

9   description of what this lady had on, and then, that's

10  when Stephanie came back out and then, we walked up

11  there.  So, what Stephanie went and asked the cashier,

12  I could not tell you.  They came to me because, you

13  know, I'm standing out there and then, here it is a

14  black lady.  Of course, they want me to go confront

15  her and that's when I told her --

16      Q    Do you know --

17      A    -- but I told them, I said --

18      Q    -- but --

19      A    -- "I can't confront her, because I didn't

20  see her do anything."

21      Q    -- but Stephanie didn't ask you to confront

22  her.  Did she?

23      A    No.  Stephanie asked for me to go with her

24  to walk down there.

25      Q    She didn't ask you to confront the woman?

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1      A    Nope.

 2      Q    Do you think Stephanie intended to confront

 3  the woman?

 4      A    I'm assuming she was, because she wanted --

 5  initiated all this.

 6      Q    Well, did you ever think to advise Stephanie

 7  that she shouldn't go talk to the woman?

 8      A    No, because that's not my job to advise her

 9  that.  That -- she knows that she has -- she can go do

10  a receipt check.  I'm not her supervisor.  I mean,

11  she's the Customer Service Manager.

12      Q    But she didn't actually see the woman take

13  anything or not pay for anything?

14      A    I can't answer that.

15      Q    But didn't she tell you that one of her

16  cashiers told her this woman didn't pay for something?

17      A    She did say that.

18      Q    So even if, hypothetically, the woman didn't

19  pay for anything, but no one -- well, let's say no one

20  who is AP authorized saw that, then, she couldn't be

21  stopped.  Is that --

22      A    Yeah.  I can't stop her, but --

23      Q    -- AP-09 policy?

24      A    -- I can't stop her, but anybody can do a

25  receipt check.  The guy working out there watering the
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   flowers, he can go up to a person right there, "Can I
 2   see your receipt?  Thank you."  And if it's stuff in
 3   her bag that's stolen, he can't do nothing about it.
 4   He can come back and tell me, and then, what I would
 5   have to do is do an investigation and then, get PD
 6   involved, because I didn't see it, but we have it on
 7   camera.
 8        Q    Is it typical for people to go do receipt
 9   checks as people are -- as customers are loading their
10   items into vehicles?
11        A    If they have -- if they -- what's the word?
12   Had maybe somebody who didn't pay for something?  Yes.
13   You have people that might -- didn't scan water.  A
14   lot of people forget to scan dog food.  Say, "Oh.  He
15   didn't scan his dog food."  They will go, "Hey," and
16   they just go, "Can I receive your receipt, please?"
17   Boom.  "Hey, you didn't scan your dog food."  "Oh.  My
18   bad."  He goes back in, scans it, pays.  They do it
19   all the time.
20        Q    Like the -- the big items you put under your
21   cart?
22        A    Yeah.  They do it -- yes, ma'am.
23        Q    So, after you wrote this witness statement,
24   looks like it's dated May 15, 2020, did you continue
25   to work for Wal-Mart?
```

Confidential

```
 1       A    I did.

 2       Q    And how -- well, let me ask you this.  When

 3   were you terminated from Wal-Mart?

 4       A    On May the 21st.

 5       Q    And how were you informed of your

 6   termination?

 7       A    They called me into the Management office.

 8   Mike Berry tells me, he says, "Man, I hate to tell you

 9   this."  He said, "I think it's wrong, he said, "but

10   Connie and Seth said I had to terminate you for the

11   incident that happened on," I guess -- what?  The 11th

12   or whatever.  The day it happened.  I'm like, "Okay.

13   Why am I getting terminated for something I didn't do?

14   This and that."  He said, "I don't know."  He said,

15   "This was the decision of Connie Morris and Seth

16   Harris.  And then, Mike told me to call The Open Door

17   policy, if I wanted to fight the termination.  So

18   that's when I called The Open Door.  Then, Open Door

19   told me they couldn't do a complaint until I talked to

20   the Store Manager.  The Store Manager refused to talk

21   to me, so I called back Open Door and told them that,

22   "I've called several times, I went there to talk to

23   him.  He refuses to talk to me."  So I called The Open

24   Door and told them everything that was going on.

25       Q    So, was the Store Manager -- was it still
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1    Ryan Fisher?

 2          A    Yes, ma'am.

 3          Q    Why did Open Door tell you you needed to

 4    talk to the Store Manager?

 5          A    I have no idea.  They said before I can file

 6    anything with them, I needed to talk to the Store

 7    Manager.  I went up to the store.  I called several

 8    times.  He hung up on me twice, before I even said,

 9    "Hello."  And then, what -- I actually went up there

10    and he told me -- he said, he has nothing to say.

11    That I need to go through the proper channels of Open

12    Door.  I'm like, "Okay."  I said, "Open Door told me

13    to call and talk to [him]."  He wouldn't even tell me

14    that.  He had Mike Hildreth come out and tell me that.

15          Q    So, when you say, "Open Door," what -- how

16    did you make an Open Door complaint?

17          A    I went and called that I got terminated for

18    something I didn't do; for actually doing my job.

19          Q    Did you call that ethics number we talked

20    about earlier?

21          A    Yeah.  And I had like four different people

22    call me back.

23          Q    And did they tell you -- who told you to

24    call or talk to the Store Manager?

25          A    The first person I talked to.  I don't
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1  remember their name, but they told me to call it --
 2  they told me I had to talk to the Store Manager first.
 3      Q    Do you remember the date when you first
 4  called to make --
 5      A    It was probably -- probably May -- I think
 6  it was May the 22nd.  The next day.  And that's when I
 7  tried to call and talk to Mr. Fisher, then.  Wouldn't
 8  receive my call twice, hung up on me both times.  So,
 9  I go up to the store, refuses to speak to me.
10      Q    I'm going to share my screen again.  Mr.
11  Osborne, did you get a copy of this exit interview
12  form?
13      A    I don't think I did.  I might have.  I don't
14  think I did, but that's -- yeah.  He was the guy who
15  was an adjuster.
16      Q    What was Justin's position?
17      A    Assistant Manager.
18      Q    And did he say anything when you were having
19  the termination discussion with Mike Berry?
20      A    Nope.  He was just in there for a witness.
21      Q    Do you know if Mike was the one that writes
22  these manager comments on the exit interview form?
23      A    Yes.  Yes.  Mike wrote that.
24      Q    And you said he was the one to tell you to
25  file an Open Door complaint?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

```
 1        A    Yes.

 2        Q    Now, did you work on May 21st?

 3        A    For half a day.  I worked for about --

 4        Q    Okay.  You then --

 5        A    -- I worked for about four hours and then,

 6   that's when he called me back and terminated me.

 7                    MS. INGLE:  -- this as Exhibit 18.

 8                    (Exhibit 18 was marked for

 9                    identification.)

10   BY MS. INGLE:

11        Q    Mr. Osborne, have you ever seen a copy of

12   your typed up Ethics Complaint?

13        A    No.  I have not seen it.

14        Q    Give you a minute to look at this document.

15   Does this accurately describe the ethics complaint

16   that you had?

17        A    [No audible response.]

18        Q    Was that a, "Yes?"

19        A    What was the question again?

20        Q    This typed up Ethics Complaint, does it

21   accurately describe the ethics complaint you made?

22        A    Yes.

23        Q    You made it verbally on the phone.  Is that

24   correct?

25        A    That is correct.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1                    MS. INGLE:  Enter this is Exhibit 19.
 2                    (Exhibit 19 was marked for
 3                    identification.)
 4    BY MS. INGLE:
 5         Q    So, I think we already did talk about this
 6    incident, where you said James Hornsby -- now, what
 7    was his position?
 8         A    He was the District Manager.
 9         Q    Okay.  So, he was in the office of Store
10    Manager, Ryan Fisher and James, who said, "I am glad I
11    have you two, now.  You all can catch some of your
12    people.  Jaylin Jackson was with me.
13         A    Mm-hmm.
14         Q    "This is Jaylin's second week of training."
15    That was the incident we talked about earlier when --
16         A    Yes.
17         Q    -- Jaylin started working in Asset
18    Protection.
19         A    Yes, ma'am.
20         Q    Then you say that you were terminated for --
21    "that you -- asked you if you had seen a customer --
22    matched."  That's the end of the description.  I think
23    it's missing a word here.  "The CSM was outside the
24    grocery store on the sidewalk.  Customer was asked for
25    a receipt."  Says, "I never stopped her.  I never
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   spoke to her.  The CSM said everything.  I was in a
 2   yellow vests and at the time, I was getting carts and
 3   CSM came to me stating that the cashier told her this.
 4   I said, 'I can't do anything about it because I didn't
 5   witness it.'  I told her that if I asked her for a
 6   receipt, I would be fired."  Did you tell Stephanie
 7   that?
 8        A    I don't told her I would be fired.  I told
 9   her I couldn't ask for a receipt because -- well, I
10   might have been, because I will be -- I would be fired
11   if I asked for a receipt, not doing a stop.  That's
12   why we never asked for receipts.
13        Q    So, Asset Protection never asks for
14   receipts?
15        A    No.  We do not ask for receipts.
16        Q    You say they fired you, but not Stephanie.
17   Do you know if they gave Stephanie any sort of
18   disciplinary action?
19        A    I have no idea, but I know she's been
20   disciplined before, but I don't know they disciplined
21   her this time.
22        Q    You say, "I feel like because I am a large
23   black man, they are discriminating against me."
24        A    Yes.
25        Q    Then there's another part to this where you
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

Confidential

1   say your Store Manager never called you back.  Three

2   days later, you went to the store.  You asked the

3   coach if you could have a pay stub, any type of

4   paperwork you needed.  Store Manager was there --

5        A    Yeah.  When I spoke to --

6        Q    -- who --

7        A    -- yeah.  So, Rich -- while I was there, I

8   spoke to Coach Rich -- well, she wasn't Manager, but

9   now they call it, "Coaches" -- and to Co-Manager, Mike

10  Hildreth, and came up front and then -- because I

11  asked them, because I see Ryan.  Ryan went through my

12  front, so I told him that I needed all subpoenas with

13  my names on it, so I would know to go to court and

14  then, all my write up paperwork, any kind of paperwork

15  dealing with Wal-Mart for disciplinary.  They refused.

16  They said I could not have it.  They said I could not

17  have the subpoenas when I got -- I think I got two

18  habeas, I'm not sure of the court, because they never

19  notified me that I had court cases.  I went up to the

20  store -- I went to the jail first, to turn myself in,

21  but then they -- the judge dismissed it.  And then, I

22  went to the store to ask for my subpoenas and Ryan

23  Fisher told me -- he said, "If you want your subpoenas

24  you need to get them subpoenaed."

25        Q    Were subpoenas issued to the store or to

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

1   your residence?

2        A    They was issued to the store, but they --

3   they had my name on them, not Wal-Mart's name.

4        **Q    And who was Connie Morris?  What was her**

5   **position?**

6        A    The District AP Manager.

7        **Q    So, had you ever met her before?**

8        A    Yes.

9        **Q    Did Wal-Mart reply back to you following**

10  **your ethics complaint to let you know the status?**

11       A    Somebody called me back.  I can't remember -

12  - I know it was from Wal-Mart, but they just told me,

13  "We're looking into it," and I never heard anything

14  else back.

15       **Q    Did they ever tell you the case was closed?**

16       A    I don't remember if they did.  I'm not 100

17  percent sure of that.

18       **Q    You eventually filed a charge of**

19  **discrimination with the EEOC.  Is that correct?**

20       A    Yes, ma'am.

21       **Q    Did you have any assistance in drafting your**

22  **charge of discrimination?**

23       A    Any what?

24       **Q    Assistance.  Did anybody help you?**

25       A    Oh, no.  And -- nobody helped me besides my

Confidential

1    attorney.

2        Q    Okay.  You don't have to tell me anything

3    your attorney said to you, but I'm going to show you

4    this document and ask you a few questions about it.

5    Can you see the Charge of Discrimination?

6        A    Yes.

7        Q    Now, in the Charge of Discrimination, you

8    mentioned there were two positions for Asset

9    Protection Manager --

10       A    Yes.

11       Q    -- that were never posted.

12       A    Yes.

13       Q    And that two white males who worked outside

14   the company were hired for the position.

15       A    One guy was working in the company.  One guy

16   was outside the company.  One guy was just a regular

17   floor stocker.  They call them a, "Cat2 Stocker."  And

18   then, the other guy was a former police officer.

19       Q    Cat2 --

20       A    Yes.

21       Q    -- employee of Wal-Mart?  What was his name?

22       A    Tyler.  That's all I know.

23       Q    I'm sorry.  What was that?

24       A    His name is -- his name is Tyler.  He's a AP

25   Manager; Tyler Beckert [ph], I believe.

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1      Q     And the guy who used to work for a police

2   department, what was his name?

3      A     Luke Robertson.

4      Q     Now, did you ever tell anybody you wanted to

5   be an Asset Protection Manager?

6      A     Oh, yeah.  They knew it.  I did everything.

7   And I told Mike Berry.  I did Mike Berry's job for

8   him.  Mike did not do anything.  I should have been

9   the AP Manager of Wards Road Wal-Mart, because I did

10  everything.  Mike would say, "Can you do this?"  Stuff

11  that's not my job that is solely for the AP Managers -

12  - his job to do -- I did it for Mike.  The weekly

13  reports that he had to do for OSHA.  I did those.

14  Doing this, doing that.  I did it.  He would be off,

15  "Hey, man.  Can you do this for me?  I forgot."  Of

16  course you forgot.  You always forget every week.  PD

17  would come in to speak -- when -- he got upset,

18  because when the police were called to speak to the AP

19  Manager, Mike would answer the phone, it was like,

20  "No.  We need to speak to Corey," because I knew

21  everything that went on in the store.

22      Q     So, did you ever tell Mike you wanted to be

23  Asset Protection Manager?

24      A     Yes.  Yes.  I have told him that.

25      Q     Did you ever tell Connie -- I'm sorry.  Go

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1   ahead.

2       A    Yes.  I have told Mike.  Never told Connie,

3   because I used my chain of command.  Mike Berry's my

4   Manager.  I told him.  He should go tell Connie that,

5   "Hey.  I got a guy who's over qualified -- that's

6   really qualified to do this job," instead of training

7   two other guys to do the job.

8       **Q    Did you ever tell anybody, besides Mike that**

9   **you would like to be Asset Protection Manger?**

10      A    No, because Mike is my Manager.  That's who

11  I had to go through; my chain of command.  Mike's my

12  chain -- is my chain of command.

13                  MS. INGLE:  Enter the Charge of

14  Discrimination as Exhibit 20.

15                  (Exhibit 20 was marked for

16                  identification.)

17  BY MS. INGLE:

18      **Q    And here, in this charge, you mention the**

19  **incident may have occurred on or about May 11, 2020.**

20  **So we're talking about the incident that we saw in**

21  **video earlier.  Is that correct?**

22      A    Yes.

23      **Q    And you say the customer complained that you**

24  **looked intimidating while the Customer Service Manager**

25  **was checking her receipt?**

```
 1      A    Yes.

 2      Q    You say that was in the letter she wrote to

 3   Wal-Mart?

 4      A    That's what Mike Berry told me.

 5      Q    You say on or about May 5, 2020, "The

 6   Marketing Regional Store Manager said, 'I'm glad you

 7   two are here now.  You can start catching some of your

 8   people."  Is that the incident we talked about earlier

 9   with Jaylin and --

10      A    Yes.

11      Q    -- Hornsby --

12      A    Yes.  Yes, ma'am.

13      Q    -- Fisher?

14      A    Yes ma'am.  No.  No.  Yeah.  Mr. Hornsby,

15   Mr. Fisher.  Yes.

16      Q    And you said here, "The Marketing Regional

17   Manager would make comments like, 'Your people are out

18   there stealing and your people out there acting a

19   fool,' or words to that effect."  Who are you talking

20   about when you say Marketing Regional Manager?

21      A    That'd be James Hornsby.  Yes.  They called

22   him -- like, the Asset Protection Manager is called a,

23   "MAPM."  And I don't know what the weird name they

24   have for the regional person.

25      Q    When did Mr. Hornsby make these comments?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
**Corey J. Osborne on 11/18/2021**

Confidential

```
 1      A    I don't know exact dates, but he's made
 2   those comments.
 3      Q    Do you know did anybody else witness him
 4   saying those words, those phrases?
 5      A    He had all the Store Managers right there.
 6   Mike Berry, Mike Hildreth.
 7      Q    Do you know what he would have been
 8   referring to in saying that?
 9      A    Excuse me?  Referring --
10      Q    Do you know what -- referring to in saying
11   that?
12      A    -- I'm assuming, black people.  "Your
13   people."  I'm black, so.  So, he probably said, "Your
14   people."
15      Q    Okay.  So I understand that you didn't
16   pursue the EEOC charge, eventually.  That got
17   withdrawn.  Is that correct?
18      A    Excuse me?
19      Q    I understand you didn't pursue the EEOC
20   charge.  Eventually, that got withdrawn and you
21   decided to pursue a lawsuit.  Is that correct?
22      A    Yes.
23      Q    See a copy of this -- have you reviewed the
24   Complaint in this case, the document that was filed in
25   Federal Court?  Have you seen this document before,
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1   Mr. Osborne?
 2       A    Yes.
 3                  MS. INGLE:  And mark this as 21.
 4                  (Exhibit 21 was marked for
 5                  identification.)
 6   BY MS. INGLE:
 7       Q    I wanted to ask you about a few specific
 8   paragraphs in your Complaint.  The first is paragraph
 9   13.  It says that you engaged in protected activity
10   when you participated as a witness in a co-worker's
11   employment discrimination complaint.  What does that
12   refer to?
13       A    Oh, yeah.  With Jaylin?  When Jaylin came --
14   was upset when Mr. Hornsby made that comment, I'm a
15   witness to that.
16       Q    Did Jaylin ever complain about that comment?
17       A    He was right there when we both told Mike
18   Berry about it.  Yes.
19       Q    Do you know if Jaylin ever made a complaint
20   to Ethics, or --
21       A    I --
22       Q    anybody else besides Mike Berry?
23       A    -- yeah.  I would not know.
24       Q    And in paragraph 15, here, you say, "The
25   workplace was permeated by anti-black, racist comments
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

1    and jokes made by management employees."  Is that what

2    you were telling me about earlier; those comments you

3    mentioned also in this paragraph, Ryan Fischer,

4    Michael Hildreth --

5        A    Yes ma'am.

6        Q    -- Hornsby.   Is there anybody else --

7        A    No, ma'am.

8        Q    -- that -- comments from?

9        A    No.  They not that dumb to say it in front

10   of other people.  They made that one mistake when they

11   said in front of Jaylin, but all the other times they

12   only said it to me.

13       Q    And in paragraph 16, where you say that you

14   reported the anti-black, racist comments and jokes to

15   your supervisor, Michael Berry, is that the incident

16   where you and Jaylin --

17       A    Yes.

18       Q    -- said something to Michael Berry?  Now,

19   did you --

20       A    Yes.

21       Q    -- so, that's just in reference to the

22   comments made to you and Jaylin by -- for Hildreth and

23   for Fisher?

24       A    Yes.

25       Q    I'm sorry.  Mr. Hornsby and Mr. Fisher?

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1      A    Yes.
 2      Q    Okay.  Did you report anything else to Mike
 3  Berry about feeling like you're getting pulled off
 4  surveillance of --
 5      A    I told --
 6      Q    -- people that were stealing --
 7      A    -- yes.  I had told Mike -- yes.  I had told
 8  Mike about that and Mike's been one -- he's one of
 9  them that has pulled me off of them.
10      Q    Did you complain to him about it?
11      A    Yes.  Like, you know, I tell them, "Some
12  black guy that's a sure thing.  I seen her conceal it
13  and everything, but you all call me to follow this
14  one.  This person didn't do absolutely nothing."  And
15  they, "Oh, man.  I could have sworn she was going to
16  get us for this."  Like, they didn't get nothing.
17  They paid for everything they picked up.  I said, "But
18  then I'll go back on video and show you."  I said,
19  "Look.  She's concealing it right now.  Look.  You see
20  me right there watching her?"  Boom.  You all --
21  that's when you all called me.  I walk away.  She
22  walks out the door with it.
23      Q    Are there certain departments at the store
24  that require more attention because thefts are higher
25  in certain departments?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1       A    Yes.

 2       Q    What departments are those?

 3       A    HBA, infants, electronics.  I mean, if it --

 4   the shadow, it won't move, they will steal it.  And it

 5   just -- the whole store is a big thing, but -- HBA,

 6   because most of that stuff, lotion, women's products,

 7   females' clothing, electronics, automotive -- most of

 8   the times when I'm getting called off something, I'm

 9   in the woman's department watching somebody conceal,

10   because usually they put it in a purse.

11       Q    So, would you ever be called to then go,

12   maybe other -- in departments of products of higher

13   value, like electronics or automotive?

14       A    Say that again, please.

15       Q    Would you ever then be called away from the

16   women's products department to go, sort of, in

17   departments -- of higher value, like electronics or

18   automotive?

19       A    Well, yeah.  But like I said, all of its

20   high theft and I only -- I wouldn't leave a -- I'm on

21   a sure thing.  I got concealment.  I got all the

22   elements, for somebody that just walked in.  Just

23   because they're black, they call me off that to go

24   follow them, when I'm -- I got all the elements I need

25   right now to stop this person as soon as they go
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential

**Corey J. Osborne on 11/18/2021**

```
 1   through the door.  They see some black lady or black
 2   dad come in, "I need you to come follow this person."
 3   I would let them know that, "Hey, all I got to do is
 4   stop this person at the door.  She's got everything on
 5   their person right now."  "Hey, get off that one and
 6   come to this one.  This one is a sure thing.  I'm
 7   telling you."  I'm, like, "Why am I leaving a sure
 8   thing for what you think is a sure thing and, it turns
 9   out, it's not," because the people they get me to
10   follow pay for their stuff?
11        Q    Okay.  And looks like in paragraph 20, here,
12   you say you don't approach vehicles in this paragraph.
13   Is that your position about approaching this customer
14   that made the complaint against Wal-Mart?
15        A    Yes.  In the video you showed, I did not
16   approach her or the vehicle.  I'm back at least five
17   feet from her.
18        Q    In paragraph 24, you talk about how Virginia
19   had issued multiple subpoenas for your appearance in
20   court to testify in cases involving your employment
21   with Wal-Mart.
22        A    Yes.
23        Q    And I'm assuming those were shoplifting
24   cases.  Is that correct?
25        A    That's correct.
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1        Q    And you said the subpoenas had been served
 2   on Wal-Mart?
 3        A    Yeah.  The subpoenas were -- the Deputy
 4   would come, bring it to Wal-Mart.  Wal-Mart has to
 5   have them signed for them or they would take them,
 6   knowing I do not work there anymore.  So they would
 7   sign and take them and then, I have a court date I
 8   have no idea of knowing.  I have a police officer
 9   calls me at home and say, "Hey, they got a habeas for
10   you, because you didn't show up for court today."  I
11   didn't have court.  So I go to do all the stuff down
12   at the jail at the barrister.  Go to Wal-Mart.  I talk
13   to Mr. Fisher there and I ask him, I say, "I need my
14   my subpoenas because, you know, I have habeas.  I had
15   two knocked on me and I need my subpoenas."  He said,
16   "Well, if you want your subpoenas, you need to get
17   them subpoenaed.  They belong to Wal-Mart."  And when
18   I actually talk to the Commonwealth Attorney -- they
19   and the judge -- he said, "That is not true.  The
20   subpoenas actually belong to the State," but they are
21   to inform me of any court dates that any subpoenas
22   that come there or tell the Deputy I no longer work
23   there.
24        Q    Now, did the AP-09 policy have a part of it
25   that dealt with -- for in-court appearances?
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1      A    Yes.  It does.

 2      Q    And -- I pulled this up on the screen here.

 3   Do you understand this to be part of the AP-09 policy

 4   that deals with court procedures?

 5      A    Yes.  Yes.

 6      Q    Do you understand that if a subpoena was

 7   received it was supposed to be submitted to Wal-Mart's

 8   Legal Department?

 9      A    That all goes on Mike Berry.  He is the

10   Manager, not me.

11              MS. INGLE:  We can mark this as Exhibit

12   22.

13              (Exhibit 22 was marked for

14              identification.)

15   BY MS. INGLE:

16      Q    And in paragraph 30, you mention that you

17   suffered severe emotional and psychological distress.

18   Have you treated with any medical providers for that?

19      A    I went to the hospital.  My -- Dr. Dobbins -

20   - that I went to the emergency room.  They put me on

21   heart medication and then, I had -- I just got -- I

22   already had asthma, but they put me on -- my -- they

23   said that my blood pressure had skyrocketed.

24      Q    Did you have any underlying heart conditions

25   before --
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1      A    No.

 2      Q    -- terminating Wal-Mart?

 3      A    Nope.

 4      Q    You said you already had asthma.  Is that

 5  correct?

 6      A    Yeah.  I had asthma, but I was -- last time

 7  I went to this doctor, it was prior, probably, maybe

 8  two months prior or something for asthma, he checked

 9  everything.  Everything was good.  Then this happened

10  and then, Wal-Mart gives me a heart attack.

11      Q    I'm sorry.  What was the last part?

12      A    I said, "Yeah.  Then all the problems with

13  the heart, dealing with all the stress from Wal-Mart,

14  almost gave me a heart attack."

15      Q    And so, what are you seeking as a result of

16  your lawsuit against Wal-Mart?

17      A    What am I seeking?

18      Q    Yeah.  Like, what are you hoping to recover

19  as a result of your lawsuit against Wal-Mart?

20      A    Damages and lost wages.

21      Q    So, we'll talk about, I guess, the lost

22  wages portion.  You found employment after your

23  termination for Wal-Mart, correct?

24      A    Yeah.  About four months later.  I had a

25  vehicle repossessed.  I had bills that were -- that
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1   were fall -- way behind because of the termination,

 2   vehicle that needs to be repaired.  I had to struggle

 3   -- I had -- without a vehicle for a while.  Had to

 4   testify for free.  I still was going to court for Wal-

 5   Mart.  They wouldn't pay me.  I had to miss time from

 6   work, drive from Lynchburg -- from Danville to

 7   Lynchburg to come to court and then, drive back to

 8   Danville to go to work.  I didn't get paid for

 9   mileage, time I missed for work, nothing.

10       Q    And you found employment with -- was it,

11   Allied Security after --

12       A    Yes, ma'am.

13       Q    -- Wal-Mart?

14       A    Yes, ma'am.

15       Q    When did you secure employment with Allied?

16       A    In September.

17       Q    Of 2020?

18       A    Yes.

19       Q    And what was your position there?

20       A    Just a Security Guard.

21       Q    Where were you a Security Guard?

22       A    I was at two locations.  I was at the VEC in

23   Danville for two and a half months and then, I went to

24   the VEC in South Boston for the -- I think, the last

25   five months.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

```
 1        Q    So you said the DMV, initially?

 2        A    VEC.

 3        Q    VEC, as in Virginia Employment Commission?

 4        A    Yes, ma'am.

 5        Q    Okay.  So it -- Allied contracted with the

 6    State to provide security at its State agencies?

 7        A    Yes.  And so --

 8        Q    Did you get unemployment -- oh, I'm sorry.

 9        A    -- I had to commute all the way from

10    Lynchburg to Danville every day and round trip, and

11    then, that made one of my vehicles, it -- motor went

12    to one of my vehicles, so then, I had to take my

13    daughter's vehicle, use hers, and then, the

14    transmission went in hers.

15        Q    That's when you were commuting --

16        A    Yes.

17        Q    -- Danville?

18        A    To Danville and then, to Boston.  Yes.

19        Q    Now, did you apply for unemployment benefits

20    after your termination from Wal-Mart?

21        A    Yes.  I did.

22        Q    Did you get those?

23        A    Yeah.  Five months later.

24        Q    Why do you think it took so long to get

25    those?
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

```
 1      A     It was in the pandemic.

 2      Q     VEC was slow at that time?

 3      A     Oh, yeah -- yep.

 4      Q     And when you worked for Allied, what did --

 5  what were your earnings?

 6      A     Excuse me?

 7      Q     How much did you make?  What were your

 8  earnings with Allied?  How much did you make per hour?

 9      A     $14.00 an hour.

10      Q     I'm sorry.  What was that?

11      A     $14.00 an hour.

12      Q     Okay.  And why did you leave Allied?

13      A     I got a new job in Arrow.

14      Q     So, was your pay always $14.00 an hour when

15  you work at Allied?

16      A     It was 14 then it went to 17 and then, it

17  dropped down to 15, because they lost a --

18      Q     Did it -- oh, no.  I'm sorry.  Go ahead.

19      A     -- they lost the contract with the VECs, so

20  I was unemployed for two weeks and then, they brought

21  me back on, but then, they gave -- they did a pay cut.

22      Q     When did you start looking for work after

23  your termination from Wal-Mart?

24      A     That Monday.

25      Q     So the Monday right after --
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1      A    Yes.

 2      Q    -- termination?

 3      A    Yes.

 4      Q    Screen again here, looking at Interrogatory

 5  number 15 that we sent you asking about your efforts

 6  to obtain employment after you were separated from

 7  employment with Wal-Mart, and you listed some

 8  employers here, a G4S Technology in June, 2020, Allied

 9  Universal Security Services, which is where I

10  understand you worked for some time.

11      A    Mm-hmm.

12      Q    Arrow Solutions, which is where you work now

13  from what I understand and then, it looks like you

14  reapplied to work for Sweet Briar.  Is that correct?

15      A    Yes.

16      Q    Did you apply for any other jobs after your

17  termination from Wal-Mart?

18      A    I applied for several -- several online.  I

19  applied for the TSA at the airport.  What else?  What

20  was one?  Verizon.  I was going to try to sell cell

21  phones at -- and that was pretty much it.  I applied

22  at Lowe's.  I did apply for them, as well.  Home

23  Depot, I did apply.

24      Q    Another document, Mr. Osborne.  Mr. Osborne,

25  is this an updated version of your resume?
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

```
 1      A     As -- no.  Because I haven't put down Arrow

 2   Solutions yet.

 3      Q     Okay.  Do you think you would have submitted

 4   this before --

 5      A     Yeah.

 6      Q     -- you became employed there --

 7      A     Yes.

 8      Q     -- during your job search?

 9      A     Mm-hmm.

10      Q     There a couple of jobs on here, I noticed, I

11   don't think we talked about earlier.  Manpower

12   International?

13      A     Yes.

14      Q     What did you do there?

15      A     It's a temp job.  It's a temp service.

16      Q     And what kind of work did you perform there?

17      A     I went to wherever they sent me.  One day I

18   was at a food processing place.  One day I was doing

19   construction.  They just send me to different jobs.

20   There was multiple stuff.

21      Q     And then ERNC Security.

22      A     Yes.

23      Q     What was that?

24      A     River Ridge Mall Security.  They just

25   changed names.
```

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

```
 1      Q    Was that -- okay.

 2                MS. INGLE:  Okay.  Mark this as Exhibit

 3   23.

 4                (Exhibit 23 was marked for

 5                identification.)

 6   BY MS. INGLE:

 7      Q    So I know that you talked about having some

 8   -- having to go on heart medication, elevated blood

 9   pressure -- you said, asthma, but have you had any

10   what you'd call significant health events since May,

11   2020?

12      A    Besides that?  No.  Before then?  No.

13      Q    Besides asthma, do you have any other kind

14   of chronic health conditions?

15      A    No.

16      Q    Have you ever applied for Social Security

17   Disability?

18      A    No.

19                MS. INGLE:  Those are all the questions

20   I have for you, Mr. Osborne.  Your attorney has some,

21   no?

22                MR. VALOIS:  Okay.  Let me get this on

23   the record.  Can you crouch in next to me?

24                THE WITNESS:  Mm-hmm.

25                MR. VALOIS:  Can -- Madame Court
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**

1    Reporter, can you hear both of us?

2                    THE REPORTER:  Yes, sir.  I can.

3                    MR. VALOIS:  Thank you.

4                         EXAMINATION

5    BY MR. VALOIS:

6         Q    Mr. Osborne, did you have any contact with

7    the lady in the pink jacket?

8         A    No.

9         Q    Did you say any words to her?

10        A    No.  I did not.

11        Q    Did you get closer than that five feet to

12    her at any time?

13        A    No.

14                    THE REPORTER:  Okay.  Sir, I cannot

15    hear you.

16                    MR. VALOIS:  Okay.  Did you get the

17    question about the pink jacket?

18                    THE REPORTER:  Barely.

19                    MR. VALOIS:  Okay.

20    BY MR. VALOIS:

21        Q    Mr. Osborne, did you ever get closer than

22    about five feet to this lady?

23        A    No.  I did not.

24        Q    Was it your job to observe her?

25        A    [Inaudible].

Confidential

```
 1                    THE REPORTER:  I cannot hear Mr.
 2   Osborne, now.
 3                    MR. VALOIS:  You know what?  This is --
 4   we're going to -- we're just going to forget it.  I'll
 5   save it for trial, if necessary, but thanks.  No
 6   further questions.
 7                    THE REPORTER:  Okay.
 8                    MS. INGLE:  That's all I have.
 9                    MR. VALOIS:  He'll read and sign,
10   please.
11                    THE REPORTER:  Okay.
12                    MR. VALOIS:  And Madame Court Reporter,
13   if you can do digital delivery, that would be ideal.
14                    THE REPORTER:  Okay.
15                    MS. INGLE:  We'd like digital, as well.
16                    THE REPORTER:  Standard okay for
17   everybody?
18                    MS. INGLE:  Mm-hmm.  Yes.  So, that's
19   good.
20                    MR. VALOIS:  I'll designate this as
21   confidential pursuant to the Protective Order, if
22   that's okay.
23                    MS. INGLE:  Yes.  Yes.  Many of the
24   exhibits were marked confidential, so we should -- so
25   -- well.  Thank you for your time today, Mr. Osborne.
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                    Corey J. Osborne on 11/18/2021

```
 1                    MR. VALOIS:  All right.  Thank you.

 2    Does that conclude the deposition?

 3                    MS. INGLE:  It does.  Thank you all for

 4    your time.

 5                    THE WITNESS:  Yes, ma'am.  Thank you.

 6                    THE REPORTER:  Everyone have a good

 7    day.

 8                    (Signature reserved.)

 9                    (Whereupon, at 5:01 p.m., the

10                    proceeding was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                Corey J. Osborne on 11/18/2021

1        CERTIFICATE OF SHORTHAND/DIGITAL COURT REPORTER

2     COMMONWEALTH OF VIRGINIA:

3

4        I, Nicole M. Peals, Virginia Notary Public, do

5     hereby certify that the foregoing testimony was taken

6     before me at the time and place hereinbefore set

7     fourth; that the witness (es) were duly sworn to tell

8     the truth, the whole truth, and nothing but the truth,

9     that said testimony was taken by me electronically and

10    thereafter reduced to computer transcription, and I

11    certify that this is a true and accurate transcript to

12    the best of my ability.

13       I further certify that I am neither counsel for,

14    related to, nor employed by any of the parties to this

15    case and have no interest, financial or otherwise, in

16    its outcome. IN WITNESS WHEREOF, I have hereunto set

17    my hand and affixed my notarial seal this 18th day of

18    November, 2021.

19                                  _Nicole_

20                              Nicole M Peals

21            Notary Public Registration No. _778093_

22               My commission expires: _4/30/2022_

23

24    [X] Review of the transcript was requested.

25

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

```
 1               CHANGES AND SIGNATURE

 2  WITNESS NAME: Corey J. Osborne, 11/18/2021

 3  PAGE    LINE    CHANGE          REASON

 4  _____

 5  _____

 6  _____

 7  _____

 8  _____

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20      I, Corey J. Osborne, have read the foregoing

21  transcript and hereby affix my signature that same is

22  true and correct, except as noted above.

23

24              _____

25                      Corey J. Osborne
```



**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                    Corey J. Osborne on 11/18/2021

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                  Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

COREY J. OSBORNE vs WAL-MART STORES EAST

Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                                Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                          **Corey J. Osborne on 11/18/2021**

COREY J. OSBORNE vs WAL-MART STORES EAST
Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Corey J. Osborne on 11/18/2021

Confidential

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                  Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                    **Corey J. Osborne on 11/18/2021**

COREY J. OSBORNE vs WAL-MART STORES EAST

**Confidential**                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                    **Corey J. Osborne on 11/18/2021**

**COREY J. OSBORNE vs WAL-MART STORES EAST**

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

COREY J. OSBORNE vs WAL-MART STORES EAST
Corey J. Osborne on 11/18/2021

Confidential

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

COREY J. OSBORNE vs WAL-MART STORES EAST

Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                 **Corey J. Osborne on 11/18/2021**

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                    **Corey J. Osborne on 11/18/2021**

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                    **Corey J. Osborne on 11/18/2021**

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                    **Corey J. Osborne on 11/18/2021**

**COREY J. OSBORNE vs WAL-MART STORES EAST**

Confidential                    Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                     Corey J. Osborne on 11/18/2021

**COREY J. OSBORNE vs WAL-MART STORES EAST**
Confidential                          **Corey J. Osborne on 11/18/2021**

```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME: Corey J. Osborne, 11/18/2021

 3    PAGE      LINE      CHANGE                REASON

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20        I, Corey J. Osborne, have read the foregoing

21    transcript and hereby affix my signature that same is

22    true and correct, except as noted above.

23

24                    _____

25                    Corey J. Osborne
```

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **COREY J. OSBORNE,** | ) | **CASE NO. 6:20-cv-00079-NKM** |
| | ) | |
| *Plaintiff* | ) | **PLAINTIFF'S OBJECTIONS AND** |
| | ) | **RESPONSES TO** |
| | ) | **DEFENDANTS' FIRST SET OF** |
| **vs.** | ) | **INTERROGATORIES** |
| | ) | |
| **WAL-MART STORES EAST, LP,** *et. al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff, COREY J. OSBORNE, by counsel, serves his Objections and Responses to Defendants' First Set of Interrogatories as follows:

## PRELIMINARY STATEMENT

By responding to these Requests, Plaintiff does not waive or intend to waive: (1) any objection as to relevancy, materiality, privilege, or admissibility of information provided in responses to these Requests; and (2) the right at any time to revise, correct, add to, or supplement any of the answers to these Requests contained herein consistent with the Federal Rules of Civil Procedure.

## GENERAL OBJECTIONS

1. The Plaintiff expressly incorporates all of the General Objections contained herein into the specific objections to each of the Requests below. Any specific objections provided below are



**EXHIBIT** 1

Osborne- 11/18/21

Huseby.com

made in addition to these General Objections and failure to reiterate a General Objection does not constitute a waiver of that or any other objection.

2. The Plaintiff objects to these Requests to the extent that they call for information or materials which are subject to one or more privileges, including, but not limited to, the attorney-client privilege, any information or materials which constitute or reflect work product of its attorneys, or any information or materials subject to any other applicable privilege.

3. The Plaintiff objects to these Requests to the extent that they are overbroad in time and scope and/or seek information or materials that are not reasonably calculated to lead to the production of admissible evidence and/or they seek information or materials that are not relevant to the claim or defense of any party.

4. The Plaintiff objects to these Requests to the extent that they are vague and/or ambiguous.

5. The Plaintiff objects to these Requests to the extent that they seek information or materials that are not within The Plaintiff's possession, custody and/or control.

6. The Plaintiff objects to these Requests to the extent that they request information or materials equally accessible to Defendants.

7. The Plaintiff objects to these Requests and the definitions and instructions contained therein to the extent they exceed the scope of permissible discovery.

## INTERROGATORIES

1.      Please provide the name, address, telephone number, place of employment and job title of any person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact alleged in the pleadings (as defined in Fed. R. Civ. P. 7(a)) filed in this Action, or any fact underlying the subject matter of this Action.

ANSWER:

**Name:** Corey Osborne
**Address:** 246 Sherbrooke Dr., Lynchburg, VA 24502
**Telephone Number:** (434) 515-9130
**Employer:** Securitas
**Job Title:** Security manager

**Name:** Tiffany Osborne
**Address:** 246 Sherbrooke Dr., Lynchburg, VA 24502
**Telephone Number:** (434) 515-9123
**Employer:** Self-employed
**Job Title:** Daycare director

**Name:** Eleanor (last name unknown)
**Address:** Unknown
**Telephone Number:** Unknown
**Employer:** Walmart
**Job Title:** Cashier

**Name:** Anthony Ware
**Address:** Unknown
**Telephone Number:** 434-942-3593
**Employer:** Walmart
**Job Title:** Assistant manager

**Name:** Antjuan Harvey
**Address:** Unknown
**Telephone Number:** 434-426-7077
**Employer:** Walmart
**Job Title:** Assistant manager

**Name:** Edna Coleman
**Address:** Unknown
**Telephone Number:** 434-426-8703
**Employer:** Walmart
**Job Title:**

**Name:** Erin Brown
**Address:** Unknown
**Telephone Number:** 856-357-3227
**Employer:** Unknown
**Job Title:** Former asset protection manager

**Name:** Dominique (last name unknown)
**Address:** Unknown
**Telephone Number:** Unknown
**Employer:** Walmart
**Job Title:** Department manager

**Name:** Damien (last name unknown)
**Address:** Unknown
**Telephone Number:** Unknown
**Employer:** Walmart
**Job Title:** Department manager

**Name:** Jalen Jackson
**Address:** Unknown
**Telephone Number:** 434-509-8120
**Employer:** Walmart
**Job Title:** Asset protection

**Name:** Melissa Winston
**Address:** Unknown
**Telephone Number:** 434-485-3275
**Employer:** Walmart
**Job Title:** Department manager

**Name:** Preston Wilkerson
**Address:** Unknown
**Telephone Number:** 434-665-9206
**Employer:** Unknown
**Job Title:** Former asset protection manager

**Name:** Tim Averett
**Address:** Unknown
**Telephone Number:** 434-444-1923
**Employer:** Unknown

**Job Title:** Former customer service manager

**Name:** Angie (last name unknown)
**Address:** Unknown
**Telephone Number:** 434-221-0303
**Employer:** Unknown
**Job Title:** Unknown

**Name:** Jason Angelique
**Address:** Unknown
**Telephone Number:** Unknown
**Employer:** Lynchburg General District Court
**Job Title:** Clerk

**Name:** Lauren Shelton
**Address:** Unknown
**Telephone Number:** 434-455-3927
**Employer:** Lynchburg Commonwealth Attorney's Office
**Job Title:** Victim/Witness

**Name:** Angie (last name unknown)
**Address:** Unknown
**Telephone Number:** 434-221-0303
**Employer:** Unknown
**Job Title:** Unknown

**Name:** Centra Urgent Care
**Address:** 16890 Forest Road, Forest, VA 24551
**Telephone Number:** 434.200.7210

**Name:** Centra Lynchburg General Hospital
**Address:** 1920 Atherholt Rd., Lynchburg, VA 24501
**Telephone Number:** 434-200-3000

**Name:** MedExpress
**Address:** 21054A Timberlake Rd., Lynchburg, VA 24502
**Telephone Number:**

**Name:** Dr. Thomas Dobyns, MD
**Address:** 4579 S Amherst Hwy, Madison Heights, VA 24572
**Telephone Number: 434-528-4312**

2.      Please state the specific nature and substance of the knowledge that you believe

the person(s) identified in your response to Interrogatory No. 1 may have.

**ANSWER**: All the individuals identified in the response to Interrogatory 1 have knowledge of the circumstances surrounding my termination from Walmart, retaliation from Walmart, as well as have witnessed racial discrimination by management during the course of their employment with Walmart. Angie was fired in the same way I was fired.

     3.    Identify each item of damages that Plaintiff claims in this Action, whether as an affirmative claim or as a setoff, and include in the answer: a) the count or defense to which the item of damages relates; b) the category into which each item of damages falls, i.e., back pay, front pay, compensatory damages, punitive damages, attorneys' fees, interest and any other categories; c) the factual basis for each item of damages; and an explanation of how Plaintiff computed each item of damages, including any mathematical formula used

ANSWER: See the demand letter dated March 9, 2021

     4.    Please identify the name, address and occupation of each person or entity who has performed any study or analysis relating to the damages sought by you in this Action, and for each such person or entity, state whether a report or written opinion has been prepared, and the date of such report or opinion.

ANSWER: This information is not yet available to me. I reserve my response to supplement this Interrogatory when that information is known by me.

     5.    Please complete the below chart identifying all oral or written statements (including but not limited to affidavits, narrative statements, reports, or other documents), whether or not made by agents or employees of the Defendant in this Action, that you believe support any aspect of your claims in this Action

ANSWER:

| DATE OF STATEMENT | WRITTEN OR ORAL | WHO MADE STATEMENT | TO WHOM WAS STATE-MENT MADE | SUBSTANCE OF STATE-MENT |
|---|---|---|---|---|
| | | | | |

|  |  |  | **AND/OR COPIED** |  |
|---|---|---|---|---|
| On or about 5/15/20 | Written | Myself | AP Manager Mike Berry | Details regarding the incident. I burned a copy of the surveillance video and gave my statement and the copies of the video to Mike Berry. |
| On or about 09/03/20 | Written | Myself | EEOC | Charge of discrimination, details of termination circumstances |
| On or about 06/01/20 | Written | Me | Walmart Global Ethics & Compliance | Discrimination and unfair hiring/ firing practices |

6.    If you allege you were subjected to harassment and/or disparate treatment on the basis of your national origin, please identify: a) the nature of the harassment and/or disparate treatment, b) the person(s) carrying out the alleged harassment and/or disparate treatment and/or retaliation, and c) the date(s) on which the acts of alleged harassment and/or disparate treatment and/or retaliation took place. Additionally, please state whether, and to whom, you complained regarding these alleged acts of harassment and/or disparate treatment and/or retaliation.

ANSWER:

**a) Nature of Harassment:** I was highly qualified but was not considered for either of two Asset Protection Manager positions which became available during my employment at other Walmart store locations. Instead, Walmart employed two (White) outside hires to fill those positions without first posting or offering me either of the positions.

**b) Person carrying out the alleged harassment:** Walmart, AP management

**c) Date:** July, 2019 – November, 2019

**d) Complaint made:** AP Management, complaint never resolved.


**a) Nature of Harassment:** During the entire course of my employment at Walmart, my managers, Ryan Fisher and Michael Hildreth, both referred to Black customers suspected of shoplifting as "your people" when speaking with me.

**b) Person carrying out the alleged harassment:** Ryan Fisher, Michael Hildreth

**c) Date:** November 2018 – May 2020

**d) Complaint made:** Mike Berry, who left the room instead of addressing the complaint. Complaint never resolved.


**a) Nature of Harassment:** On several occasions, I was directed by manager, Ryan Fisher, to forego surveillance of White customers I suspected of shoplifting, to instead observe Black customers who I did not suspect of shoplifting.

**b) Person carrying out the alleged harassment:** Ryan Fisher

**c) Date:** November 2018 – May 2020

d) **Complaint made:** Mike Berry. Complaint never resolved.


**a) Nature of Harassment:** When speaking to me and another Black associate, Manager James Hornsby stated, "I'm glad I got you two. Now you can start catching some of your people."

**b) Person carrying out the alleged harassment:** James Hornsby

**c) Date:** April 2020

d) **Complaint made:** Ryan Fisher responded to the complaint by laughing at the comments made by James Hornsby. Complaint never resolved.


**a) Nature of Harassment:** I was asked by a White associate to stand as a witness while they checked a customer's receipt in the parking lot who they suspected of shoplifting. I did not leave the sidewalk, did not interact with the customer, or involve myself in any way except to stand as a witness from afar. The customer complained to corporate that I was standing on the sidewalk "looking intimidating." The associate, who violated Walmart policy by following the customer to her car and asking to see her receipt was allowed to keep her job, but I was fired for no real reason.

**b) Person carrying out the alleged harassment:** Walmart, AP management

**c) Date:** May 21, 2019

d) **Complaint made:** EEOC. Notice of Right to Sue issued.


     7.     For any harassment or disparate treatment identified in response to Interrogatory No. 6, above, please identify the name(s) and title(s) of the person(s) to whom you allegedly complained regarding the alleged harassment or disparate treatment. In responding to this interrogatory, please provide: a) the date(s) on which you complained; b) whether each such

complaint was oral or written; c) any individuals/employees who received a copy of your complaint, if written; d) the name(s) and title(s) of the person(s) who witnessed the complaints; and e) each response to each complaint

ANSWER: See response to Interrogatory #6.

    8.    Please identify any and all health care practitioners, including, but not limited to, physicians, surgeons, dentists, nurses, chiropractors, therapists, clinics, hospitals, hospices, pharmacies, laboratories or any other health care provider of any kind, who has examined, treated or conducted any medical tests on you from 2016 to the present.

**ANSWER:**

Centra Urgent Care
16890 Forest Road
Forest, VA 24551
Phone: 434.200.7210
Fax: 434.525.2138

Centra Lynchburg General Hospital
1920 Atherholt Rd
Lynchburg, VA 24501
(434) 200-3000

MedExpress
21054A Timberlake Rd
Lynchburg, VA 24502

Dr. Thomas Dobyns, MD
4579 S Amherst Hwy
Madison Heights, VA 24572
Phone: (434) 528-4312

    9.    Please separately identify each and every disease, illness, injury, disability, defect, medical symptom or other physical or mental condition which you claim was caused or

aggravated by Defendant as a result of Defendant's alleged improper conduct set forth in the

Complaint.

**ANSWER:** Because of the tremendous amount of stress I endured following my termination from Walmart, unemployment, and fear associated with missing subpoenas issued to me that were being withheld by Walmart (resulting in several show causes), I developed dangerously high blood pressure. At a pre-employment physical screening, my blood pressure was 183/131 and I was told to go to urgent care for examination and treatment. At urgent care, my blood pressure was 221/141. The doctors there were afraid I was at risk of having a stroke because of it and transferred me to Lynchburg General Hospital for treatment.

10.     Please identify any and all health care practitioners, including, but not limited to,

physicians, surgeons, dentists, nurses, chiropractors, therapists, clinics, hospitals, hospices,

pharmacies, laboratories or any other health care provider of any kind, who has tested for,

diagnosed or treated the illness identified in response to Interrogatory 9 above

**ANSWER:**

Centra Urgent Care
16890 Forest Road
Forest, VA 24551
Phone: 434.200.7210
Fax: 434.525.2138

Centra Lynchburg General Hospital
1920 Atherholt Rd
Lynchburg, VA 24501
(434) 200-3000

Dr. Thomas Dobyns, MD
4579 S Amherst Hwy
Madison Heights, VA 24572
Phone: (434) 528-4312

11.     Please identify all medications (prescription and non-prescription) and drugs

that you have taken for the period commencing 2016 to the present, including, but not limited

to, the reasons for taking the medication, and if prescribed, the name address, telephone

number and occupation of the person prescribing it

**ANSWER:**

Losartan Potassium – Hypertension – Dr. Dobyns
Hydreochlorothlazide – Blood pressure – Dr. Dobyns
Albuterol – Asthma – Dr. Dobyns

12.     Please state if you have ever been a party in a lawsuit or other judicial

proceedings, other than the present matter, and, if so, please identify the lawsuit or proceeding,

whether you were plaintiff/claimant or defendant/respondent, the nature of the Action, and the

date and court in which such suit was filed.

**ANSWER:**

Unlawful detainers:

GV12003160-00 – Lynchburg General District Court – Filed 05/18/2012 - Defendant
GV17002896-00 – Lynchburg General District Court – Filed 06/12/2017 - Defendant
GV14000293-00  - Campbell County General District Court – Filed 02/08/2014 - Defendant
GV17003159-00  - Campbell County General District Court – Filed 11/02/2017 - Defendant
GV17003658-00  - Campbell County General District Court – Filed 01/03/2018 - Defendant
GV18000562-00  - Campbell County General District Court – Filed 03/06/2018 - Defendant
GV18003754-00 – Campbell County General District Court – Filed 12/27/2018 - Defendant

Warrants in Debt:

GV19003183-00 – Campbell County General District Court – Filed 10/02/2019 - Defendant
GV14000585-00 – Campbell County General District Court – Filed 04/08/2014 - Plaintiff

13.     Please identify each and every other source of income you had at any time

during your employment with Defendant. For each source, please provide the name, address and

telephone number, the amount of income and the time period such income was provided.

**ANSWER:** I only had income from Walmart during my employment with Walmart.

14.     Please identify each of your employers, including self-employment, since your separation from Defendant, including, but not limited to, the name, address and telephone number of each employer, dates of each employment, job titles and descriptions, your salary including all bonuses, commissions and prerequisites, names of immediate supervisors and reasons for leaving

**ANSWER:**

Allied Universal Security Services
161 Washington St., Ste. 600
Eight Tower Bridge
Conshohocken, PA 19428
September 2020 – July 2021
Armed Officer - $10-$17 p/hour
Reason for leaving: Unstable contract positions, inflexibility with pay, and excessive travel

Arrow Solutions, LTD
920 Shenandoah Village Dr, Ste. 11
Waynesboro, VA 22980
434-381-4500
July 27, 2021 –
Armed Security Manager - $18 p/hour

15.     With regard to any effort by you to obtain employment after your separation from Defendant, please identify each employer or potential employer, including, but not limited to, the names, addresses and telephone numbers of the places to which you applied for employment, the dates you applied for employment at these places (or estimated dates if exact dates are unknown), the dates of your interviews for employment, if any, the name and title of each person who interviewed you for employment, the position for which you applied, and any position offered.

ANSWER:

G4S Technology – June 2020
18805 Forest Rd
Lynchburg, VA 24502

(434) 455-3022
Security Officer
Result: Denied employment because of markers for high blood pressure

Allied Universal Security Services – August 2020
161 Washington St., Ste. 600
Eight Tower Bridge
Conshohocken, PA 19428

Arrow Solutions, LTD
920 Shenandoah Village Dr, Ste. 11
Waynesboro, VA 22980
434-381-4500

Sweet Briar College Campus Safety – June 2021
134 Chapel Rd.
Sweet Briar, VA 24595
434-381-6100

16.    Please identify each of your employers, including self-employment, in the 5

years prior to your employment with Defendant, including, but not limited to, the name,

address and telephone number of each employer, dates of each employment, job titles and

descriptions, your salary including all bonuses, commissions and perquisites, names of

immediate supervisors and reasons for leaving

ANSWER:

Randolph College
2500 Rivermont Ave.
Lynchburg, VA 24503
434-947-8000
12/2015 - 11/2017
Campus Security Officer - $13 p/hour
Resigned from position to start at Walmart

Sweet Briar College Campus Safety
134 Chapel Rd.
Sweet Briar, VA 24595
434-381-6100
09/2012 - 11/2015
Campus Security Officer - $10 p/hour
Resigned from position to start at Randolph College

K-Mart
Lynchburg, VA
2011 – 2017
Asset Protection Manager - $10 p/hour
Resigned from position because of a reduction in hours

Blue Ridge Regional Jail
510 9th St.
Lynchburg, VA 24504
(434) 847-3100
09/2004 - 09/2011
Corrections Officer
Resigned from position because of a conflict of interest

17.     Please identify each person whom you may use as an expert witness at trial, or

with whom you have consulted, and identify the substance of the opinions provided or to be

provided by each such expert

ANSWER: This information is not yet available to me, but I reserve my right to supplement if

and when it becomes available.

M. Paul Valois, Esq.
Counsel for Defendant
James River Legal Associates
7601 Timberlake Rd.
Lynchburg, VA 24502
(434) 845-4529

# Corey J. Osborne

64 Maybrook Dr
Lynchburg, VA 24502
434-515-9130
cory.osb@gmail.com

**Objective:**  To find a full-time position in loss prevention where I can use my strong leadership
skills and organizational skills in a position that offers a stable environment with growth
potential.

---

### EDUCATION
**Liberty University Online**
Criminal Justice Classes
2011
**Central Virginia Criminal Justice Academy**
Basic Jail Officer's Course
April 2005
**DCJS**
Armed Security
August 2004
**United States Army**
11 Bravo Airbourne Rangers
August 1998

---

### QUALIFICATIONS

- Knowledge of and ability to use Defensive Tactics
- Ability to use weapons in a trained manor
- Skilled in basic customer relations
- Ability to meet deadlines while handling multiple tasks
- Skilled in report writing and other company writings
- Ability to maintain confidentiality
- Ability to maintain order over multiple situations all at once

---

### EXPERIENCE

Jan 1992-Aug 1998   United States Army
Infantry Soldier, Airbourne Ranger Sgt.
- Supervise Platoon Squad
- Physical Training
- Use multiple weapons

June 1999-Aug 2004 River Ridge Mall Security
Assistant Director of Security
- Handled all paperwork
- Supervised all security officers
- Responded to calls that were called in
- Maintain maintenance on the security vehicle and equipment

**EXHIBIT** 2

Osborne- 11/18/21

Huseby.com

Sep 2004-Sep 2009 Blue Ridge Regional Jail Authority
Correctional Officer
> Supervise Inmates in housing units that was assigned to
> Respond to all calls
> Transport inmates to and from hospital and court

Aug2010-Sept 2011 News and Advance
Paper Carrier
> Home Delivery of newspapers

Oct 2011-Present   Kmart
Loss Prevention
> Apprehend external and internal theft
> Conduct Safety Inspection of Property
> Chairman of Kmart #4084 Wards Rd National Safety
  Weekend

Sep 2014-Dec 2015 Sweet Briar College
Safety Officer
> Law Enforcement and security duties on campus
> Check perimeter gates
> Building and dorm checks
> Open and close campus
> All investigations
> Vehicle maintenance

Dec 2015-Present   Randolph College
Safety Officer
> Law Enforcement and security duties on campus
> Check perimeter gates
> Building and dorm checks
> Open and close campus
> All investigations
> Vehicle maintenance

WM-OSBORNE0000032

**Walmart**

**Job Description**

## Asset Protection Associate

This position is responsible for assisting in the operation of a department. An individual in this position will be expected to perform additional job related responsibilities and duties throughout the facility as assigned and/or as necessary.

### Essential Functions

*An individual must be able to successfully perform the essential functions of this position with or without a reasonable accommodation.*

Completes work assignments and priorities by using policies, data, and resources; collaborating with managers, co-workers, customers, and other business partners; identifying priorities, deadlines, and expectations; carrying out tasks; communicating progress and information; determining and recommending ways to address improvement opportunities; and adapting to and learning from change, difficulties, and feedback.

Maintains area of responsibility in accordance with company policies and procedures by properly handling claims and returns, zoning the area, arranging and organizing merchandise/supplies, identifying shrink and damages, and ensuring a safe work environment.

Monitors activities and store standards within the store that relate to safety, OSHA Compliance, and basic customer traffic flow by maintaining safety standards to ensure a safe and clean environment, and responding to assistance requests from customers and associates.

Assists with securing and safeguarding the assets of the facility and property by observing and communicating suspicious activity, assisting with investigations, maintaining paperwork, logs, and other required documentation, appropriately executing emergency response procedures, and ensuring security and safety practices are in place and adhered to.

Detects, deters, investigates, and resolves violations of company policies and criminal activities by maintaining a highly visible presence when posted in designated areas; observing customer and associate behavior; investigating alleged fraud and other alleged illegal activities; conducting investigations relating to the operations and policies of the company; obtaining evidence, taking statements, writing case reports, and providing court room testimony, as needed; and participating in collaborative efforts with other investigative entities.

Complies with company policies, procedures, and standards of ethics and integrity by implementing related action plans; using the Open Door Policy; and applying these in executing business processes and practices.

### Competencies

*An individual must be proficient in each of the competencies listed below to successfully perform the responsibilities of this position.*

Asset Protection - Follows safety and security guidelines and related laws and regulations when dealing with suspected theft and other suspicious or criminal acts. Advises Associates on asset protection policies, practices, and guidelines when asked to do so. Identifies signs of shrink and suspicious or criminal acts, keeps goods secure, and properly documents incidents in a timely manner. Reports shrink issues and problems with products, services, and work areas that could prevent successful asset protection. Uses asset protection equipment in correct ways.

Customer/Member Centered: Serve the Customer/Member - Shows care and concern when serving our customers/members. Asks questions in order to understand customer/member needs. Uses policies and information in order to exceed customer/member expectations. Finds and uses the right resources (people, products, tools) at the right time in order to resolve customer/member requests.

Judgment: Make Effective Choices - Uses policies, procedures, and/or guides to make good choices. Uses data and facts in order to make day-to-day decisions and involves others as needed. Recognizes what might be a problem and informs those who can correct it.

Planning and Improvement: Plan for and Improve Work - Accepts responsibility and meets expectations for own work. Identifies steps needed in order to carry out work as required.

Influence and Communicate: Share Information - Listens to others and asks questions to learn about what is needed. Communicates the right information to associates and leaders when they need it. Communicates in a respectful and professional manner.

Execution and Results: Get Results - Makes sure work is done correctly. Works on top priorities first. Makes a consistent effort to get results. Meets deadlines. Takes action in order to solve problems so work can be completed in a timely manner.

Ethics and Compliance: Perform to Ethical Standards - Follows company policies and procedures (for example, the Ten Foot Rule). Shows integrity and ethical behavior in all work situations. Reports ethical and compliance issues promptly.

Adaptability: Adapt - Adapts to changing work demands. Stays focused on own work when faced with change or difficulties. Stays open to and learns from assignments and feedback.

### Physical Activities

*The following physical activities are necessary to perform one or more essential functions of this position.*

Observes associate, customer, or supplier behavior.

Enters and locates information on computer.



EXHIBIT 3

Osborne- 11/18/21

Huseby....

WM-OSBORNE0000036

**Walmart**

**Job Description**

## Asset Protection Associate

Moves up and down a ladder.

Presents information to small or large groups and individuals.

Communicates effectively in person or by using telecommunications equipment.

Creates documents, reports, etc., using a writing instrument (such as a pencil or pen) or computer.

Grasps, turns, and manipulates objects of varying size and weight, requiring fine motor skills and hand-eye coordination.

Visually verifies information, often in small print.

Reads information, often in small print.

Visually locates merchandise and other objects.

Visually inspects equipment.

Reaches overhead and below the knees, including bending, twisting, pulling, and stooping.

Moves, lifts, carries, and places merchandise and supplies weighing up to 25 pounds without assistance.

## Work Environment

*Working in the following environment is necessary to perform one or more of the essential functions of this position.*

Moves through narrow, confined spaces such as stacks of merchandise or supplies, storage areas, and closets.

Works overnight and on varying shifts as required.

## Entry Requirements

### Minimum Qualifications

- Meets applicable state requirements to work in Asset Protection, such as: minimum age, specialized training, certification and/ or licensing.

- Will successfully complete all job required trainings and assessments.

WM-OSBORNE0000037

**Walmart** ⁎⁎⁎

**Job Description**

## Asset Protection Associate

---

### Signature

I have read and understand the essential functions for this position and certify that:

_____   I have the ability to perform the essential functions of this position either with or without a reasonable accommodation

_____   I do not have the ability to perform the essential functions of this position either with or without a reasonable accommodation

_____        _____        _____

Associate/Applicant Printed Name        Associate/Applicant Signature        Date

---

WM-OSBORNE0000038

# Investigation and Detention of Shoplifters Policy

(AP-09)

Edit Text

Updated: January 11, 2018

At Walmart, we are committed to providing a safe shopping and working environment for our customers, members, associates and visitors. We also strive to protect our assets and profitability. To achieve these goals, we employ asset protection programs designed to deter shoplifting and in some cases, prosecute individuals that attempt or commit theft. This policy establishes the standards for investigating and detaining those suspected of such activities.

It applies to all associates who work for Walmart Inc., or one of its subsidiary companies in the United States.

Managers and supervisors should use the Supplemental Investigation and Detention Guide for additional guidance in administering this policy. Some portions of this policy may vary by state. Please check the state drop down box before applying this policy

# Make Safety Your Priority

Your personal safety and the safety of our associates and customers is your top priority. Nothing in this policy supersedes the importance of protecting yourself and others from injury.

- If a Suspect is believed to **possess a weapon** or brandishes or threatens use of a weapon; **disengage** from the situation, withdraw to a safe position and contact law enforcement.
- If at any time a Suspect appears to be **under the influence** of drugs or alcohol; **disengage** from the situation, withdraw to a safe position and contact law enforcement.
- If at any time the Suspect or any other involved person becomes **violent or physically threatens violence; disengage** from the situation, withdraw to a safe position and contact law enforcement.
- Never restrain a Suspect or any other customer.
- Never threaten physical harm to or direct profanity at a Suspect.
- Never pat down, frisk, or search a Suspect or a Suspect's belongings (e.g., purses, bags).
- Never pursue a fleeing Suspect.
- Always summon medical personnel if any person experiences medical distress.
- Associates may only **defend themselves** or others **to the extent necessary** to disengage and withdraw from the situation.

# Authorized Associates

An Authorized Associate is an associate who has been

1. Trained to comply with the requirements of this policy
2. Is in a position with an Asset Protection Associate job code (APA and APM), hourly support manager, or is a salaried manager
   - Customer Hosts are not eligible to be certified as an Authorized Associate
3. Works at a retail facility operated by Walmart Inc. (e.g., Walmart Store, Supercenter, Neighborhood Market or Sam's Club) (collectively "Facilities" or individually as "Facility")

# Witness

At least one other associate (must be 18 years or older) must be present as a witness during the approach and any resulting investigation. The associate witness must remain a safe distance from the approach and investigation while maintaining the ability to see and hear the interaction between the Authorized Associate and the Suspect.

During the approach and investigation, the associate witness is not required to be the same gender as the Suspect. However, if the Suspect is detained, an associate witness 18 years of age or older and the same gender as the Suspect must be present from the time of detention until the Suspect leaves the store

# Surveillance of Suspicious Behavior

EXHIBIT 4
Osborne- 11/18/21
Huseby.com

WM-OSBORNE0000489

Surveillance of a person must be based upon objective actions and cannot be based on race, color, religion, sex, pregnancy, national origin, age, disability, veteran status, sexual orientation, gender identity/expression or any other legally protected status.

Surveillance is only allowed in the areas of the store open to the public.

Surveillance in person, or through any other means is not permitted in restrooms or fitting rooms.

# Confirmation of "Unlawful Taking"

An "Unlawful Taking" must be confirmed by one or more Authorized Associates observing each of the five acts set forth below ("Five Elements") before a Suspect may be approached.

1. **Alert Signal** – The Suspect's Suspicious Behavior must be documented.
2. **Selection** - The Suspect must select and take possession of Facility merchandise.
3. **Concealment/Dispossession** - The Suspect must either conceal or demonstrate intent to steal the merchandise.
4. **Continued Possession of the Merchandise** - Following concealment/dispossession, visual contact must be maintained in a manner sufficient to conclude the Suspect has the merchandise after passing the last point of sale.
   o Two Authorized Associates may work jointly on the sales floor or through the use of cameras to maintain visual contact.
5. **Passing the Last Point of Sale** – The Suspect must pass the last point of sale without paying for the merchandise.

If any of the Five Elements is not observed or is otherwise questionable, the Authorized Associate should request that another member of management provide pro-active customer service prior to the Suspect reaching the last point of sale. In such a situation, there must never be an accusation of theft, concealment, or any other statement made that would suggest the Suspect is attempting to shoplift.

# Approaching a Suspect

Authorized Associates may Approach a Suspect only if:

- An Authorized Associate has observed all Five Elements
- An Associate Witness is present
- The Associate Witness is able to be in a safe position while maintaining the ability to see and hear the interaction between the Authorized Associate and the Suspect
- Doing so will not place an associate or customer in an unsafe situation

The purpose of an Approach is to verify that the Suspect

- Is in possession of the Facility's merchandise
- Has not paid for the merchandise
- Does not have a reasonable explanation for passing the last point of sale without paying for the merchandise

During the Approach, the Authorized Associate and the Associate Witness must maintain a safe distance from the Suspect and any other involved parties.

**All associates are prohibited from going beyond the facility's sidewalk** to make an Approach or obtain additional information regarding a Suspect (e.g., license plate, direction of travel) even if directed to do so by law enforcement.

- In the absence of a sidewalk, the MAPM will establish a boundary not to extend into the crosswalk or parking area.
- If there is a high frequency of fire exit push outs, the MAPM may establish boundaries for the fire exits that are not overly intrusion into the path of traffic, or parking lot.

# Decision to Detain

Only an Authorized Associate may ask a Suspect to proceed to a detention area.

- Only non-aggressive methods may be used.
- Motion and verbally instruct the Suspect to the detention area.
- If necessary, an Authorized Associate may utilize respectful, light physical contact to direct the Suspect toward the AP office or detention area. No contact beyond an open hand on the arm, shoulder or middle of the back of the Suspect is authorized.
- At all times that a Suspect is detained, an Associate Witness must be present in a safe position while maintaining the ability to see and hear the interactions between the Authorized Associate and the Suspect.
- If the Suspect fails to comply, associates must withdraw from the situation and notify local law enforcement.

# Detention

Only an Authorized Associate may ask a Suspect to proceed to a detention area.

- Only non-aggressive methods may be used.
- Motion and verbally instruct the Suspect to the detention area.
- If necessary, an Authorized Associate may utilize respectful, light physical contact to direct the Suspect toward the AP office or detention area. No contact beyond an open hand on the arm, shoulder or middle of the back of the Suspect is authorized.

WM-OSBORNE0000490

- At all times, associates must act in a manner that is consistent with the safety of the Authorized Associate and the Suspect.
- If the Suspect fails to comply, associates must withdraw from the situation and notify local law enforcement.

# Personal Responsibility

**Failure to comply with any aspect of this policy may result in disciplinary action, up to and including termination.**

Any salaried member of management that witnesses this policy being violated or a situation that is placing the safety of another at risk is obligated to instruct the involved associate(s) to disengage and withdraw from the situation.

If you observe or become aware of this policy being violated, immediately report it to the Market Asset Protection Manager ("MAPM") and the Regional Asset Protection Director ("RAPD") for the facility.

All incidents that result in physical contact beyond what is outlined in the "Detention" section of this policy must be entered in the Incident Reporting System (IRS) within 24 hours.

- All available video related to the incident, including each of the Five Elements and any confrontation, must be preserved and retained as part of the case file.

# Prosecution of Suspects

A Suspect should only be prosecuted if the Authorized Associate concludes that sufficient evidence exists to prove guilt of the Suspect beyond a reasonable doubt **and**

1. The retail value of merchandise is at or above $25.00 **and**
2. The Suspect is at or between the ages of 16 and 65 **or**
3. Fails to produce a valid government I.D. or school I.D. **or**
4. The Suspect is a repeat shoplifter at a Walmart Facility, regardless of the value of the merchandise or the age of the Suspect **or**
5. The Suspect committed, or threatened violence, regardless of the value of the merchandise or the age of the Suspect.

# Minor Suspects

Authorized Associates must only release minor Suspects to

- Their parent or guardian
- Law Enforcement

If an Authorized Associate is unable to contact a parent or guardian within 30 minutes after detaining the minor or if a parent or guardian does not arrive at the Facility within 60 minutes after notification to pick up the minor, law enforcement should be contacted regardless of the retail value of the merchandise recovered.

The decision of whether to file charges against a minor follows the decision making process stated in the "Prosecution of Suspects" section of this policy.

# Trespassing a Suspect

An Authorized Associate or other manager in charge of the Facility may trespass a Suspect under this policy only when the Suspect is between the age 16 to 65 years of age and

- The Suspect is a repeat shoplifter at a Walmart Facility or
- The Suspect was violent, threatened violence or attempted to flee

The Trespass form must be completed by an Authorized Associate and entered into APIS.

**Trespassing a person under other circumstances is reserved for facility management.te**

# State Specific Investigation and Detention Requirements

Edit Text

WM-OSBORNE0000491

Connec

**Statutory Limitations Regarding Detentions**

Authorized Associates may only request the name and address of a suspected shoplifter and no other information shall be required of a suspected shoplifter until a police officer has taken the suspected shoplifter into custody.

**Illinois**

**Statutory Limitations Regarding Processing Minor Shoplifting Suspects**

Authorized Associates, upon detaining a suspected shoplifter, who is a minor, must immediately attempt to inform the parents, guardian or other private person interested in the welfare of that minor and, at the merchant's discretion, a peace officer, of this detention and to surrender custody of such minor to such person.

**Indiana**

Detention of a suspected shoplifter may not exceed the arrival of local law enforcement or two (2) hours under any circumstances.

**Statutory Limitations Regarding Detentions**

**Statutory Limitations Regarding Processing of Minor Shoplifting Suspects**

If a suspected shoplifter is detained and they are a minor, an Authorized Associate can ask the minor to identify themselves and their parents can be contacted. The shoplifter apprehension form may be completed and any concealed merchandise can be obtained. However, no verbal or written statement acknowledging theft or conversion shall be solicited from the minor until the minor has had an in person meaningful consultation with his or her parent, guardian, custodian, or guardian ad litem.

**Kentucky**

**Statutory Limitations Regarding Processing of Minor Shoplifting Suspects**

Authorized Associates may inform parents or guardians of the detention of a minor and surrender custody to a peace officer.

**Louisiana**

**Statutory Limitations Regarding Detentions**

Authorized Associates must not detain a suspected shoplifter beyond sixty (60) minutes, unless it is reasonable under the circumstances.

**Maine**

**Statutory Limitations Regarding Detentions**

Authorized Associates must not detain a suspected shoplifter for a period of time not to exceed 30 minutes.

**Statutory Limitations Regarding Processing of Minor Shoplifting Suspects**

In the case of a minor, a law enforcement officer or the minor's parents must be informed of the detention and custody surrendered to that person.

**Minnesota**

Authorized Associates must not detain a

WM-OSBORNE0000492

Statutory Limitations Regarding Detentions

not to exceed one (1) hour.

Statutory Limitations Regarding Processing of Minor Shoplifting Suspects

Minor shoplifting suspects may be detained for more than one (1) hour if the Authorized Associate is waiting to surrender the minor to parent, guardian, or police officer.

Montana

Authorized Associates must inform a suspected shoplifter investigated for shoplifting that the stop is for investigation of shoplifting and that upon completion of the investigation, the person will be released or turned over to the custody of a peace officer.

Statutory Limitations Regarding Detentions

Authorized Associates may only request the name and address of a suspected shoplifter and no other information shall be required of a suspected shoplifter.

After the purpose of an investigation and/ or detention has been accomplished or 30 minutes have elapsed, whichever occurs first, the Authorized Associates shall allow the person to go unless the person is arrested and turned over to the custody of a peace officer.

New Hampshire

Statutory Limitations Regarding Detentions

Authorized Associates may reasonably detain a suspected shoplifter as long as necessary so long as that suspected shoplifter is ultimately surrendered person to a peace officer.

North Carolina

Statutory Limitations Regarding Processing of Minor Shoplifting Suspects

If the suspected shoplifter is a minor (under the age of 18 years), the Authorized Associates, shall call or notify, or make a reasonable effort to call or notify the parent or guardian of the minor, during the period of detention.

North Dakota

Statutory Limitations Regarding Processing of Minor Shoplifting Suspects

In the case of a detained shoplifter suspect who is a minor, Authorized Associates must inform a peace officer, the parents, guardian, or other private person interested in the welfare of that minor of the detention and to surrender custody of said minor to the person informed.

Statutory Limitations Regarding Obtaining Signed Admission or Similar Declaration from Minor Shoplifting Suspects

If the merchant knows or reasonably should know that the individual believed to have committed theft is a minor, the merchant may not request that the individual sign an admission of theft or other similar declaration unless the minor's parent, guardian, or attorney is present.

WM-OSBORNE0000493

Immediately upon stopping the person, the investigating Authorized Associate shall identify himself or herself and state his or her reason for stopping the person.

Statutory Limitations Regarding Detentions

The Authorized Associates may only request that the suspected shoplifter promptly identify himself or herself by name and address. Once placed under detention, no other information shall be required of the person and no written and/or signed statement shall be elicited from the person until a police officer has taken him or her into custody.

The Authorized Associates shall not detain a suspected shoplifter for a period exceeding one (1) hour.

South Dakota>

Statutory Limitations Regarding Processing of Minor Shoplifting Suspects

In the case of a detained shoplifter suspect who is a minor, Authorized Associates must notify a peace officer, a parent, or guardian of the detention, and surrender custody of the minor to the person informed.

Utah

Statutory Limitations Regarding Processing of Minor Shoplifting Suspects

In the case of a detained shoplifter suspect who is a minor, Authorized Associates must immediately inform a peace officer, the parents, guardian, or other private person interested in the welfare of that minor of the detention and to surrender custody of the minor to the person informed.

Vermont

Statutory Limitations Regarding Detentions

Statutory Limitations Regarding Processing of Minor Shoplifting Suspects

Every detained shoplifting suspect, shall, if a telephone is available, have the right to make one local telephone call of reasonable duration. The investigating Authorized Associate shall advise the detained shoplifting suspect of this right.

In the case of a detained shoplifter suspect who is a minor, Authorized Associates must notify a parent, guardian or law enforcement officer of the detention and to surrender custody of the minor to the person informed.

Virginia

Statutory Limitations Regarding Detentions

Statutory Limitations Regarding Processing of Minor Shoplifting Suspects

Authorized Associates may not detain a suspected shoplifter longer than 60 minutes pending the arrival of a law enforcement officer.

In the case of a detained shoplifter suspect who is a minor, Authorized Associates may detain until law enforcement officer arrives.

WM-OSBORNE0000494

# Resources

For further guidance, contact:

| Type | Resources | |
|------|-----------|---|
| Related Policies | Discrimination & Harassment Prevention Policy<br>Statement of Ethics Policy<br>Disciplinary Action Policy<br>Investigation and Detention of Shoplifters - Spanish version | |
| Form | Civil Recovery Notice<br>Trespass Form | |
| Guides | Investigation and Detention of Shoplifters Guide | |
| Contacts | For further guidance, contact | |
| | Facility | Contact Person |
| | Walmart Stores | Store Manager<br>Market Asset Protection Manager<br>Regional Asset Protection Director<br>Divisional Asset Protection Director |
| | Sam's Clubs | Market Asset Protection Manager<br>Regional Human Resources Director |

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Edit Text

Last Modified: January 11, 2018

Edit Text

WM-OSBORNE0000495



Section 700 – Key Terms

Key Terms

This section contains definitions of key terms with which authorized associates must be completely familiar in order to apply AP-09 correctly.

Authorized Associates. Authorized associates are those associates who are authorized by AP-09 to surveil, investigate and/or detain suspects. Associates filling the following positions are considered to be authorized associates: A Store/Club Manager, Co-Manager, Assistant Manager, Asset Protection Manager, Hourly Support Manager, or an Asset Protection Associate.

Concealment. Concealment is the second of the five elements required to establish that an unlawful taking has occurred. Concealment occurs when a suspect intentionally hides from the view of Walmart associates merchandise for which the suspect has not paid. Concealment tends to prove that a suspect consciously intended to shoplift merchandise. A suspect who removes unpaid-for merchandise from a facility without concealing it could argue that his or her conduct was accidental. See "Dispossession" for another way in which a suspect may demonstrate intent to steal.

Continued Possession of Merchandise. Continued possession of merchandise is the third of the five elements required to establish that an unlawful taking has occurred. Continued possession means that the suspect has maintained possession of the merchandise from the point at which the suspect conceals or dispossesses merchandise through the point at which an authorized associate approaches the suspect to conduct an investigation.

Detention (Authorized Methods). AP-09 allows authorized associates to detain suspects for a reasonable period of time, in a reasonable manner, using five approved methods: Verbal Request, Verbal Command, Physical Redirection, and Restraint. After approaching the suspect, the authorized associate should complete the investigation in order to determine whether to release the suspect or continue the detention in accordance with this policy. The purpose of detention is to enable the facility to complete its investigation, retrieve the facility's merchandise, and/or refer the suspect to local law enforcement authorities. If the suspect flees upon being approached or during the course of the investigation, the authorized associates may not pursue the suspect in accordance with AP-09.

Dispossession. Dispossession is the second of the five elements required to establish that an unlawful taking has occurred. Dispossession occurs when a suspect takes some action that demonstrates the suspect intends to deprive Walmart of merchandise for which the suspect has not paid. Usually the suspect's purpose in undertaking this action will be to deceive Walmart associates into believing that the suspect actually owns the merchandise taken. For example, the suspect could remove the tag from a jacket or other item of clothing and attempt to wear it out of the facility. Dispossession tends to prove that a suspect consciously intended to shoplift merchandise. A suspect who

EXHIBIT 5
Osborne- 11/18/21
Huseby.com



removes unpaid-for merchandise from a facility without an act of dispossession could argue that his or her conduct was accidental. See "Concealment" for another way in which a suspect may demonstrate intent to steal.

**Five Elements.** The five elements are the five acts that a suspect must complete in order to establish that the suspect has engaged in an unlawful taking of Walmart merchandise, as defined in AP-09. The legal standard for when an unlawful taking has occurred may differ by state and may not require all five elements. The five elements are: (1) Alert Signal; (2) Selection; (3) Concealment/Dispossession; (4) Continued Possession; and (5) Passing the Last Point of Sale. Each is defined separately in this section. Establishing the five elements helps to provide the reasonable cause or probable cause necessary to approach and investigate the actions of a shoplifter suspect.

**Good Faith Belief in Guilt of Suspect.** Before initiating prosecution, the facility manager should have a good faith belief that sufficient evidence exists to prove that the suspect committed an unlawful taking. In order to reach this conclusion, the facility manager should review the evidence to ensure that authorized associates established that the suspected completed each of the five elements. If any of the five elements is missing, the facility manager should carefully consider whether prosecution for shoplifting is appropriate. Note that prosecution for other crimes, such as assault or destruction of property, may still be appropriate.

**Passing the Last Point of Sale.** Passing the last point of sale is the fourth of the five elements required to establish that an unlawful taking has occurred. This element consists of: *The suspect must pass the last point of sale, fail to pay for the merchandise, and enter the vestibule or final point of exit.* If the suspect is detained after passing internal cash registers, but before entering the vestibule or final point of exit, the suspect might still argue that he or she still intended to pay, but wanted to visit tenant shops or the restrooms first. In contrast, if the suspect is detained outside the facility, but before a point of sale on the sidewalk, the suspect could argue that he or she intended to pay at the register on the sidewalk.

**Physical Redirection.** This is the third authorized method of detention. Physical redirection means that authorized associates should use motion in a non- aggressive manner in   the direction they would like a suspect to proceed.  If   that is unsuccessful, the authorized associate may utilize respectful, light physical contact  in directing the suspect toward the AP office or other location.

**Pursuing a Fleeing Suspect.** AP-09 prohibits associates from pursing a suspect for more than 10 feet beyond the point they are located when the suspect begins to run inside of outside the facility. 10 feet is about three long steps. A suspect may, however, be followed to gather identifying information so long as it can be done from a safe distance and without putting others at risk. A vehicle description, license plate number, or direction of flight may be obtained if it can be accomplished from a safe distance and without putting yourself, other associates, or customers at risk. This ability to follow does not extend beyond Walmart property.

**Put People First.** Protecting the physical well-being of suspects, customers, and Walmart associates is your first priority. Recovering merchandise or detaining a shoplifter is your second priority.

**Reasonable Manner.** Reasonable manner means taking just those actions that an ordinary and reasonable person would agree are necessary and justified under the circumstances.

WM-OSBORNE0000465



Reasonable Period of Time. Authorized associates may not detain a suspect longer that one hour, unless the period allowed by state law is shorter, in which case the detention may not exceed the shorter period.

Restraint. This is the fourth authorized method of detention. Restraint means that authorized associates may use reasonable and minimal force necessary to limit or control the movements of a suspect. If restraint is attempted and the suspect cannot be controlled with a reasonable and minimal force, disengage from the situation, withdraw to a safe position, and contact law enforcement.

Restraint Device. Any physical object that can be used to restrain a subject. Suspects may not be detained with any restraining device such as belts, handcuffs, or zip ties.

Selection. Selection is the first of the five elements required to establish that an unlawful taking has occurred. Selection means the suspect chooses and takes possession of an item of merchandise. Observing selection is important to ensure that the suspect did not bring the merchandise in the store.

Self-defense. The associate may assume a defensive position, but must only utilize the least amount of physical confrontation necessary to protect them self and must take advantage of the first opportunity to disengage from the situation and withdraw to a safe location.

Suspect. Any person in a facility who engages in behavior that reasonably suggests that the person may be attempting to shoplift ("Suspicious Behavior") may be considered a suspected shoplifter ("Suspect") for the purpose of commencing surveillance under this policy.

Suspect – Minor. A suspect under the age of 18

Suspicious Behavior. Any behavior by a suspect that would suggest to a reasonable person that the suspect might be considering shoplifting. Authorized associates may not surveil a person, unless that person has engaged in observable suspicious behavior.
Remember that honest people sometimes engage in behavior that might strike a reasonable person as suspicious. Suspicious behavior by itself can never be used as a basis to perform a detention of a person. Persons may only be detained once they have committed an unlawful taking.

Unlawful Taking. An "Unlawful Taking" means that suspect has completed each of the five elements required by AP-09 to show that the suspect intended to unlawfully deprive Walmart of its merchandise.

WM-OSBORNE0000466



Verbal Command. This is the second authorized method of detention. A verbal command means that an authorized associate has orally directed a suspect to take some act or to proceed to a designated area of detention.

Verbal Request. This is the first authorized method of detention. A request means verbally securing the consent of the suspect to cooperate in an investigation and/or to accompany the authorized associate to any area of detention.

Violence. The act of aggression or verbal threat of aggression to induce bodily harm or injury to a person or persons. If at any point, a detained suspect or any other involved person becomes violent, terminate your attempt to detain the suspect, disengage from the situation, withdraw to a safe position, and contact law enforcement.

Withdrawal. Withdrawal means physically disengaging from a confrontation with a suspect. "Opportunity for Withdrawal" means that under the circumstances an authorized associate can physically disengage from a confrontation with a suspect, without increasing the danger to him or herself or another person

WM-OSBORNE0000467



## Section 100: AP-09 Supplemental Investigation & Detention Guide

**Purpose Of Guide**     This guide to the Investigation and Detention of Shoplifters Policy, AP- 09, is designed to be a reference manual providing explanatory materials that will assist authorized associates in correctly applying AP-09.

- **Failing to comply with AP-09 or this guide may result in disciplinary action, up to and including termination.**

**Overview**     AP-09 sets forth the procedures authorized associates must follow in investigating and detaining suspected shoplifters. AP-09 rests on these core principles:

- Your personal safety and the safety of our associates and customers is your top priority. Nothing in this policy supersedes the importance of protecting yourself and others from injury.
- Surveillance of a person must be based upon objective actions and cannot be based on race, color, religion, sex, pregnancy, national origin, age, disability, veteran status, sexual orientation, gender identity/expression or any other legally protected status.
- Treat detained suspects with respect and courtesy. Suspects may only be processed in a private location inside the facility. Make the detained suspect as comfortable as possible under the circumstances.
- Take personal responsibility. Do not violate AP-09, even if directed to do so. If you observe or become aware of this policy being violated you are required to report the incident to the market asset protection manager and regional asset protection director for the facility.

In most cases, proper surveillance, investigation and detention techniques will reduce the possibility of confrontations leading to the risk of injuries to our associates, customers and suspects while still achieving the goals of asset protection. This guide provides information and tools to assist you with your understanding of the company's expectations with regard to the proper handling of potential shoplifting incidents. For ease of use, it is divided into seven sections:

- Section 100. AP-09 Supplemental Investigation and Detention Guide
- Section 101. Lease Space Process Control and AP Guidelines
- Section 102. Guidelines for the Investigation of Financial Crimes
- Section 200. Civil Recovery





EXHIBIT 6

Osborne- 11/18/21

Huseby.com

March 19, 2018

WM-OSBORNE0000274



- Section 300. Investigative Report
- Section 400. Collection, Handling & Preservation of Evidence
- Section 500. Asset Protection Files
- Section 600. Court
- Section 700. Key Terms.

In order to make best use of the guide, you must first be thoroughly familiar with the AP-09 policy.

| Walmart's Right To Investigate And Detain Shoplifters | **What is shoplifting?**<br><br>Shoplifting is the criminal offense of stealing merchandise displayed for sale within a retail business establishment. Essential elements of the offense include (1) willfully taking possession of merchandise offered for sale, (2) with the intention of converting the merchandise to the taker's own use, (3) without paying the purchase price of the merchandise.<br><br>**Reasonable or Probable Cause to Investigate and Detain Shoplifters**<br><br>Walmart is considered a "merchant" under state laws. Merchants are permitted by state laws known as "merchant privilege statutes" to investigate and detain shoplifting suspects for possible referral to law enforcement authorities. This right to investigate and detain suspects is commonly referred to as the "merchant's privilege." Merchant's privilege statutes may provide you and Walmart with limited legal defenses against certain legal claims, provided you (1) have reasonable and probable cause to conduct a shoplifting investigation; (2) detain the subject in a reasonable manner; and (3) detain the subject for a reasonable amount of time. The rules and procedures set forth in AP-09 are designed to meet or exceed the requirements of state merchant privilege statutes. |
|---|---|
| Basic Components Of A Shoplifting Incident | A shoplifting investigation and detention generally involves all or most of the following components:<br><br><ul><li>Suspicious behavior</li><li>An unlawful taking</li><li>Approaching the Suspect and investigating the unlawful behavior</li><li>Detention</li><li>Administratively processing the Suspect</li><li>Releasing or referring the Suspect to Law Enforcement authorities</li><li>Investigative report</li></ul> |
| | This guide explains each of these components, as well as discussing other relevant matters. |



WM-OSBORNE0000275

| Take Personal Responsibility | Do not violate this policy, even if directed to do so.

If you observe or become aware of this policy being violated, immediately notify the market asset protection manager and regional asset protection director for the facility.

If you are aware of become aware of a detention or attempted detention which results in physical contact between a customer and an associate beyond light physical contact, as defined under "Authorized Methods of Detention" of this policy, you are required to immediately report the incident to the market asset protection manager and regional asset protection director for the facility. |
|---|---|
| Identifying Shoplifting Suspects | **Policy**

*Any person in a facility who engages in behavior that reasonably suggests that the person may be attempting to shoplift ("suspicious behavior") may be considered a suspected shoplifter ("suspect") for the purpose of beginning surveillance under this policy. Authorized associates may themselves observe or rely on a report of suspicious behavior from any other associate, or third party for the purpose of identifying a suspect.*

***All associates not specified as an authorized associate may not participate in the surveillance, investigation and/or detention of a person suspected of or committing shoplifting except to; act as a witness to an investigation or detention from a safe distance; to provide an accurate statement of their observations while acting as a witness; and to contact law enforcement, emergency services, Walmart Asset Protection or Walmart store management.***

*Any associate not specified as an authorized associate that witnesses or is made aware of suspected criminal activity or violence within a facility should advise a member of Walmart Asset Protection or member of management of the incident and if necessary to protect the safety of themselves, other associates or customers, contact the appropriate law enforcement or emergency authorities.*

**Neither authorized associates nor any other associate may monitor or surveil a person based on race, color, religion, sex, pregnancy, national origin, age, disability, veteran status, sexual orientation, gender identity/expression or any other legally protected status.**

**Suspicious Behavior**

Each shoplifting incident must begin with a recordable observation of the suspect engaging in suspicious behavior. Suspicious behavior is conduct that would lead a reasonable person to suspect that a person was considering shoplifting. If you cannot specifically identify and describe the suspicious behavior, in which the suspect was engaged, you are not authorized to begin surveillance of the suspect.

This constitutes as your first element. |



WM-OSBORNE0000276



## Examples of Suspicious Behavior That May Warrant Surveillance

Depending on the circumstances, the following types of conduct by customers may constitute suspicious behavior that warrants surveillance:

- Opening merchandise packaging.
- Removing merchandise from packaging.
- Entering the facility with empty shopping bags.
- Wandering around the facility with large shopping bags, backpacks, open purses or duffel bags.
- Engaging in conversations that suggest they intend to steal merchandise.
- Transferring merchandise from the original container into another.
- Wearing out-of-season apparel, i.e., a winter coat during summer.
- Folding or condensing merchandise before payment is made
- Moving throughout the facility and reappearing at the same counter.
- Removing labels or price tags from merchandise.
- Changing or altering labels or price tags.
- Creating disturbances to distract facility personnel.
- Entering the facility with merchandise (apparently intended for return)
- Removing large quantities of a particular item from the shelf
- Intently studying the facility's security conditions rather than the merchandise being selected.

**Note:** These are merely examples of conduct that suggest an individual may intend to shoplift. Many suspects who intend to shoplift may not engage in any of these activities, while some honest customers may engage in these activities without any intention of stealing. That is why, before approaching a suspect, authorized associates must establish that an unlawful taking has occurred by observing the suspect complete **all** five elements.

**Photo Center Note:** Selection and concealment of processed film at the photo center does not necessarily constitute suspicious behavior. The customer may take prints to several different registers for payment within the facility, the prints may have been paid for prior to selection, or the facility may have provided the prints to the customer at no charge. Do not investigate and/or detain a customer solely based upon the selection and concealment of film or prints from the photo center.

**Pharmacy Note:** Selection and concealment of prescription medication from the pharmacy does not necessarily constitute suspicious behavior. The customer may take their prescription to another register for payment, the prescription may have been paid for prior to selection, or the prescription may have been given to the customer with no charge. As a result, do not investigate and/or detain a customer solely based upon the selection and concealment of prescription medication from the pharmacy. The following procedures within



WM-OSBORNE0000277



the pharmacy will give you a basic understanding of how these conditions may occur:

**Front Lane Scanning** - Customers have the option to pay for most prescriptions (under $100) at any register after the prescription is released from TaSCO. If a prescription released for front lane scanning appears on the POS Pending Action Required Report as unpaid, stores should follow procedures as outlined in the Pharmacy Operations Manual section 508 (POM 508).

**Easy Pay** – The Easy Pay program retains a customer's credit/debit card information on file to enable quick and easy prescription purchases. An Easy Pay customer can opt to charge their Easy Pay account when their order is checked out through TaSCO. TaSCO processes the amount due to the credit card on file. The register process is eliminated. Additional information can be found in the Pharmacy Operations Manual section 1806 (POM 1806).

**Partial Fill** – When there is insufficient quantity to fill the prescription, the pharmacy may dispense an initial partial fill for the customer. At that time, the third party payer will not be billed for the medication that is initially delivered to the customer. When the customer returns for the remainder of their order, a claim for the entire amount of the prescription will be submitted to the appropriate third party payer. Additional information can be found in the Pharmacy Operations Manual section 1704 (POM 1704).

**Scan & Go (Scan & Go Stores Only)**
Go is a unique program which enables customers to scan merchandise into an electronic basket in the Walmart application on their Smartphone or on a store provided handheld device. These customers may bag the merchandise themselves as they shop. The customer will then transfer their electronic basket to the register in order to complete the transaction. Payments can be made on their Smartphone but, must be completed at a register using a unique barcode provided when payment is selected on the phone.  Customers using the handheld device must transfer the cart to a Scan and Go register to complete the transaction.  Comprehensive program information is available on the WIRE for stores on this program. Due to the uniqueness of this program, caution must be used when encountering possible apprehension situations for Scan & Go customers.

Below are a few situations which may be encountered with this program.

**Note:**  Walmart US AP Only – Refer to AP-09 Section 103 for further instruction on dealing with unique Scan and Go situations

- Customers may bring their own shopping bag(s) into the store to use while shopping (re-useable bags, freezer bags, plastic bags, etc.); therefore one may observe a customer putting merchandise into their bags as they shop.
    - Be cautious when identifying suspicious behavior. A customer who appears to be concealing merchandise may simply be bagging an item after scanning it with their smartphone.



WM-OSBORNE0000278

- All five AP-09 elements are required before an approach or apprehension can be made.

- After shopping and while processing payment at the checkout, customers MAY be systematically selected for a Quality Check. Only system generated Quality Checks are permitted. The SCO Host or CSM will receive the alert for the audit on their handheld device. There is no need to document or log quality checks manually. The system automatically logs quality checks.

  - The customer, unless systematically flagged for a Quality Check, will process payment and depart the store.
  - If systematically selected for a Quality Check, the designated associate at the checkout area will conduct the Quality Check. If, during the Quality Check, merchandise is found that is not part of the customer's purchase, the associate conducting the Quality Check will explain to the customer that particular item was not on the transaction and will politely ask if the customer wants to add the item. If so, the item is simply added to the transaction. If not, the item is returned to the shelf and the Quality Check continues as systematically directed.
  - All five AP-09 elements are required to make an approach or apprehension. **Finding items(s) that have not been paid for during the Quality Check does not justify a shoplifting approach or apprehension.**
- A Customer is observed selecting merchandise and clearly and obviously is not scanning some or all the item(s) for payment.
  - If the customer proceeds to checkout and processes payment, no further action is necessary or required.
  - All five AP-09 elements are required before an approach or apprehension can be made.

**Note:** Walmart US AP Only – Refer to AP-09 Section 103 for further instruction on dealing with unique Scan and Go situations.

| Conducting Surveillance In Order To Establish That An Unlawful Taking Has Occurred | **Policy**<br><br>*The purpose of surveillance is to observe a Suspect engage in an "unlawful taking."*<br><br>An "unlawful taking" has occurred when one or more Authorized Associates have observed a suspect taking the merchandise of a facility by committing each of the five elements. The five elements are alert signal, selection, concealment/dispossession, continued possession of merchandise, and passing the last point of sale.<br><br>**Note:** By verifying that a suspect has completed the five elements, an authorized associate establishes the reasonable basis to approach and investigate the unlawful taking of merchandise by that suspect. |
| --- | --- |



WM-OSBORNE0000279



| The Five Elements | 1. **Alert Signal**<br>A report of suspicious behavior |
|---|---|

1. **Alert Signal**
A report of suspicious behavior

2. **Selection**
The suspect must select and take possession of the facility's merchandise.

**Note:** A customer may bring personal property into a facility in order to compare that item to similar Walmart merchandise. For example, a customer may take an I-Pad, cell phone or toner cartridge out of a purse and compare it to merchandise on a shelf. An authorized associate should not mistake this action for selection.

3. **Concealment/Dispossession**
The suspect must either conceal or reasonably demonstrate the intent to steal the merchandise in their possession. An example of concealment is when a suspect places a box of video games into a backpack. An example of dispossession is when a suspect removes a tag from a leather coat.

**Note:** In some states, a merchant's observation of a suspect concealing merchandise is sufficient to establish the reasonable or probable cause legally needed to investigate or detain that suspect. Walmart, however, requires that all five elements of an unlawful taking be observed by an authorized associate prior to approaching a suspect.

Generally there are two types of shoplifters: amateurs and professionals. Both use common methods of concealment or dispossession in order to further their acts of theft. However, all shoplifters share the same objective: to illegally remove merchandise from the facility without detection. Below are common examples of concealment and dispossession by shoplifters:

- **Merchandise concealed in factory sealed boxes.** Shoplifters may remove the contents of a factory sealed box and replace the contents with merchandise of greater value. Shoplifters may even tape or glue the box shut making it appear factory new. Then they purchase the item, and pay for the lower priced item rather than the price of the item actually located on the box.

- **Merchandise Concealed in Clothing.** The use of modified clothing to assist in concealment of merchandise is common.
Coats, jackets, and sweaters may have modified interior pockets large enough to hold merchandise. Shoplifters may also conceal items by stuffing items into their pants, skirts, shirts, underwear, and shoes. A shoplifter may even use elastic girdles placed around the waist or thighs, or lodge merchandise between their legs. The shoplifter may also conceal apparel items under their own outer clothes and attempt to wear the merchandise out of the facility.



March 19, 2018

WM-OSBORNE0000280

Other shoplifters may simply put on an apparel item and leave without paying for it.

**Note:** Authorized associates shall not instruct a suspect to lift clothing or disrobe in an effort to locate concealed or stolen merchandise. Do not permit suspects to disrobe in order to demonstrate they are not in unlawful possession of facility merchandise. Walmart associates may never pat-down, frisk, or search a suspect. Only law enforcement may search a suspect's person.

- **Merchandise concealed in trash cans or plastic storage containers.** Shoplifters may conceal large or small amounts of merchandise within a trash can or plastic storage container and pay only for the trash can or storage container.

- **Merchandise concealed in purses.** Shoplifters may use their own purses or remove a purse from a facility rack to conceal items.

Often, a shoplifter will separate the small items away from other items by placing the small items next to a purse located in the child carrier portion of a shopping cart. An over-sized purse or a purse that appears "flat" or empty can become a storage place for unpaid merchandise.

**Note:** Never search the belongings of a suspect, such as purses, bags, or other containers. Even if a suspect requests an associate to reach into or open a suspect's belongings, the associate shall not empty, reach into, or otherwise search the belongings of a suspect.

- **Merchandise concealed in shopping bags.** A popular technique is to conceal merchandise within a shopping bag before leaving the facility. These bags can be shopping bags brought in from competitors, bags obtained from purchases made at a satellite register, or even empty Walmart bags brought into the facility and concealed on the suspect. Some shoplifters will take a fraudulent receipt; either brought in or found in the facility, and staple it to the bag. Other types of bags may also be used such as diaper bags and backpacks.

- **Other devices for concealing merchandise** Professional shoplifters may use any number of devices to conceal or steal merchandise. For example, shoplifters may use fake arm slings, empty boxes, trash cans, newspapers, umbrellas or even wheel chairs to conceal merchandise.

- **Tools/ techniques used to avoid EAS detection**
  - Shoplifters may use tools or "theft detection device removers" to remove theft detection tags or devices from merchandise.
  - Pocket knives and box cutters may be used to remove an item from packaging containing an EAS tag.
  - Shoplifters may carry bags or containers that are laminated, coated or lined with foil in an attempt to defeat EAS systems.

- **Ticket/price switching.** Professional shoplifters may attempt to remove a price tag or bar code from one item of merchandise and switch it with a tag on a higher priced item.



WM-OSBORNE0000281



These items may lead to a case of "your word against their word." With that in mind, if you observe ticket/price switching, consider requesting an associate to exercise aggressive hospitality in order to deter the activity or conduct a price check at the register.

**Note**: In order to prove the criminal intent of suspects that engage in this type of activity, check for additional witnesses, CCTV camera footage or PTZ footage of the act of ticket/ price switching.

• **Impersonators.** A shoplifter may assume the identity of another individual and commit theft. Sometimes an impersonator may act as an agent of a supplier pretending to remove merchandise for credit. Professionals may go as far as dressing in uniform styled clothing, attempt to wear a company name badge or vest and claim to be transferring merchandise to another facility.

• **Restroom/fitting room concealments**. A shoplifter may select merchandise and take it to a restroom or fitting room for concealment. In many cases, it is difficult to determine if the Suspect has continued possession of the merchandise. Pro-active customer service should be exercised rather than a shoplifting investigation or detention. If possible, prevent the suspect from entering the fitting room or restroom with merchandise by simply stating that merchandise should not be taken into the restroom/ fitting rooms.

**Note:** Customers maintain an expectation of privacy while inside a restroom or fitting room. Do not approach, investigate, or detain a suspect within a restroom or fitting room. Further, if a suspect enters a restroom or fitting room with selected merchandise, visual contact has been lost and all five elements must be re-established. Video surveillance is NEVER permitted within a restroom or a fitting room.

### 4. Continued Possession of Merchandise

After observing concealment and/or dispossession, the authorized associate must maintain visual contact with the suspect in a manner sufficient to conclude that the suspect still has possession of the merchandise, until they pass the last point of sale.

The use of the term "sufficient to conclude" acknowledges that in some circumstances it will be impossible to maintain visual contact with a suspect throughout every second of the surveillance; however, visual contact must be sufficiently rigorous and continuous so that a reasonable person would expect to find the merchandise in the possession of the suspect at the time the suspect is approached. You must use common sense, experience, and good judgment to decide whether surveillance has been sufficiently interrupted to allow the suspect an opportunity to abandon the selected merchandise unobserved. If the suspect has had a reasonable opportunity to abandon the selected merchandise unobserved, you are no longer in a position to conclude that the suspect has continued possession and may not approach the suspect however, you may approach to provide pro-active customer service.



WM-OSBORNE0000282

**Example:** An assistant manager has observed selection and concealment, is following a suspect down an aisle. Just as the suspect turns the corner, an insistent customer stops the assistant manager and asks a question. The encounter takes just 15 seconds. The assistant manager then proceeds down the aisle, turns the corner, and tries to find the suspect by looking down aisles as he passes by. The assistant manager eventually locates the suspect, who is now midway down an aisle, three rows past where the assistant manager last had visual contact with the suspect. The suspect now appears to be studying merchandise in that aisle. The total interruption in visual contact was no more than 45 seconds. **Result:** The suspect has had a reasonable opportunity to abandon the concealed merchandise unobserved. The assistant manager can no longer conclude that the suspect still has possession of the merchandise.

**Note:** If you ever come to reasonably doubt that the suspect still has possession of the selected merchandise, you may not approach the suspect, unless another unlawful taking is observed

### 5. Passing Last Point of Sale

The suspect must pass the last point of sale, fail to pay for the merchandise, and enter the vestibule or final point of exit. If a sidewalk sale with a register outside the vestibule occurs, then the store must work with the MAPM to establish a protocol for the duration of the sidewalk sale.

Criminal intent is more easily established in court when evidence is presented demonstrating that a suspect, in addition to concealment or dispossession, passed the last point of sale without paying for merchandise.

## Confirming All Five Elements Are Present

Authorized associates must establish that a suspect has completed all five elements of an unlawful taking prior to approaching the suspect for investigation. These five elements help 1) establish the reasonable basis to believe a suspect is attempting to unlawfully remove merchandise from the facility and 2) justify the approach of a suspect for investigation.

If you lack concealment/dispossession or continued possession of the merchandise, exercise pro-active customer service prior to the customer reaching the last point of sale. In such a situation, there must not be any accusation of theft, concealment, or any other statement made that would suggest the suspect is attempting to shoplift

Note: Under no circumstances does the word of an associate not fitting the definition of an "authorized associate" in the AP-09 policy or a customer establish any of the elements.



**Walmart** ❊
Save money. Live better.

| | |
|---|---|
| | **Example:** A department manager in electronics informs you that she witnessed a customer conceal two DVDs under his jacket. You maintain visual surveillance and see no other unusual activity. The customer passes the last point of sale and enters the vestibule. You may not approach the individual as you did not witness either selection or concealment and you many not rely on the word of an hourly department manager to establish the two elements. This department manager is not an authorized associate as described in AP-09. |
| | **Example:** A customer in the health and beauty aids section of your facility tells you that a customer in a large coat is "stuffing his pockets with merchandise in the next aisle." You proceed to the next aisle and see a customer wearing a large coat. As you observe this customer, you do not notice any suspicious behavior, the customer heads to the register, pays for his items, and leaves the facility. You may not approach this customer because you did not witness selection or concealment and you may not rely on the word of the customer to establish these two elements. |
| **Additional Authorized Methods** | **Collaboration Among Authorized Associates**<br><br>*Authorized associates may surveil a suspect alone or work with other authorized associates to conduct surveillance first hand. Walmart video surveillance may only be used to obtain the five elements required by this policy when working with another authorized associate.* There are two methods by which authorized associates may collaborate on the five elements.<br><br>**Pan/Tilt/Zoom ("PTZ") Surveillance**<br>Authorized associates operating PTZ equipment may obtain three of the five elements of an unlawful taking: alert signal, selection and concealment. The PTZ operator may radio these observations by "walkie" to another authorized associate on the salesfloor who may assist in the continued surveillance and investigation of a suspect.<br><br>    **Example:** You are working in a facility with a PTZ camera system and the operator of the system, who is an authorized associate, summons you and states they just witnessed, and recorded on video, the alert signal, selection and concealment of a video gaming system. You find the individual by the instructions of the PTZ operator, maintain visual surveillance, observe the suspect maintain continued possession of the merchandise, and observe the suspect pass the last point of sale and enter the vestibule or last point of exit. In this case, you are in collaboration with another trained authorized associate who also maintained video documentation of the first three elements. The PTZ operator assisted you in maintaining surveillance allowing you to properly approach a suspect and investigate the matter.<br><br>**Note**. Remember, observing the actions of a shoplifting suspect via PTZ CCTV requires that the video of the elements must be preserved as evidence. The video images of the suspect must be transferred to a CD and maintained in the investigation file of the suspect. |


**Walmart** ❊
Asset Protection

March 19, 2018

WM-OSBORNE0000284

**Visual Surveillance By Multiple Associates**

Authorized associates collaborate during surveillance of a suspect to establish that the suspect has completed all five elements. The following types of collaboration are authorized:

> • A report of suspicious behavior (alert signal) by any associate may be sufficient to begin surveillance of a suspect. However, you may not rely on the word of an unauthorized associate to establish any of the remaining four elements.
>
> • An authorized associate who has personally observed selection and concealment/dispossession may hand off the suspect to another authorized associate for the purpose of verifying continued possession. Additionally, authorized associates may join the surveillance and approach.

The authorized associate who approaches and investigates the suspect is responsible for writing the investigative report. The investigative report must identify all associates who collaborate and specify which associates verified which elements.

**The Accomplice**

Professional shoplifters frequently operate with one or more skilled accomplices. An accomplice may distract associates, while the professional thief goes to another area of the facility to begin the process of stealing merchandise. A distraction may occur at any time during your attempt to establish the five elements. Accomplices may create disturbances, such as:

- Pretending to faint.
- Pretending to shoplift.
- Acting as a shield to prevent visual surveillance.
- Asking questions about merchandise.
- Requesting your assistance away from the actual shoplifter.

Do not approach an accomplice, unless the accomplice actively participates in both the selection and concealment/dispossession of merchandise and remains in the company of the suspect as the suspect passes the last point of sale and enters the vestibule. In other words, for the purposes of the five elements, the accomplice must be working so closely with the suspect, that the only meaningful difference between the two at the time of approach is that the suspect has possession of the merchandise and the accomplice does not.

> **Example 1:** An APA observes two suspects loitering at an aisle, looking around nervously. Suspect A suggestively, but discretely points first at an item and then at suspect B's pocket. Suspect B nods, "yes." Suspect B spreads her jacket slightly to cover suspect A, as suspect A puts the item in her pocket. They immediately proceed together, past the cash registers to the vestibule where the APA approaches. Result: APA properly approached both because they actively participated in the selection and concealment of the merchandise and both accompanied



WM-OSBORNE0000285

**Walmart** Save money. Live better.

the merchandise past the last point of sale into the vestibule. The only practical difference is one carried the merchandise and one did not.

**Example 2:** Same as above except after concealing the item, the suspects part ways and proceed separately past the last point of sale towards different exits. Both are approached. Suspect A has merchandise; suspect B does not. Result: Suspect A was properly detained because all five elements were observed. Suspect B was not properly approached because authorized associates did not observe suspect B remain in the company of the Suspect A as the suspect passes the last point of sale and enters the vestibule.

**Note:** Be observant of suspects who may pass stolen merchandise to a second person. When you see partners in action, always maintain visual surveillance of the suspect who possesses the merchandise.

Only accomplices that actively participate in the unlawful taking should be detained and entered into APIS as suspect. Remember that a suspect may conceal or steal merchandise without the knowledge of the person accompanying the thief. If the person accompanying the suspect did not actively engage in the unlawful taking, they should not be approached.

| Approaching & Investigating Suspects | **Policy** |
|---|---|
| | *An authorized associate may approach a suspect to investigate an unlawful taking only if an authorized associate has observed all five elements in accordance with this policy. At least one other associate (must be 18 years or older) must be present as a witness during the approach and any resulting investigation. The associate witness must remain a safe distance from the approach and investigation while maintaining the ability to see and hear the interaction between the authorized associate and the suspect. During an approach and investigation, the associate witness is not required to be the same gender as the suspect. However, if the suspect is detained, an associate witness, 18 years or older and the same gender as the suspect, must be present from the time of detention until the suspect leaves the store. The purpose of the investigation is to verify that the suspect is in possession of the facility's merchandise, has not paid for the merchandise, and does not have a reasonable explanation for passing the last point of sale and entering the vestibule or final point of exit.* |
| | **Approaching the Suspected Shoplifter** |
| | It is critical that you approach each suspect properly, in a reasonable manner that is appropriate to the circumstances. Below are step-by-step instructions on how to approach a suspect in a manner that maintains respect for the individual and will minimize the possibility of a verbal or physical confrontation |
| | There is no way to know how each approach will unfold. Accordingly, to deal with the varying circumstances you may encounter, it is essential that you always address each approach with the proper attitude: |



**Walmart**
Asset Protection

March 19, 2018

WM-OSBORNE0000286

- Demonstrate Respect for the Individual.
- Be Sure.
- Be Firm.
- Be Positive.
- Be Professional.
- Be Polite.

The authorized associate investigating the unlawful taking must follow these steps:

- Approach the suspect with an associate witness present.
- Disclose the authorized associate's name and job title to the suspect.
- Explain the reason that the authorized associate approached the suspect.
- Attempt to verify that the suspect is in possession of facility merchandise that was not purchased.
- Listen to any explanation the suspect may offer for having possession of the merchandise.
- Decide whether to detain the suspect, in accordance with this policy, based on a reasonable evaluation of the available facts.

Associates should NEVER imply physical touching will be utilized when investigating or detaining a suspect. For example, it is improper to make a statement to a suspect such as, "We could do this the easy way or we could do this the hard way." This implies the potential of a physical confrontation if the suspect does not comply. The authorized associate should attempt to gain voluntary compliance from the suspect by explaining that we are investigating observations of the suspect within the facility.

**Step One:  Approach the Suspect**
- Do not approach unless an associate witness over the age of 18 is present.
- Address the suspect politely and directly.
- Never verbally accuse the suspect of a criminal act while approaching.

**Step Two: Disclose the Authorized Associate's Name and Job Title to the Suspect**

- Display Walmart name badge.
- Be discreet when addressing the individual.
- The following is an example of an identification statement.
  - "Sir/Ma'am, my name is '_____'. I am an asset protection associate for this Walmart facility."

**Note:** Never embarrass, harass or intimidate a shoplifting suspect.

**Step Three:  Explain the Reason for Approaching the Suspect**

- "I would like to discuss your actions that I observed in the _____department or inside the facility."


Walmart Asset Protection

March 19, 2018

WM-OSBORNE0000287

**Step Four: Attempt to verify that the Suspect is in Possession of Facility Merchandise for which the Suspect Has Not Paid**

Ask the suspect for the merchandise that has not been paid for. The suspect may admit to the theft and voluntarily relinquish the merchandise. On the other hand, if a suspect questions or takes issue with your reason for approach and investigation, it may be necessary to discreetly identify the merchandise which is the subject of the unlawful taking and identify the location of the item on the suspect in order to encourage cooperation.

**Note:** If the suspect does not voluntarily relinquish the merchandise subject to the unlawful taking, politely and discreetly request the suspect to voluntarily give the merchandise to you. You should attempt to obtain at least one item of merchandise prior to directing the suspect to the detention office, if it will not result in embarrassment to the suspect, based on the location of the concealed merchandise. It is not necessary to obtain every single item of merchandise outside of the facility. Keep in mind, the suspect may relinquish the merchandise voluntarily once inside the facility during processing or to local law enforcement.

> **Example:** At the time of the approach, you reasonably believe that the suspect possesses concealed merchandise inside their shirt. You may not demand that the suspect remove his or her clothes. In fact, you should not permit suspects to disrobe in order to demonstrate they do not have selected merchandise. If a suspect voluntarily disrobes or attempts to disrobe, you must immediately instruct the suspect to clothe themselves.

**Step Five: Listen to the Explanation the Suspect May Offer for Having Possession of Facility's Merchandise or any Other Aspect of the Unlawful Taking**

If the suspect would like to discuss this matter with you, let them explain. The suspect may be able to explain his or her actions and demonstrate that the incident is a misunderstanding. Offer to discuss the matter away from public view. Remember, it may only require a limited investigation to verify a suspect's explanation. For example, a suspect may produce a valid receipt for the subject items, the suspect may prove he or she owns the subject item or the suspect may demonstrate that the subject of the unlawful taking is not merchandise sold by Walmart.

**Note:** If the investigation at any point reasonably leads the authorized associate investigating the unlawful taking, to doubt that the suspect has unlawful possession of the facility's merchandise, the authorized associate must terminate the investigation.

**Step Six: Decide Whether to Detain the Suspect, Based on a Reasonable Evaluation of the Available Facts**

If you reasonably doubt that the suspect unlawfully possesses Facility merchandise or the suspect demonstrates a misunderstanding, you must terminate the investigation. The following is an example of a statement to be made in a situation when the authorized associate decides to terminate the investigation and release the suspect:



March 19, 2018

WM-OSBORNE0000288



"Thank you for your time and your cooperation. We regret any inconvenience."

You should make no further comments without discussing the matter with your supervisor. Facility management and your market asset protection manager **must** be contacted immediately regarding any such customer contact. If unable to contact your MAPM, you must report the event to the regional asset protection director (RAPD).

If you are asked by the individual to give your name, simply state, "My name is _____. I am an associate of Walmart's Asset Protection Division. My supervisor's name is _____. He/she can be contacted by calling _____".

An Investigative Report, concerning all details of the event, must be completed immediately and forwarded to your market asset protection manager. This report includes any statements from witnesses present during the initial customer contact.

*If you are aware or become aware of a detention or attempted detention, which results in physical contact between a customer and an associate beyond physical redirection as defined under Authorized Methods of Detention in the AP-09 policy, you are required to immediately report the incident to the market asset protection manager and regional asset protection director for the facility.*

**PUT PEOPLE FIRST. Protecting the physical well-being of Suspects, customers, and Walmart associates is your first priority.** Only non- aggressive methods may be used when investigating suspects. To minimize the risk of physical injury to associates, customers and suspects:

- Maintain a calm, confident, and professional demeanor.
- If at any time it appears that the suspect is under the influence of drugs or alcohol, the suspect must not be approached. If at any time during an approach or investigation it appears that that the suspect is under the influence of drugs or alcohol, all associates must **disengage** from the situation, **withdraw** to a safe position and **contact law enforcement**.
- If the suspect is **believed to possess a weapon**, the suspect **must not** be approached. If during an approach or investigation, it becomes apparent that the suspect has a weapon or brandishes or threatens use of a weapon; all associates **must disengage** from the situation, **withdraw** to a safe position and **contact law enforcement**.
- If at any point the suspect or any other involved person becomes violent, disengage from the confrontation, withdraw to a safe position, and contact law enforcement.
- If at any point the suspect or any other involved person exerts physical resistance, associates may only defend themselves or others to the extent necessary to disengage the suspect and withdraw from the situation. After disengaging, associates should contact law enforcement.
- During the approach, maintain enough distance from the suspect and any other involved parties to ensure your safety.



March 19, 2018

WM-OSBORNE0000289



* The use of any object or equipment to limit or control the movements of the suspect or to block the suspect from leaving the facility is not allowed.

If the investigation at any point reasonably leads the authorized associate investigating the unlawful taking to doubt that the suspect has unlawful possession of the facility's merchandise, the authorized associate must terminate the investigation. See state specific drop down box within the AP-09 policy for state specific information that may apply.

Associate Witness is Required in Order to Approach

After establishing all five elements, an authorized associate may approach a suspect to investigate an unlawful taking, but only if at least one other associate is present. Another authorized associate or a facility management associate is preferred to be a witness. Associates under the age of 18 may never serve as a witness. Having a witness enhances the safety of all persons involved because a suspect is less likely to become violent or create a disturbance. The presence of the witness also enhances the overall integrity of the investigation because the witness can corroborate the conduct of other associates and refute any false allegations from the suspect.

Associate witnesses must remain a safe distance from the approach and investigation while maintaining the ability to see and hear the interaction between the authorized associate and the suspect.

Note: You should establish a code with your facility that can be communicated via "walkie" which will alert management that an investigation of a suspected shoplifter is in progress and that a witness is needed for the approach of the suspect.

Evaluating the Potential for a Hostile Confrontation Before Approaching

Authorized associates should be alert for behavior that suggests that an approach of a suspect could turn hostile. Although not exhaustive, any of these examples of behaviors might indicate a potential violent situation:

• The suspect is accompanied by other individuals.

• The suspect's attitude or demeanor suggests the suspect might react with hostility. Factors that might be considered include tone of voice, facial expressions, physical mannerisms (such as clenched fists), or a bold, almost provocative failure to hide the fact that the suspect is stealing.

• Pay attention to suspect's eyes. If they are looking for an exit strategy or appear to be surveying the situation, they may be making a determination on how to react.



WM-OSBORNE0000290

**Walmart**
Save money. Live better.

- Be aware of any signs that the suspect may be under the influence of alcohol or intoxicating drugs that would diminish their normal inhibitions. Examples of warning signs include: slurred speech, loud or boisterous behavior, bloodshot or watery eyes, erratic physical mannerisms, or the smell of alcohol.

- The suspect ignores an authorized associate during the approach and walks away

- The suspect possesses any item that could be used as a weapon, such as a knife, screwdriver, box cutter, etc.

- The suspect engages in conduct or makes statements that suggest or imply the suspect may be carrying a weapon. For example, the suspect refuses to remove his or her hands from their pockets.

**Note**: If the suspect is believed to possess a weapon, the suspect must not be approached. If during an approach or investigation, it becomes apparent that the suspect has a weapon or brandishes or threatens use of a weapon; all associates must disengage from the situation, withdraw to a safe position, and contact law enforcement.

If at any time it appears that that the suspect is under the influence of drugs or alcohol, disengage from the situation, withdraw to a safe position, and contact law enforcement.

**A weapon includes:**

**Weapons by Design:** A weapon by design is an instrument that was designed for the purpose of seriously injuring or killing human beings, such as a handgun, switchblade or bomb.

**Weapons by Use:** A weapon by use is an instrument that was not designed for the purpose of injuring or killing human beings, but which a suspect brandishes or uses for that purpose. For example, a suspect could use a baseball bat, box cutter, screwdriver, scissors, kitchen knife or even an ordinary steam iron.

**Note:** Verbal threats or insults are not justification to utilize physical means of self-defense. However, if a suspect or other individual makes threats or takes actions that create a reasonable expectation of physical harm to the associate, the associate must disengage from the suspect.

**Suggested Countermeasures to Diffuse Hostile Situations (De- Escalation)**

- Always engage the suspect with a calm, confident and professional tone.
- At least one other associate (must be 18 years or older) must be present as a witness during the approach and any resulting investigation. Be prepared for the worst when conducting an approach. Maintain enough distance (arm's length) from the suspect and any other involved parties to ensure your safety.
- Make initial contact with the suspect face to face.
- Do not place yourself directly in front of the suspect. If possible, position yourself to the front of the suspect by at least one step to the side.


**Walmart**
Asset Protection

WM-OSBORNE0000291

**Walmart**
Save money. Live better.

- Never be dishonest, but minimize the consequences that the suspect is about to face.
- Be aware of your surroundings (who and what is around you).
- Minimize any potentially dangerous objects or persons from the area.
- Summon local authorities pursuant to AP-09.

**Note:** Terminate the approach or detention of a suspect whenever you come to believe that the circumstances justify terminating the approach or detention. Remember to use caution. Make your first priority your safety and the safety of other associates, customers and the suspect.

| | |
|---|---|
| **Detention Policy** | *If an authorized associate investigating an unlawful taking determines that a suspect has stolen merchandise from the facility, the authorized associates may detain the suspect, in a reasonable manner, for a reasonable period of time, using only those methods of detention authorized in this policy ("Authorized Detention Methods"). The purpose of detention is to enable an authorized associate to complete the investigation, retrieve the facility's merchandise, and/or refer the suspect to local law enforcement authorities.* |

*Authorized associates must follow AP-09 in determining whether detention is authorized and the manner in which to proceed.*

**Remember, protecting the physical well-being of Walmart associates, customers and suspects is your first priority.**

**Authorized Detention Methods**

The following methods of detention are authorized:

**Request:** *Authorized associates may ask a suspect to follow them to a detention area (no physical contact).*

**Verbal Command:** *Authorized associates may instruct a suspect to follow them to a detention area (no physical contact).*

**Physical Redirection:** *Initially, an authorized associate should motion in a non-aggressive manner in the direction they would like the suspect to proceed. For example, an open hand on the arm, shoulder or middle of the back of the suspect. If that is unsuccessful, the authorized associate may utilize respectful, light physical contact in directing the suspect toward the AP office or other location.*

**Request: a Verbal Request for Voluntary Cooperation**

This is the first authorized method of detention. A request means verbally securing the consent of the suspect to cooperate in an investigation and/or to accompany the authorized associate to any area of detention.

**Example:** "Sir, please accompany me to discuss this matter further?"



WM-OSBORNE0000292

**Verbal Command: a Verbal Instruction to Cooperate**

This is the second authorized method of detention. A verbal command means that an authorized associate has orally directed suspect to take some act or to proceed to a designated area of detention.

> **Example:** "Sir, you need to accompany me now to discuss this matter further."

**Physical Redirection: a non-aggressive physical redirection of the Suspect**

This is the third authorized method of detention. Physical redirection means that Authorized Associates should motion in a non-aggressive manner in the direction they would like a suspect to proceed. If this is unsuccessful, the authorized associate may utilize respectful, light physical contact in directing the suspect toward the AP office or other location.

**Example:** An open hand on the shoulder, arm, or middle of the back of the suspect directing them toward the AP office or other location.

| | |
|---|---|
| **Limitations On Detention Of Suspects** | **Detention Specifics**<br>If at any point during the investigation or detention of a suspect, the authorized associate reasonably doubts that an unlawful taking has occurred, the authorized associate must terminate the investigation or detention.<br><br>**Example:** An authorized associate puts the suspect under surveillance, when engaged in suspicious behavior. The associate should watch as the suspect completes the five elements of an unlawful taking. Pass the last point of sale, the authorized associate approaches the suspect and asks if he has an unpaid-for DVD in his right front pocket. The suspect denies taking any merchandise and voluntarily, without being asked, pulls both front pockets inside out. The suspect is not carrying any bags, there are no other pockets into which the DVD could logically fit, and the suspect is wearing a skin-tight tee shirt. There is a possibility that the suspect placed the DVD inside his waistline however, the associate's observation was that they suspect placed the DVD in his right front pocket. Even if the authorized associate is positive he saw the suspect place the DVD in his pants, the associate should release the suspect. Despite the associate's tight surveillance, the suspect may have abandoned the DVD without the associate noticing.<br><br>***PUT PEOPLE FIRST.*** *Protecting the physical well-being of Walmart associates, customers and suspects is your first priority.*<br><br>*If a suspect is believed to be under the influence of drugs or alcohol, the suspect must not be detained. If at any time it appears a detained suspect is under the influence of drugs or alcohol, ensure that you, all other associates and customers disengage from the situation, withdraw to a safe position, and immediately contact law enforcement.* |



March 19, 2018

WM-OSBORNE0000293

**Walmart**
Save money. Live better.

*If at any point, a detained suspect or any other involved person becomes violent, terminate your attempt to detain the suspect, disengage from the situation, withdraw to a safe position, and contact law enforcement.*

> **Example:** *A suspect is approached and immediately attempts or threatens to strike the authorized associate. The authorized associate must immediately disengage and withdraw from the situation without making any further attempt to approach or detain him or her. The authorized associate should document the unlawful taking and report it and the threatening behavior to law enforcement.*

*If a suspect is under the influence of drugs or alcohol, ensure that you, all other associates and customers disengage from the situation, withdraw to a safe position, and immediately contact law enforcement.*

*If at any point, a detained suspect or any other involved person becomes violent, terminate your attempt to detain the suspect, disengage from the situation, withdraw to a safe position, and contact law enforcement.*

> **Example:** A suspect is approached and immediately attempts or threatens to strike the authorized associate. The authorized associate must immediately disengage and withdraw from the situation without making any further attempt to approach or detain him or her. The authorized associate should document the unlawful taking and report it and the threatening behavior to law enforcement.

*If a detained suspect strikes or attacks any other person, associates may only defend themselves or others to the extent necessary to disengage a suspect, withdraw from the situation, and contact law enforcement.*

Associates are prohibited from striking or hitting a suspect for any reason, other than when absolutely required to defend themselves. To disengage from a situation, simply withdraw and go to a safe location.

> **Example 1:** Authorized associate approaches a suspect. The suspect yells, "Don't touch me!" and strikes the associate in the face, but takes no further action toward the associate. The associate must move away from the suspect to avoid further confrontation and call the police to report the assault.

> **Example 2:** Same as above. This time, however, the associate's back is to a wall and the suspect is advancing toward the associate with clenched fists. The associate may assume a defensive position, but must only engage in the least amount of physical confrontation necessary to protect him/her and must take advantage of the first opportunity to disengage from the situation and withdraw to a safe location.

*If a suspect is believed to possess a weapon, it becomes apparent that a suspect has a weapon, or brandishes or threatens use of a weapon, all associates must disengage from the situation, withdraw to a safe position, and contact law*



WM-OSBORNE0000294

*enforcement.*

If a suspect is observed using a knife or other sharp instrument during the concealment process and is believed to be in possession of that instrument after passing the last point of sale and proceeding to the vestibule or the last point of exit, the suspect should not be approached, investigated, or detained.

> **Note:** Some state laws permit the carrying of open or concealed firearms. Associates should not immediately summon local law enforcement. The customer may be carrying a weapon pursuant to local state laws; however, if this customer completes the five elements of an unlawful taking and also possesses a weapon, associates should document the incident and then contact local enforcement. Such a suspect should not be approached by any associate.

*Suspects may only be processed in a private location inside the facility.*

*An associate, 18 years and older and of the same gender as the detained suspect, must remain with the suspect at all times.*

***NEVER*** *search a suspect's belongings such as purses, bags, or other containers.*

If the suspect was observed concealing a number of items in their coat and voluntarily turns over a few items, but the authorized associate reasonably believes that more items are still concealed, law enforcement should be informed so that they can determine whether they will conduct any further search of the suspects' belongings.

***NEVER*** *pat down, frisk, or search a suspect. Suspects who voluntarily disrobe or attempt to disrobe must be instructed to immediately clothe themselves. Only law enforcement personnel may search a suspect's person.*

***ALWAYS HONOR*** *a suspect's request for medical attention or other reasonable requests, such as water.*

If a suspect claims to need to take any prescription medication that they have on their person, ask that they do not take it until law enforcement or emergency medical personnel are present. Immediately ask the suspect if they would like emergency medical personnel to be summoned.

**ALWAYS HONOR** a suspect's request that law enforcement personnel be summoned.

**ALWAYS HONOR** a minor suspect's request that parents or a guardian be summoned.

**ALWAYS SUMMON** medical personnel if any person experiences medical distress.

**TERMINATE** a detention after one hour, unless the facility manager in charge, market asset protection manager or regional asset protection director authorizes continued detention. Do not exceed the maximum period of


**Walmart**
Asset Protection

March 19, 2018

WM-OSBORNE0000295

detention allowed by state law, even if shorter than one hour.

**TERMINATE** the detention whenever a salaried manager in a position of authority greater than that of the authorized associate directs the authorized associate to terminate the detention, regardless of reason.

**NEVER** push, kick, or strike a suspect unless it is done in self-defense and only to the extent necessary to disengage a suspect, and withdraw from the situation.

**NEVER** tell suspect they cannot leave and/or that they are required to remain at the store.

**NEVER** use a chokehold or apply pressure to a suspect's head or neck.

**NEVER** place a suspect in a prone position (with the chest down and the backup), unless you are unable to safely disengage from an encounter and need to do so to prevent the suspect from committing a violent act. A suspect in the prone position should be constantly monitored and moved to a sitting or standing position as soon as reasonably possible.

**NEVER** use any type of device to restrain a suspect. Suspects may not be detained with any restraining device such as belts, handcuffs or zip ties.

**NEVER** attempt to physically re-capture a suspect who breaks free from physical restraint.

**NEVER** pursue a fleeing suspect beyond 10 feet from the place they began to run regardless of being inside or outside the facility.

**PUT PEOPLE FIRST**. Protecting the physical well-being of suspects, customers and Walmart associates is your first priority. Only non-aggressive methods may be used when investigating suspects.

If you observe or become aware of this policy being violated you are required to report the incident to the regional asset protection director for the facility.



March 19, 2018

WM-OSBORNE0000296

| Pursuit of Shoplifting Suspects Prohibited | **Pursuit of Shoplifting Suspects Prohibited**<br>Authorized Associates and Associate Witnesses are prohibited from going beyond the facility's sidewalk to make an approach or to obtain additional information regarding a Suspect.<br><br>**Example:** A license plate, direction of travel, etc. even if law enforcement directs doing so.<br><br>• In the absence of a sidewalk the MAPM will establish a designated boundary not to extend into the crosswalk or parking area.<br><br>Remember to put people first and remember the importance of safety. A suspect's vehicle may contain a weapon, may be a friend of the suspect, or it may begin moving.<br>• **DO NOT** follow a suspect in the parking lot, even if directed by law enforcement.<br>• **Do NOT** attempt to re-capture a suspect who breaks free from restraint.<br><br>*If an unlawful taking occurs and suspect is not detained, becomes violent, or flees, the authorized associate should contact law enforcement and enter the information into APIS as an incident.*<br><br>*DO NOT leave Walmart property to collect merchandise a suspect may have dropped or abandoned. Law enforcement should recover merchandise that has been dropped or abandoned off Walmart property.*<br><br>**Withdrawal**<br>*If a Suspect or any involved person becomes violent, all attempts to investigate and/or detain the suspect must discontinue and associates must disengage from the situation, withdraw to a safe position and contact law enforcement.*<br><br>*If a suspect is believed to possess a weapon or it becomes apparent that a suspect has a weapon or brandishes or threatens use of a weapon, all associates must disengage from the situation, withdraw to a safe position and contact law enforcement.*<br><br>***If a suspect strikes or attacks any other person, associates may only defend themselves or others to the extent necessary to disengage the suspect and withdraw from the situation. Law enforcement must be immediately contacted. Exercise good judgment to release suspects when unexpected facts arise.***<br><br>*If at any time it appears that that the suspect is under the influence of drugs or alcohol, disengage from the situation, withdraw to a safe position and contact law enforcement.*<br><br>*If at any point during the investigation or detention of a suspect, the authorized associate reasonably doubts that an unlawful taking has occurred, the authorized associate must terminate the investigation or detention.* |



WM-OSBORNE0000297

**Walmart** ⚡
Save money. Live better.

| Prohibited Activities | NEVER threaten physical harm to, or direct profanity at a suspect. |
|---|---|
| | NEVER use any type of device to restrain a suspect. |
| | NEVER attempt to remove a suspect from a vehicle or attempt to block a vehicle that is exiting. |
| | NEVER use a weapon or any other physical implement to hit or strike a suspect. |
| | NEVER strike or hit a suspect, unless in self-defense and in the course of disengaging the suspect. |
| | NEVER use a chokehold or apply pressure to a suspect's head or neck. |
| | NEVER attempt to re-capture a suspect who breaks free from restraint. |
| | If you observe or become aware of this policy being violated, immediately notify your market asset protection manager and your regional asset protection director. If you are aware or become aware of a detention or attempted detention which results in physical contact beyond physical redirection between a customer and an associate, you are required to immediately report the incident to the market asset protection manager and regional asset protection director for the facility. |
| **Summoning Local Authorities** | **Policy** |
| | Authorized associates must summon local law enforcement authorities whenever: |
| | (a)      anyone involved in the investigation or detention of a suspect experiences medical distress or requests emergency medical services; |
| | (b)      a suspect requests law enforcement authorities; |
| | (c)      a suspect is violent or threatens violence or attempts to flee detention; |
| | (d)      a suspect has a weapon or brandishes or threatens use of a weapon Or |
| | (e)      the facility manager or other manager in charge of the facility at the time makes the decision to prosecute the suspect. |
| | If an unlawful taking is reported to an authorized associate and it is later verified that an unlawful taking did occur, the authorized associate must discuss the matter with and receive approval from the asset protection manager, facility manager, or other manager in charge before law enforcement is contacted. |
| | Refer to the Investigation and Detention of Shoplifters Policy (AP-09) for state specific information that may apply to summoning local authorities. |



## Communication with the Shoplifter Suspect

Because you are not Law Enforcement, you do not legally place a suspect under arrest and there is no need to "read the suspect their rights." During the processing phase, your goal is to quickly investigate the alleged act of theft in order to determine if there is sufficient evidence to prove guilt of the suspect beyond a reasonable doubt and/or to summon local law enforcement to the scene to investigate and/or prosecute the shoplifting suspect. Ask questions that will allow you to:

- Ascertain that stolen merchandise is possessed by the suspect.
- Identify the suspect.
- Investigate or substantiate the alleged act of theft.
- Recover the merchandise.
- Establish that the suspect committed an unlawful taking of Walmart merchandise.
- If elements of Organized Retail Crime (ORC) exist, complete the ORC interview form on the WIRE.

*Note*: Certain states limit the questions that merchants may ask a shoplifting suspect. Refer to the Investigation and Detention of Shoplifters Policy (AP-09) for state specific information.

Never lecture a suspect. Your purpose in interviewing the suspect is to investigate an attempt to unlawfully remove merchandise from our premises and to recover, in a reasonable manner, all of the merchandise taken from the facility.

## Recovery of the Merchandise

It is the preferred practice to recover at least one item of merchandise, prior to re-entering the facility, if it will in no way cause embarrassment to the subject based on the location of the concealment. Once in the asset protection room or designated detention room with the appropriate witness, attempt to recover the remaining merchandise. This should be completed prior to initiating paperwork in regard to the incident.

Give direction to the suspect to place all of the items they have not paid for on the table or desk. If the suspect refuses to produce the concealed merchandise, you may decide to call for law enforcement assistance.

If you performed a thorough investigation of the suspect, you should be prepared to prosecute the suspect if you contact the authorities.

Hold all recovered merchandise for later processing. Refer to section 400 for proper evidence handling.

*Note*: Remember, if, at any time, you realize during the processing of the suspect that he or she did not shoplift merchandise from Walmart, discontinue the detention of the suspect and immediately release the suspect.



WM-OSBORNE0000299

**Investigative Report**

Collect information for the investigative report. Tell the suspect that you are going to need their full name and correct address. Tell them, "Before you give it to me, be aware that I will verify the information that you give me." At that point, ask the suspect to provide you with photo identification (ID) and verify the information on the ID by asking the individual questions as you fill out your report.

Document all aspects of the incident including the actions that show the suspect engaged in suspicious activity and each of the five elements.

**Photographing of Suspects**

Your facility should take photographs of every shoplifting suspect, who will be prosecuted, unless the shoplifting suspect is a juvenile or appears to be a juvenile, and picture identification is not available.

- Always show respect for the individual when taking photographs.
- Do not photograph shoplifting suspects under the age of 18. If you reasonably suspect a person is under 18 and you are unable to determine their age from a photo ID, do not take their photo.
- All shoplifting suspects to be photographed must complete the photography consent form. If the shoplifting suspect refuses to sign the consent form, then explain it is the policy of Walmart. If the shoplifting suspect continues to refuse, place a check in the box on the consent form, stating the shoplifting suspect refuses to sign the consent form, and print the shoplifting suspects name, print your name and sign your name, then file in the case folder pertaining to this case. (If a shoplifting suspect refuses to have their photograph taken you **may** use a DVR captured photograph for the file. The DVR captured photograph may be taken from any DVR camera shot. Any photographs captured from any shoplifting suspect, must be cropped or restricted to show only the person who is believed to be the shoplifting suspect. In a situation where this is not possible, efforts must be made to disguise the images of other individuals so that they cannot be recognized.)
- Shoplifting suspects must be photographed and processed in the same room.
- A witness must be present when a photograph is taken.
- Photographs must only be taken of shoplifting suspects who **will** be prosecuted.
- All shoplifting suspects must be photographed from the waist up, while they are standing and facing the camera against a plain wall.
- Photographs which are printed from a DVR, must be secured in the asset protection office in a locked filing cabinet and not removed from the office without the approval of the market asset protection manager. When sharing photographs, it should be indicated the reason for sharing the photo is for identification purposes, or to alert others of suspect activity. Each hard copy photograph must be labeled to include the shoplifting suspect's name, date of detention, APIS case number, printed name and signature of associate who made the photograph.



- DVR stores must not keep copies of photographs on file; they should all be uploaded into APIS and printed only if providing the photograph to law enforcement to file charges against a suspect or when requested by law enforcement. If the printing of a photograph is not related to current apprehension, the law enforcement request form must be utilized.
- Photographs must never be displayed for public view inside or outside the asset protection office.

### Reasonable Detention Period

Remember; you may only detain the suspect for a reasonable period of time, depending on the circumstances. If the police do not arrive within one hour after attempted contact, telephone them again and note the time of the second call. Based on the information received in the second call, consider the feasibility of further detention. Request the MAPM or facility management to make a decision regarding further detention. If the decision is made to release the suspect, make every attempt to verify the suspect's identity prior to their release.

> **Note:** Whenever a salaried manager in a position of authority, greater than that of the authorized associate, directs the authorized associate to terminate the detention, regardless of the reason, the request must be followed through.

> **Note:** If the police do not arrive within a reasonable period of time or within the requirements of the state, the suspect may be told that it has been (the amount of time) since the police were summoned and unknown how much longer it will be until police arrive. If the suspect asks if he/she can leave, let them know that WM cannot advise them of whether they can, but that all of the information surrounding the incident, including their contact information will be provided to the police to support criminal charges. Document this communication and whether the suspect chose to leave.

### Suspect Request for Medical Attention

In some cases, a suspect may inform you that they feel ill and request medical attention.

Immediately call for assistance, even if you feel they are being untruthful. Should the suspect request a glass of water, or to use the restroom, you should make every effort to accommodate them. While you should be cautious to ensure that the suspect does not try to harm themselves or others, you should attempt to grant such reasonable requests.

### Civil Recovery

Refer to section 200 of the Investigation and Detention of Shoplifters Guide Policy (AP-09) for state specific information.



| Prosecuting Shoplifters | **Policy** |
|---|---|
| | *The facility should prosecute a suspect only if he or she believes in good faith that the facility possesses sufficient evidence to prove guilt of the suspect beyond a reasonable doubt and:* |

**A**
*The retail value of all merchandise recovered exceeds $25.00, and the suspect is at or between the ages of 16 and 65.*

**OR B**
*Except where prohibited by state law, a suspect between or at the ages of 16 to 65 fails to produce a valid government I.D. or school I.D., regardless of the value of the merchandise recovered.*

**OR C**
*The suspect is a repeat shoplifter at a Walmart facility, regardless of the value of the merchandise taken or age of the suspect.*

**OR D**
*The suspect committed, or threatened violence, regardless of the value of the merchandise or the age of the suspect.*

***Note:*** *If your store participates in a restorative justice program, follow the guidelines as outlined in the training guide to determine if the Suspect qualifies for the program before contacting Law Enforcement.*

**Signing the Criminal Complaint**
When the decision is made to prosecute a suspect, contact the local authorities. Always allow local law enforcement to conduct an independent investigation of the incident. When summoned to the facility, the officer may elect to issue a citation to the subject. This citation is handled much the same way that a traffic citation is handled. The suspect Is released after the officer obtains a signature on a promise from the suspect to appear in court. The signing of the criminal complaint is crucial. Proceed on the assumption that it is the responsibility of the authorized associate who made the detention to ensure the complaint is signed. If an oversight occurs and the complaint is not signed, the charges against the suspect could be dismissed and the suspect may consider filing a future civil suit against you and the company.

**Note:** In any statement or writing provided to law enforcement, Walmart associates must always provide accurate, truthful, and factual information.

Once charges have been filed, only a vice-president or a senior director of Walmart asset protection can authorize recommending the dismissal of those charges to prosecuting authorities.

**Note:** Generally "victims" of crime, such as Walmart, cannot automatically dismiss or drop charges filed against a person. This is the decision of the prosecuting authorities.



| | |
|---|---|
| | *If an unlawful taking is reported to an authorized associate and it is later verified that an unlawful taking did occur, the authorized associate must discuss the matter with and receive approval from the asset protection manager, facility manager, or other manager in charge before law enforcement is contacted.*<br><br>In these situations, the authorized associate must compile all documentation and video of the incident confirming the unlawful taking and file a police report with local law enforcement. A criminal complaint should not be signed as the authorized associate might not have firsthand knowledge of all the actions resulting in the unlawful taking. Thus, the information is provided to law enforcement for their independent judgment of whether criminal charges should be filed. Associates must assist in the prosecution of the suspect if law enforcement makes the decision to do so. |
| **Release Of Adult Shoplifters vs. Prosecuting** | The facility shall make the decision as to whether charges should be initiated against a shoplifting suspect. Should there be disagreement or uncertainty as to the course of action to be pursued, facility management should confer with the market asset protection manager or regional asset protection director.<br><br>The facility may elect to release the shoplifting suspect (after recovering the merchandise), instead of having the individual arrested when extenuating circumstances suggest release rather than prosecution.<br>Some examples of circumstances warranting such action include the following:<br><br>• One or more of the elements required to prove intent to steal are missing.<br>• The observations of the witnesses are limited and they cannot be satisfied about all of the elements required to prove intent.<br>• The detained person appears to be incompetent.<br>• The subject does not meet the requirements of an accomplice who actively participated in the theft.<br>• If the suspect is under 16 or over 65<br>• If the dollar amount of the theft is under $25.00 and is not a repeat offender.<br><br>**Note**: Prosecute only those suspects whom you believe can  be proven guilty through testimony in court. |
| **Release Of Minor Suspects** | <u>Policy</u><br><br>*Unless state law requires a different procedure, authorized associates may release minor suspects only to their parent or guardian. If an authorized associate is unable to reach a minor suspect's parent or guardian within 30 minutes after detaining a minor suspect or if a parent or guardian does not arrive at the facility within 60 minutes after notification to pick up a minor suspect, an authorized associate should contact local law enforcement authorities and pursue charges against a minor suspect, regardless of the amount of the theft. Document as a part of the file all communications to law enforcement.* |



WM-OSBORNE0000303



| | |
|---|---|
| | All efforts to contact the parent or guardian and any communications with a suspect's parent or guardian must be documented and made part of the file. Information to be collected includes the parent or guardian's name, the number called, time of call(s) and address provided by the suspect. Record the type of identification reviewed and the name of the individual claiming to be a parent or guardian. Information other than the name of the parent, guardian, family member, or family friend may not be copied from nor may copies be made of the identification provided. |
| | Authorized associates should make efforts to deter rather than detain a minor suspect who: |
| | • Appears to be 12 years old or younger, and<br>• Is suspected of shoplifting items valued at less than $25.00. |
| | Refer to the Investigation and Detention of Shoplifters Policy (AP-09) for state specific information. |
| **Trespassing The Shoplifter** | **Policy** |
| | An Authorized Associate, facility manager or other manager in charge of the facility *may trespass a suspect under this policy only when the suspect is 16 years of age or older and:* |
| | • *The suspect is a repeat shoplifter at a Walmart facility; or*<br>• *The suspect was violent or threatened violence; or attempted to flee detention; or*<br>• *The suspect disrupted business operations beyond suspected shoplifting activities and processing procedure and refused to terminate their behavior upon request. Following required processing procedures (for example, having a female associate present as a witness) is not considered disruption of business for purposes of trespassing.* |
| | *Being a shoplifting suspect or detained for shoplifting activities without the above stated conditions occurring is not adequate to justify a person being trespassed from Walmart property under this policy.* |
| | *Trespassing individuals under other circumstances is reserved for facility management only.* |
| | *Trespass of a shoplifter means that the individual is prohibited from entering Walmart property.* |
| | Suspects may only be trespassed under this policy if the required criteria are met. Facilities are not authorized under this policy to trespass every shoplifting suspect. Asset protection personnel are only authorized to trespass shoplifting suspects in accordance with this policy. All other instances of trespassing an individual from Walmart property is at the discretion of facility management. |



Asset Protection

March 19, 2018

WM-OSBORNE0000304

**Steps for Trespassing a Shoplifter/ Using the Trespass Form**
Guidelines for issuing trespass forms are located on the WIRE->Work->Asset Protection/Loss Prevention->State Statues, Trespass Forms and Restitution Notes.

It is crucial that if a person is trespassed, they understand they are not allowed on any Walmart/Sam's Club facility property. Attempt to provide the individual with a copy of the trespass notice.

If the suspect refuses to sign or accept the trespass form, then verbally communicate to the suspect that he/she has been trespassed from Walmart property by reading the trespass form to him/her. Further, ask law enforcement to inform the suspect that he/she has been trespassed from Walmart property and to document the notification from law enforcement in the resulting police report.

**Note:** Asset protection hourly associates are permitted to trespass suspects from a facility only under AP-09. Trespassing individuals under other circumstances is reserved for facility management only.

> **Example:** A cashier calls an APA and tells her that there is a drunk and disorderly customer bothering other customers in checkout line number 18 and asks the APA to come to the frontend and trespass this individual. What should the APA do?
>
> Answer: Politely remind the cashier that the trespassing of customers is handled by facility management and ensure facility management is notified of the situation.

**Enforcement of Trespass Notice**
Enforcement of the trespass notice must be initiated by facility management only, using the following steps:

- Ensure the person was previously issued a trespass warning. If uncertain about identity, facility management should not approach the individual.
- Ask the person in question to leave the facility.

If this person does not comply, facility management is to make the decision whether to contact local law enforcement. Local law enforcement will handle the situation and ask them to leave.

**Note**: If a request for readmission to Walmart property is received, forward the request to the asset protection recovery team at the following address:
AP Recovery
Attn: Readmission, MS 0815
702 SW 8th Street Bentonville,
AR 72716-0815

Determining the length of time for a trespass will vary depending on your State's guidelines. Under all circumstances you will comply with the guidelines set by your State. A reasonable "rule of thumb" is one year from the date the notice was provided.



**Walmart** ⁘
Save money. Live better.

| Responsibility | Facility managers and managers in charge are responsible to ensure that authorized associates are utilizing only approved authorized detention methods detailed in this policy. The physical well-being of suspects, customers, and Walmart associates is first priority. If you are aware or become aware of a detention or attempted detention, which results in physical contact beyond physical redirection between a customer and an associate, you are required to immediately report the incident to the market asset protection manager and regional asset protection director for the facility. |
|---|---|
| | If you observe or become aware of this policy having been violated, you are required to immediately report the incident to the market asset protection manager and regional asset protection director for the facility. |
| | Failure to comply with this Policy may result in disciplinary action, up to and including termination. |



March 19, 2018

| RequestID: | [REDACTED] |
|---|---|
| Request Date: | [REDACTED] |
| WIN: | 223941284 |



| WIN_NBR | FIRST_NAME | LAST_NAME | MIDDLE_INITIAL | ASC_USERID | PREF_DISPLAY_NAME | HIRE_DATE | GENDER_CODE | EEOC_CODE | EMPLOY_STAT_CODE | ASC_TYPE_CODE | PAY_TYPE_CODE | STORE_NBR | STR_STATE_PROV_CD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 223941284 | COREY | OSBORNE | J | | | 2017-11-14 | M | 2 | T | F | H | 1350 | VA |

| STR_COUNTRY_CODE | WMT_JOB_CODE | WMT_JOB_DESC | JOB_NBR | STR_JOB_DESC | TERMINATION_DATE | LST_DAY_WRK_DATE | ELG_REHIRE_IND | TERM_REASON_CODE | TERMINATION_DESC |
|---|---|---|---|---|---|---|---|---|---|
| US | | | 000754 | ASSET PROTECTION ASSOC | 2020-05-21 | 2020-05-21 | N | 79 | GROSS MISCONDUCT - OTHER |

| PERSONNUMBER | FIRSTNAME | LASTNAME | CODE | ACTIVITYNAME | HIDDEN_FROM_TRANSCRIPT | ACTIVITY_TYPE | SCORE | STATUS | ELAPSEDSECONDS | STARTDT(GMT) | ENDDT(GMT) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2239412M4 | COREY | OSBORNE | RCALL127485 | HIPAA | Yes | Versional | | completed | | 2017-11-20 17:36:47.000 | 2017-11-20 17:37:12.000 |
| 2239412M4 | COREY | OSBORNE | RCALL127485 | HIPAA (1.4) | Yes | Course | | completed | 617 | 2017-11-20 17:26:47.000 | 2017-11-20 17:37:12.000 |
| 2239412M4 | COREY | OSBORNE | FH5161599 | Academy Code of Conduct | Yes | Versional | | completed | 101 | 2017-11-20 17:37:33.000 | 2017-11-20 17:39:12.000 |
| 2239412M4 | COREY | OSBORNE | FH5161599 | Academy Code of Conduct (1.3) | Yes | Course | | completed | 101 | 2017-11-20 17:37:33.000 | 2017-11-20 17:39:12.000 |
| 2239412M4 | COREY | OSBORNE | 1163 | Baler and Compactor Safety (New Hire) | Yes | Versional | | completed | | 2017-11-20 17:39:23.000 | 2017-11-20 18:05:27.000 |
| 2239412M4 | COREY | OSBORNE | C8L1563 | Baler and Compactor Safety (New Hire) (1.9) | Yes | Course | | completed | 1559 | 2017-11-20 17:39:23.000 | 2017-11-20 18:05:27.000 |
| 2239412M4 | COREY | OSBORNE | RCAH125110 | Bloodborne Pathogens - Hourly | Yes | Versional | | completed | | 2017-11-20 18:05:43.000 | 2017-11-20 18:20:52.000 |
| 2239412M4 | COREY | OSBORNE | RCAH125110 | Bloodborne Pathogens - Hourly (1.4) | Yes | Course | | completed | 905 | 2017-11-20 18:05:42.000 | 2017-11-20 18:20:52.000 |
| 2239412M4 | COREY | OSBORNE | RCALL115109 | Personal Protective Equipment (PPE) | Yes | Versional | | completed | | 2017-11-20 18:21:04.000 | 2017-11-20 18:40:57.000 |
| 2239412M4 | COREY | OSBORNE | RCALL115109 | Personal Protective Equipment (PPE) (1.5) | Yes | Course | | completed | 1185 | 2017-11-20 18:21:04.000 | 2017-11-20 18:40:57.000 |
| 2239412M4 | COREY | OSBORNE | PCMH102482 | AP-09 Authorized Associates | Yes | Versional | | completed | | 2017-11-20 18:41:24.000 | 2017-11-20 19:06:24.000 |

Walmart Inc. Confidential



| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 223941284 | COREY | OSBORNE | RCAll283827 | Age Verification - Restricted Items | Yes | Versional | | completed | 289 | 2018-03-23 20:32:49.000 | 2018-04-04 19:03:56.000 |
| 223941284 | COREY | OSBORNE | RCAll283827 | Age Verification - Restricted Items (1.0) | No | Course | | completed | 995 | 2018-03-23 20:32:49.000 | 2018-04-04 19:03:56.000 |
| 223941284 | COREY | OSBORNE | Academy-01833-Spark It | Academy-01833-Spark It | Yes | ILT Class | | completed | | 2018-04-18 12:00:00.000 | 2018-04-18 13:25:00.000 |
| 223941284 | COREY | OSBORNE | LDM241020 | Academy Spark It | Yes | ILT Course | | completed | | 2018-04-18 12:00:00.000 | 2018-04-18 13:25:00.000 |
| 223941284 | COREY | OSBORNE | FHSM284597 | Spark It for ASM/DM Assessment | Yes | Versional | 73 | failed | 856 | 2018-04-18 20:58:00.000 | 2018-04-18 21:12:54.000 |
| 223941284 | COREY | OSBORNE | FHSM284597 | Spark It for ASM/DM Assessment (1.0) | No | Quick Assessment | 73 | failed | 856 | 2018-04-18 20:58:00.000 | 2018-04-18 21:12:54.000 |
| 223941284 | COREY | OSBORNE | Academy-01833-Core | Academy-01833-Core | Yes | ILT Class | 92 | passed | | 2018-04-23 12:00:00.000 | 2018-04-27 20:15:00.000 |
| 223941284 | COREY | OSBORNE | LDM157086 | Academy Core | Yes | ILT Course | 92 | passed | | 2018-04-23 12:00:00.000 | 2018-04-27 20:15:00.000 |
| 223941284 | COREY | OSBORNE | FHS157811 | Academy Skill Builder Activity #1 | Yes | Versional | 50 | completed | 165 | 2018-05-22 16:21:09.000 | 2018-05-30 14:53:38.000 |
| 223941284 | COREY | OSBORNE | FHS157811 | Academy Skill Builder Activity #1 (1.8) | Yes | Quick Assessment | 50 | completed | 165 | 2018-05-22 16:21:09.000 | 2018-05-30 14:53:38.000 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q2 FY19 | Yes | Versional | | completed | | 2018-05-22 16:21:27.000 | 2018-05-22 16:30:47.000 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q2 FY19 (1.1) | Yes | Course | | completed | 543 | 2018-05-22 16:21:27.000 | 2018-05-22 16:30:47.000 |
| 223941284 | COREY | OSBORNE | FHS158937 | Academy Skill Builder Activity #2 | Yes | Versional | 50 | completed | 391 | 2018-06-06 16:05:24.000 | 2018-06-08 19:44:38.000 |
| 223941284 | COREY | OSBORNE | FHS158937 | Academy Skill Builder Activity #2 (1.8) | Yes | Quick Assessment | 50 | completed | 391 | 2018-06-06 16:05:24.000 | 2018-06-08 19:44:38.000 |
| 223941284 | COREY | OSBORNE | FHS160489 | Academy Skill Builder Activity #3 | Yes | Versional | 40 | completed | 487 | 2018-07-03 17:00:48.000 | 2018-07-03 17:09:16.000 |
| 223941284 | COREY | OSBORNE | FHS160489 | Academy Skill Builder Activity #3 (1.6) | Yes | Quick Assessment | 40 | completed | 487 | 2018-07-03 17:00:48.000 | 2018-07-03 17:09:16.000 |
| 223941284 | COREY | OSBORNE | FHS161173 | Academy Skill Builder Activity #4 | Yes | Versional | 33 | completed | 847 | 2018-07-23 19:21:51.000 | 2018-07-23 19:36:25.000 |
| 223941284 | COREY | OSBORNE | FHS161173 | Academy Skill Builder Activity #4 (1.5) | Yes | Quick Assessment | 33 | completed | 847 | 2018-07-23 19:21:51.000 | 2018-07-23 19:36:25.000 |
| 223941284 | COREY | OSBORNE | Academy-02312-AP | Academy-02312-AP | Yes | ILT Class | 88 | passed | | 2018-08-13 12:00:00.000 | 2018-08-17 20:30:00.000 |
| 223941284 | COREY | OSBORNE | LDM192040 | Academy AP | Yes | ILT Course | 88 | passed | | 2018-08-13 12:00:00.000 | 2018-08-17 20:30:00.000 |
| 223941284 | COREY | OSBORNE | FHS161180 | Academy Skill Builder Activity #5 | Yes | Versional | 66 | completed | 149 | 2018-08-18 19:57:37.000 | 2018-08-18 20:00:25.000 |
| 223941284 | COREY | OSBORNE | FHS161180 | Academy Skill Builder Activity #5 (1.5) | Yes | Quick Assessment | 66 | completed | 149 | 2018-08-18 19:57:37.000 | 2018-08-18 20:00:25.000 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q3 FY19 | Yes | Versional | | completed | | 2018-08-18 20:00:31.000 | 2018-08-18 20:09:56.000 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q3 FY19 (1.0) | Yes | Course | | completed | 558 | 2018-08-18 20:00:31.000 | 2018-08-18 20:09:56.000 |
| 223941284 | COREY | OSBORNE | FHS161182 | Academy Skill Builder Activity #6 | Yes | Versional | 50 | completed | 237 | 2018-09-19 00:13:14.653 | 2018-09-19 00:17:25.547 |
| 223941284 | COREY | OSBORNE | FHS161182 | Academy Skill Builder Activity #6 (1.5) | Yes | Quick Assessment | 50 | completed | 237 | 2018-09-19 00:13:14.653 | 2018-09-19 00:17:25.547 |
| 223941284 | COREY | OSBORNE | PCMHS32482 | AP-09 Authorized Associates | Yes | Versional | | completed | | 2018-09-19 00:17:32.813 | 2018-09-19 00:43:40.167 |
| 223941284 | COREY | OSBORNE | PCMHS32482 | AP-09 Authorized Associates (1.4) | No | Course | | completed | 1556 | 2018-09-19 00:17:32.813 | 2018-09-19 00:43:40.167 |
| 223941284 | COREY | OSBORNE | FAll313399 | CMA Acknowledgment: Crowd Management Associate Supervisor / Quick Response Team | Yes | Document | | completed | 84 | 2018-10-02 21:10:23.960 | 2018-10-02 21:11:47.853 |
| 223941284 | COREY | OSBORNE | FAll313379 | CMA Acknowledgment: Quick Response Team | Yes | Document | | completed | 19 | 2018-10-02 21:15:09.907 | 2018-10-02 21:15:28.673 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q4 FY19 | Yes | Versional | | completed | | 2018-11-02 19:08:26.560 | 2018-11-02 19:18:27.833 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q4 FY19 (1.0) | Yes | Course | | completed | 597 | 2018-11-02 19:08:26.560 | 2018-11-02 19:18:27.833 |
| 223941284 | COREY | OSBORNE | 12301 | Fire Safety (Annual) | Yes | Versional | 80 | completed | | 2018-12-14 22:35:36.820 | 2018-12-14 22:46:45.347 |
| 223941284 | COREY | OSBORNE | CBL12301 | Fire Safety (Annual) (1.9) | No | Course | 80 | completed | 659 | 2018-12-14 22:35:36.820 | 2018-12-14 22:46:45.347 |
| 223941284 | COREY | OSBORNE | CBL12301 | Safety 2 | Yes | Objective | 80 | completed | | 2018-12-14 22:35:36.820 | 2018-12-14 22:46:45.347 |
| 223941284 | COREY | OSBORNE | RCH186270 | WM Safety for Hourly (Annual) | Yes | Versional | 80 | completed | | 2018-12-14 22:47:00.770 | 2018-12-14 23:18:09.080 |
| 223941284 | COREY | OSBORNE | RCH186270 | WM Safety for Hourly (Annual) (1.1) | Yes | Course | 80 | completed | 1859 | 2018-12-14 22:47:00.770 | 2018-12-14 23:18:09.080 |
| 223941284 | COREY | OSBORNE | 11796 | Advanced Hazardous Waste | Yes | Versional | 100 | completed | 1993 | 2018-12-15 23:07:15.800 | 2018-12-28 03:27:47.753 |
| 223941284 | COREY | OSBORNE | CBL11796 | Advanced Hazardous Waste (1.7) | No | Course | 100 | completed | 2331 | 2018-12-15 23:07:15.800 | 2018-12-28 03:27:47.753 |
| 223941284 | COREY | OSBORNE | CBL11796 | Hazardous Waste 2 | Yes | Objective | 100 | completed | 1993 | 2018-12-15 23:07:15.800 | 2018-12-28 03:27:47.753 |
| 223941284 | COREY | OSBORNE | 96309 | A Safer Workplace: Hourly (Annual) | Yes | Versional | | completed | | 2018-12-28 03:28:10.270 | 2018-12-28 03:38:25.917 |
| 223941284 | COREY | OSBORNE | PCAH96309 | A Safer Workplace: Hourly (Annual) (1.3) | No | Course | | completed | 607 | 2018-12-28 03:28:10.270 | 2018-12-28 03:38:25.917 |
| 223941284 | COREY | OSBORNE | RCALL161870 | OSHA Refresher | No | Versional | 100 | completed | | 2018-12-28 03:38:39.293 | 2018-12-28 03:48:06.327 |
| 223941284 | COREY | OSBORNE | RCALL161870 | OSHA Refresher (1.2) | Yes | Course | 100 | completed | 561 | 2018-12-28 03:38:39.293 | 2018-12-28 03:48:06.327 |
| 223941284 | COREY | OSBORNE | RCALL31560 | Hazardous Waste Refresher (1.8) | No | Course | 100 | completed | 1317 | 2019-02-01 19:24:35.087 | 2019-02-01 19:46:43.333 |
| 223941284 | COREY | OSBORNE | VerRCALL31560 | Hazardous Waste Refresher | Yes | Versional | 100 | completed | | 2019-02-01 19:24:35.087 | 2019-02-01 19:46:43.333 |
| 223941284 | COREY | OSBORNE | CBL337354 | Attendance Reinvention | Yes | Versional | | completed | | 2019-02-01 19:46:57.367 | 2019-02-01 20:00:21.033 |
| 223941284 | COREY | OSBORNE | CBL337354 | Attendance Reinvention (1.0) | No | Course | | completed | 776 | 2019-02-01 19:46:57.367 | 2019-02-01 20:00:21.033 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q1 FY20 | Yes | Versional | | completed | | 2019-03-05 18:05:36.010 | 2019-03-05 18:14:05.670 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q1 FY20 (1.0) | Yes | Course | | completed | 505 | 2019-03-05 18:05:36.010 | 2019-03-05 18:14:05.670 |
| 223941284 | COREY | OSBORNE | 92258 | A Safer Workplace: Management | Yes | Versional | | completed | | 2019-03-08 19:23:57.763 | 2019-03-08 19:38:23.877 |
| 223941284 | COREY | OSBORNE | PCM92258 | A Safer Workplace: Management (1.5) | No | Course | | completed | 856 | 2019-03-08 19:23:57.763 | 2019-03-08 19:38:23.877 |
| 223941284 | COREY | OSBORNE | FALL336707 | Addressing Disruptive Behavior - #1 Understanding Disruptive Behavior | Yes | Versional | 80 | completed | | 2019-03-08 19:39:28.637 | 2019-03-08 19:59:53.160 |
| 223941284 | COREY | OSBORNE | FALL336707 | Addressing Disruptive Behavior - #1 Understanding Disruptive Behavior (1.0) | No | Course | 80 | completed | 1192 | 2019-03-08 19:39:28.637 | 2019-03-08 19:59:53.160 |
| 223941284 | COREY | OSBORNE | FALL337938 | Addressing Disruptive Behavior - #2 Embrace Your Unique Position of Influence | No | Versional | 100 | completed | | 2019-03-09 00:51:53.933 | 2019-03-09 01:14:56.543 |
| 223941284 | COREY | OSBORNE | FALL337938 | Addressing Disruptive Behavior - #2 Embrace Your Unique Position of Influence (1.0) | Yes | Course | 100 | completed | 1366 | 2019-03-09 00:51:53.933 | 2019-03-09 01:14:56.543 |
| 223941284 | COREY | OSBORNE | RCAll283827 | Age Verification - Restricted Items | Yes | Versional | | completed | 37 | 2019-03-09 01:15:10.763 | 2019-03-11 21:16:09.557 |
| 223941284 | COREY | OSBORNE | RCAll283827 | Age Verification - Restricted Items (1.0) | No | Course | | completed | 1041 | 2019-03-09 01:15:10.763 | 2019-03-11 21:16:09.557 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q2 FY20 | Yes | Versional | | completed | | 2019-05-16 18:20:36.757 | 2019-05-16 18:29:00.770 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q2 FY20 (1.0) | Yes | Course | | completed | 498 | 2019-05-16 18:20:36.757 | 2019-05-16 18:29:00.770 |
| 223941284 | COREY | OSBORNE | FALL350795 | Addressing Disruptive Behavior - #3 Commit to Situational Safety | Yes | Versional | 80 | completed | | 2019-05-19 15:40:30.930 | 2019-05-19 16:03:05.517 |
| 223941284 | COREY | OSBORNE | FALL350795 | Addressing Disruptive Behavior - #3 Commit to Situational Safety (1.0) | No | Course | 80 | completed | 1331 | 2019-05-19 15:40:30.930 | 2019-05-19 16:03:05.517 |
| 223941284 | COREY | OSBORNE | FALL352322 | Addressing Disruptive Behavior - #4 Develop Influence and De-Escalation Skills | Yes | Versional | 100 | completed | | 2019-05-20 17:17:37.673 | 2019-05-20 18:33:33.530 |
| 223941284 | COREY | OSBORNE | FALL352322 | Addressing Disruptive Behavior - #4 Develop Influence and De-Escalation Skills (1.0) | No | Course | 100 | completed | 4531 | 2019-05-20 17:17:37.673 | 2019-05-20 18:33:33.530 |
| 223941284 | COREY | OSBORNE | FH354036 | Hourly 2 Step Verification job aid | Yes | Versional | 100 | completed | | 2019-05-20 18:33:57.157 | 2019-05-20 18:35:13.053 |
| 223941284 | COREY | OSBORNE | FH354036 | Hourly 2 Step Verification job aid (1.0) | Yes | Course | 100 | completed | 57 | 2019-05-20 18:33:57.157 | 2019-05-20 18:35:13.053 |
| 223941284 | COREY | OSBORNE | FALL341487 | Pool Chemical training | Yes | Versional | | completed | | 2019-05-20 18:35:23.200 | 2019-05-20 18:38:16.617 |
| 223941284 | COREY | OSBORNE | FALL341487 | Pool Chemical training (1.0) | Yes | Course | | completed | 162 | 2019-05-20 18:35:23.200 | 2019-05-20 18:38:16.617 |
| 223941284 | COREY | OSBORNE | FH358932 | SNAP Training - eLearning | No | Versional | 86 | completed | | 2019-07-19 12:46:47.973 | 2019-07-19 12:53:42.050 |
| 223941284 | COREY | OSBORNE | FH358932 | SNAP Training - eLearning (1.0) | No | Course | 86 | completed | 395 | 2019-07-19 12:46:47.973 | 2019-07-19 12:53:42.050 |
| 223941284 | COREY | OSBORNE | PCMHS32482 | AP-09 Authorized Associates | Yes | Versional | | completed | | 2019-07-19 12:53:59.763 | 2019-07-19 13:23:25.200 |
| 223941284 | COREY | OSBORNE | PCMHS32482 | AP-09 Authorized Associates (1.4) | No | Course | | completed | 1749 | 2019-07-19 12:53:59.763 | 2019-07-19 13:23:25.200 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q3 FY20 | Yes | Versional | | completed | 131 | 2019-08-04 18:49:07.510 | 2019-08-04 19:09:30.337 |
| 223941284 | COREY | OSBORNE | PCALL269172 | Active shooter quarterly training Q3 FY20 (1.0) | No | Course | | completed | 659 | 2019-08-04 18:49:07.510 | 2019-08-04 19:09:30.337 |
| 223941284 | COREY | OSBORNE | GWP368598 | Great Workplace Journey | Yes | Versional | | completed | | 2019-10-04 18:41:49.930 | 2019-10-04 18:43:17.320 |
| 223941284 | COREY | OSBORNE | GWP368598 | Great Workplace Journey (1.1) | No | Course | | completed | 13 | 2019-10-04 18:41:49.930 | 2019-10-04 18:43:17.320 |
| 223941284 | COREY | OSBORNE | FAH127416 | Introduction to Lottery | Yes | Versional | | completed | 113 | 2019-10-04 18:45:17.860 | 2019-10-04 21:26:49.703 |
| 223941284 | COREY | OSBORNE | FAH127416 | Introduction to Lottery (1.3) | No | Course | | completed | 1066 | 2019-10-04 18:45:17.860 | 2019-10-04 21:26:49.703 |
| 223941284 | COREY | OSBORNE | RCALL366818 | Associate Pay - Wage and Hour | Yes | Versional | | completed | | 2019-10-04 18:47:53.730 | 2019-10-04 18:56:21.050 |
| 223941284 | COREY | OSBORNE | RCALL366818 | Associate Pay - Wage and Hour (1.0) | No | Course | | completed | 550 | 2019-10-04 18:47:53.730 | 2019-10-04 18:56:21.050 |
| 223941284 | COREY | OSBORNE | 12301 | Fire Safety (Annual) | Yes | Versional | 80 | completed | | 2019-10-04 23:23:19.587 | 2019-10-04 23:31:59.940 |
| 223941284 | COREY | OSBORNE | CBL12301 | Fire Safety (Annual) (1.9) | No | Course | 80 | completed | 512 | 2019-10-04 23:23:19.587 | 2019-10-04 23:31:59.940 |
| 223941284 | COREY | OSBORNE | CBL12301 | Safety 2 | Yes | Objective | 80 | completed | | 2019-10-04 23:23:19.587 | 2019-10-04 23:31:59.940 |
| 223941284 | COREY | OSBORNE | RCH186270 | WM Safety for Hourly (Annual) | Yes | Versional | 90 | completed | | 2019-10-04 23:32:14.743 | 2019-10-05 00:09:32.983 |
| 223941284 | COREY | OSBORNE | RCH186270 | WM Safety for Hourly (Annual) (1.1) | Yes | Course | 90 | completed | 2230 | 2019-10-04 23:32:14.743 | 2019-10-05 00:09:32.983 |
| 223941284 | COREY | OSBORNE | FALL373641 | CMA 2019 - Supervisor/QRT Training Acknowledgement | Yes | Versional | | completed | 38 | 2019-10-10 16:02:24.190 | 2019-10-10 16:03:02.213 |
| 223941284 | COREY | OSBORNE | FALL373641 | CMA 2019 - Supervisor/QRT Training Acknowledgement (1.0) | No | Document | | completed | 38 | 2019-10-10 16:02:24.190 | 2019-10-10 16:03:02.213 |
| 223941284 | COREY | OSBORNE | FALL372642 | CMA 2019 - Supervisor Training | Yes | Versional | | completed | | 2019-10-17 23:54:21.920 | 2019-10-18 00:23:30.843 |
| 223941284 | COREY | OSBORNE | FALL372642 | CMA 2019 - Supervisor Training (1.0) | Yes | Course | | completed | 1730 | 2019-10-17 23:54:21.920 | 2019-10-18 00:23:30.843 |
| 223941284 | COREY | OSBORNE | PCALL383214 | Active shooter quarterly training Q4 FY20 | Yes | Versional | | completed | | 2019-11-19 00:48:46.240 | 2019-11-19 00:57:10.340 |
| 223941284 | COREY | OSBORNE | PCALL383214 | Active shooter quarterly training Q4 FY20 (1.0) | No | Course | | completed | 499 | 2019-11-19 00:48:46.240 | 2019-11-19 00:57:10.340 |
| 223941284 | COREY | OSBORNE | FH382234 | Card Reader Security | Yes | Versional | | completed | | 2019-11-30 17:25:49.753 | 2019-11-30 17:29:26.613 |
| 223941284 | COREY | OSBORNE | FH382234 | Card Reader Security (1.0) | No | Course | | completed | 202 | 2019-11-30 17:25:49.753 | 2019-11-30 17:29:26.613 |
| 223941284 | COREY | OSBORNE | PCAll379484 | Walmart Ethics and Privacy Refresher- HRLY | Yes | Versional | | completed | | 2019-11-30 17:29:43.330 | 2019-11-30 17:36:23.750 |
| 223941284 | COREY | OSBORNE | PCAll379484 | Walmart Ethics and Privacy Refresher- HRLY (1.0) | No | Course | | completed | 386 | 2019-11-30 17:29:43.330 | 2019-11-30 17:36:23.750 |
| 223941284 | COREY | OSBORNE | 96309 | A Safer Workplace: Hourly (Annual) | Yes | Versional | | completed | | 2019-11-30 17:36:36.313 | 2019-11-30 17:54:04.080 |
| 223941284 | COREY | OSBORNE | PCAH96309 | A Safer Workplace: Hourly (Annual) (1.3) | No | Course | | completed | 1039 | 2019-11-30 17:36:36.313 | 2019-11-30 17:54:04.080 |
| 223941284 | COREY | OSBORNE | 11796 | Advanced Hazardous Waste | Yes | Versional | 100 | completed | 828 | 2019-11-30 17:54:20.650 | 2019-12-06 18:36:12.603 |
| 223941284 | COREY | OSBORNE | CBL11796 | Advanced Hazardous Waste (1.7) | No | Course | 100 | completed | 2874 | 2019-11-30 17:54:20.650 | 2019-12-06 18:36:12.603 |
| 223941284 | COREY | OSBORNE | CBL11796 | Hazardous Waste 2 | Yes | Objective | 100 | completed | 828 | 2019-11-30 17:54:20.650 | 2019-12-06 18:36:12.603 |
| 223941284 | COREY | OSBORNE | RCALL161870 | OSHA Refresher | No | Versional | 100 | completed | | 2019-12-06 18:36:34.840 | 2019-12-06 18:51:44.317 |
| 223941284 | COREY | OSBORNE | RCALL161870 | OSHA Refresher (1.2) | Yes | Course | 100 | completed | 880 | 2019-12-06 18:36:34.840 | 2019-12-06 18:51:44.317 |

# Walmart

# Global Statement
## of Ethics

EXHIBIT 8

Osborne- 11/18/21

Huseby.com

WM-OSBORNE0000539

# Table of Contents

A message from our Chief Executive Officer ..... 2

Using the Statement of Ethics .................. 3

How the Statement of Ethics is Organized ......3

Walmart Policies & Local Laws ..................3

Our Beliefs ...................................... 4

Introduction ..................................... 5

Who is Covered by the Statement of Ethics ......5

Associate Responsibilities .......................5

Additional Responsibilities for Management.....6

Discipline for Violations .........................6

Raising Concerns & Speaking Up .............. 7

Ethics Opinions ..................................7

What Happens When an Ethics Concern
is Raised .........................................7

Non-Retaliation..................................8

How to Raise a Concern ..........................8

Immediately Reportable Criteria ................9

Waivers...........................................9

Q&A............................................. 10

Leading with Integrity in Our Workplace ....... 11

Alcohol & Drug Free Workplace ............... 11

Discrimination & Harassment Prevention ...... 11

Inappropriate Conduct......................... 12

Wage & Hour .................................. 12

Conflict of Interest ............................. 13

Financial Investments .......................... 13

Outside Employment ........................... 13

Former Employment............................ 13

Personal Relationships with Suppliers ......... 14

Gifts & Entertainment.......................... 14

Personal Relationships with Other Associates .. 15

Walmart Assets ................................. 15

Q&A...........................................16–19

Leading with Integrity in Our Marketplace ..... 20

Fair Competition & Fair Dealing ............... 20

Intentional Dishonesty......................... 20

Financial Integrity & Accounting Irregularities.. 21

Insider Trading ................................. 21

Restrictive Trade Practices...................... 21

Q&A...........................................22–23

Leading with Integrity in Our Communities .... 24

Anti-Corruption ................................ 24

Anti-Money Laundering ........................ 25

Authority to Work............................... 25

Environmental Responsibility, Health & Safety
in the Workplace................................ 25

Product & Food Safety ......................... 26

Protecting Personal & Business Information ... 26

Governmental & Political Activities ............ 27

International Trade.............................. 27

Media Statements .............................. 27

Q&A...........................................28–32

Global Ethics Helpline Numbers ............... 33

Final Disclaimer ................................ 36

Index ........................................... 37

WM-OSBORNE0000540

# A message from our Chief Executive Officer

## Doug McMillon, CEO



Our unique culture drives our purpose of saving people money so they can live better, and the foundation of our culture is a commitment to operating with integrity. Even as we change to meet the needs of our customers, Walmart will stay true to the values, beliefs and behaviors that have guided us over the last 50 years.

Regardless of where each of us works in our global company, this Statement of Ethics is the guide to exemplifying integrity as a Walmart associate. It's a daily resource for making honest, fair and objective decisions while operating in compliance with all laws and our policies. This Statement of Ethics applies to me, the board of directors and all associates at every level of our organization.

Through your ethical behavior and willingness to speak up for the highest standards, we earn and keep the trust of our customers, each other and our local communities. We believe in everyday low cost and everyday low prices, but only if accomplished through our everyday integrity.

Thank you for your commitment to our Statement of Ethics. It means more than making ethical decisions; it demonstrates you care about Walmart, our reputation and our customers.

Doug McMillon
President and CEO
Wal-Mart Stores, Inc.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

2

WM-OSBORNE0000541

# Using the Statement of Ethics

Our Statement of Ethics will introduce you to the behaviors and conduct that create an honest, fair and objective workplace while operating in compliance with all laws and our policies. It will help you recognize situations that might come up on your job which could be a violation of our company ethics. You'll also learn what to do if you have questions about what is considered ethical conduct.

## How the Statement of Ethics is Organized

* Inside the front cover, Doug McMillon, our President and CEO, points out how important it is for all of us to follow our Statement of Ethics and to report anything we feel might be a violation of those ethics.

* The next page features Our Beliefs. These are Walmart's fundamental beliefs for all conduct, including acting with integrity.

* The Introduction section explains it's everyone's responsibility to comply with our Statement of Ethics and to report what you feel might be a violation of policy or law.

* The section Raising Concerns & Speaking Up tells you how to request an opinion before you take action and how to report what you think might be a violation of ethics, including how to make a report in private without giving your name.

* This guide gives you an overview of many, but not all, Walmart policies. Some commonly asked questions are included to help explain the policies better. There also are examples of how this Statement of Ethics and other Walmart policies apply in all countries.

## Walmart Policies & Local Laws

Walmart publishes several global policies, which are designed to give associates guidance that is the same for all locations. This Statement of Ethics is an example of a global policy. In addition, each business unit Walmart operates is expected to have a complete set of policies providing guidance to associates for the country in which they are working. Because these policies may vary by business unit or market, they are not linked to this Statement of Ethics. It's our responsibility to know all of the policies that might apply to our areas of the business. If you're not sure about the policies in your area, please talk to your manager, the Legal Department or Global Ethics.

Walmart conducts business in many countries around the world. Our associates are citizens of many countries. As a result, our operations are subject to many different laws, customs and cultures. Our operations must comply with all applicable local laws and regulations in addition to this Statement of Ethics. In some instances, the laws of two or more countries may conflict, or a local law may conflict with the Statement of Ethics. When you encounter a conflict, contact Global Ethics for guidance on how to apply the Statement of Ethics in your country.



## Contact Us
anonymous and confidential

walmartethics.com
1-800-WM-ETHIC • 1-800-963-8442

Specific phone numbers for all
countries are listed at the back
of this document

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000542

# Our Beliefs



Since Sam Walton founded our company it always has been a values-based, ethically led organization. Our beliefs are the values that guide our decisions and our leadership.

## Respect for the Individual

We value every associate, own the work we do, and communicate by listening and sharing ideas.

## Service to our Customers

We're here to serve customers, support each other, and give to our local communities.

## Striving for Excellence

We work as a team and model positive examples while we innovate and improve every day.

## Act with Integrity

We act with the highest level of integrity by being honest, fair and objective, while operating in compliance with all laws and our policies.

## Vision Statement

The vision of Global Ethics is to promote ownership of Walmart's ethical culture to all stakeholders globally.

## Are you making the right decisions?

When faced with making any decision, you should ask yourself the following questions:

* Is it consistent with Our Beliefs?
* Would I want others to know about it?

If the answer to either question is no consider whether your potential action complies with our Statement of Ethics. If it does not, identify a better plan of action. If you are unsure about a decision, talk to your manager or contact Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

4

WM-OSBORNE0000543

# Introduction

> **66** **Personal and moral integrity is one of our basic fundamentals and it has to start with each of us. 99**

Sam Walton,
Founder

## ○ Who is Covered by the Statement of Ethics?

### Associates and Directors

Our Statement of Ethics applies to all associates at all levels of the organization worldwide and all members of the board of directors of Wal-Mart Stores, Inc. It also applies to all associates and directors of Walmart-controlled subsidiaries.

### Third Parties

Walmart expects all suppliers, consultants, law firms, public relations firms, contractors and other service providers to act ethically and in a manner consistent with this Statement of Ethics. If you hire a third party, you should take reasonable steps to ensure the third party is aware of this Statement of Ethics, has a reputation for integrity and acts in a responsible manner consistent with our standards.

## ○ Associate Responsibilities

Every Walmart associate has responsibility to:

* Follow the law at all times. If you see any associate violating the law, or if you're asked to do something you believe may violate the law, discuss it immediately with your manager or Global Ethics.

* Read and understand Our Beliefs and use them in your job every day.

* Learn the policies that apply to your job. No one expects you to memorize every policy, but it's good to have a basic understanding of the issues covered by each policy.

* Ask for help from your manager, Global Ethics or other Walmart resources when you have questions about the application of this Statement of Ethics or other policies.

* Immediately raise any concern you or others may have about possible requests or acts that may be a violation of this Statement of Ethics or a Walmart policy.

* Raise any ethics concerns with a manager or by contacting Global Ethics. If you raise an ethics concern through a manager and the issue is not resolved, raise it through a different manager or contact Global Ethics. The various ways to raise concerns are described in more detail later in this guide.

* Cooperate with Walmart's investigations and report all information truthfully.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

5

WM-OSBORNE0000544



## Additional Responsibilities for Management

All management associates are responsible for creating an environment that encourages compliance with our Statement of Ethics. Supervision of responsible business practices is as important as supervision of performance. To help us maintain the highest ethics, you should:

- Contact Global Ethics if you are made aware of an ethics issue covered by the Immediately Reportable Criteria on page 9 or for assistance handling an ethics question or concern.

- Meet with your direct reports periodically to review Our Beliefs and our Statement of Ethics.

- If there is a conflict between our ethics and business objectives, ensure our ethics always come first.

- Lead by example and encourage your associates to act with integrity in all dealings to avoid even the appearance of a violation of our ethical standards.

- If an ethics issue arises with one of your associates, make sure other associates in your area are not making the same mistake.

- Ensure open communication by encouraging associates in your department or division to ask questions concerning our Statement of Ethics.

- Never cover up or ignore any ethical conduct problem. Address the matter timely and seek guidance if necessary.

- Appreciate associates who raise issues.

- Never retaliate against anyone for raising an ethics issue, assisting in an investigation or participating in any proceeding relating to an alleged violation of any government regulation, law or rule or alleged fraud against shareholders.

- Once an ethical concern is raised, do not interfere with any investigation into the matter.

- Encourage self-reporting of business conduct violations. If an associate voluntarily reports he or she was involved in an ethics violation, self-reporting may be considered when determining the appropriate disciplinary action to be taken.

## Discipline for Violations

Appropriate disciplinary action, up to and including termination, may be taken against any associate who violates our Statement of Ethics, or applicable laws, regulations or policies.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

6

WM-OSBORNE0000545

# Raising Concerns & Speaking Up

> **Don't compromise your reputation. It's a precious commodity. Don't compromise your integrity... have a good name.**

Sam Walton,
Founder

All of us should constantly strive to maintain a work environment that encourages associates to raise concerns about possible violations of our Statement of Ethics. Often we hear stories of other companies where employees were aware of problems, but did not feel comfortable coming forward. No one should ever feel that way at Walmart. Please report possible ethics issues immediately so they can be resolved before more serious consequences develop. Walmart prohibits retaliation against any associate who raises a concern.

## Ethics Opinions

In the normal course of business, you might have a situation in which you're not sure if your conduct violates the Statement of Ethics or not. When you have an ethics question, you are encouraged to contact Global Ethics for a verbal or written opinion before you take action.



Opinion requests may be submitted to Global Ethics under the "Ask a Question" option at **www.walmartethics.com.**

## What Happens When an Ethics Concern is Raised?

Walmart takes all reported concerns seriously. We confidentially investigate ethics allegations to determine if any law, policy or the Statement of Ethics has been violated. Walmart has a compelling interest in protecting the integrity of every investigation, including protecting reporters and witnesses from harassment, intimidation and retaliation; keeping evidence from being destroyed; ensuring testimony is honest and identifying and addressing root causes. If you report a violation, Global Ethics will make every effort to keep your identity private and to secure any data relating to the investigation. Also, Global Ethics may reasonably impose a requirement that witnesses must maintain a particular investigation and their role in it in strict confidence. In such cases, you must maintain confidentiality and not discuss your report or the investigative process with others. Global Ethics does not generally disclose investigation details, but you will be informed of the status of the investigation.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

7

WM-OSBORNE0000546

## ◯ Non-Retaliation

Associates who come forward with concerns play an important role in maintaining a healthy, respectful and productive workplace, as well as protecting our stakeholders. These associates help our company address problems early — before more serious consequences develop. It's important for each of us to create a work environment where everyone can raise concerns of ethics issues without fear of retaliation.

Retaliation against associates who raise concerns or questions about misconduct will not be tolerated. Concerns should be raised in good faith, which means you have made a genuine attempt to provide honest and accurate information, even if you are later proven to have been mistaken. Walmart reserves the right to discipline anyone who knowingly makes a false accusation or has acted improperly. However, if an associate voluntarily reports they were involved in a violation, self-reporting may be considered when determining the appropriate disciplinary action to be taken.

Walmart will not terminate, demote or otherwise discriminate against associates for raising concerns. Also, it is important for co-workers not to isolate associates who have raised concerns — such associates should be treated with respect. Any change in treatment toward an associate who has raised a concern could be seen as a form of retaliation.

Walmart has an established process to deal with retaliation issues. Associates who believe they have experienced retaliation after raising an ethics concern should report the issue to their manager or Global Ethics.

## ◯ How to Raise a Concern

Walmart provides a variety of resources for you to raise a question or concern. Depending on the nature of the concern, it may be easiest to talk directly to the person responsible about your concern, providing the person with an opportunity to clarify the issue. If you don't feel comfortable talking to the person responsible, you should consult one of the resources listed below. Self-reporting is encouraged and may be taken into consideration in determining appropriate disciplinary action.

## Use the Open Door Communications process

The Open Door Communications process is the most direct way to voice any concern to a manager. If you believe your immediate manager is involved in the problem, discuss the issue with the next level of management who is not involved, use the Open Door Helpline (1-800-530-9929) or use one of the other resources described below.

### Contact Global Ethics

Walmart has a Global Ethics Helpline, which is available to associates around the world 24 hours a day, seven days a week, and is equipped to handle most local languages. The helpline is staffed by an organization not affiliated with Walmart, and to the extent possible (and in conformity with local regulations), callers may remain anonymous. In all cases, associate privacy will be respected to the fullest extent possible under the law. The operator will relay the information to Global Ethics and will provide the associate with a case number and callback date if desired. Contact information for Global Ethics is provided below. The Immediately Reportable Criteria outlined on page 9 must be reported through these channels. Country-specific contact information is listed at the back of this document.

## Global Ethics Contact Information

### ☎ Phone

U.S.A., Puerto Rico and Canada:
1-800-WM-ETHIC
(1-800-963-8442)

Specific phone numbers for all countries are listed at the back of this document.

### ✉ Mail

Wal-Mart Stores, Inc.
Attn: Global Ethics
702 SW 8th Street
Bentonville, AR
72716-0860

### 🖥 Internet

walmartethics.com

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

8

WM-OSBORNE0000547

# ⬭ Immediately Reportable Criteria

Associates may raise concerns regarding conduct that may violate the Global Statement of Ethics through the various channels listed in the Raising Concerns & Speaking Up section. However, there are certain types of allegations that must immediately be reported to Global Ethics. They are:

## Bribery

- Providing, offering, promising, requesting, or receiving any improper or unearned benefit
- Any violation of the company's Global Anti-Corruption Policy or related procedures
- All suspected violations of anti-bribery laws should also be reported, including any violations of the anti-bribery restrictions in the U.S. Foreign Corrupt Practices Act (FCPA) and the U.K. Bribery Act.

## Officer Misconduct

- Violations of the Global Statement of Ethics by company officers or direct reports to any company CEO

## Fraud or Theft Greater Than $100,000 and Involving an Associate

## Incorrect Records and Accounts

- Interfering with audits or internal controls, falsifying, misrepresenting, or destroying financial records, reports, or data, or improperly concealing, altering, or manipulating financial records, reports, or data

## Information System Hacking

- Any conduct involving an associate maliciously gaining unauthorized access to company information systems

## Global Corporate Brand Reputation Risks

- Threats to human life, slave or forced labor, human trafficking, or child labor
- Serious criminal misconduct, such as:
  - Bid rigging, price fixing, market or customer division or allocation, or other anti-competitive collusion
  - Insider trading
  - Trade sanctions and export regulation violations
  - Money laundering

# ⬭ Waivers

Any associate can request a waiver of the applicability of this Statement of Ethics. All requests must be submitted in writing to Global Ethics by the associate and must contain the relevant details and facts supporting the requested waiver. Global Ethics will respond in writing to the associate. Where required by law for certain executive officers or board of directors members, requests for waivers will be considered by the audit committee or the full board of directors and approval of such waivers will be promptly disclosed to shareholders.

All waiver requests must be approved in advance of the conduct for which approval is sought.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1 800 WM ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

9

WM-OSBORNE0000548

## Non-Retaliation



**Q** I reported an allegation six months ago. Ever since, my manager has stopped including me in several meetings. Is this retaliation?

**A** Significant changes in how you're treated may be retaliation. If your manager treats you differently after reporting an allegation, you should raise your concern to management through the Open Door process or by contacting Global Ethics.

**Q** One of my associates called the Helpline and made a false claim against me. I think she did it to hurt my career. Can I give her a lower rating on her evaluation since she is obviously trying to spread lies about me?

**A** We should believe associates who report concerns do so in good faith. Taking action against an associate because the associate reported a concern is retaliation and may result in disciplinary action for you as a manager. Retaliation will not be tolerated at Walmart. It prevents an open reporting environment and encourages a culture of fear.

**Q** Is protection from retaliation only available if I report my concerns through the Helpline?

**A** Retaliation is unacceptable no matter how you report your concern whether through management, Human Resources or Global Ethics. If you believe you have been retaliated against, report your concern to management through the Open Door process or contact Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

10

WM-OSBORNE0000549

## Leading with Integrity in Our Workplace

> ❝ **You can overcome almost anything, but you cannot overcome a lack of integrity.** ❞
>
> Lee Scott,
> Former President and CEO,
> Wal-Mart Stores, Inc.

## ⦿ Alcohol & Drug Free Workplace

Walmart is committed to a safe and healthy workplace for everyone. The possession, solicitation or use of illegal drugs, or being under the influence of such drugs while at work, is

*Walmart strictly forbids improper use of drugs and alcohol.*

prohibited and will not be tolerated. Walmart strictly forbids improper use of drugs and alcohol. All associates should ensure their performance and judgment are unimpaired by alcohol consumption during work hours. Associates should not report to work under the influence of alcohol nor should they consume alcohol on company property. In some instances, associates of the legal drinking age may consume alcoholic beverages at company-sponsored events if the consumption of alcohol is approved in advance by the country president or the corporate executive vice president for the business unit sponsoring the event. Walmart will take customary practices into consideration in countries where a moderate consumption of alcohol with a business meal is common.

## ⦿ Discrimination & Harassment Prevention

One of the basic beliefs upon which Sam Walton founded our company is "respect for the individual." Each of us is responsible for creating a culture of trust and respect that promotes a positive work environment. This means treating one another with fairness and courtesy in all of our interactions in the workplace. We are committed to maintaining a diverse workforce and an inclusive work environment. Walmart prohibits discrimination in employment, employment-related decisions or in business dealings on the basis of an individual's race, color, ancestry, age, sex, sexual orientation, religion, disability, ethnicity, national origin, veteran status, marital status, pregnancy or any other status protected by law or local policy. We should provide an environment free of discrimination to our associates, customers, members and suppliers.

*We believe in a positive, respectful work environment for all associates.*



To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000550

*Harassment in the workplace is prohibited regardless of whether it is welcome or unwelcome.*

We believe in treating each other with respect, whether it's a co-worker, supplier, customer or anyone doing business with us.

Harassment is conduct which inappropriately or unreasonably interferes with work performance, diminishes the dignity of any person or creates an intimidating, hostile or otherwise offensive work environment based on an individual's legally protected status. Verbal, visual, or physical conduct of a sexual nature is not acceptable in the workplace and may be determined to be sexual harassment. Examples include:

- Sexual advances, requests for sexual favors, sexually explicit language, off-color jokes, remarks about a person's body or sexual activities
- Displaying sexually suggestive pictures or objects, suggestive looks, leering or suggestive communication in any form
- Inappropriate touching, both welcome and unwelcome

We also prohibit other forms of harassment based on an individual's legally protected status, such as:

- Using slurs or negative stereotyping
- Verbal kidding, teasing or joking
- Intimidating acts, such as bullying or threatening
- Any other conduct that shows hostility toward, disrespect for or mistreatment of an individual based on the individual's legally protected status

Harassing conduct in the workplace, such as that described above, is prohibited regardless of whether it is welcome or unwelcome and regardless of whether the individuals involved are of the same or different sex, sexual orientation, race or other status. Again, Walmart prohibits retaliation and will not terminate, demote or otherwise discriminate against associates for reporting concerns.

## Inappropriate Conduct

We believe in maintaining a working environment free of inappropriate conduct such as obscene, profane, gross, violent, discriminatory, bullying or similarly offensive language, gestures or conduct. Walmart will not tolerate such conduct, which violates our belief of respect for the individual.

While posting information online can be a great way to connect with others, always conduct yourself online in a manner that is consistent with Walmart's ethics and Our Beliefs. Inappropriate conduct of the type described here is strictly prohibited, even if it occurs online.



## Wage & Hour

We are committed to complying fully with all applicable laws and regulations dealing with wage and hour issues, including off-the-clock work, rest breaks, meal periods and days of rest, overtime pay, termination pay, minimum-wage requirements, wages and hours of minors and other subjects related to wage and hour practices. As Walmart associates, we must:

- Comply fully with all corporate policies and procedures related to wage and hour issues
- Comply fully with all applicable laws and regulations pertaining to wage and hour issues
- Report any violations of wage and hour laws or policies through the Open Door Communication process or by contacting Global Ethics

It is a violation of law and Walmart policy for you to work without compensation or for a supervisor (hourly or salaried) to request you work without compensation. You should never perform any work for Walmart without compensation.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000551



## ○ Conflict of Interest

### General

We have a responsibility to all our stakeholders to make decisions strictly on the basis of Walmart's interests, without regard to personal gain. A conflict of interest can arise when our judgment could be influenced, or might appear as being influenced, by the possibility of personal benefit. Even if it's not intentional, the appearance of a conflict may be just as damaging to your reputation, and Walmart's reputation, as an actual conflict. We should always be on the lookout for situations that may create a conflict of interest and do everything we can to avoid them.

It's your responsibility to tell your manager about any situation you think creates, or could create, a conflict of interest. Managers are encouraged to bring such matters to the attention of Global Ethics for advice. You also may contact Global Ethics with any question you have.

Conflict of interest situations can come up in various ways. The following sections outline some of the possibilities.

### Financial Investments

You have a responsibility to make sure your personal financial activities do not conflict with your responsibilities to the company. A financial conflict of interest can arise when your judgment could be influenced, or might appear as being influenced, by the possibility of personal financial gain.

Examples of conflicting financial investments are:

- Financial interest in a supplier of Walmart, if you have direct or indirect involvement in our business with that supplier
- Receiving personal compensation from a supplier, if you have direct or indirect involvement in our business with that supplier
- Using confidential company information for personal gain

Additionally, ownership of stock in a competitor with a market value in excess of U.S. $20,000 (or equivalent local currency amount) must be disclosed in writing to Global Ethics. Global Ethics will determine whether or not a conflict or a potential conflict exists and how it should be handled.

### Outside Employment

Associates should avoid employment or outside interests that may create, or give the appearance of creating, a conflict of interest. For example, management associates working for a competitor is deemed to be a conflict. Hourly associates should check with their managers before accepting employment with a competitor to determine if a conflict exists. Factors for consideration include similarity of position and job responsibilities. Similarly, associates may not work for a supplier if they have any influence (either direct or indirect) over the supplier's product or the supplier's business with Walmart.

Associates may operate and work in a side business as long as it does not create a conflict of interest with their work at Walmart. This means the side business cannot interfere with your responsibilities as a Walmart associate, be similar in nature to your role as an associate, benefit from the use of Walmart assets, supply products to Walmart or reflect negatively on Walmart.

If you have a question about whether outside employment is a potential conflict, contact your manager or Global Ethics.

### Former Employment

A conflict of interest may exist if a former associate is calling on Walmart in an area in which the associate worked or had influence while employed at Walmart. If the former associate was a Walmart officer, a conflict may exist regardless of the area in which the officer worked.

When a former associate takes a position with or on behalf of a supplier, Walmart will not do business with that associate for a period of one year following his or her separation if the former associate is dealing with a business area in which he or she worked or had business influence. Walmart will not do business with former officers for a period of one year regardless of the area in which the former officer worked. Global Ethics may, in partnership with senior business leadership, determine a different time period is reasonably warranted under the circumstances. All conflict determinations must be submitted to Global Ethics in advance for a written opinion.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1 800 WM ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000552

## Personal Relationships with Suppliers

Associates should not have social or other relationships with suppliers if the relationship would give the perception a business influence is being exerted. We believe in basing our relationships with suppliers on efficient, fair and lawful business practices. The selection of suppliers must be made on the basis of objective criteria, including integrity, quality, price, delivery, adherence to schedules, product suitability, maintenance of adequate sources of supply and Walmart's

> *The selection of suppliers must be made on the basis of objective criteria.*

purchasing practices and procedures. We must treat our suppliers with respect, fairness and honesty. We must not take undue advantage of a supplier by using Walmart's business influence. Also, we should expect our suppliers to follow all applicable legal requirements in their business practices, as well as our supplier standards.

If you believe you may be perceived as having an inappropriately close relationship with a supplier, or appear to be exerting a business influence on the supplier, inform your manager or contact Global Ethics.

## Gifts & Entertainment

Accepting gifts and entertainment can cause a conflict, or the appearance of a conflict, between personal interests and professional responsibility. Walmart's culture is to never accept gifts or entertainment from any supplier, potential supplier, government agent or other third party the associate has reason to believe may be seeking to influence business decisions or transactions. Associates also may not accept a gift or gratuity from a customer for work performed by the associate in a Walmart facility, except as required by local or national policy.

We may not accept items donated to Walmart by suppliers for the purpose of raising funds for charities or non-profit organizations. Also, we should never ask for, accept or approve of suppliers making donations on behalf of Walmart. Additionally, associates should not provide a list of our suppliers to charitable organizations for the purpose of fundraising.

Our policy on gifts and entertainment stems from our values of complete transparency and objectivity and our principle of maintaining Every Day Low Costs. Since such gifts and entertainment increase the cost of doing business, we help our suppliers give us low costs on products by not expecting the gifts and entertainment they may have to spend on other customers. We recognize, as a global company, we may encounter situations in which local practices will come into play. Global Ethics will review these situations on a case-by-case basis.

When you are establishing a new business relationship, make sure all parties are aware of our policy regarding gifts and entertainment. In some countries where gift giving is a custom or tradition, you should politely explain this policy to your customers and suppliers, especially prior to holiday gift-giving periods, to establish expectations.



JUST SAY...
**No, thank you.**

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

14

WM-OSBORNE0000553

## ASK YOURSELF...



*Would this business offer me this gift or gratuity if I wasn't employed by Walmart?*

You always should be aware of how the act of accepting a gift or gratuity might be perceived by the public, by other suppliers or by other associates. When dealing with external businesses, you should ask yourself, "Would this business offer me this gift or gratuity if I wasn't employed by Walmart?" If the answer is "no" or is unclear, you should not accept it.

Occasionally, there may be times when returning a gift would be impractical or embarrassing. In those rare instances, the gift should be managed in a fair and objective manner that does not benefit you personally, such as donating it to charity. You should immediately tell your manager or Global Ethics about any gift you've been offered or received if you feel that gift might be a violation of our policy. If you have any questions about gifts and entertainment, you should seek assistance from your manager or Global Ethics.

### Personal Relationships with Other Associates

At Walmart, we want to maintain a work environment in which associates can perform effectively and achieve their full potential. We all are responsible for creating a climate of trust and respect and for promoting a productive work environment.

A conflict of interest exists when you manage someone with whom you have a family, romantic or dating relationship. A family relationship includes the following relatives by birth, adoption, marriage, domestic partnership or civil union: your spouse, children, parents, siblings, grandparents or grandchildren, as well as anyone who currently is a member of your household, whether or not you are related. It also may include other close personal relationships such as godparents. Even if you're acting properly, your relationship will likely be seen as influencing your judgment. This can damage morale and disrupt workplace productivity. Therefore, you may not directly or indirectly supervise any family members or any

associate with whom you have a close personal relationship, date or are romantically involved. This includes situations in which you may be able to influence that associate's terms and conditions of employment or that associate may be able to influence the terms and conditions of your employment.

Walmart strives to eliminate personal relationships that interfere with work performance or which may constitute harassment.

You should ask for guidance from your manager or contact Global Ethics whenever an issue comes up regarding a personal relationship.



*At Walmart, we want to maintain a work environment in which associates can perform effectively and achieve their full potential.*

## Walmart Assets

We have a responsibility to our shareholders to use Walmart property and assets for Walmart business and not allow them to be used for any type of personal gain. You're responsible for maintaining Walmart property under your control and should take reasonable steps to protect it from theft, misuse, loss, damage or sabotage. Where permitted by law, associates have no expectation of privacy as to the use of Walmart communication tools (such as email or voice mail). Walmart has the right to and does monitor communications tools, including the content and usage of such tools.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

15

WM-OSBORNE0000554

# Alcohol & Drug Free Workplace



**Q** I was asked to take a drug test before accepting a promotion into management. Is this standard?

**A** Where permitted by law, job applicants may be drug screened as part of the post-offer hiring process or prior to accepting a promotion into management. Any applicant who tests positive for illegal drug use will not be hired or promoted, and may be terminated. In addition, Walmart may require you to submit to drug testing, where permitted by law following certain on-the-job injuries or if there is reasonable basis to suspect you're under the influence of drugs.

**Q** Is there somewhere I can go for help if I have a drug or alcohol problem?

**A** Walmart operations in some countries provide counseling services. Please contact your manager through the Open Door process, your Human Resources manager or your local substance abuse counseling center for help.

**Q** I'm attending a Walmart - sponsored group meeting where alcohol will be served. May I drink alcohol while there?

**A** With prior approval from the market country president or corporate executive officer of the business unit sponsoring the event, alcohol may be served at some company-sponsored events. Associates of legal drinking age may consume alcohol at these events.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

16

WM-OSBORNE0000555

## Discrimination and Harassment Prevention

**Q** In the break room, another associate called me a disrespectful name associated with my nationality. What should I do?

**A** Immediately report the incident to management through the Open Door process or contact Global Ethics.

**Q** A department manager regularly comments about how attractive I am, which makes me feel uncomfortable. What should I do?

**A** We encourage you to tell the person to stop. If you're not comfortable talking to the person or the activity does not stop, immediately report the issue to management through the Open Door process or contact Global Ethics.

**Q** Is my desk calendar with occasional stereotypical and sexual jokes appropriate in the workplace?

**A** No. It could be offensive to someone else in the workplace. If you're in any doubt, remove the item from the workplace.

**Q** An associate used a word in a meeting that is offensive to me. What should I do?

**A** Speak up and tell the person if you feel comfortable. Some words are universally offensive but some are not. The associate might not know the word could be offensive to someone else. You also can exercise the Open Door process or contact Global Ethics.

## Inappropriate Conduct

**Q** A customer continues to call me bad names while in my checkout line. What should I do?

**A** Contact a member of management or Asset Protection in your store.

## Wage and Hour

**Q** My manager asks me to gather carts each evening on my way out to my car. Is this acceptable?

**A** No. You should tell your manager you have already clocked out and it is a violation of company policy for you to work off-the-clock. You also should report the issue to management through the Open Door process or contact Global Ethics.

## Conflict of Interest

**Q** I've recently invested $10,000 in my bank's mutual fund program. The fund may invest some of the money in either competitor or supplier stock. Is this a violation?

**A** If you have no direct control over the investment strategy, it's not a violation.

**Q** Someone told me I cannot own stock in a supplier. Is this correct?

**A** Maybe. The restriction is that you may not have any direct financial interest in a supplier whose business you have direct or indirect influence over in your position at Walmart. There are no restrictions against financial interests in suppliers whose business you do not influence.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000556

**Q** I recently joined Walmart and I own more than $20,000 (or local currency equivalent) of stock in a key competitor. Must I sell this stock?

**A** You should disclose the information to your manager and Global Ethics. Global Ethics will advise you regarding any potential conflict of interest.

**Q** There's a contracting company I do business with as part of my position with Walmart. They have asked me if I know of an engineer they could hire. My son is qualified and would like to work for this company. May I refer my son for the position?

**A** No. Even though the contracting company sought your recommendation, it may appear that you are using your position with Walmart to get your son a job. That would be a conflict of interest that could compromise your reputation as a representative of Walmart.

**Q** My neighbor is one of my suppliers. He invited my family and me to a neighborhood party. Would it be a conflict of interest if we went to the party?

**A** It is not a violation to attend as long as the party is open to the neighborhood and you're invited because you're a neighbor, not because of your position with Walmart. Remember to ask yourself: if another supplier or other associates knew of this situation, would it appear you are giving preferential treatment to your neighbor as a supplier, or that the supplier is trying to influence you?

**Q** Our market electronics team is attending a training session hosted by a supplier to learn about a new item the supplier is launching. The supplier said we will each get a free t-shirt for attending the training. Can we accept the t-shirts?

**A** Because the t-shirts are coming from the supplier and are not related to the product or gaining an understanding of the product, the team should not accept the t-shirts. Politely decline the t-shirts and explain our standard on gifts and entertainment to the supplier.

**Q** I have been requested to speak on a panel at an event sponsored by a supplier. The supplier has offered to pay for all expenses incurred for all speakers. Is it appropriate for the supplier to cover my expenses?

**A** No. Due to our business relationship with the supplier, Walmart should incur the costs associated with the event.

**Q** I work in Financial Services, and I received a birthday gift from a close personal friend who happens to be employed by a Walmart toy supplier. Can I accept the gift?

**A** In your role, you have no direct or indirect influence over the business relationship with the supplier, so it would not be a violation to accept the gift from your friend.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000557

**Q** In my market, it is a cultural custom for suppliers to offer beverages, such as coffee, tea or soft drinks, and other small snacks during business meetings at their facilities. Can I accept these refreshments?

**A** You may accept customary refreshments such as a coffee, soft drink or small snack. However, you should not accept food and beverages that would be considered a meal.

**Q** A supplier I work with has offered me two tickets to the World Cup if I pay face value for them. Can I buy the tickets?

**A** No. Although you may be paying face value for the tickets, it may not reflect the market value of the item. Some areas allow you to resell tickets, and you might be able to make a profit if you sold them. Also, this can be considered a gift of prestige, as having the opportunity to attend a coveted event such as the World Cup is not readily available to everyone.

## Walmart Assets

**Q** I have to travel often for my job. Can I use my company laptop to check my bank account online while I am traveling?

**A** Yes, as long as it does not interfere with your work performance.

**Q** My manager told me when I travel with my laptop I should carry it on the plane with me. Is this really necessary?

**A** Yes. When traveling with a company-issued laptop, you must carry it on the plane with you. It may not be checked with your baggage. It is necessary to protect the laptop and the information contained on it from theft, loss, misuse or damage.



To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000558

# Leading with Integrity in Our Marketplace



66 ...Acting with integrity, it's the foundation of Walmart. It's how our company was created. It's the expectation — the absolute. 99

Mike Duke,
Former President and CEO,
Wal-Mart Stores, Inc.

## ◯ Fair Competition & Fair Dealing

We are committed to complying with all competition, fair dealing and antitrust laws applicable to our global businesses. These laws help protect competition to enable open markets and enhance productivity, innovation and value for customers. Our policies and actions demonstrate our interest to encourage competition by complying with all applicable competition and antitrust laws, as well as engaging in truthful and accurate sales and marketing practices. In doing so, we will thrive as a company and continue to help our customers around the world save money and live better. For specific information on applicable laws or to seek advice, contact the Legal Department.

## ◯ Intentional Dishonesty

Striving for excellence means operating our business with high integrity and never conducting or participating in deceptive, dishonest or fraudulent activities. These activities are not only unethical, but may also be a violation of law. You should manage your particular area of business with as much transparency as possible. You should also encourage a work environment that supports the contributions of your associates and is based on our company's ethical values and Our Beliefs. Acts of fraud or dishonesty are more likely to occur in environments with insufficient controls or unrealistic expectations. To maintain excellence in our operations, encourage transparency, honesty and realistic expectations.



To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000559

# Financial Integrity & Accounting Irregularities

Walmart requires honest and accurate recording and reporting of financial information to make responsible business decisions. All financial books, records and accounts must accurately reflect financial transactions and events. They must conform to generally accepted accounting principles and to Walmart's system of internal controls. No Walmart document or record may be falsified for any reason. No undisclosed or unrecorded accounts of Walmart's funds or assets may be established for any purpose.

# Insider Trading

It is illegal to buy or sell stock or other securities on the basis of material, non-public information or inside information. Inside information is any material, non-public information a reasonable investor is likely to consider important when making an investment decision. Some common examples include periodic sales or earnings information for Walmart U.S., Walmart International or the total company prior to the public release of such information, projections of future earnings or loss or news of a significant event such as a pending merger, a change in operations structure or a change in executive management.

It also is illegal to communicate or tip inside information to others so they can buy or sell stock or other securities on the basis of such information. If you are aware of inside information about Walmart or any other company, including our suppliers or business partners, you are prohibited from trading directly or indirectly or tipping others to trade in stock or other securities of that company. These same restrictions apply to any person living in your household or who is financially dependent upon you, as well as to any entity or securities account you may control. As Walmart associates, we all must remember to:

* Never buy or sell stock or other securities of any company while you have inside information about that company.

* Never recommend anyone buy or sell stock or other securities of any company while you have inside information about that company.

* Never disclose inside Information about Walmart to anyone outside of Walmart (including your family members), unless such information has been released to the general public or unless such disclosure has been approved by the Legal Department and only after the Legal Department has informed you that adequate steps have been taken to prevent misuse of the information.

* Disclose inside information to people within Walmart only on a need-to-know basis.

* Never attempt to manipulate market prices, or spread market rumors or false information.

* Never buy or sell Walmart securities while the trading window is closed if you are subject to trading windows as described in Walmart's Insider Trading policy.

If you have questions or concerns about insider trading, refer to Walmart's Insider Trading policy, contact the Legal Department or Global Ethics.

# Restrictive Trade Practices

We will not participate in any activity intended to restrain trade or promote a refusal to conduct business with customers, members or suppliers in any country where such a refusal would be in violation of an applicable law. If you learn of a refusal to conduct business or any related communications regarding such a refusal, contact the Legal Department.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000560



## Intentional Dishonesty

**Q** An industry trade association has contacted me about participating in a benchmarking study for members of their association. This seems like a good way to obtain information about our competitors. Should we participate?

**A** There is nothing wrong with participating in industry benchmarking activities. However, this should never be used as a means to obtain confidential information about competitors.

**Q** Our store has several associates who are behind on their CBLs. To avoid a late report being elevated to my manager, can I have my office associate take their CBLs and then cover the material with my associates during our team meetings?

**A** No. Having your office associate complete the CBLs of other associates would not only be an act of intentional dishonesty, but also an unethical directive by the manager. This would compromise your integrity, as well as the integrity of the office associate and the associates who should be taking the CBLs. In addition, CBLs are used to ensure our associates are appropriately trained to handle specific situations they may encounter in their jobs. If you do not allow your associates to take their assigned CBLs, you are potentially putting your associates, customers and the company at risk.

**Q** I am applying for another job at Walmart. A requirement of the job is a college degree. I am actually due to finish my degree in a few months. Can I state that I have the degree on my resume?

**A** No. You should be honest about your qualifications when seeking a job. Misrepresenting your education, experience, certifications or licensing is a dishonest act that could potentially put our company at risk as well as provide an unfair advantage in the candidate selection

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

22

WM-OSBORNE0000561

**Q** My manager has stated that, due to the difficulty involved in reaching the high bins in the backroom, we should acknowledge in the system that a bin audit has occurred when, in fact, it has not. What should I do?

**A** What your manager is suggesting you do is to falsify bin audits, which is not only a dishonest act but also could be detrimental to our business. By not properly conducting your bin audits, you are potentially impacting the level of customer service at the store as well as impacting the store's ability to maintain accurate in - stock levels. Additionally, your manager asked you to engage in a dishonest act. You should report this to management through the Open Door process or contact Global Ethics.

## Financial Integrity

**Q** My manager told me to markdown several items to zero but leave them on the shelves to sell because it will "help our inventory." Is this acceptable?

**A** No. The manipulation of markdowns is not only dishonest, but it also could affect the store's profitability. If you're being instructed to do this, report it to Global Ethics immediately.

**Q** An associate near me says she makes adjustments to our financial information so our "good months" will help out our "bad months." Could this be an issue?

**A** The manipulation of accounts and allowances is not only intentionally dishonest, but also is a financial integrity concern that can have serious consequences both personally and as a company. You should report this immediately to Global Ethics.

## Insider Trading

**Q** I have inside information from a publicly listed vendor about an amazing new product the company is going to launch. Can I buy that public company's stock?

**A** No. Any stock sale or purchase based on material, non-public information is considered insider trading.

**Q** Could I encourage a friend to buy that public company's stock?

**A** Encouraging others to purchase the stock would still be considered insider trading and is commonly referred to or known as "tipping." The friend would be liable for insider trading, if he or she purchased shares based on your tip, and you would be liable for insider trading for giving the tip even though you did not buy any shares of the public company's stock.

## Restrictive Trade Practices

**Q** I was told I should boycott one of my suppliers because they conduct business in a certain country. Should I not do business with that supplier?

**A** Although restrictions are sometimes placed on certain countries and individuals, it's always best to speak to the Legal or Compliance Department before taking any action if you are instructed to boycott a supplier or country.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

23

## Leading with Integrity in Our Communities



**Integrity is the single most important characteristic of a leader.**

Lee Scott,
Former President and CEO,
Wal-Mart Stores, Inc.

## ◯ Anti-Corruption

Walmart believes in fair, free and open markets. We also believe in promoting good government. We do not tolerate bribery, corruption or unethical practices of any kind.

*Our stance on improper benefits is firm — regardless of local practice or custom, or even harm to our business.*

Walmart strictly prohibits anyone acting on behalf of Walmart, whether directly or indirectly, from making or receiving bribes or improper payments. Walmart's Global Anti-Corruption Policy forbids us from paying, offering or authorizing payment of money (or anything that has value) to improperly influence anyone. This also applies to payments made through someone unaffiliated with Walmart, such as a third party acting on Walmart's behalf. Our prohibition also covers small or minor benefits to influence someone improperly. Our stance on improper benefits is firm — regardless of local practice or custom, or even harm to our business.

We must avoid any interaction with a public official, employee of a publicly owned company or political organization that could even appear improper. This includes any person who exercises a public function or who works for a government at any level (e.g., customs clearance officer, members of the military and law enforcement), a political party or campaign (including unpaid staff), a public international organization (e.g., the World Bank) or a government-owned or government-controlled enterprise (e.g., employees at state-owned utilities, energy companies, hospitals). A contract with a state-owned or public entity requires prior written Legal Department approval and the approval of the Anti-Corruption Compliance team.

You must immediately report any suspected violations or any requests for a bribe. For further guidance on this topic, contact the Anti-Corruption Compliance team or Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

24

WM-OSBORNE0000563

# Anti-Money Laundering

We're committed to complying fully with all applicable money-laundering laws throughout the world. Some countries also have laws related to the reporting of cash or other suspicious transactions we must obey.

Be alert to the following activities:

- Types of payments associated with money laundering, such as: multiple money orders, volume purchases of prepaid products such as gift cards or large cash transactions

- A customer or other third party who is reluctant to provide complete information, provides false or suspicious information or is anxious to avoid reporting or record-keeping requirements

- Unusual domestic or foreign fund transfers that indicate scam activities or fraudulent schemes

- Structuring a transaction to avoid requirements, such as conducting multiple transactions below the reportable threshold amounts

Walmart has established rules concerning acceptable forms of payment. For further guidance on this topic, please contact the Compliance Department.

# Authority to Work

We strive to be good corporate citizens. Therefore, we will not hire, recruit or refer for a fee, anyone not legally authorized to work in the country in which employment is sought. It is our responsibility to inspect, verify and document the identity and employment authorization of every new associate, including associates on global assignment in a country different from their home country. We also are responsible for re-verifying the continuing employment eligibility of each associate by requesting further documentation when the initial work authorization has expired.

All persons we hire or send on a global assignment to a country other than their home country, must provide proper documentation and verification of their authorization to work in the country where they are to be employed.

In complying with immigration laws, it is important that we follow our policy against employment discrimination on the basis of national origin or possible citizenship status.

We require all employment agencies, contractors and others doing business with us to fully comply with all immigration laws.



# Environmental Responsibility, Health & Safety in the Workplace

We all must serve as responsible stewards of the environment and care for the safety and well-being of our associates, members, customers and communities.

## Environmental Responsibility

Walmart is committed to conducting business in a socially responsible and ethical manner that protects the environment. We are committed to environmental protection and preservation of our natural resources. We are also responsible for complying with all applicable environmental laws and regulations. This responsibility is a core foundation of our commitment to environmental sustainability. We must all act ethically in regards to environmental issues to further our goal of helping people live better and to ensure a better world for generations to come.

## Health & Safety

Walmart is also committed to protecting the health and safety of our associates, members, customers and communities because we care for one another's well-being. Conducting our business in compliance with all health and safety laws is crucial to protecting each other from harm. As associates of Walmart, we must always comply with all relevant health and safety laws and policies and never ignore a potential health and safety concern. Acting ethically in regards to health and safety issues is critical to our corporate goal of providing a safe shopping and working environment.

If you have questions regarding environmental or health and safety issues, please contact the Compliance Department or Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000564

# Product & Food Safety

At Walmart, food and product safety are more than a priority or regulatory requirement; they're part of our culture. As Walmart associates, we must comply with all applicable food and product safety laws and regulations in our daily business. With thousands of suppliers around the world, we realize we have an important obligation to require our suppliers to adhere to stringent food and product safety expectations, laws and regulations. If you have any questions or concerns regarding food or product safety and the regulations or requirements that apply to your area of the business, please contact the Compliance Department or Global Ethics.

# Protecting Personal & Business Information

In our daily business, we may be exposed to personal and business information about associates, customers, members, suppliers and our own company. It's our responsibility to protect this information in accordance with applicable laws, our policies (including our records retention requirements), and our company beliefs.

Information may be physical (on paper) or electronic. You only should collect or save company business information needed to perform your job. You must manage such information securely through its lifecycle and in accordance with Walmart's records management requirements. Confidential company information is divided into three classes of data: highly sensitive (high security), sensitive (medium security) and non-sensitive (low security).

Examples of ways to protect highly sensitive or sensitive information include:

* Accessing the information for business purposes only

* Sharing it with other associates for legitimate business purposes only

* Preventing unauthorized access (for example, locking up highly sensitive data)

* Returning all highly sensitive and sensitive information to Walmart along with any other Walmart property upon termination of employment

* If there is no business need for keeping the data and no hold for legal purposes, dispose of it by placing it in a shredder or confidential bin; never throw it in the trash

*In addition to protecting our trade secrets, it's our policy to respect the trade secrets of others.*

If you believe you have confidential company information that needs to be shared outside the company, seek approval from your manager or the Compliance Department before sharing information.

Trade secrets are an example of business data we must protect. In our pursuit of striving for excellence, we have invested in the development of systems, processes, products, business procedures and technology — our trade secrets — that have made us a leader in the retail industry and give us a competitive edge. All trade secrets are highly sensitive data and must be kept secure. In addition to protecting our trade secrets, it's our policy to respect the trade secrets of others. No associate may reveal the trade secrets of the companies with which we conduct business or companies with which they were previously employed.

All associates should ensure their use of social media does not compromise the confidentiality of Walmart trade secrets, highly sensitive or sensitive business information.

Personal information about customers, members, suppliers and vendors must also be securely managed. Do not access or collect such information unless necessary to perform your job and only as directed by your manager. If you suspect there may be a breach of such personal information, notify a member of management, Human Resources or Global Ethics. Treat associate medical information the same.

Specific departments within our company may have special privacy rules or procedures. We must read, understand and stay current on information that applies to our specific areas of the business and job functions. Additionally, we must follow the applicable records management requirements. If you have questions about the record-keeping requirements that apply to your job, please contact the Compliance Department or the Privacy Office Records Management team for assistance.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

26

WM-OSBORNE0000565

## ○ Governmental & Political Activities

### Governmental Contracts and Inquiries

We should not enter into any contract or agreement with any governmental entity for any purpose without prior written approval from the Legal and Anti-Corruption Compliance departments. This specifically includes accepting bids, contracts or purchase orders for products and services. Failure to follow this requirement may result in Walmart incurring significant compliance obligations and related expenses.

You must immediately report all inquiries from governmental entities or investigators to your manager or contact the Legal Department. All inquiries from government entities and investigators must be answered accurately and completely.

### Political Involvement

Participation in the political process outside of work and during non-work time is admirable. You can make lawful contributions of personal funds to political activities; however, Walmart will not reimburse you for those activities unless required by law. Corporate funds shall not be provided to political candidates, entities or organizations without the express knowledge and written consent of Walmart's Corporate Affairs Department. You cannot use your job title or company affiliation in connection with personal political activities unless that information is required by law.

## ○ International Trade

All countries regulate international trade transactions covering activities such as imports, exports and financial transactions. For example, all inbound merchandise entering the commerce of a country must clear customs prior to being released and delivered to the recipient. At customs, merchandise is examined for compliance with regulations and assessed for the payment of duties and taxes, where applicable.

It's important we all keep the following points in mind:

* Make sure a thorough check of all regulatory requirements has been performed before attempting to import and export merchandise. Regulatory requirements apply to both the merchandise and the documentation.

* Documentation must be complete and accurate, including description, prices and the parties to the transaction.

* Internal controls must be established to ensure compliance with all regulatory requirements, including any record-keeping obligations.

As a Walmart associate, you must be familiar with the various trade rules and regulations that apply to your work, including not only the trade laws of your own country, but also the laws in all other countries that may affect your work at Walmart. For example, some governments may administer a variety of trade restrictions, such as embargoes and sanctions against a number of countries, including nationals of those countries. Transactions with certain designated individuals and organizations, such as terrorist organizations, narcotics traffickers and weapons proliferators, also are prohibited even though those individuals or organizations may not be associated with any particular country's embargo. Always consult the Compliance Department prior to entering into international trade negotiations or transactions.

## ○ Media Statements

Communication in the age of social media has changed the way we live and work. When events are unfolding or when people are simply looking for information, you may be viewed as a source of information about the company. As you talk with family members, customers and club members or participate in social media, we encourage you to share your Walmart story. If you are asked questions and are unsure of the answers, the company has created resources you may consult for the latest information, including the corporate website: http://corporate.walmart.com. Our associates play a critical role in sharing information with the public when unfortunate disasters occur or when communities are in need.

With regards to making public statements to media outlets such as television, news stations, local newspapers or trade publications, Walmart must ensure the accuracy of all information it provides to the public. You must receive prior written approval from the in-country or global Corporate Affairs Department before making any public statement, whether written or verbal, to such media outlets. For statements about financial matters, contact the Finance Department prior to making any statement or conducting any interview.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart strictly forbids retaliation against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

27

WM-OSBORNE0000566

## Anti-Corruption



**Q** **Local police officers have recently stopped trucks leaving our distribution center and threatened to delay deliveries unless the driver pays $50 U.S. in cash to the officer. My manager said we should carry $50 gift cards with us. Is it permissible?**

**A** No. Walmart policy prohibits all unofficial payments to government officials to influence government action. This prohibition applies to cash, gifts or other things of value. You should report this immediately to Global Ethics.

**Q** **A store is seeking a permit from the local Transport Authority. The store usually gives holiday baskets to various local officials. This year, the store manager suggested including a $300 gift card in the basket for the head of the Transport Authority. Is this acceptable?**

**A** No. The policy does not allow the gift because it's something of value and is apparently intended to influence the Transport Authority. The policy does permit certain customary gifts, such as holiday baskets that are of low or little value and are not intended to influence anyone. However, an approval process must be followed prior to giving even something as minor as a customary holiday basket. If you have questions about providing customary gifts to any government official, please contact your Anti-Corruption Compliance team or Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

28

WM-OSBORNE0000567

# Anti-Money Laundering

**Q** A customer refuses to provide her address for a $3,000 money transfer to another country. Should I report this as a "suspicious person"?

**A** Any customer reluctant to provide the requested information should be reported as a "suspicious person" when processing financial transactions.

**Q** A customer asked me if I could split a $5,000 transaction into two transactions of $2,500 so they did not have to bother with the paperwork that may otherwise be involved. Should I process the transaction this way?

**A** No. If it's truly the same transaction, it should be processed as one transaction and the proper paperwork should be completely filled out and turned in for reporting to the government. If the customer refuses to comply, contact a member of management to assist you.

# Authority to Work

**Q** Should I report suspected non-authorized workers if they're technically employed by a contractor and not Walmart?

**A** Yes. We require all of our contractors to use only work-authorized employees at our facilities. If you suspect there are unauthorized workers at our work sites, please report to management through the Open Door policy or contact Global Ethics.

**Q** What should I do if an associate arrives ready to begin working and they cannot show evidence of work authorization?

**A** Follow your country's policies regarding employment authorization. This includes verification for new associates as well as visiting associates on an expatriate or transition assignment. For example, under U.S. law an employer must terminate the employment of an employee who is unable to show evidence of work authorization within a certain time period.

# Environmental Responsibility, Health and Safety in the Workplace

**Q** While working in the backroom, I noticed associates were placing boxes or pallets in front of the emergency exit, blocking the door. I reported this to my manager who stated he saw no problem with the practice since it was just temporary and the items would be moved when the merchandise went out on the sales floor. Is this a problem?

**A** Yes. Blocking emergency exits endangers associates and customers should an emergency occur at the store. In addition, we may face potential fines and liabilities for safety hazards such as the blocking or locking of emergency exits. It is crucial that emergency exits be accessible for immediate use in the event of a fire or other emergency. You should immediately report the information to the Compliance Hotline or Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

29

WM-OSBORNE0000568

**Q** An associate is asked to dispose of several containers of damaged household cleaning chemicals. He knows there is a standard operating procedure that governs the proper disposal of those kinds of items, but instead of following it, simply moves the chemicals outside the building and leaves them there. How should this be handled?

**A** Chemicals never should be stored outside and subjected to the elements, especially if they are damaged. They may leak or deteriorate, allowing the chemicals to be released into the environment. Associates should ensure all chemicals are stored safely in approved areas with proper containment to prevent releases to the environment. Associates always should follow corporate standard operating procedures regarding environmental issues. If an associate discovers leaking or improperly stored chemicals, he should immediately notify management and contact the Compliance Hotline or report the information to Global Ethics.

## Protecting Personal and Business Information

**Q** An invoice associate is married to a supplier who works with the buyers at the Home Office. I've seen her call her husband and tell him the cost of products we're buying from his competitors. Is this a violation?

**A** Yes. Although she does not have influence over the business he works with at Walmart, she has access to confidential information that may be giving her husband's company an advantage over other suppliers.

**Q** A co-worker of mine has recently given her resignation. Since then, she's been emailing supplier contact information to her home computer so she can start her own business. Is this a violation?

**A** Yes. The supplier information she obtained through her position at Walmart is considered confidential company information. She should not be using it for her personal business. You should report this to Global Ethics.

**Q** A friend of mine said he could give me information regarding a competitor's upcoming confidential advertising strategy. Should I accept this information?

**A** No. We have no desire or need to know the confidential information of other companies.

**Q** My manager told all my peers about my medical condition when I called in sick yesterday. Is that a violation of the Privacy policy?

**A** It could be. Your peers do not have a business need for knowing your medical condition. Many times this type of information is shared out of genuine care and concern for you as an important and valued member of the team. Talk to your manager and tell them your concern. If you don't feel comfortable talking to them, contact your Human Resources manager or Global Ethics.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

30

WM-OSBORNE0000569

**Q** A pharmacy associate told me a certain customer has a rare medical condition. Is she allowed to share this information?

**A** No. Personal information about our customers, including medical data, is confidential and should not be shared. You should report the incident to management or contact Global Ethics.

**Q** I have an anonymous blog that I write on a regular basis. Can I post information I've learned in my role at Walmart?

**A** While posting information online can be a great way to communicate with others, it's important to consider some of the risks and rewards that are involved. Maintain the confidentiality of company business information related to Walmart and its partners, and the personal information of customers, members and suppliers, as well as associate medical information. Ultimately, you're responsible for what you post.

**Q** My friend and I work in the same department. We both work with sensitive information. I recently learned confidential information that could impact her role. Can I share this information with her?

**A** No. Although the two of you are friends and work in the same department, you should not discuss or share sensitive information with anyone who doesn't have a business need to know it.

## Governmental and Political Activities

**Q** We have a representative from the government here to inspect our food products. What should I do?

**A** Contact your manager or Compliance Department immediately. Ensure you follow the notification process for your market.

**Q** My team is interested in purchasing products from a government-owned business. What should I do?

**A** Contact your Anti-Corruption Compliance Team or Global Ethics before taking any action or making any commitment on behalf of Walmart.

**Q** My team is interested in submitting a Request for Proposal (RFP) to become the exclusive provider of food items for the local school district cafeteria program. What should I do?

**A** Contact the Legal Department before making any commitment and discuss the issue with the government contracting team.

**Q** I would like to sit on the Education Board for my city. Am I allowed to do this as a manager at Walmart?

**A** Yes. You must ensure your position with Walmart, and any influence related to it, is kept separate from your position on the Education Board. You also should be transparent with your manager about your involvement with the board.

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

31

WM-OSBORNE0000570

## International Trade



**Q** I believe one of our imported items was classified incorrectly on the paperwork. What should I do?

**A** Contact your manager and the Compliance Department immediately. There are fines and tariffs in many countries for misclassifying import information on products.



**Q** I was told one of my new suppliers appeared on some sort of government list and I shouldn't do business with the supplier. What should I do?

**A** Contact the Compliance Department for guidance on how to proceed or correct the issue. Many governments keep a list of countries and people with which businesses may not enter into transactions.

## Media Statements

**Q** I think my new store will be opening on a certain date. Can I call the local media to tell them about the grand opening and activities involved?

**A** You should contact the Corporate Affairs Department prior to contacting the media. Corporate Affairs will provide you with the resources and official information you may share with your local community and the media.



To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000571

## Global Ethics Helpline Numbers*
*Numbers subject to change

| Country | | Contact Numbers |
|---|---|---|
| | Argentina | 0800-888-0124 |
| | Bahrain | 800-06-102 |
| | Bangladesh | 000800-032-035 |
| | Belgium | 0800-750-76 |
| | Botswana, BTC | 0800-600-644 |
| | Botswana, Orange | 1144 |
| | Brazil | Retail: 0800-703-3966<br>eCommerce: 8007211491 |
| | Cambodia | 1800-20-8963 |
| | Canada | 1-800-963-8442(English)<br>1-800-805-9121(French) |
| | Chile | 800-550707 |
| | China | 400-120-4020 |
| | Colombia | 01800-913-7496 |
| | Costa Rica | 800-968-4771 |
| | Dominican Republic | 1-888-751-8878 |
| | Ecuador | 1-888-751-8878 |
| | Egypt | 0800-000-9471 |
| | El Salvador | 800-6126 |
| | France | 0800-903277 |
| | Germany | 0800-188-8917 |
| | Guatemala | 800-835-0377 |

WM-OSBORNE0000572

## Global Ethics Helpline Numbers*
*Numbers subject to change

| Country | | Contact Numbers |
|---|---|---|
| | Honduras | 800-2220-0141 |
| | Hong Kong | 800-930-587 |
| | India | 000-800-040-1503 |
| | Indonesia | 007-803-321-8281 |
| | Ireland | 1-800-200-356 |
| | Italy | 800-143-952 |
| | Japan | 0120-692-344 |
| | Jordan | 0800-22319 |
| | Kenya | 704-973-0299 |
| | Malawi | ZAIN TNM 847<br>MTL 8000 0847 |
| | Malaysia | 1-800-817-362 |
| | Mexico | 001-888-280-0603<br>01-800-963-8422 |
| | Morocco | +212-5204-85021 |
| | Namibia | 0800 003 313 for Namibia Telecoms<br>081 91847 for MTC |
| | Netherlands | 0-800-024-9759 |
| | New Zealand | 0800-424280 |
| | Nicaragua | 800-5151 |
| | Pakistan | 00800-90-033-041 |

WM-OSBORNE0000573

## Global Ethics Helpline Numbers*
*Numbers subject to change

| Country | | Contact Numbers |
|---|---|---|
| | Peru | 0800-78378 |
| | Philippines | 1-800-1-322-0162 |
| | Puerto Rico | 866-418-4024 |
| | Russia | 8-800-100-9476 |
| | Singapore | 800-130-1529 |
| | South Africa | 0800-999-620<br>0800-203-246 |
| | South Korea | 080-822-1367 |
| | Spain | 900-494776 |
| | Sri Lanka | 247-2469 |
| | Taiwan | 00801-49-1191 |
| | Thailand | 001-800-13-203-9969 |
| | Turkey | 00-800-113-6848 |
| | United Arab Emirates | 8000-3201-39 |
| | United Kingdom | 0800 318 405 |
| | United States | 800-963-8442 |
| | Vietnam | 1-201-0288<br>800-613-9679 |
| | Zambia | 120-32-518<br>122-80-160 |

WM-OSBORNE0000574



## Final Disclaimer

This Statement of Ethics provides an introduction to the responsibilities of all associates, along with an overview of certain important policies. It's an important part of your employment with Walmart; however, it's not intended to create an express or implied contract of employment in and of itself. It is also not inclusive of all applicable company policies. Furthermore, the policies of Walmart may be modified at our sole discretion, without notice, at any time. Employment with Walmart is on an at-will basis — where permitted by law — meaning associates are free to resign at any time for any or no reason. Violations of this Statement of Ethics may result in disciplinary action up to and including termination.

## Global Ethics Contact Information

International access numbers may change. Refer to walmartethics.com for the most updated access numbers by country if you experience difficulties.



WM-OSBORNE0000575

# Index

Accounting or Audit Issues
(See Financial Integrity) ................ 21, 23

Accurate Bookkeeping
(See Financial Integrity) ................ 21, 23

Alcohol & Drug Abuse................ 11, 16

Anti-Corruption...................... 24, 28

Anonymous Reporting .................... 8

Antitrust................................. 20

Associate Responsibilities ................ 5

Authority to Work..................... 25, 29

Boycotts............................... 21, 23

Bribery .................................. 9, 24

Commercial Bribery .................... 9, 24

Competitive Information ............. 26, 30

Confidential Information .......... 26, 30, 31

Conflict of Interest ................. 13, 17–19

Contact Information ................... 8, 33

Copyrights (See Protecting Personal
& Business Information) ................... 26

Discrimination .................... 11, 17, 25

Discipline for Violations ................ 6, 8

Drug Use ............................... 11, 16

Entertainment ................... 14, 15, 18

Environmental Responsibilities .... 25, 29, 30

Equal Employment Opportunity......... 11

Export Control ........................... 27

External Communications
(See Media Statements) .............. 27, 32

Facilitation Payments .................... 12

Fair Competition ........................ 20

Fair Treatment .................... 11, 12, 17

Family .................................... 15

Financial Integrity.................. 9, 21, 23

Fraud........................... 9, 20, 25, 29

Friends ............................... 14, 15

Gifts ......................... 14, 15, 18, 28

Government Contracts & Inquiries ........ 27

Government Customers (See Government
Contracts & Inquiries) ..................... 27

Government Officials. ................ 24, 28

Gratuities...................... 14, 15, 18, 19

Harassment................. 7, 11, 12, 15, 17

Health ................................. 25, 29

Helpline ..................... 8, 10, 33, 34

Illegal Activities ......................... 5, 9

Immediately Reportable Allegations ....... 9

Immigration ............................. 25

Importing Laws
(See International Trade) .............. 27, 32

Inappropriate Conduct............... 12, 17

Inside Information .................... 21, 23

Insider Trading....................... 21, 23

Intentional Dishonesty .............. 20, 23

International Trade.................. 27, 32

Investigations........................... 6, 7

Investments in Competitors or Suppliers.. 13

Lobbying (See Political Activities) ...... 27, 31

Local Laws................................. 3

Management's Responsibility ............ 6

Meals, Accepting/Offering (See Gifts
& Entertainment) ................... 14, 19

Media Statements..................... 27, 32

Money Laundering.................... 25, 29

Offering Gifts
& Entertainment .............. 14, 15, 18, 28

Online Privacy ...................... 26, 31

Opinions.................................. 7

Outside Employment .................... 13

Payment for Work.................... 12, 17

Personal Use of Company Resources.. 15, 19

Political Activities ................... 27, 31

Privacy .......................... 15, 26, 30

Product and Safety....................... 26

Proprietary Information ............. 26, 30

Questions about the
Statement of Ethics ...................... 3

Raising Concerns...................... 7, 8

Reporting Violations .................. 8, 9

Restrictive Trade Practices........... 21, 23

Retaliation............................ 8, 10

Safety ......................... 25, 26, 29

Sexual Harassment................... 11, 12

Suppliers .......... 14, 15, 17–19, 23, 30, 32

Suspicious Transactions ............. 25, 29

Trade Secrets ........................... 26

Violence ................................ 12

Wage & Hour Laws ................... 12, 17

Waivers.................................. 9

To ask a question or report a violation, contact Walmart Global Ethics at www.walmartethics.com or call 1-800-WM-ETHIC in the U.S., Puerto Rico and Canada. For other locations, consult the back of this Statement of Ethics. Walmart **strictly forbids retaliation** against any associate who reports a concern. Reports can be made anonymously and will be treated as confidential by Walmart.

WM-OSBORNE0000576

# Discrimination & Harassment Prevention Policy English

Updated: April 3, 2020

**State Specific**

We believe in fostering a workplace culture and customer experience where everyone is and feels included. We respect the dignity of every individual and value their unique skills. Having a workforce of associates from diverse backgrounds makes us a better company. Respectful and professional conduct furthers our mission, promotes productivity, minimizes disputes and enhances our reputation in the communities where we work.

All associates, customers, members, or other individuals with whom we have contact in the course of our business should be treated fairly and respectfully without regard to their personal appearance, beliefs, culture, affiliations, or any other characteristics, as long as their conduct does not interfere with the legitimate interests of Walmart or other individuals.

We are also committed to providing an environment that is free of discrimination or harassment based on an *individual's status*.

*Individual's status* means an individual's race, color, ancestry, ethnicity, religion, sex, pregnancy, national origin, age, disability, marital status, veteran status, military status (including required military training obligations) or membership in the uniformed services, sexual orientation, gender identity or expression, genetic information or any other legally protected status. Individual's status also includes an individual's marriage to or association with someone with any status listed above.

We will not tolerate any form of discrimination or harassment in any aspect of our business. This means that we strictly prohibit any discrimination or harassment, as described within this policy, by or directed at:

- an associate
- job applicant
- customer
- member
- supplier
- or person working on behalf of Walmart.

This policy applies to all associates who work for Walmart Inc., or one of its subsidiary companies, in the United States (Walmart).

Managers and supervisors should use the Discrimination and Harassment Prevention Management Guidelines.

# Prohibited conduct

### Discrimination

We prohibit any discriminatory action based on an individual's status in all aspects of our business.

For purposes of this policy, Discriminatory action includes, but is not limited to

- firing,
- refusing to hire,
- denying training,
- failing to promote or



EXHIBIT 9
Osborne- 11/18/21
Huseby.com

WM-OSBORNE0000125

- discriminating in pay or other terms, conditions or privileges of employment based on an individual's status.

It also includes encouraging or assisting anyone to take discriminatory actions.

We prohibit associates from designing, implementing or executing a business process in any manner that discriminates against, singles out or subjects to heightened scrutiny a person based on an individual's status.

For the purposes of this policy, a business process includes, but is not limited to

- sales and purchase of goods and services
- customer service;
- verification or acceptance of any form of payment, including checks, money orders and credit cards; acceptance of shopping cards, gift cards, gift certificates and coupons;
- refunds, returns and/or exchanges of merchandise;
- surveillance, investigation or detention of suspected shoplifters, and
- use of Electronic Article Surveillance.

### Harassment

We prohibit any form of harassment based on an individual's protected status in all aspects of our business. This includes, but is not limited to:

- Pressure for sexual activity, including offering employment benefits in exchange for sexual favors or denying employment benefits in response to a refusal to provide sexual favors
- Repeated unwanted sexual flirtations, advances, or propositions;
- Using slurs or negative stereotyping;
- Verbal kidding, teasing, joking or making offensive comments about an individual's status, appearance, or sexual activity;
- Leering or making offensive gestures;
- Circulating or displaying offensive pictures, cartoons, posters, letters, notes, e-mails, social media, text messages, invitations, or other materials;
- Using company e-mail or Internet resources to receive, view, or send offensive jokes, pictures, posters, or other similar materials;
- Intimidating acts, such as bullying or threatening based on an individual's status;
- Offensive physical contact such as patting, grabbing, pinching, or intentionally brushing against another's body;
- Physical touching or assault, as well as impeding or blocking movements;
- Any other conduct that shows hostility toward, disrespect for or degradation of an individual based on the individual's status.

Harassing conduct, such as that listed above, is prohibited regardless of whether it is welcome or unwelcome and regardless of whether the individuals involved are of the same or are of a different sex, sexual orientation, race, or other status.

### Retaliation

We prohibit taking negative action against any individual for reporting conduct that violates this policy, cooperating in an investigation, opposing discrimination or harassment, or filing or assisting another individual in filing a complaint of discrimination or harassment with a government agency or court.

# Reporting procedures

We are committed to preventing discrimination and harassment in all aspects of our business and will take all reasonable measures to prevent it. However, if we are not aware that discrimination or harassment is taking place, we cannot address the situation.

If you experience, observe or become aware of any conduct that may violate this policy, you should immediately report the violation to any salaried member of management or confidentially and/or anonymously to the Global

WM-OSBORNE0000126

Ethics Office, email: ethics@walmart.com or phone: 1-800-WMETHIC (1-800-963-8442). If you believe a salaried member of management may be violating this policy, you do not have to report the violation to that person. You may report the possible violation to another salaried member of management or call/email the Global Ethics Office.

### Managers

If you observe, receive a report or otherwise become aware of a possible violation of this policy, you must immediately report such conduct to the appropriate level of management for investigation. A salaried member of management who fails to report a violation of this policy may be subject to disciplinary action, up to and including termination.

Appropriate level of management includes, but is not limited to, facility management, Human Resources or Global Ethics.

We will take appropriate steps to ensure there is no retaliation of any kind for using the reporting procedures described in this policy. Retaliation of any kind for using the reporting procedures is strictly forbidden and violates this policy.

# Investigation and appropriate action

We take all reported violations of this policy seriously, and we will promptly and thoroughly investigate all allegations in accordance with the procedures set forth in the management guidelines.

In order to conduct a prompt and thorough investigation, we ask that you cooperate and tell the truth to the individual who investigates your report. If you do not cooperate or you fail to tell the truth, we will be unable to conduct a proper investigation or take prompt remedial action. Any associate who refuses to cooperate in an investigation or fails to tell the truth during an investigation may be subject to disciplinary action up to and including termination.

We will take appropriate action to eliminate conduct that violates this policy and are committed to ensuring that there is no recurrence of such conduct. We may put reasonable interim measures in place during an investigation of a reported policy violation including, but not limited to, suspension or transfer of the associate who reportedly violated this policy. Suspensions are unpaid; however you may use PTO in accordance with the applicable PTO Policy for scheduled hours during your suspension. If you are suspended and the allegations against you are not substantiated, you will be returned to work and paid for all scheduled hours missed while suspended and applicable PTO used during that time will be reinstated.

We will take further appropriate action once the reported violation has been thoroughly investigated. If an investigation reveals that an associate has violated this policy (or any other policy), that associate will be subject to disciplinary action up to and including termination and any other appropriate corrective action.

# Confidentiality

Walmart will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. We will disclose information to only those having a need to know in order to facilitate the investigation or resolution.

# For More Information

If you have questions or need further guidance, please contact

- your HR representative
- Ethics Office using one of these methods:
    - www.walmartethics.com and select "Report a Concern"
    - Access True North on the WIRE and select "Report a Concern"
    - Email: ethics@walmart.com
    - 1-800-WMETHIC (1-800-963-8442)

WM-OSBORNE0000127

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: April 22, 2020

WM-OSBORNE0000128

Content Name: en_US_09010aff8001a539_A_pd-30.htm
Version #: 7.0
Start Date: 2019-04-01 13:44:28
End Date: Currently Active

WMT $##.## +#.##    Associate Name | Logout



# Disciplinary Action Policy

### Effective: April 1, 2019

At Walmart, we believe in empowering you to perform your job well and to take charge of your personal and professional growth. Our goal is to provide you with clear expectations and help you to develop your potential. Expectations regarding your job performance and conduct are communicated through company policies, associate training, evaluations and regular communication with your leaders. Our goal is to retain associates who demonstrate the interest, ability and desire to be successful.

This policy provides instructions and guidance concerning action that may be taken if:

- your job performance fails to meet reasonable expectations and standards for associates in the same or a similar position
- your conduct violates a company policy
- your conduct or job performance violates the Statement of Ethics Policy or a company policy and/or guideline; or
- your conduct is contrary to one or more of our Values as listed below:
    - Service to the customer
    - Respect for the individual
    - Strive for excellence
    - Act with integrity

This policy applies to all associates who work for Walmart Inc., or one of its subsidiary companies in the United States (Walmart) except hourly associates who work in Field Supply Chain. Special considerations apply to associates employed less than 90 days, Home Office temporary associates and associates returning from Military Leave.

Managers should refer to the Disciplinary Action Management Guidelines and Being a Better Leader Resource for additional guidance in administering this policy.

## Feedback for Success

To help ensure you are successful, you and your manager should be engaging in ongoing feedback regarding your performance and/or conduct as an associate.

## Documented Verbal Conversation

Your manager may meet with you to address a specific performance and/or conduct issue prior to administering any formal disciplinary action. This verbal conversation will be documented for record-keeping purposes, but you will not be required to sign or acknowledge, and it will not be maintained within the disciplinary action system.

## Disciplinary Action

Your manager will determine the appropriate level of accountability to use depending on the individual situation, and levels may be skipped based on the circumstances.

You may receive only one of each level of disciplinary action in any 12-month period. If subsequent disciplinary action is warranted, you will receive the next appropriate level of disciplinary action, or a higher level of disciplinary action depending upon the severity of the performance and/or conduct issue, up to and including termination.

You may not be eligible for a promotion or transfer if you have an active disciplinary action within 12 months. Refer to the Job Transfers and Postings Policy, a member of management or your People Partner for the eligibility guidelines for your division.

**Resources**

Being a Better Leader Resource

Disciplinary Action System



EXHIBIT 10
Osborne- 11/18/21
Huseby.com

WM-OSBORNE0000051

Your manager will refer to the following colored action plans in order to help identify which level of Disciplinary Action is most appropriate based on the level of severity and/or next progressive DA step.

### First Written/Yellow Action Plan

- **Slight** impact on associates and/or service to the customer; or
- Causes minimal impact on operations or strategy; or
- Does not meet performance and/or conduct expectations.
- Any conduct that violates a company policy or guideline

### Second Written/Orange Action Plan

- **Moderate** impact on associates and/or service to the customer
- Causes moderate impact on operations or strategy
- Any conduct that violates a company policy or guideline
- Due to the nature of the performance and/or conduct issue you may proceed straight to this level and/or the issue may have been addressed with the associate

### Third Written/Red Action Plan

- **Significant** level of impact on associates and/or service to the customer
- More than a moderate disruptions on operations or a significant deviation in strategy
- Any conduct that violates a company policy or guideline
- Due to the nature of the performance and/or conduct issue and its critical impact to the business, you may proceed straight to this level and/or the issue may have been addressed with the associate

### Immediate Action

If any legal, compliance, safety, labor or ethical violations occur, your manager will determine the next steps, up to and including termination, regardless of your current level of Disciplinary Action.

### Disciplinary Action 1 - Yellow

If your manager has already had a verbal conversation with you about a specific performance and/or conduct issue, and steps have not been taken to remedy it, or if your manager has determined the circumstances with your performance and/or conduct warrant this level of accountability, you may receive a DA1-Yellow. You will have the opportunity to identify, acknowledge and commit to how you will correct the job performance or conduct.

### Disciplinary Action 2 - Orange

You may already have an active DA1-Yellow, or your manager has determined the circumstances with the job performance or conduct warrants a higher level of accountability. You will have the opportunity to identify, acknowledge and commit to a plan for correcting the job performance or conduct.

### Disciplinary Action 3 - Red

You may already have an active DA1-Yellow or DA2-Orange or your manager may have determined that the circumstances of the job performance or conduct warrants a higher level of accountability. You will have the opportunity to identify, acknowledge and commit to a plan for correcting the job performance or conduct.

### Associates Employed Less than 90 days and Home Office Temporary Associates

Associates employed less than 90 Days and Home Office temporary associates should be given verbal feedback regarding their performance and behavior. The formal accountability process is preferred, but not required.

Unacceptable performance should be addressed in a timely manner giving the associate an opportunity to meet company expectations. However, any unacceptable performance may be grounds for termination.

If you fail to submit an acceptable plan of action for a Second or Third Written, you may be subject to further disciplinary action up to and including termination.

### Associates employed less than 90 days and Home Office temporary associates

Associates employed less than 90 Days and Home Office temporary associates should be given verbal feedback regarding their performance and behavior. The formal accountability process is preferred, but not required.

WM-OSBORNE0000052

Unacceptable performance should be addressed in a timely manner giving the associate an opportunity to meet company expectations. However, any unacceptable performance may be grounds for termination.

## Active Disciplinary Action Period

When you receive a level of Disciplinary Action, it will be active for 12 months.

If you take a leave of absence during this 12-month time frame, your disciplinary action period will be suspended and will resume upon your return to work.

If you terminate during an active disciplinary action period, the disciplinary action will remain active for the duration of the initial 12-month period. If you are rehired during the initial 12-month period, you will have an active disciplinary action until the end of the 12-month period.

## Investigations and Appropriate Action

### Investigation

When a manager learns of potential misconduct, he/she may need to conduct an investigation to determine what occurred and take appropriate action. If you refuse to cooperate in an investigation, you may be subject to disciplinary action up to and including termination.

We strictly prohibit retaliation for cooperating in an investigation. If you retaliate against another associate for cooperating in an investigation, you will be subject to disciplinary action.

### Action during investigation

It may be necessary to put reasonable interim measures in place during an investigation. Measures may include, but are not limited to, suspension or transfer if the manager conducting the investigation determines that such measures are appropriate.

Suspensions are unpaid. However, if you are suspended pending the outcome of a company investigation and the result is that the allegations against you are not substantiated, you will be returned to work and paid for all scheduled hours missed while suspended. You may use PTO available to you consistent with the applicable policy for your scheduled hours during your suspension. If you receive pay for any portion of the suspension because the allegations are not substantiated, applicable PTO used during that time will be reinstated.

### Appropriate action

If the investigation reveals that you have engaged in misconduct, your manager will take appropriate action.

### Confidentiality

We will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. We will disclose information only to those having a need to know in order to facilitate the investigation or its resolution. Any other disclosure constitutes a breach of confidentiality and will result in disciplinary action.

## Termination

If you receive disciplinary action(s) and your job performance or conduct remains unacceptable, your employment may be terminated.

If your unacceptable performance and/or conduct is found to be serious, this may result in your immediate termination, even if you have not received prior disciplinary action. You may also be ineligible for rehire with the company.

## For more information

If you have questions or need further guidance, please contact a member of management or your People Partner.

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Last Modified: April 1, 2019

WM-OSBORNE0000053

WM-OSBORNE0000054

| Disciplinary Action # 22588361 Status is Active Mode is View |||||||
|---|---|---|---|---|---|---|---|
| **Win Number** | **First Name** | **Middle Name** | **Last Name** | **Userid** | **Country** | **Division** | **Facility** |
| 223941284 | COREY | J | OSBORNE | | US | 1 | 1350 |

**Type Of Disciplinary Action :**

The Level, and Reason(s) displayed below were the original Level, and Reason(s) selected for the Disciplinary Action

| Level | Reason(s) |
|---|---|
| Disciplinary Action 1 - Yellow | Job Performance |

**Observations of Associate's Behavior and/or Performance :**

Inappropriate conversations/not balancing appropriate interaction with employees as Asset Protection to maximize productivity.

**Impact of Associate's Behavior :**

Negative affect on productivity, the perception of talking versus looking for theft/shrink opportunities, perception of AP.

**Behavior Expected Of Associate :**

Balance building rapport versus socializing to positively impact productivity. Use appropriate conversation with employees to "keep it clean".

**Next Level of Action :**

**Action Plan :**

I, Corey Osborne action plan is not to talking to anyone (associates), not to trust anyone (associates) , and to keep to myself. Speak only when spoken by management and only respond to a call assign to me by management. If I am needed by any associates , it must by called in by a manager and a manager must be present, I will not respond either wise.

**Date, Time, and Place of Disciplinary Action :**

**Date Given :** 02/22/2020   **Time :** 17:13   **Place :** AP Office

**Expiration Date :**

The expiration date of the disciplinary action may be extended beyond 02/22/2021 date, if the Associate spent time on LOA.

**Acknowledgements**

**Date Acknowledged :** 02/22/2020

| Associate Name : | Userid : |
|---|---|
| **Manager** Name : MICHAEL A BERRY | **Userid :** MABERRY |
| **Witness** Name : RYAN G FISHER | **Userid :** RGF000L |

Print



EXHIBIT 11
Osborne- 11/18/21
Huseby.com

CONFIDENTIAL                                                                                    WM-OSBORNE0000915

CONFIDENTIAL

WM-OSBORNE0000916

| Disciplinary Action # 20999489 Status is Expired Mode is View | | | | | | | |
|---|---|---|---|---|---|---|---|
| Win Number | First Name | Middle Name | Last Name | Userid | Country | Division | Facility |
| 223941284 | COREY | J | OSBORNE | | US | 1 | 1350 |

**Type Of Disciplinary Action :**

The Level, and Reason(s) displayed below were the original Level, and Reason(s) selected for the Disciplinary Action

| Level | Reason(s) |
|---|---|
| Disciplinary Action 1 - Yellow | Shoplifter Apprehension |

**Observations of Associate's Behavior and/or Performance :**

Corey approached/stopped a shoplifter that was in possession of a concealed knife that she stole ripping it out of the package. Corey stated to Mike B. after the fact that he knew at the time that he was not supposed to stop/engage with her since she had a weapon.

**Impact of Associate's Behavior :**

Violate AP-09 and put himself and others safety at risk.

**Behavior Expected Of Associate :**

If suspect is believed or known to be in possession of a weapon, Corey will not approach or apprehend but follow company policy.

**Next Level of Action :**

**Action Plan :**

**Date, Time, and Place of Disciplinary Action :**

**Date Given :** 10/26/2018  **Time :** 20:47  **Place :** AP office

**Expiration Date :**

The expiration date of the disciplinary action may be extended beyond 10/27/2019 date, if the Associate spent time on LOA.

**Acknowledgements**

**Date Acknowledged :** 10/26/2018

| Associate Name : | Userid : |
|---|---|
| Manager Name : MICHAEL A BERRY | Userid : MABERRY |
| Witness Name : BARBARA J PADGETT | Userid : BJPADGE |

Print



EXHIBIT 12A
Osborne- 11/18/21
Huseby.com

CONFIDENTIAL  WM-OSBORNE0000957

To request the contents of the **USB** drive or **CD/DVD**, please contact support via email at <u>support@huseby.com</u>. If you ordered hard copies of the exhibits, a disc will be included containing those files.



To request the contents of the **USB** drive or **CD/DVD**, please contact support via email at <u>support@huseby.com</u>. If you ordered hard copies of the exhibits, a disc will be included containing those files.



To request the contents of the **USB** drive or **CD/DVD**, please contact support via email at <u>support@huseby.com</u>. If you ordered hard copies of the exhibits, a disc will be included containing those files.



To request the contents of the **USB** drive or **CD/DVD**, please contact support via email at <u>support@huseby.com</u>. If you ordered hard copies of the exhibits, a disc will be included containing those files.



To request the contents of the **USB** drive or **CD/DVD**, please contact support via email at support@huseby.com. If you ordered hard copies of the exhibits, a disc will be included containing those files.



5/15/2020

To whom it may concern,

I don't remember thedate. but I do remember the incident. CSM Stephanie comes to me (APA Corey) while I was breaking a AP Host at the GR Doors.

CSM Stephanie stated that one of her Cashiers said a African American lady with 2 children in a toddler shopping cart, did not pay for for their merchandise.

Stephanie ask me if I had seen them and the only people fitting that describician was on the side walk just passed the Soda machines.

CSM Stephanie walks up to the lady and asked to see her receipt. Never did Stephanie say any thing about stealing, just asked for to see her receipt.

Children was not crying, boyfriend or husband was in a hurry to load the vehicle for some reason. Stephanie looked at her receipt, thanked her then walked back into the store.

Corey Jansel Osborne

The female comes back into store, being loud trying to make a scene.

EXHIBIT 17

Osborne- 11/18/21
Huseby.com

**Exit Interview Form**

# Walmart, Inc.
# EXIT INTERVIEW

Printed From GAIN - GAIN # 16939937

## Associate Information

| | | |
|---|---|---|
| Associate Name : COREY OSBORNE | WIN : 223941284 | SSN # : |
| Address : 246 SHERBROOKE DRIVE,,LYNCHBURG,VA-24502 USS US9 USS | | Phone: 4345159130 |
| Facility #: 01350 | Division # : 1 | Associate Type: Hourly |
| Last Worked Date : 05/21/2020 | Termination Date: 05/21/2020 | |
| Last Position Held : | Last Rate of Pay : | |

## Company Property Information

The following applicable Company property must be collected at the time of Exit Interview.

☐ Badge ☐ Discount Card ☐ Membership Card ☐ Company Issued Clothings ☐ Weight Belt ☐ Box Cutter ☐ Freezer Gear

Note : To be considered for re-employment, you must re-apply. Your previous work record with Walmart, Inc. will be reviewed. The Company assumes no obligation to contact you for possible re-employment. Where state laws allow, a Neutral Reference will be provided to external employers seeking information regarding your employment with Walmart, Inc. Dates of employment and last position held is the only information that will be released.

## Summary of Termination Information

| | | |
|---|---|---|
| Termination Type: In Voluntary Termination | | Eligible for Rehire Status: Not Rehirable |
| Termination Reason: Gross Misconduct - Other | | Last Day Worked: 05/21/2020 |

## Manager Comments

Corey was involved,wintessed in an incident with a CSM being he was working the doors to help with the count and carts. The CSM asked Corey if he had seen a female of certain description and Corey stated that lady matches, Corey stated that I cant ask for a receipt but that she could and that he could go as a witness, in which the CSM was outside the Grocery doors on the sidewalk and went to the customers car parked at the sidewalk and asked her for her receipt thinking that she had not paid when in fact she did as she loaded items into her car.

## Signatures

| | | |
|---|---|---|
| Associate Name : COREY OSBORNEBANEDA | Date : 05/21/2020 | Electronic Acknowledge : NO |
| Supervisor Name : MICHAEL BERRY | Date : 05/21/2020 | Electronic Acknowledge : YES |
| Witness Name : JUSTIN HOWELL | Date : 05/21/2020 | Electronic Acknowledge : YES |

Provided below is important information related to your separation...,

If you are eligible and enrolled in any company employee wellare benefits plans or programs, including company health and/or accident insurance plans, your eligibility and enrollment in each of those plans will end and you will no longer receive any benefits from those plans and programs after the above termination date. However you may be able to continue coverage after termination.

| | | |
|---|---|---|
| COBRA | Continuation of Benefits | (800) 421-1362 |
| DISCOUNT CARD - RETIREE | Application Information | (800) 421-1362 |
| LIFE INSURANCE | Conversion of Benefits | (877) 740-2116 * must call within 31 days of date coverage ends |
| PROFIT SHARING | Account Information | (888) 968-4015 |
| STOCK OWNERSHIP | Account Information | (800) 438-6278 |
| 401K | Account Information | (888) WMT401K OR (888) 968-4015 |
| RESOURCES FOR LIVING | Counseling Service | (800) 825-3555 |

As a reminder, you will continue to have an additional way to access all of your pay statements through the PayStub Portal on the moneynetwork.com website.



EXHIBIT 18
Osborne 11/18/21
Huseby.com

**Report Title:**     Additional Category Details
**Run Date and Time:**
**Run by:**            Redacted
**Table name:**       sn_hr_core_additional_category

## Additional Category

| | | |
|---|---|---|
| HR Case: | HRC1242133 | Witnesses: |
| HR Service: | Ethics | Substantiated/unsubstantiated: |
| Category: | Discrimination | |
| Sub category: | Race, Color, Ethnicity, National Origin | |
| Sub-sub-category: | | |

Issue description:

WMT200509425-INV0013795
Ethics Investigation-Ethics CM Nathan McInturff
Store # 1350

Allegations:
Harassment-race, color, ethnicity, national origin MM James Hornsby was in the office with the SM Ryan Fisher and James who said I am glad I have you too now you all can catch some of your peoples.
Jaylin Jackson was with me and this was Jaylin's 2nd week training.

Discrimination-race, color, ethnicity, national origin I got terminated for being a witness. May 21st. Reason of termination Gross Misconduct Other. Non rehireable. APASM Mike Berry and ASM Justin was the witness. Corey was involved slashed witness with a CSM. CSM asked Corey if he had seen a customer that matched. CSM was outside the grocery door on the sidewalk. The customer was asked for a receipt. I never stopped her. I never spoke to her. The CSM said everything. I
was in a yellow vest at the time. I was getting carts in. The CSM came to me stating that the cashier told her this. I said I can't do anything about it because I didn't witness it. I told her that if I asked her a receipt I would be fired. I was still on the sidewalk getting carts. They fired me but not CSM Stephanie. They said this had nothing to do with me and this was Conny Morris's position and she wanted it. I am 6'5 and she felt threatened by my presence. I am witness all the time. Managers call me all the time to be a witness. I didn't initiate it. I didn't say anything to the lady. I don't know what Stephanie said in her statement. I didn't even walk up to the car. APASM Mike Berry told me to do the open door because he watched the video. I feel like because I a large black man they are discriminating against me.

Issue Summary:
Former Associate alleged discrimination and harassment based on race

Issue Report:
What happened? SM never called me back. 3 days later I went to the store. I asked Coach if I could have my pay stub and any type of paper work I needed. SM was there. Coach Rich and the Co-Manager came up front and said they weren't obligated to give you anything. They said if you are going to get a lawyer you would need to subpoena. I got terminated for being a witness. May 21st. Reason of termination Gross Misconduct Other. Non rehireable. APASM Mike Berry and ASM Justin was the witness. Corey was involved slashed witness with a CSM. CSM asked Corey if he had seen a customer that matched. CSM was outside the grocery door on the sidewalk. The customer was asked for a receipt. I never stopped her. I never spoke to her. The CSM said everything. I was in a yellow vest at the time. I was getting carts in. The CSM came to me stating that the cashier told her this. I said I can't do anything about it because I didn't witness it. I told her that if I asked her a receipt I would be fired. I was still on the sidewalk getting carts. They fired me but not CSM Stephanie.

You talk to CSM Stephanie? No. This happened on May 11th. Friday before then. They asked me about it. I remembered and pulled the video and I wrote a statement. I told Stephanie that I had to write a statement. I said no harm no foul. I was supposed to work that Saturday and Sunday. I had 2 uncles and my wife's grandmother passed. I had to go to work Monday because I had court Monday morning. I went back again Thursday. They called me back and terminated me. They said this had nothing to do with me and this was Conny Morris's position and she wanted it. I am 6'5 and she felt threatened by my presence. I am witness all the time. Managers call me all the time to be a witness. I didn't initiate it. I didn't say anything to the lady. I don't know what Stephanie said in her statement. I didn't even walk up to the car. APASM Mike Berry told me to do the open door because he watched the video. I feel like because I a large black man they are discriminating against me.

MM James Hornsby was in the office with the SM Ryan Fisher and James who said I am glad I have you too now you all can catch some of your peoples. Jaylin Jackson was with me and this was Jaylin's 2nd week training. We went back in the office and Jaylin asked me what does he mean by that. I didn't report it because I was afraid of retaliation.



EXHIBIT 19
Osborne- 11/18/21
Huseby.com

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 438-2020-01084 |

| VIRGINIA DIVISION OF HUMAN RIGHTS | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone | Year of Birth |
|---|---|---|
| MR. COREY J OSBORNE | (434) 515-9130 | |

Street Address: 246 SHERBROOKE DRIVE,  TIMBERLAKE, VA 24502     City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| WAL MART | 201 - 500 | (434) 832-0304 |

Street Address: 3900 WARDS RD,  LYNCHBURG, VA 24502     City, State and ZIP Code

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

Street Address    City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | Earliest: 07-08-2019    Latest: 05-21-2020 |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION | |
| ☐ OTHER (Specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.     I was hired as an Asset Protection Associate by the above-named employer on or about November 14, 2017. In or around July 2019 and November 2019, there were 2 Asset Protection Manager positions available. The 2 positions were never posted. Two (White) males who worked outside of the company were hired for the position. I met the qualifications for the positions. On or about May 11, 2020, I was a witness to a (White) Customer Service Manager checking the receipt of a customer. Shortly afterwards, the customer complained that I looked intimidating while the Customer Service Manager was checking her receipt. On or about May 5, 2020, the Marketing Regional Store Manager said, Im glad you two are here, now you can start catching some of your people. On or about May 21, 2020, I was terminated. On or about May 22, 2020, I contacted Corporate about my termination. Corporate advised me to talk with my Manager. On or about May 22, 2020, I contacted the Store Manager and he refused to talk with me. I called Corporate back the same day and discussed my termination and the racial comments that were made by the Marketing Regional Manager. The Marketing Regional Manager would make comments like your people out there stealing and your people out there acting a fool, or words to that effect. On or about May 26, 2020, I went to the store and asked for any paperwork pertaining to me and I was told no

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)  9/15/30 |

EXHIBIT 20
Osborne- 11/18/21
Huseby.com

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 438-2020-01084 |

| VIRGINIA DIVISION OF HUMAN RIGHTS | and EEOC |
|---|---|
| *State or local Agency, if any* | |

that I would need a subpoena.

II.     The reason given for my discharge was gross misconduct. There was no reason given to me for the harassment, denial of hiring, or the retaliation.

III.    I believe that I was subjected to harassment, denied hiring, and discharged based on my race (Black) and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* 9/3/20 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |  |
|---|---|---|
| **COREY J. OSBORNE,** | ) | |
| *Plaintiff* | ) | |
| | ) | |
| **v.** | ) | **CIVIL CASE NO.** |
| | ) | |
| **WALMART, INC.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **and** | ) | |
| | ) | |
| **WAL-MART ASSOCIATES, INC.** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **WAL-MART STORES EAST, LP** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **WAL-MART STORES EAST, INC.** | ) | |
| *Defendants.* | ) | |

## FIRST AMENDED COMPLAINT[1]

Plaintiff Corey J. Osborne moves for judgment against Defendants Wal-Mart Associates, Inc., Walmart, Inc., Wal-Mart Stores East, LP and Wal-Mart Stores East, Inc.; and as grounds therefore, states as follows:

---

1    This First Amended Complaint has been amended prior to service to add Walmart, Inc and Wal-Mart Associates, Inc. as named defendants.  Walmart maintains a complicated system of management, employing subsidiaries, partnerships and fictitious names to operate its businesses in Virginia and all four defendants are listed on the Virginia SCC entity directory.  Furthermore, there is a discrepancy between the entity listed on Mr. Osborne's paycheck stub ("Wal-Mart Associates, Inc.") and the entity listed as operator of the store where he worked on state licensing documents ("Wal-Mart Stores East, LP").  Mr. Osborne intends to either seek leave to amend further or to consent to dismissal of some defendants as appropriate once discovery reveals the involvement of these entities.

*Corey J. Osborne v. Wal-Mart Associates, Inc. et al. ● Complaint  Page 1 of 7*


EXHIBIT 21
Osborne- 11/18/21
Huseby.com

## SUMMARY

1. This is a suit for retaliation and discrimination on the basis of race (Black) for termination of employment authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 42 U.S.C. §2000e-5(f) and 28 U.S.C. §1343(a)(4).

3. Venue is proper in the Court and in its Lynchburg Division because all acts relevant to this Complaint occurred in the City of Lynchburg and within the Western District of Virginia.

## PARTIES

4. Plaintiff Corey J. Osborne "Mr. Osborne" is a resident of Virginia.

5. Defendant Walmart Associates, Inc. is a Delaware corporation that is authorized to do business in Virginia and operates and controls the Wal-Mart Supercenter on Wards Road in the City of Lynchburg, Virginia. Walmart, Inc. is a Delaware corporation that is authorized to do business in Virginia and operates and controls the Wal-Mart Supercenter on Wards Road in the City of Lynchburg, Virginia.

6. Defandant Walmart, Inc. is a Delaware corporation that is authorized to do business in Virginia and operates and controls the Wal-Mart Supercenter on Wards Road in the City of Lynchburg, Virginia. Walmart, Inc. is a Delaware corporation that is authorized to do business in Virginia and operates and controls the Wal-Mart Supercenter on Wards Road in the City of Lynchburg, Virginia.

7. Defendant Wal-Mart Stores East, LP is Delaware limited partnership that is authorized to do business in Virginia and owns the Wal-Mart Supercenter on Wards Road in the City of Lynchburg, Virginia. Its registered agent is CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060-6808.

8. Defendant Wal-Mart Stores East, Inc. is a Delaware corporation that is the sole general partner in Wal-Mart Stores East, LP. Its registered agent is CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060-6808.

## FACTS

9. Mr. Osborne timely filed a charge of discrimination with the Equal Employment Opportunity Commission; received a notice of right to sue dated September 15, 2020 on September 19, 2020; and filed this action within 90 days of receipt of the notice of right to sue.

10. Defendants Walmart, Inc., Wal-Mart Stores East, LP. and Wal-Mart Stores East, Inc. do business throughout Virginia by operating Walmart stores, supercenters, distribution centers and other businesses.

11. Mr. Osborne was hired by the defendants as an Asset Protection Associate on or about November 14, 2017.

12. Mr. Osborne is Black and, as such, is a member of protected class as contemplated by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.*

13. Mr. Osborne engaged in protected activity when he participated as a witness in a co-worker's employment discrimination complaint.

14. In or around July, 2019 and November, 2019, Defendant filled two Asset Protection Manager positions.  Mr. Osborne was qualified for both of these positions; and though either of these positions would have involved a promotion for Mr. Osborne, he was not considered for them.  Indeed, Mr. Osborne did not have the opportunity to apply for either position because neither was posted.  The positions were filled by two White individuals who were not employed by the defendants at the time of their selections.

15. During almost the entire term of Mr. Osborne's employment by the defendants, the workplace was permeated by anti-Black racist comments and jokes made by management employees.  For example, management officials Ryan Fisher and Michael Hildreth, in addressing Mr. Osborne, referred to customers of color as "your people" and often told Mr. Osborne to "go watch your people" or "your people are acting crazy out in the store." On several occasions, Mr. Fisher removed Mr. Osborne from surveillance of White shoplifting suspects and directed him to observe customers of color instead; which resulted in increased shoplifting by White customers.  In addressing Mr. Osborne, management official James Hornsby also referred to Black customers as "your people." In or around April, 2020, Mr. Hornsby stated to Mr. Osborne and another Black Asset Protection Associate, "I'm glad I got you two.  Now you can start catching some of your people." Mr. Fisher, who was present when Mr. Hornsby made the comments,  laughed.

16. Mr. Osborne reported the anti-Black racist comments and jokes to his supervisor, Michael Berry, who left the room upon hearing the allegations and declined to investigate them further.

17. This anti-Black hostile work environment was severe and pervasive.

18. The defendants knew of this anti-Black hostile work environment, and the defendants should have implemented a prompt and effective remedy.

19. On or about May 11, 2020, at the request of a Customer Service Manager, who is White, Mr. Osborne witnessed the Customer Service Manager checking the receipt of a customer.

20. In accordance with the defendants' policy, Mr. Osborne did not approach the customer or her vehicle; but, instead, stood on the sidewalk and observed the Customer Service Manager checking the receipt.

21. Shortly thereafter, the customer complained that Mr. Osborne looked intimidating while the Customer Service Manager checked the receipt.

22. On May 21, 2020, Mr. Osborne's employment was terminated ostensibly for "gross misconduct."

23. The employment of the Customer Service Manager, who is White, was not terminated.

24. Since his termination, the Commonwealth of Virginia has issued multiple subpoenas for Mr. Osborne to appear in courts to testify in cases involving Mr. Osborne's employment by the defendants. These subpoenas have been served upon the defendants.

25. The defendants refused to comply with Mr. Osborne's repeated requests to notify him of all of these subpoenas. Consequently, on October 6, 2020, Defendant was not given notice of the court dates and so he did not appear in the Lynchburg General District Court (Criminal Division) and the judge in that court issued a criminal Show Cause Summons against Mr. Osborne. The criminal case is pending.

26. The defendants have not paid Mr. Osborne for his time and travel expenses for appearing

in courts in response to these multiple subpoenas.  Thus, the defendants continue to retaliate against Mr. Osborne even after unlawfully terminating his employment.

## CAUSE OF ACTION

27. The defendants violated Mr. Osborne's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq.* by subjecting him to a hostile work environment based on race; failing to select him for promotion based on race and reprisal; and terminating his employment based on race and reprisal.  There was no legitimate reason to terminate Mr. Osborne's employment.

28. The termination of his employment was imposed with malice or reckless, deliberate indifference to the federally protected rights of Mr. Osborne.

29. The defendants' conduct was outrageous and intolerable.

## DAMAGES

30. As a direct and proximate result of the defendants' actions, Mr. Osborne has suffered and continues to suffer loss of pay and benefits; has suffered and continues to suffer damage to his professional reputation; and has suffered and continues to suffer severe emotional and psychological distress.

31. The defendants are liable for compensatory and punitive damages.

WHEREFORE, Mr. Osborne demands judgment against the defendants, jointly and severally, for injunctive and equitable relief, reinstatement, back pay, compensatory and punitive damages, together with pre-judgment interest,- costs and reasonable attorney's fees to the extent recoverable by law, and for such other and further relief as may be just and equitable.

Trial by jury is demanded.

*Corey J. Osborne v. Wal-Mart Associates, Inc. et al.* ● *Complaint  Page 6 of 7*

Respectfully submitted,

**COREY J. OSBORNE**
By Counsel

**JAMES RIVER LEGAL ASSOCIATES**
**7601 Timberlake Road**
**Lynchburg, Virginia 24502**
**P (434) 845-4529**
**F (434) 845-8536**
**mvalois@vbclegal.com**

**By: /s/ M. Paul Valois**
    **M. Paul Valois, Esquire**
    **Counsel for Plaintiff**
    **Virginia State Bar No. 72326**



Section 600 – Court

Introduction

### Your Role as a Witness

As an associate who is authorized to investigate and detain shoplifters, you will become an integral witness within the criminal and civil justice process. A witness testifies to what he or she has seen, heard, or otherwise observed. This testimony may be offered in court, in an oral examination/deposition, or within an affidavit. The following are suggestions to assist you with your future experience with the legal system.

### Parties in a Criminal Case

In criminal cases, the parties consist of the "Prosecution" which may be the state, local or federal government (also known as the "State" or the "People") and "the Defendant(s)", the person or people accused of the charged crimes. In a criminal matter, Wal-Mart Stores, Inc. ("Walmart") is generally referred to as the "victim" of the criminal defendant's crime. In a civil matter, Walmart is generally the party against whom relief or recovery is sought. Of course, Walmart may also be the Plaintiff or the Party that brings a civil action.

**Responding to Subpoenas**

**You may be subpoenaed to appear in a case, provide evidence for a case, etc. It is important to submit every subpoena to legal@walmartlegal.com.**

Preparing For
Criminal Court

Any associate participating in a legal proceeding must be prepared for the experience. You must review the AP case file and all evidence relevant to the case prior to attending any legal proceeding. You must be prepared to provide factual information concerning the subject incident. You may be the main witness who can establish all of the crucial evidence necessary to prove a criminal is guilty beyond a reasonable doubt or one of many fact witnesses requested to appear at a hearing. If a Walmart witness needed to help the prosecution prove a case no longer works for the company or transferred to another location, it is important that you or the MAPM notify the prosecutor immediately. Prosecutors need witnesses who possess personal knowledge of the facts to prove their case.

> *Note:* Keep in mind that when bringing the Asset Protection case file to court it may become admissible as evidence and should therefore only contain information relevant to the subject proceeding.

> *Note:* If you do not feel adequately prepared for a legal proceeding, inform the MAPM/RAPD or the legal department immediately.

Courtroom
Behavior

If you are requested to appear in a deposition or courtroom preceding you must conduct yourself in a professional and appropriate manner. You must always:



EXHIBIT 22

Osborne- 11/18/21

Huseby.com



- Be on time for scheduled proceedings
- Tell the truth
- Treat all court personnel with respect.
- Dress appropriately (use business casual as a minimum expectation. In general, it is better to overdress than to under dress).
- Call the judge "Your Honor" when on the stand.

WM-OSBORNE0000157

# new resume.pdf

## Generated

### Coding Fields

Bates Range: Osborne v. Walmart000274  -  Osborne v. Walmart000276
Shortcut: new resume.pdf
Author:
Document Type: Efile
Notes: new resume.pdf

CONFIDENTIAL



# COREY J OSBORNE

246 SHERBROOKE DRIVE
Lynchburg, VA 24502
Phone: (434) 515-9130
Email: cory.osb@gmail.com

## Employment History

### Armed Officer

09/2020 - Current          Allied Universal Security Services          4358 Starkey Rd A., Roanoke, VA

- Lock doors and gates of entrances and exits to secure buildings.
- Answer alarms and investigate disturbances.
- Monitor and authorize entrance and departure of employees, visitors, and other persons to guard against theft and maintain security of premises.
- Write reports of daily activities and irregularities, such as equipment or property damage, theft, presence of unauthorized persons, or unusual occurrences.
- Patrol industrial or commercial premises to prevent and detect signs of intrusion and ensure security of doors, windows, and gates.

### Asset Protection Associate (APA)

11/2017 - 05/2020          Walmart          3900 Wards Rd., Lynchburg, VA

- Investigate known or suspected internal theft, external theft, or vendor fraud.
- Implement or monitor processes to reduce property or financial losses.
- Identify and report merchandise or stock shortages.
- Maintain documentation or reports on security-related incidents or investigations.
- Apprehend shoplifters in accordance with guidelines.

### Campus Security Officer

12/2015 - 11/2017          Randolph College          2500 Rivermont Ave., Lynchburg, VA

- Lock doors and gates of entrances and exits to secure buildings.
- Answer alarms and investigate disturbances.
- Monitor and authorize entrance and departure of employees, visitors, and other persons to guard against theft and maintain security of premises.
- Write reports of daily activities and irregularities, such as equipment or property damage, theft, presence of unauthorized persons, or unusual occurrences.
- Patrol industrial or commercial premises to prevent and detect signs of intrusion and ensure security of doors, windows, and gates.

back to top

CONFIDENTIAL

**Campus Security Officer**

09/2012 - 11/2015          Sweet Briar College Campus Safety          134 Chapel Rd , Sweet Briar, VA

- Lock doors and gates of entrances and exits to secure buildings.
- Answer alarms and investigate disturbances.
- Monitor and authorize entrance and departure of employees, visitors, and other persons to guard against theft and maintain security of premises.
- Write reports of daily activities and irregularities, such as equipment or property damage, theft, presence of unauthorized persons, or unusual occurrences.
- Patrol industrial or commercial premises to prevent and detect signs of intrusion and ensure security of doors, windows, and gates.

back to top

**JAIL OFFICER**

09/2004 - 09/2011          BLUE RIDGE REGIONAL          Lynchburg, VA

- Conduct head counts to ensure that each prisoner is present.
- Inspect conditions of locks, window bars, grills, doors, and gates at correctional facilities to ensure security and help prevent escapes.
- Monitor conduct of prisoners in housing unit, or during work or recreational activities, according to established policies, regulations, and procedures, to prevent escape or violence.
- Search prisoners and vehicles and conduct shakedowns of cells for valuables and contraband, such as weapons or drugs.
- Maintain records of prisoners' identification and charges.

**SECURITY SUPERVISOR**

06/2000 - 08/2004          ERMC SECURITY          3405 Candlers Mtn. Rd., Lynchburg, VA

- Analyze and evaluate security operations to identify risks or opportunities for improvement through auditing, review, or assessment.
- Assess risks to mitigate potential consequences of incidents and develop a plan to respond to incidents.
- Attend meetings, professional seminars, or conferences to keep abreast of changes in executive legislative directives or new technologies impacting security operations.
- Communicate security status, updates, and actual or potential problems, using established protocols.
- Conduct physical examinations of property to ensure compliance with security policies and regulations.

**LABOR**

04/1999 - 02/2000          MANPOWER INTERNATL I

INVENTORING PARTS AND MACHINES

# Education History

| Issuing Institution | Location | Degree Received | Course of Study |
|---|---|---|---|
| U.S.ARMY | | No degree provided | 11 BRAVO |

CONFIDENTIAL

# Occupational Licenses, Certificates and Training

**Certification Title**          **Issuing Organization**          **Completion Date**

BASIC JAIL OFFICER

CONFIDENTIAL