COREY J. OSBORNE vs WAL-MART EAST
HARRIS, SETH on 12/13/2021

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF VIRGINIA

3                  LYNCHBURG DIVISION

4    ----------------------------------

5    COREY J. OSBORNE,

6                    Plaintiff,

7      -vs-                    Case No.: 6:20CV00079

8    WAL-MART EAST, LP, et al.,

9                    Defendants.

10   ----------------------------------

11

12

13        REMOTE VIDEOCONFERENCE DEPOSITION OF

14                    SETH HARRIS

15            Monday, December 13, 2021

16                    10:04 a.m.

17                   Pages 1 - 60

18     Reported by:  Tracy W. Koschara, Court Reporter

19

20

21

22               EVANS & COMPANY

23            Post Office Box 11822

24           Lynchburg, Virginia  24506

25                 (434) 239-2552

Page 2

```
 1              Remote videoconference deposition of SETH

 2   HARRIS taken by Tracy W. Koschara, eNotary Public in

 3   and for the Commonwealth of Virginia, taken pursuant

 4   to Notice, commencing at 10:04 a.m., December 13,

 5   2021.

 6

 7   REMOTE APPEARANCES:

 8        ON BEHALF OF THE PLAINTIFF:

 9             M. PAUL VALOIS, ESQUIRE

10             JAMES RIVER LEGAL ASSOCIATES

11             7601 Timberlake Road

12             Lynchburg, Virginia  24502

13             434.845.4529

14             mvalois@vbclegal.com

15

16        ON BEHALF OF DEFENDANTS:

17             G. BETHANY INGLE, ESQUIRE

18             LITTLER MENDELSON, PC

19             1650 Tysons Boulevard, Suite 700

20             Tysons Corner, Virginia  22102

21             703.442.8245

22             GIngle@littler.com

23        ALSO PRESENT:

24             Judy Valois via Zoom

25
```

```
 1                    C O N T E N T S

 2

 3     EXAMINATION OF SETH HARRIS                    PAGE

 4          By Mr. Valois                               4

 5          By Ms. Ingle                               55

 6

 7                      E X H I B I T S

 8     NO.            DESCRIPTION                    PAGE

 9     Exhibit 15    Job Description                   25

10     Exhibit 2     AP-09 Policy                      42

11     Exhibit 6     Disciplinary Policy               43

12

13        REPORTER'S NOTE:  Exhibits were marked out of

14    order pursuant to Plaintiff's counsel's request.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2                  SETH HARRIS,

 3     having been duly sworn, testified as follows:

 4         EXAMINATION BY COUNSEL FOR PLAINTIFF:

 5  BY MR. VALOIS:

 6     Q     Sir, would you mind stating your full name,

 7  please?

 8     A     My name is Seth Randall Harris.

 9     Q     And you understand that you're here for a

10  deposition today?

11     A     Yes, sir.

12     Q     Have you ever given a deposition before?

13     A     Yes, sir.

14     Q     And in what context?  What kind of case was

15  it?

16     A     In times whenever I was in criminal

17  proceedings as law enforcement, and then also as a

18  witness for shoplifting prior in-operations for

19  Wal-Mart.

20     Q     All right.  So you're no stranger to

21  depositions, then?

22     A     No, sir.

23     Q     You do understand that you're under oath

24  now?

25     A     Yes.
```

 1      Q      And you understand the significance of

 2  being under oath as you testify?

 3      A      Yes, sir.

 4      Q      All right.  Are you ready to answer my

 5  questions today?

 6      A      Yes, sir.

 7      Q      I'm going to assume if I ask a question

 8  that you understand the question, unless you tell me

 9  differently?

10      A      Yes, sir.

11      Q      If you don't understand the question or if

12  I phrase it in a confusing manner, please tell me so,

13  and I will attempt to phrase it in a different manner

14  so that you can answer the question.

15      A      Yes, sir.

16      Q      You understand that the case is being

17  recorded by a court reporter?

18      A      Yes, sir.

19      Q      And I'll tell you that you're doing a

20  better job than I do, but it's important that we take

21  turns talking in order to let the court reporter get

22  everything down.

23      A      Yes, sir.

24      Q      And so to that end, if you would allow me

25  to finish asking my entire question, I will do my

Page 6

 1  best to let you finish giving your complete answer.

 2  Can we agree to that?

 3      A      Yes, sir.

 4      Q      All right.  Are you under the influence of

 5  any medications or drugs or anything else that would

 6  affect your testimony?

 7      A      No, sir.

 8      Q      I don't know how long this deposition will

 9  take.  I don't anticipate it will take extremely

10  long, but if at any time during this deposition you

11  need a break for any purpose, please just let me know

12  and we will accommodate that request.

13      A      Yes, sir.

14      Q      During breaks, please understand you're not

15  to discuss your testimony while you're on breaks.

16      A      Yes, sir.

17      Q      All right.  Well, what did you do to

18  prepare for this deposition?

19      A      I reviewed any case files that I may have

20  had as far as prior communication with anything with

21  Mr. Osborne.

22      Q      What in particular?  Which files did you

23  review?

24      A      The e-mails that were discussing basically

25  whenever we had legal documentation that was

 1  requested.  Beyond that, I didn't have anything prior

 2  to the actual legal request that discussed

 3  Mr. Osborne at all.

 4      A     Have you reviewed any of the documents

 5  related to the incident that led to his termination?

 6      A     I reviewed witness statements.

 7      Q     All right.  And are you aware that there

 8  was a video?

 9      A     Yes, I was.

10      Q     Have you reviewed the video?

11      A     I did not.

12      Q     Have you spoken to anyone besides your

13  attorney regarding this case?

14      A     Other than the APASM that was --

15      Q     Let's deal with those acronyms now because

16  we want to get them out of the way.  Can you please

17  tell us what an APASM is?

18      A     Other than the asset protection store

19  manager that brought the issue during the time of

20  questioning, I have not discussed the case with

21  anybody else since the time of the incident.

22      Q     And who is the APASM?  What is the name of

23  that person?

24      A     That would be -- I'm drawing a blank here.

25  It was in the store at the time.  I will have to

 1   reference that.

 2       Q      Where are you physically located right now,

 3   sir?

 4       A      I'm at home at 1329 Johns Berry Court in

 5   Roanoke, Virginia.

 6       Q      And is there anyone there with you?

 7       A      My girlfriend is on the other side of the

 8   house.

 9       Q      All right.  Are you in communication with

10   anyone right now by text or social media app or

11   anything like that?

12       A      No.  My phone is across the room.

13       Q      Can we commit for the duration of this

14   deposition to refrain from communicating with other

15   people --

16       A      Yes, sir.

17       Q      -- about the subject matter here?

18       A      Yes, sir.

19       Q      Okay.  Have you signed any agreements or

20   any memorandum of understanding that would limit your

21   ability to testify today?

22       A      No.

23       Q      Are you bound by any corporate policy in

24   any way which would prevent you from fully and

25   completely answering my questions today?

```
 1     A     No.

 2     Q     Thank you.

 3           All right.  I'm going to talk a little bit

 4     about your background, if we could.  How old are you,

 5     sir?

 6     A     I'm 39.

 7     Q     And when did you start working for

 8     Wal-Mart?

 9     A     This time around, I began in May of 2009.

10     Q     Okay.  So did you have more than one stint

11     in Wal-Mart?

12     A     Yes.  Whenever I was in college, I was also

13     employed with Wal-Mart as well.

14     Q     Okay.  So 2009 -- when did you graduate

15     from high school?

16     A     2001.

17     Q     And where did you go to high school?

18     A     Mt. Vernon Senior High School in

19     Mt. Vernon, Indiana.

20     Q     And after high school did you go to

21     college?

22     A     Yes, I did.

23     Q     And where did you go to college?

24     A     University of Southern Indiana in

25     Evansville, Indiana.
```

```
 1      Q      And was it during this period that you

 2   worked at Wal-Mart?

 3      A      Yes, it was.

 4      Q      What was your position there during this

 5   period?

 6      A      I had two different positions.  I started

 7   off as a sporting goods associate, and then began as

 8   a first-in-line trainee, basically an intern program.

 9      Q      All right.  And this is while you were in

10   college in Indiana?

11      A      Yes, sir.

12      Q      And did you obtain a degree?

13      A      Yes, I did.

14      Q      What year did you obtain your degree?

15      A      2007.

16      Q      And what was your degree in?

17      A      Business management with an emphasis in

18   human resources and labor relations.

19      Q      And were you an intern with Wal-Mart when

20   you graduated?

21      A      No, I was not.

22      Q      Aside from Wal-Mart have you worked

23   anywhere else?

24      A      Yes.

25      Q      Where else have you worked?
```

```
 1      A      I worked for Deaconess Hospital as

 2  security.  I worked for the Department of Homeland

 3  Security as a board patrol agent.

 4      Q      And where is Deaconess Hospital?

 5      A      That is in Evansville, Indiana.

 6      Q      How long did you work there?

 7      A      I want to say approximately two years.

 8      Q      And were you a security officer?

 9      A      I was a board coordinator and security

10  officer.

11      Q      Why did you leave that position?

12      A      I took a role with the Department of

13  Homeland Security.

14      Q      And you worked for border protection?

15      A      Yes, sir, border patrol.

16      Q      And where was that?  Was it the northern

17  border or southern border?

18      A      Southern border in San Diego.

19      Q      What was your role then?

20      A      I was a border patrol agent.

21      Q      And were you assigned to any particular

22  region?

23      A      Yes, the El Cajon sector.

24      Q      How long did you work there?

25      A      Two years.
```

1     Q      And why did you leave that position?

2     A      An injury resulted in my inability to

3  return to service.

4     Q      Was it a work-related injury?

5     A      Yes, it was.

6     Q      Do you receive benefits because of that

7  injury?

8     A      I do not.

9     Q      Do you have any lingering effects because

10  of that injury?

11     A      I do not.

12     Q      And so after you left that position what

13  did you do?

14     A      I was unemployed for some time, and then I

15  was offered and took a position back with Wal-Mart.

16     Q      How long were you unemployed after leaving

17  the border patrol?

18     A      Roughly six months.

19     Q      And when you hired back on with Wal-Mart,

20  where were you hired?

21     A      In Marshall, Illinois.

22     Q      Is that close to where you grew up?

23     A      It is about two hours away.

24     Q      How did you end up in Marshall, Illinois?

25     A      One of the individuals that was a manager

 1  whenever I was a trainee was a store manager up in

 2  that area, that whenever he found out that I was in

 3  need of employment, he reached out to me and offered

 4  a position.

 5      Q     Okay.  And your initial position there was

 6  what?

 7      A     An overnight support manager.

 8      Q     How long did you hold that position?

 9      A     Roughly, ten months.

10      Q     And what happened next?  What was your next

11  position at Wal-Mart?

12      A     I went into store planning.

13      Q     What does store planning mean?

14      A     Basically a remodel team that traveled the

15  country working on remodel or expansion or new store

16  projects and setup.

17      Q     All right.  And so -- and then how long did

18  you hold that position?

19      A     About three years.

20      Q     All right.  So that takes us to about 2013?

21  Is that about right?

22      A     Yes, sir.

23      Q     Where did you go from there?

24      A     I went back into operations as an assistant

25  store manager.

Page 14

```
 1      Q      And where was that?

 2      A      That was in Urbana, Illinois.

 3      Q      How long were you an assistant store

 4   manager?

 5      A      For a year.

 6      Q      And so then where?

 7      A      I became a co-manager in Evansville,

 8   Indiana.

 9      Q      Co-manager is a step up from assistant

10   manager?

11      A      Correct, sir.

12      Q      Okay.  And how long did you hold that

13   position?

14      A      Roughly 15, 16 months.

15      Q      All right.  And then what?

16      A      And then onto -- as a market human resource

17   manager.

18      Q      Is that your current position now?

19      A      Our role was converted about a year and a

20   half ago to market people operations lead.

21      Q      Are the duties the same or do you get --

22   did you pick up more work?

23      A      We essentially picked up more work to be in

24   more alignment with operational functions.

25      Q      So in your current role -- in your current
```

```
 1  role, are you still -- you said people relationship

 2  manager; is that what you said?

 3      A     People operations lead.

 4      Q     Operations lead, I'm sorry, is it still a

 5  human resources-type function?

 6      A     I would say it's more people-focused, but

 7  more along the lines of staffing and --

 8

 9            (Remote transmission interruption)

10            (Recess, 10:17 a.m. to 10:40 a.m.)

11

12            MR. VALOIS:  Let's go ahead and strike that

13  question and partial answer and I will reask it.  We

14  are back on the record.

15  BY MR. VALOIS:

16      Q     Mr. Harris, some of your answer was

17  truncated, so I'm going to start with a new question;

18  all right?

19      A     Yes, sir.

20      Q     Your newest title -- up until now, I've

21  kind of been going forward in time, but now I'm kind

22  of going to go backward in time.  Your newest

23  position is a people operations lead?

24      A     Yes, sir.

25      Q     Is that right?
```

 1      A       (Indicating in the affirmative).

 2      Q       And you said that that involves more than

 3   just HR; is that right?

 4      A       Yes, sir.

 5      Q       Can you tell me what it involves?

 6      A       Our position is more centrally focused on

 7   staffing, on training and on development and

 8   implementation of new positions, rather than -- I

 9   would say more of the generalist HR positions such as

10   benefits, employment decisions, things of that

11   nature.  And we've kind of moved into a more tactical

12   standpoint.

13      Q       Is it fair to characterize that as more of

14   a planning-type thing than an operational-type thing?

15      A       I think the company would like to see it as

16   both.

17      Q       Okay.  But prior to that, you were a human

18   resources manager?

19      A       That's correct.

20      Q       And is that a regional position?

21      A       It is a market-level position, sir.

22      Q       Can you describe what "market-level" means?

23      A       Starting from the store level, the stores

24   are grouped into markets which are in a geographical

25   location, and those markets normally consisted of

Page 17

 1  anywhere from 6 to roughly 12 stores, I do believe.

 2  Those markets are then grouped into a larger

 3  geographical area and into regional and so on and so

 4  forth.  But a market is normally made up of 6 to 12

 5  stores in a geographic area.

 6      Q     Okay.  So kind of like a sub-region?

 7      A     Yes, sir.

 8      Q     So in your capacity, you had -- you were

 9  the human resources manager for 6 to 12 stores?

10      A     At that period, it depends.  I've had

11  single and dual markets throughout my position as

12  both a market human resource manager and a market

13  people ops.

14      Q     What is the difference between a single and

15  a dual position?

16      A     Having more than one market.

17      Q     Okay.  So there were periods where you

18  managed one market and then there were periods where

19  you managed human resources for more than one; is

20  that right?

21      A     Yes, sir.

22      Q     And depending on the period of time the

23  markets may be of a different store alignment.  It

24  may be a totally different market altogether,

25  depending on whenever the coverage would call for it

 1  at the time.

 2      Q      How many employees does the average

 3  Wal-Mart have?

 4      A      Just on a brief estimate, I would say 200,

 5  maybe.

 6      Q      So if a market has 6 to 12, that's an

 7  average of about 8; right?

 8      A      I would say that's typical, yes, sir.

 9      Q      And 280, you said, employees per store?

10      A      Yes, sir.

11      Q      So that would mean that you are managing

12  human resources for 1300 people, approximately; is

13  that right?

14      A      I would say the majority of my period of

15  time in coverage, it would also be double markets, so

16  more along the lines of my head count is normally

17  above 3,000.

18      Q      All right.  And so in your capacity, do you

19  do -- were you involved in hiring at all?

20      A      For salary level and above.

21      Q      And were you involved in employee

22  grievances at all?

23              MS. INGLE:  Object to the form.

24              THE WITNESS:  If an associate had a concern

25  and discussed it with their supervisors and the store

 1  manager, then the market would do a review upon the

 2  associate's request.

 3  BY MR. VALOIS:

 4      Q      All right.  And were you involved in, I

 5  guess, routine discipline?

 6      A      Routine discipline, I would say no.  Only

 7  things that were either employment impacting to the

 8  point where somebody may lose their position or a

 9  multiple-level disciplinary action or circumstances

10  that were unfamiliar with the management team, but

11  not typical day-to-day routines of disciplinary

12  actions or just overall oversight.

13             So, for instance, if attendance of an

14  associate wasn't showing up for work, that's fairly

15  typical that we see.  That would be almost fully to

16  the store's discretion because it doesn't have

17  anything out of the ordinary along those lines.

18      Q      Okay.  And who do you report to at

19  Wal-Mart?

20      A      I report to a regional people operations

21  director.

22      Q      Who is that person?

23      A      Currently, it is Kirsten Frey, F-R-E-Y.

24      Q      Who was it back in May of 2020 when this

25  incident took place?

Page 20

```
 1     A     That would have been -- we did not have a
 2  supervisor at that time.
 3     Q     And as of -- as a market human resources
 4  manager, did you have subordinates, people that
 5  answered to you?
 6     A     No, no direct reports.
 7     Q     Okay.  And what was your salary?
 8     A     My salary at the time currently or --
 9     Q     At the time in May of 2020.
10           MS. INGLE:  Objection to relevance.
11  BY MR. VALOIS:
12     Q     You can answer.
13     A     I would have to make an estimate, but I
14  couldn't give you an exact figure.
15     Q     Well, give me your best estimate.
16     A     I would say around 80,000.
17     Q     All right.  And have you been involved in
18  EEO complaints before this one?
19     A     Yes.
20     Q     Have you ever been named as a responsible
21  management official in an EEOC complaint before?
22     A     No.
23           MS. INGLE:  Objection to form.
24  BY MR. VALOIS:
25     Q     Do you know what a responsible management
```

```
 1  official is in the context of an EEOC complaint?

 2     A     Yes.

 3     Q     And with that understanding, have you ever

 4  been named a responsible management official in an

 5  EEO complaint by an employee of Wal-Mart?

 6     A     No.

 7     Q     Have you ever met Corey Osborne?

 8     A     I have not.  Not to my recollection, I have

 9  not met him before.

10     Q     You're aware that he was employed at the

11  Wal-Mart on Wards Road?

12     A     Yes.

13     Q     In Lynchburg?

14     A     Yes, correct.

15     Q     And at the time, that was within your

16  purview as market resources manager?

17     A     Yes, sir.

18     Q     And so those employees came under your

19  auspices; right?

20     A     Yes, sir.

21     Q     Have you ever been to that store?

22     A     Yes, I have.

23     Q     Had you been to that store on or before

24  May 9th of 2020?

25     A     Yes, sir.
```

Page 22

1      Q      In your role as market human resources

2   manager, how much time did you spend actually in

3   stores versus in the office?

4      A      I would say 60 to 70 percent of the time.

5      Q      60 to 70 percent of the time in stores or

6   in the office?

7      A      We are -- we actually office in the stores.

8      Q      I'm sorry?

9      A      We office in the stores.

10     Q      So you don't have, like, a home office?

11     A      We have a market office, but it is in a

12   store as well.

13     Q      What store was that located in?

14     A      At the time, it was -- that store where we

15   had the market office was located in Staunton,

16   Virginia.

17     Q      Do you know Corey Osborne's race?

18     A      I do not.

19     Q      Did you review his personnel file before

20   making the termination decision?

21     A      I did not.

22     Q      You have reviewed the witness statements,

23   however?

24     A      Yes.

25     Q      At this point I'm going to try and put

Page 23

 1  Mr. Osborne's job description on the screen.  Okay.

 2  If you could just give me a second to do that.  I'm

 3  having technology issues.  Can you see anything on

 4  the screen?

 5      A     Yes, sir.  I see it now.

 6            MR. VALOIS:  For the record, this is a

 7  document that's been provided in discovery beginning

 8  with Bates number WM-Osborne 000036.

 9  BY MR. VALOIS:

10      Q     Sir, can you look at this document and --

11  just the top of this document, and tell me what this

12  document is.

13      A     This is a Wal-mart job description for an

14  asset protection associate as it pertains to, I would

15  say the vast majority but not necessarily all asset

16  protection associates at the time whenever this

17  essential function job description was created by the

18  company.

19      Q     And Corey Osborne was, in fact, an asset

20  protection associate; correct?

21      A     Yes, sir.

22      Q     And this document is provided to employees

23  when they are hired; correct?

24      A     Correct.

25      Q     And employees are expected to perform the

Page 24

```
 1  essential functions of the position using this

 2  description as guidance; is that correct?

 3      A     Yes, sir.

 4      Q     We see after the official functions -- and

 5  I'm not going to labor with you reading all of these

 6  verbatim.  We don't want to be here all day.  I'm

 7  going to ask you just to read them yourself and tell

 8  me when you're finished reading them if there is

 9  anything in there that you disagree with or you think

10  is incorrect.  Just the section underneath essential

11  functions for now.

12      A     Yes.

13            MR. VALOIS:  Madam court reporter, while

14  he's doing that, I am going to offer this -- I have

15  labeled it as Exhibit 15.

16            THE REPORTER:  Yes, sir.  Do you want me to

17  call it Exhibit 1?

18            MR. VALOIS:  Whatever is easier for you.

19            THE WITNESS:  To the best of my

20  recollection, this is all within the guidelines.  To

21  the best of my recollection, this is in all order,

22  yes, sir.

23            MR. VALOIS:  All right.  And, Madam Court

24  Reporter, I have gone through my list of questions

25  using the exhibit numbers as I've labeled them.  If
```

```
 1  it's easier for me to call it Exhibit 1, that's fine,

 2  but if we could just leave it Exhibit 15 and take

 3  them out of order, I think that might be the easiest

 4  way.

 5             THE REPORTER:  Yes.

 6

 7             (Harris Deposition Exhibit Number 15 was

 8  marked for identification)

 9

10  BY MR. VALOIS:

11     Q     Sir, could you go down next and do the same

12  thing for the section called "Comptencies."  Just

13  read through those and see if there's anything that

14  you disagree with in that list of "Competencies."

15     A     Everything seems to be in order with the

16  "Competencies" area as well, sir.

17     Q     All right.  Very good.

18             Moving down to the next section, "Physical

19  Activities."  There are only two sentences there.  Do

20  they look okay?

21     A     Yes, sir.

22     Q     Anything you disagree with there?

23     A     No, sir.

24     Q     Oh, I'm sorry, there are some more

25  "Physical Activities" that continue on the next page.
```

 1  Can you look through those and make sure that you

 2  agree with all those requirements?

 3      A     Yes, sir.

 4      Q     Is there anything that you disagree with

 5  there?

 6      A     No, sir.  It is all in order.

 7      Q     And moving on, we have "Work Environment,"

 8  two sentences there, can you read those and tell me

 9  whether you agree with those?

10      A     I agree with those, sir.

11      Q     And the last one "Entry Requirements," any

12  problem with those sentences there?

13      A     No, sir.

14      Q     All right.  And finally, there appears to

15  be a place where an employee has to acknowledge this.

16  You can see in this particular exhibit, that is blank

17  and unacknowledged; is that correct?

18      A     Yes, sir.

19      Q     There we go.  Okay.  I'm going to go back

20  and get to this one.  Let me see.  And so who

21  investigated the report of the incident that was

22  alleged to have occurred on May 9th of 2020 that

23  resulted in Mr. Osborne's termination?

24      A     That would be the asset protection

25  assistant store manager at the time.

Page 27

```
 1      Q      Who is that?

 2      A      Once again, I would need to reference the

 3  listing in order to bring up that individual's name.

 4      Q      But you made the decision to terminate?

 5      A      I made the recommendation, yes.

 6      Q      Who made the decision?  Ultimately, whose

 7  decision was it?

 8      A      Well, the decision is because since the

 9  termination is actually taken care of by the direct

10  supervisor, the direct supervisor would be the one to

11  make the decision in order to carry it out.

12  Recommendations are obviously going to be highly

13  weighted, but our job is to advise, and then our

14  recommendation can either be pushed back and if the

15  operator disagrees or the supervisor disagrees.

16      Q      So is it my understanding that you made a

17  recommendation to Mr. Osborne's direct supervisor?

18      A      Yes.

19      Q      And it was the direct supervisor's decision

20  to terminate?

21      A      It would actually be the facility manager

22  under these circumstances.

23      Q      I'm sorry, who is the facility manager?

24      A      That would have been Ryan Fisher at the

25  time.
```

```
 1      Q     And a facility manager, is that different

 2  than the store manager?

 3      A     No.

 4      Q     Is that synonymous with the term "store

 5  manager"?

 6      A     Yes, sir.

 7      Q     If someone walked in the door to the

 8  Wal-Mart and asked to speak to the store manager, it

 9  would be Mr. Fisher that they would be talking about?

10      A     Yes, sir.

11      Q     So you advised Mr. Fisher, and Mr. Fisher

12  made the decision?

13            MS. INGLE:  Objection, mischaracterizes

14  testimony.

15            THE WITNESS:  Yes.

16            MR. VALOIS:  I'm sorry, I couldn't hear the

17  objection.

18            MS. INGLE:  I said, "Objection,

19  mischaracterizes previous testimony.

20            MR. VALOIS:  Oh, well, I don't want to do

21  that.

22  BY MR. VALOIS:

23      Q     So who did you give advice to?

24      A     The asset protection store manager.

25      Q     And you don't remember that person's name?
```

 1      A      I do not recall at this time.

 2      Q      But when you gave advice to that person,

 3   was it your understanding that Mr. Fisher would be

 4   the one who ultimately made the termination decision?

 5      A      The information would be routed to him,

 6   yes.

 7      Q      And you knew that at the time you made your

 8   recommendation?

 9      A      Yes, sir.

10      Q      And that would be the standard procedure

11   within Wal-Mart at that time?

12      A      Yes.

13      Q      And how were you advised of this situation

14   to begin with?

15      A      The assistant -- the asset protection

16   assistant store manager actually brought it to my

17   attention verbally while I was in the store

18   physically officing for the day.

19      Q      I'm sorry, what?

20      A      Officing for the day.  I was operating in

21   an administrative function in an office during that

22   day.

23      Q      An office at the Lynchburg store on Wards

24   Road?

25      A      Yes, sir.

1      Q      When you're officing, is that like a

2   (inaudible) desk arrangement?

3      A      Yes.

4      Q      And so you were approached initially by the

5   person whose name you don't remember right now?

6      A      Correct.

7      Q      Okay.  And had a verbal conversation?

8      A      Yes.

9      Q      When did this verbal conversation occur?

10     A      I can't remember the exact date.

11     Q      Are these the kinds of things that should

12   have been documented in the employee's personnel

13   file?

14     A      Not necessarily.

15     Q      Is there a policy of not -- what should be

16   documented in an employee's file when there are

17   allegations of misconduct?

18     A      Not in this case, I don't believe so.

19     Q      Is there a general policy at Wal-mart that

20   governs -- on May 20th of 2020, was there a policy

21   that in general governed what should happen when an

22   allegation of misconduct was made as to

23   documentation?

24            MS. INGLE:  Objection to form.

25            THE WITNESS:  Not to my knowledge.

 1   BY MR. VALOIS:

 2       Q     So what was the substance of this

 3   communication from this assistant asset protection

 4   person?

 5       A     Essentially stating the fact that he

 6   believed that there was a policy violation on a bad

 7   stop that he was looking into and was looking to get

 8   a recommendation on what disciplinary actions may

 9   come of the bad stop.

10             At that point I told him to go get the

11   normally requested information and to complete his

12   investigation prior to receiving a recommendation,

13   and at that point he left, completed his

14   investigation and then returned with statements and

15   information that he received from reviewing footage

16   on videotape.

17       Q     And then, did you have any more

18   communication with him after that?

19       A     I made the recommendation to

20   terminate and --

21       Q     Well, let me rephrase.  That was maybe

22   confusing.  You had this initial verbal

23   communication?

24       A     Right.

25       Q     You told him to go get more information and

Page 32

1  to conduct the proper investigation; is that right?

2      A      Essentially.  I sent him to conduct the

3  investigation; that way, I could make a

4  recommendation based on that information.

5      Q      Right.  And then was there -- after that

6  initial verbal communicatin, was there any other

7  communication with this individual?

8      A      No.

9      Q      Well -- but, you ended up making a

10  recommendation; correct?

11      A      Right.  Once he returned with the

12  investigation that was completed --

13      Q      That's what I'm asking you about.  But how

14  did he return with the investigation?

15      A      Verbal, same thing --

16          MS. INGLE:  Objection, argumentative.

17          MR. VALOIS:  I'm sorry?

18          MS. INGLE:  I said "Objection,

19  argumentative."  Let him answer the question.

20  BY MR. VALOIS:

21      Q      Okay.  So after -- let me rephrase the

22  question.

23          So, Mr. Harris, you had an initial verbal

24  communication?

25      A      Right.

```
 1      Q      And then you asked him to go acquire more

 2   information?

 3      A      Yes, sir.

 4      Q      And then did you have any subsequent

 5   communication with him?

 6      A      Yes.  He returned with his completed

 7   investigation.

 8      Q      Was this on the same day?

 9      A      Yes, it was, sir.

10      Q      All right.  And although you don't remember

11   the day, you're certain it was the same day; is that

12   correct?

13      A      Yes, sir.

14      Q      Did you have any other communication with

15   anyone before you made your recommendation?

16      A      No, sir.

17      Q      Okay.  Did you receive any copies of the

18   witness statements before you made your

19   recommendation?

20      A      Yes.  I received physical copies.

21      Q      How were those provided to you?

22      A      By the assistant -- by the asset protection

23   assistant store manager.

24      Q      In person?

25      A      Yes.
```

Page 34

1    Q    He just handed them to you?

2    A    Yes.

3    Q    When you reviewed them, did you review them

4  with him present?

5    A    Yes.

6    Q    When I say "him," I'm jumping to a

7  conclusion, a sexist conclusion.  I apologize.

8         The assistant asset management protection

9  officer, do you remember whether it was a male or

10  female?

11    A    Male.

12    Q    Okay.  So did you review that information

13  with him?

14    A    Yes.

15    Q    All right.  And did you -- you made your

16  recommendation on the spot right there?

17    A    Yes.

18    Q    Was there anyone else present at this time

19  when you made your recommendation?

20    A    I do not recall.

21    Q    And it was your understanding that this

22  asset protection manager would relay your

23  recommendation to Mr. Fisher for a final

24  determination?

25    A    Yes.

1      Q      Did you consult with anyone else prior to

2   making this recommendation?

3      A      No.

4      Q      And essentially the recommendation was

5   based on a violation of a specific Wal-Mart policy;

6   is that correct?

7      A      Yes, sir.

8      Q      And that policy is an asset protection

9   policy?

10      A      Yes, sir.

11      Q      And it's called AP-09.  Are you familiar

12   with that policy?

13      A      I am, sir.

14      Q      And that's the policy that Mr. Osborne was

15   alleged to have violated?

16      A      Yes, sir.

17      Q      And so -- well, I hate to do this to you,

18   but I'm going to have to put this one on the screen,

19   too.  Give me just a second, please.

20             All right.  Mr. Harris, do you see

21   something that popped up on your screen?

22      A      Yes, sir.

23      Q      Can you tell us what the title of that

24   document is?

25      A      It's the "Investigation and Detention of

 1  Shoplifters Policy."

 2      Q      And is this the policy -- what does this

 3  policy do?  Let me ask you that.  What is its intent?

 4      A      So the AP-09 policy is a general,

 5  all-purpose asset protection policy for Wal-Mart.

 6      Q      All right.  And what guidance does it give

 7  to employees?

 8      A      It gives guidance in multiple different

 9  ways.  As far as investigations, this one states

10  clearly, investigation detention of shoplifters, but

11  also gets into things such as insider trading,

12  ethics, violations, things along those guidelines.

13  It a very large policy within the company that

14  involves anything that would basically pertain to

15  anything of worth within the company.

16      Q      Right.  So it covers all kinds of stuff.

17  It covers, you know, fraudulent uses of debit cards,

18  merchandise going out the backdoor, a lot of things

19  that aren't really relevant to this case; right?

20      A      Correct, sir.

21      Q      With regard to the allegations in this

22  case, it also covers surveillance, pursuit,

23  apprehension and detention of suspected shoplifters;

24  is that correct?

25      A      Yes, sir.

Page 37

```
 1      Q      And in that role, that's the guidance that

 2   Corey Osborne would be expected to follow if he were

 3   pursuing a suspected shoplifter; is that correct?

 4      A      Correct, sir.

 5      Q      And you would agree that this policy

 6   doesn't cover every interaction between Wal-Mart

 7   employees and their customers?

 8      A      Correct, sir.

 9      Q      For example, I mean, there's nothing

10   stopping a Wal-mart employee from approaching a

11   customer to say "good morning"?

12      A      Correct, sir.

13      Q      Or for a Wal-mart employee to follow a

14   child that appears to be lost around the store to

15   make sure the child is okay?

16      A      Correct, sir.

17      Q      Or to follow a customer into the parking

18   lot if the customer left her purse on the counter --

19   and forgotten her purse and walked out to the parking

20   lot?  There's nothing stopping the Wal-Mart employee

21   from taking her purse to the customer in the parking

22   lot?

23      A      Not specifically in this policy, no, sir.

24      Q      I mean, that would not fall under AP-09.

25   AP-09 only applies to --
```

Page 38

```
 1              MS. INGLE:  Calls for speculation.  The

 2  attorney can't testify.

 3  BY MR. VALOIS:

 4     Q     And AP-09 only calls for dealing with

 5  suspected shoplifters; is that correct?

 6              MS. INGLE:  Objection, it mischaracterizes

 7  previous testimony as well.

 8  BY MR. VALOIS:

 9     Q     The provisions of AP-09 that deal with the

10  pursuit -- surveillance, pursuit, apprehension and

11  detention of suspected shoplifters only apply to

12  suspected shoplifters; is that correct?

13     A     Correct, sir.

14     Q     All right.  And so conversely --

15              MS. INGLE:  My objection still stands.

16  This is mischaracterizing previous testimony.  The

17  witness previously testified this called for insider

18  trading which is not shoplifting.

19              MR. VALOIS:  Well, again, I'll rephrase the

20  question again.

21  BY MR. VALOIS:

22     Q     With regard to the specific provisions

23  inside Wal-Mart Policy AP-09 that pertain to the

24  manner in which Wal-Mart associates surveil, pursue

25  apprehend and detain suspected shoplifters, those
```

```
 1  provisions only apply to suspected shoplifters;
 2  correct?
 3      A      Correct.
 4      Q      All right.  So, Mr. Harris, I'm going to
 5  ask you to look at where it says, "make safety a
 6  priority on this policy."  Do you see that, where I'm
 7  going up and down right now?
 8      A      Yes, sir.
 9      Q      All right.  Rather than read all this into
10  the record, all right, I'm going to ask you to
11  carefully read each of those bulleted sentences.  And
12  what I'm going to ask you at the end of that to do is
13  to tell me if at the time you made your
14  recommendation you had any information that
15  Mr. Osborne had violated any of those bulleted
16  sentences.
17      A      There are two bullet points I see here that
18  would have been violated on the information that I
19  was given at the time.
20      Q      Can you look at the first point and tell me
21  which of those bullets it is?  Start at the top and
22  count down and tell me which one it is, please.
23      A      It would be the sixth and seventh.
24      Q      All right.  The sixth would be -- can you
25  read the sixth one, please?
```

 1      A      Yes.   "Never pat down, frisk or search a

 2   subject or a subject's belonging; example, purses or

 3   bags."

 4      Q      So let's go with that.  Did you have -- had

 5   you received any information at the time you made

 6   your recommendation to terminate Mr. Osborne that he

 7   had patted down anyone?

 8      A      No.

 9      Q      Had you received any information at that

10   time that he had frisked anyone?

11      A      No.

12      Q      Had you received any information at that

13   time that he had searched anyone?

14      A      No.

15      Q      Had you received any information at the

16   time that he had searched a suspect's belongings?

17      A      Yes.

18      Q      Which belongings had you received

19   information that he had searched?

20      A      The customer's vehicle.

21      Q      And who told you that Mr. Osborne had

22   searched the customer's vehicle?

23      A      The asset protection assistant store

24   manager.

25      Q      And what did the asset protection --

 1  assistant asset protection store manager tell you

 2  Mr. Osborne had done during the course of that

 3  search?

 4      A     He had looked through the vehicle.

 5      Q     In what manner?

 6      A     In a manner beyond visual, actually

 7  physically moved items in the vehicle.

 8      Q     And you said the next bulleted point is in

 9  number 7., "Never pursue a fleeing suspect."

10  Correct?

11      A     Correct.

12      Q     All right.  What evidence did you have that

13  Corey Osborne had pursued a fleeing suspect?

14      A     He had passed through the threshold, last

15  threshold of the building in pursuit of what he

16  believed somebody that was being investigated for

17  shoplifting.

18      Q     So the act of leaving the building to

19  pursue a suspect is the violation of that policy?

20      A     Correct.

21      Q     And you had received a report from the same

22  person that Mr. Osborne had left the building to

23  pursue that suspect?

24      A     Correct.

25      Q     I'm just going to -- Mr. Harris, I'm going

Page 42

```
 1   to scroll down through the rest of this thing myself

 2   just to see if I need to ask you anything else.  I

 3   don't think so, but I'm just going to run through

 4   this thing to make sure.

 5       A    Yes, sir.

 6       Q    I think I'm done with this one for now.

 7   I'm going to stop sharing.  Are we back?

 8       A    Yes, sir.

 9       Q    All right.  Very good.

10            Now, Wal-Mart also has disciplinary

11   policies; is that correct?

12       A    That is correct, sir.

13       Q    And I'm going to go ahead -- and might as

14   well get it out of the way.

15            MS. INGLE:

16            MR. VALOIS:  Oh, I'm sorry, Madam Court

17   Reporter, can we admit that AP-09 that I just

18   displayed at Exhibit Number 2, please.

19

20            (Harris Deposition Exhibit Number 2 was

21   marked for identification)

22

23            MR. VALOIS:  I am now going to show Exhibit

24   6, which is the Wal-Mart disciplinary policy.  I'm

25   going to attempt to show that now.  Okay.
```

```
 1
 2              (Harris Deposition Exhibit Number 6 was
 3  marked for identification)
 4
 5  BY MR. VALOIS:
 6      Q     Can you see that one?
 7      A     Yes, sir.
 8      Q     So this is the -- can you describe what
 9  this document is, please?
10      A     It is the disciplinary action policy for
11  how to essentially conduct or navigate disciplinary
12  actions for any sort of infraction most typically
13  being policy or process and procedure.
14      Q     All right.  Well, is it fair to say -- let
15  me phrase the question a little bit more artfully.
16  Is it fair to say that there are two disciplinary
17  policy documents; one, this one for the employees,
18  and then management guidelines for managers to use
19  when giving discipline?
20      A     Typically, yes, I would say that is
21  something you would see.
22      Q     And this is the one that tells employees --
23  this is the guidance for employees; is that correct?
24      A     To my knowledge, yes, sir.
25      Q     Well, look at the first sentence down there
```

Page 44

```
 1  and see.  Read that first sentence and make sure you

 2  agree with that statement that this is the one for

 3  employees.

 4      A     Yes, sir, to my knowledge.

 5      Q     All right.  What I'm going to do is, I'm

 6  going to ask you to read through this document.

 7  Well, let me ask you, before I do this:  Are you

 8  familiar with this document?

 9      A     Yes, maybe not as it stands currently, as

10  the policies are updated fairly frequently.

11  Normally, if I'm doing a policy review, I will always

12  bring it up each time that it may come into fruition

13  for me to be able to use it, as the policies are

14  updated very frequently.  So even if I made a

15  decision from the previous day, I might look it up

16  again today.

17      Q     Okay.  That's a good point, and an

18  important one.  Thank you.

19            MR. VALOIS:  And for the record, we are

20  looking at a document that's been provided in

21  discovery to us by Wal-Mart marked WM-Osborne,

22  O-S-B-O-R-N-E, 0000055.  And this is a policy that is

23  dated April 1, 2019.  And it has been provided to us

24  as the policy that was in force on May 9th of 2020.

25  BY MR. VALOIS:
```

Page 45

1      Q      Does that sound reasonable to you, sir?

2      A      Yes, sir.

3      Q      Okay.  What I'm going to ask you to do,

4  here Mr. Harris, you don't happen to have a copy you

5  can put your hands on independently, do you?

6      A      If it is a prior policy, then I do not have

7  it.

8      Q      All right.  Well, then we are going to have

9  to do it the hard way.  What I'm going to do is I'm

10  going to leave this screen up, and I'm going to ask

11  you to read this portion carefully.  When you get to

12  the bottom, let me know, and I'm going to put it to

13  the next portion, and I want you to read this whole

14  document carefully.  And take as much time as you

15  need, please; okay?

16     A      Yes, sir.

17     Q      But just read this part, and let me know

18  when you're finished with it, and then I'll move on

19  to the next part.

20     A      Yes, sir.

21     Q      Are you done?

22     A      Yes, sir.

23     Q      I will scroll it up and start at the next

24  part.  Can you read that part and tell me when you

25  have completed reading that part?

```
 1      A      Yes, sir.

 2      Q      Yes, sir.

 3      Q      All right.  Let me know when are you done

 4  reading this one?

 5      A      Yes, sir.

 6      Q      Okay.  This section, same thing.

 7      A      I have completed that, sir.

 8      Q      All right.  We will do one more.

 9      A      I have completed that, sir.

10      Q      That one.

11      A      I have complete it, sir.

12      Q      Next one.

13      A      I've completed that, sir.

14      Q      I think this is it.  I think we're at the

15  end, but let's make sure.  Let me know when you are

16  done reading that section, and I will go to the last

17  bit, but I think it's blank.

18      A      I'm done reading that.

19      Q      Having read all that, Mr. Osborne, I mean,

20  you would agree that that policy doesn't provide any

21  means for an employee to dispute or file a grievance

22  with regard to disciplinary action?

23      A      For a dispute or grievance with an outcome

24  of a disciplinary action that an associate would use

25  the open-door process?
```

 1      Q     Well, I'm asking in this policy here, there

 2  is nothing within this policy that provides any type

 3  of grievance policy?

 4           MS. INGLE:  Objection, asked and answered.

 5  BY MR. VALOIS:

 6      Q     You can answer the question.

 7      A     The grievance policy is not addressed by

 8  this policy.

 9      Q     And it's not -- right.  And that there is

10  no union contract in place in these stores; is that

11  correct?

12      A     Not to my knowledge, sir.

13      Q     Well, if Mr. Osborne were a a union

14  employee, you would know that before you made a

15  recommendation of termination as a human resources

16  manager, wouldn't you?

17           MS. INGLE:  Objection to relevance.

18           THE WITNESS:  That's a hypothetical

19  situation that I would only be able to walk through

20  if I was actually in the situation.

21  BY MS. INGLE:

22      Q     Well, do you deal with union employees at

23  Wal-mart?

24           MS. INGLE:  Objection to this line of

25  questioning and whether they are unionized.

```
 1  BY MR. VALOIS:

 2      Q     You can answer.

 3            MS. INGLE:  It's irrelevant.

 4            THE WITNESS:  I would deal with union

 5  activity if there was union activity to occur.

 6  BY MR. VALOIS:

 7      Q     Are there any union contracts in place at

 8  this store?

 9      A     No.

10      Q     And so the open-door policy that you

11  were -- to which you refer, that provides a means of

12  filing a grievance?

13      A     Correct, sir.

14      Q     How does an employee avail him or herself

15  of an open-door grievance procedure?

16      A     During this time, because I do believe that

17  the policy has -- some process and procedures have

18  been updated, at this time the associate would bring

19  their issue to their direct supervisor, and after

20  speaking with their direct supervisor if they are not

21  satisfied with the outcome, they may speak to the

22  co-manager at that time as well, would review the

23  situation, once again on not being satisfied, they

24  would take it to the store manager.  The store

25  manager would review, and at that point they would be
```

Page 49

```
 1  allowed to speak with the market level.  And after

 2  the market level if they are still not satisfied,

 3  they would be allowed to speak with the associate

 4  relations group, who would review the entire

 5  situation and make a recommendation for the next

 6  steps.

 7      Q      And when employees are disciplined, are

 8  they notified of their rights under this open-door

 9  policy?

10      A      It is posted in the store.

11      Q      Where is it posted?

12      A      It is going to be posted in the break rooms

13  and in the associate resource center.

14      Q      Now, with regard to policies in general, do

15  employees have access to review these policies?

16      A      Yes.

17      Q      For example, the AP-09 policy we talked

18  about earlier, if an employee wants to review that

19  policy, how does that employee access that policy?

20      Q      They would end up getting onto the Wal-mart

21  internal communications group known as -- it's known

22  as One Wal-Mart now.  It might have been referred to

23  as The Wire at that point.  At that point you can

24  either go in using the search bar, or if you know the

25  manual way of getting to the paths of the policies,
```

 1  then you can research policies that way as well.

 2      Q     Okay.  And to do that, do you have to be

 3  inside the store to do that?

 4      A     It depends on your level of accessibility.

 5  For instance, if you're an hourly associate, you need

 6  to be on the clock and be able to access things along

 7  those lines.  If you are salary, you are able to

 8  access at any time.

 9      Q     So Corey Osborne was an hourly associate?

10      A     Yes, sir.

11      Q     As an hourly associate, he would need to be

12  on the clock and be at the store to access this

13  information?

14      A     To my knowledge at that time, he would have

15  needed to be.  We're still with technology going

16  through different things that if he was clocked in,

17  he may have been able to use a BYOB device as well to

18  look those up, but I can't be positive for that

19  period of time.

20      Q     All right.   I'm going to get rid of this

21  document and bring up another one; okay?

22              MS. INGLE:  Paul, before we go to the next

23  document, can we take just a brief five-minute break?

24              MR. VALOIS:  Absolutely.  We're off the

25  record.

 1

 2              (Recess, 11:35 a.m. to 11:40 a.m.)

 3

 4  BY MR. VALOIS:

 5      Q    All right.  I'm going to share this

 6  document now.  Mr. Harris, we're back on the record.

 7  Let's put this one up.  Okay.  Do you see this

 8  document?

 9      A    Yes, sir.

10      Q    Do you recognize this document?

11      A    Not necessarily, no.

12      Q    Are you aware that the Wal-Mart policy

13  AP-09 has subsections?

14      A    Yes.

15      Q    And are you aware of the -- that one of

16  those subsections governs court appearances for

17  Wal-Mart associates that are called to testify?

18      A    I'm aware of it.  I am not in detail with

19  it, no, sir.

20      Q    Have you ever seen that policy?

21      A    Not that I recall.

22      Q    Okay.  Well, in that case, I'm not going

23  to -- I'm going to go back and ignore this document.

24           Were you aware that Mr. Osborne had to

25  testify in court as part of his duties as an asset

Page 52

1   protection officer for Wal-Mart?

2       A    As an associate, yes.

3       Q    Yes.  And are you aware that since his

4   termination, he's still being required to testify in

5   those cases?

6       A    I was not aware of any cases that he was

7   still testifying for.

8       Q    In your role as a -- when you were a human

9   resources manager if you made a recommendation and

10  later learned that the information upon which you

11  made your recommendation was incorrect, what would

12  you do?

13      A    There is multiple outcomes of how that

14  would occur.

15      Q    Can you run through those multiple

16  outcomes, the multiple possibilities, please?

17      A    It would have to be very general, as I

18  normally operate on making a decision on specifics.

19           So this is, like I said, a very wide

20  hypothetical.  If the information is absolutely

21  incorrect, depending on the time lines in which

22  somebody had been dismissed, because I receive open

23  door for reviews sometimes for situations that are

24  longer than -- it's been longer than 30 years in some

25  cases.  So, obviously, it may be a decision that

1   might come back to allowing somebody to be rehired.

2   It may end up somebody being reinstated.  It may be

3   somebody that may be reinstated with back pain,

4   depending on how severe the incorrect decision was

5   made and the impact to the associate or former

6   associate.

7       Q      Who decides which of those outcomes apply?

8   Who ultimately makes that decision?

9       A      Once again, it would kind of deal with how

10  large the scope or how incorrect the decisions were

11  made.  That discussion can occur anywhere from --

12  between the store in the market level to market all

13  the way up to executive level if the situation is

14  severe enough.

15      Q      Well, let's say -- again, I'm asking you a

16  hypothetical question here.

17      A      Right.

18      Q      But hypothetically if your decision -- if

19  you were to learn to your decision to terminate Corey

20  Osborne as an asset protection officer at the

21  Wal-mart on Wards Road was made because of false

22  information and you were to learn that, what outcome

23  would Corey Osborne be looking at receiving?

24              MS. INGLE:  Objection, calls for

25  speculation.

```
 1  BY MR. VALOIS:

 2      Q      You can answer.

 3      A      Under this circumstance presently where we

 4  are at in the time line and everything, the first

 5  thing I would do would be to pair with legal.

 6      Q      All right.  So you would escalate it?

 7      A      Yes, sir.

 8      Q      And take it above your pay grade

 9  effectively; is that correct?

10      A      Yes, sir.

11      Q      Mr. Harris, what I'm going to to do now, is

12  I am going to -- I'm going to take another break, if

13  it's okay with Ms. Ingle, for about 15 minutes to

14  confer with my mom.  I think I'm about done with my

15  deposition, but if we could just -- if we could go

16  off the record for about 15 minutes, I'm going to

17  call her.  And then when we come back, I may have a

18  few more questions, but I anticipate we won't have

19  anything lengthy.

20              MR. VALOIS:  So we are off the record.

21  Thank you.

22

23              (Recess, 11:46 a.m. to 11:58 a.m.)

24

25              MR. VALOIS:  All right.  Mr. Harris, that's
```

 1  going to conclude my questions on direct examination.

 2  I may come back on what is called redirect

 3  examination if I have any further questions, but for

 4  now, that's going to conclude my questions.

 5

 6          EXAMINATION BY COUNSEL FOR DEFENDANTS:

 7  BY MS. INGLE:

 8      Q     Mr. Harris, I do have a question.  Earlier,

 9  plaintiff's counsel asked you some questions about

10  the number of employees sort of under your management

11  and in your capacity as an HR manager, and you gave

12  an estimated head count of 3,000 employees earlier?

13      A     Yes.

14      Q     But in the market are there people who

15  perform HR functions at the store level?

16      A     There are.  We have human resources, and

17  basically generalists at stores.  At that time, they

18  were the personnel coordinators.  I do believe at

19  this point, once again, they have been re-branded as

20  well, where they are people leads.  So they would be

21  able to assist with if an associate had a general

22  question.  An associate not only would be able to

23  contact their -- whenever any of the policies would,

24  for instance, say "contact your People Partner" on

25  this thing, the person to go to would be the people

1  lead within the store, or they would also be able to

2  contact their direct line of management.  And their

3  direct line of management if not able to answer the

4  question, once it gets to the store manager, a store

5  manager will sometimes contact me about -- you know,

6  even general issues that are not easily able to be

7  found or something that would be a rare circumstance.

8     Q      Thank you.

9            And, Mr. Harris, do you know who Michael

10  Berry is?

11    A      Michael Berry is the current AP coach at

12  the Bedford store.  He was the APASM at the 1350

13  Wards Road in Lynchburg that Mr. Osborne worked at at

14  the time of his release.

15    Q      So was Michael Berry the person that

16  reported the incident to you that eventually led to

17  Mr. Osborne's termination?

18    A      Yes.

19    Q      And is Michael Berry the person that

20  investigated the incident at your direction?

21    A      He is, yes.

22            MS. INGLE:  I don't have any further

23  questions Mr. Harris.

24            MR. VALOIS:  I have no redirect.

25            Will Mr. Harris be reading and signing?

1    MS. INGLE:  Yes, please.

2

3   AND FURTHER THIS DEPONENT SAITH NOT.

4        SIGNATURE RIGHTS RESERVED.

5

6   (Deposition concluded at 12:02 p.m.)

7

8                    *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COREY J. OSBORNE vs WAL-MART EAST
HARRIS, SETH on 12/13/2021                                          Page 58

1

2            **CHANGES REQUESTED TO THE DEPOSITION OF:**

3                           **SETH HARRIS**

4                    **TAKEN:  December 13, 2021**

5

6

7    **PAGE/LINE:**                 **DESCRIPTION**

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16

17

18              **DATE: _____**

19       **SIGNATURE: _____**

20

21   **NOTARY PUBLIC: _____**

22   **MY COMMISSION EXPIRES: _____**

23

24

25   **REPORTED BY: TRACY W. KOSCHARA, COURT REPORTER**

1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2           I, Tracy W. Koschara, Court Reporter,

3   Notary Public, eNotary in and for the Commonwealth of

4   Virginia at Large, and whose commission expires May

5   31, 2024, do certify that the aforementioned appeared

6   before me, was sworn by me, and was thereupon

7   examined by counsel; and that the foregoing is a

8   true, correct, and full transcript of the testimony

9   adduced.

10          I further certify that I am neither related

11  to nor associated with any counsel or party to this

12  proceeding, nor otherwise interested in the event

13  thereof.

14          IN WITNESS WHEREOF, I have hereunto set my

15  hand and affixed my notarial seal this 20th day of

16  December, 2021.

17

18  _____

19

20      Tracy W. Koschara, Notary Public, eNotary

21          Commonwealth of Virginia at Large

22          NOTARY REGISTRATION NO. 193599

23

24

25

Page 60

```
 1

 2                        Evans & Company
                       Post Office Box 11822
 3               Lynchburg, Virginia 24506-1822
                        (434) 239-2552
 4

 5   December 20, 2021

 6   G. Bethany Ingle, Esq.

 7   Via email:  GIngle@littler.com

 8   Re:  Deposition of SETH HARRIS

 9

10   Dear Ms. Ingle:

11       You will find attached to this email a PDF copy
     of the deposition transcript of SETH HARRIS and
12   signature page thereto.  Please have Mr. Harris print
     the errata page of the transcript, which printed page
13   will serve as the original signature page.  After
     reviewing the transcript, the deponent should make
14   any changes deemed necessary on the original errata
     page, noting page and line number of the change
15   desired and a brief explanation of the reason for the
     change.
16
         Within 30 days of receipt of this letter,
17   forward the signed and notarized original signature
     page to Mr. Valois, as well as a copy to Evans &
18   Company at the above address.  Thank you for your
     prompt attention to this matter.
19

20               Kind Regards,

21

22               Tracy W. Koschara, Court Reporter
                 tracy.koschara@gmail.com
23
     cc:  M. Paul Valois, Esq.
24

25
```

**Exhibits**

**EXHIBIT 2 - AP-09 Policy** 3:10
  42:18,20

**EXHIBIT 6 -**
  **Walmart Disciplinary Policy**
  3:11 42:23,24 43:2

**EXHIBIT 15 -**
  **Osborne Job Description** 3:9
  24:15 25:2,7

**0**

**0000055** 44:22

**000036** 23:8

**1**

**1** 24:17 25:1 44:23

**10:17** 15:10

**10:40** 15:10

**11:35** 51:2

**11:40** 51:2

**11:46** 54:23

**11:58** 54:23

**12** 17:1,4,9 18:6

**12:02** 57:6

**1300** 18:12

**1329** 8:4

**1350** 56:12

**15** 14:14 24:15 25:2,7 54:13,16

**16** 14:14

**2**

**2** 42:18,20

**200** 18:4

**2001** 9:16

**2007** 10:15

**2009** 9:9,14

**2013** 13:20

**2019** 44:23

**2020** 19:24 20:9 21:24 26:22
  30:20 44:24

**20th** 30:20

**280** 18:9

**3**

**3,000** 18:17 55:12

**30** 52:24

**39** 9:6

**6**

**6** 17:1,4,9 18:6 42:24 43:2

**60** 22:4,5

**7**

**7** 41:9

**70** 22:4,5

**8**

**8** 18:7

**80,000** 20:16

**9**

**9th** 21:24 26:22 44:24

**A**

**a.m.** 15:10 51:2 54:23

**ability** 8:21

**absolutely** 50:24 52:20

**access** 49:15,19 50:6,8,12

**accessibility** 50:4

**accommodate** 6:12

**acknowledge** 26:15

**acquire** 33:1

**acronyms** 7:15

**act** 41:18

**action** 19:9 43:10 46:22,24

**actions** 19:12 31:8 43:12

**Activities** 25:19,25

**activity** 48:5

**actual** 7:2

**addressed** 47:7

**administrative** 29:21

**admit** 42:17

**advice** 28:23 29:2

**advise** 27:13

**advised** 28:11 29:13

**affect** 6:6

**affirmative** 16:1

**agent** 11:3,20

**agree** 6:2 26:2,9,10 37:5 44:2
  46:20

**agreements** 8:19

**ahead** 15:12 42:13

**alignment** 14:24 17:23

**all-purpose** 36:5

**allegation** 30:22

**allegations** 30:17 36:21

**alleged** 26:22 35:15

**allowed** 49:1,3

**allowing** 53:1

**answering** 8:25

**anticipate** 6:9 54:18

**AP** 56:11

**AP-09** 35:11 36:4 37:24,25 38:4,
  9,23 42:17 49:17 51:13

**APASM** 7:14,17,22 56:12

**apologize** 34:7

**app** 8:10

**appearances** 51:16

**appears** 26:14 37:14

**applies** 37:25

**apply** 38:11 39:1 53:7

**apprehend** 38:25

**apprehension** 36:23 38:10

**approached** 30:4

**approaching** 37:10

**approximately** 11:7 18:12

**April** 44:23

**area** 13:2 17:3,5 25:16

**argumentative** 32:16,19

**arrangement** 30:2

**artfully** 43:15

**asset** 7:18 23:14,15,19 26:24
28:24 29:15 31:3 33:22 34:8,22
35:8 36:5 40:23,25 41:1 51:25
53:20

**assigned** 11:21

**assist** 55:21

**assistant** 13:24 14:3,9 26:25
29:15,16 31:3 33:22,23 34:8
40:23 41:1

**associate** 10:7 18:24 19:14
23:14,20 46:24 48:18 49:3,13
50:5,9,11 52:2 53:5,6 55:21,22

**associate's** 19:2

**associates** 23:16 38:24 51:17

**assume** 5:7

**attempt** 5:13 42:25

**attendance** 19:13

**attention** 29:17

**attorney** 7:13 38:2

**auspices** 21:19

**avail** 48:14

**average** 18:2,7

**aware** 7:7 21:10 51:12,15,18,24
52:3,6

---

**B**

---

**back** 12:15,19 13:24 15:14 19:24
26:19 27:14 42:7 51:6,23 53:1,3
54:17 55:2

**backdoor** 36:18

**background** 9:4

**backward** 15:22

**bad** 31:6,9

**bags** 40:3

**bar** 49:24

**based** 32:4 35:5

**basically** 6:24 10:8 13:14 36:14
55:17

**Bates** 23:8

**Bedford** 56:12

**began** 9:9 10:7

**begin** 29:14

**beginning** 23:7

**believed** 31:6 41:16

**belonging** 40:2

**belongings** 40:16,18

**benefits** 12:6 16:10

**Berry** 8:4 56:10,11,15,19

**bit** 9:3 43:15 46:17

**blank** 7:24 26:16 46:17

**board** 11:3,9

**border** 11:14,15,17,18,20 12:17

**bottom** 45:12

**bound** 8:23

**break** 6:11 49:12 50:23 54:12

**breaks** 6:14,15

**bring** 27:3 44:12 48:18 50:21

**brought** 7:19 29:16

**building** 41:15,18,22

**bullet** 39:17

**bulleted** 39:11,15 41:8

**bullets** 39:21

**Business** 10:17

**BYOB** 50:17

---

**C**

---

**Cajon** 11:23

**call** 17:25 24:17 25:1 54:17

**called** 25:12 35:11 38:17 51:17
55:2

**calls** 38:1,4 53:24

**capacity** 17:8 18:18 55:11

**cards** 36:17

**care** 27:9

**carefully** 39:11 45:11,14

**carry** 27:11

**case** 4:14 5:16 6:19 7:13,20
30:18 36:19,22 51:22

**cases** 52:5,6,25

**center** 49:13

**centrally** 16:6

**characterize** 16:13

**child** 37:14,15

**circumstance** 54:3 56:7

**circumstances** 19:9 27:22

**clock** 50:6,12

**clocked** 50:16

**close** 12:22

**co-manager** 14:7,9 48:22

**coach** 56:11

**college** 9:12,21,23 10:10

**commit** 8:13

**communicatin** 32:6

**communicating** 8:14

**communication** 6:20 8:9 31:3,
18,23 32:7,24 33:5,14

**communications** 49:21

**company** 16:15 23:18 36:13,15

**Competencies** 25:14,16

**complaint** 20:21 21:1,5

**complaints** 20:18

**complete** 6:1 31:11 46:11

**completed** 31:13 32:12 33:6
  45:25 46:7,9,13

**completely** 8:25

**Comptencies** 25:12

**concern** 18:24

**conclude** 55:1,4

**concluded** 57:6

**conclusion** 34:7

**conduct** 32:1,2 43:11

**confer** 54:14

**confusing** 5:12 31:22

**consisted** 16:25

**consult** 35:1

**contact** 55:23,24 56:2,5

**context** 4:14 21:1

**continue** 25:25

**contract** 47:10

**contracts** 48:7

**conversation** 30:7,9

**conversely** 38:14

**converted** 14:19

**coordinator** 11:9

**coordinators** 55:18

**copies** 33:17,20

**copy** 45:4

**Corey** 21:7 22:17 23:19 37:2
  41:13 50:9 53:19,23

**corporate** 8:23

**correct** 14:11 16:19 21:14 23:20,
  23,24 24:2 26:17 30:6 32:10
  33:12 35:6 36:20,24 37:3,4,8,12,
  16 38:5,12,13 39:2,3 41:10,11,20,
  24 42:11,12 43:23 47:11 48:13
  54:9

**counsel** 4:4 55:6,9

**count** 18:16 39:22 55:12

**counter** 37:18

**country** 13:15

**court** 5:17,21 8:4 24:13,23 42:16
  51:16,25

**cover** 37:6

**coverage** 17:25 18:15

**covers** 36:16,17,22

**created** 23:17

**criminal** 4:16

**current** 14:18,25 56:11

**customer** 37:11,17,18,21

**customer's** 40:20,22

**customers** 37:7

---

**D**

---

**date** 30:10

**dated** 44:23

**day** 24:6 29:18,20,22 33:8,11
  44:15

**day-to-day** 19:11

**Deaconess** 11:1,4

**deal** 7:15 38:9 47:22 48:4 53:9

**dealing** 38:4

**debit** 36:17

**decides** 53:7

**decision** 22:20 27:4,6,7,8,11,19
  28:12 29:4 44:15 52:18,25 53:4,8,
  18,19

**decisions** 16:10 53:10

**DEFENDANTS** 55:6

**degree** 10:12,14,16

**Department** 11:2,12

**depending** 17:22,25 52:21 53:4

**depends** 17:10 50:4

**DEPONENT** 57:3

**deposition** 4:10,12 6:8,10,18
  8:14 25:7 42:20 43:2 54:15 57:6

**depositions** 4:21

**describe** 16:22 43:8

**description** 23:1,13,17 24:2

**desk** 30:2

**detail** 51:18

**detain** 38:25

**detention** 35:25 36:10,23 38:11

**determination** 34:24

**development** 16:7

**device** 50:17

**Diego** 11:18

**difference** 17:14

**differently** 5:9

**direct** 20:6 27:9,10,17,19 48:19,
  20 55:1 56:2,3

**direction** 56:20

**director** 19:21

**disagree** 24:9 25:14,22 26:4

**disagrees** 27:15

**disciplinary** 19:9,11 31:8 42:10,
  24 43:10,11,16 46:22,24

**discipline** 19:5,6 43:19

**disciplined** 49:7

**discovery** 23:7 44:21

**discretion** 19:16

**discuss** 6:15

**discussed** 7:2,20 18:25

**discussing** 6:24

**discussion** 53:11

**dismissed** 52:22

**displayed** 42:18

**dispute** 46:21,23

**document** 23:7,10,11,12,22
  35:24 43:9 44:6,8,20 45:14 50:21,
  23 51:6,8,10,23

**documentation** 6:25 30:23

**documented** 30:12,16

**documents** 7:4 43:17

**door** 28:7 52:23

**double** 18:15

**drawing** 7:24

**drugs** 6:5

**dual** 17:11,15

**duly** 4:3

**duration** 8:13

**duties** 14:21 51:25

**E**

**e-mails** 6:24

**earlier** 49:18 55:8,12

**easier** 24:18 25:1

**easiest** 25:3

**easily** 56:6

**EEO** 20:18 21:5

**EEOC** 20:21 21:1

**effectively** 54:9

**effects** 12:9

**EI** 11:23

**emphasis** 10:17

**employed** 9:13 21:10

**employee** 18:21 21:5 26:15
   37:10,13,20 46:21 47:14 48:14
   49:18,19

**employee's** 30:12,16

**employees** 18:2,9 21:18 23:22,
   25 36:7 37:7 43:17,22,23 44:3
   47:22 49:7,15 55:10,12

**employment** 13:3 16:10 19:7

**end** 5:24 12:24 39:12 46:15 49:20
   53:2

**ended** 32:9

**enforcement** 4:17

**entire** 5:25 49:4

**Entry** 26:11

**Environment** 26:7

**escalate** 54:6

**essential** 23:17 24:1,10

**essentially** 14:23 31:5 32:2 35:4
   43:11

**estimate** 18:4 20:13,15

**estimated** 55:12

**ethics** 36:12

**Evansville** 9:25 11:5 14:7

**eventually** 56:16

**evidence** 41:12

**exact** 20:14 30:10

**examination** 4:4 55:1,3,6

**executive** 53:13

**exhibit** 24:15,17,25 25:1,2,7
   26:16 42:18,20,23 43:2

**expansion** 13:15

**expected** 23:25 37:2

**extremely** 6:9

**F**

**F-R-E-Y** 19:23

**facility** 27:21,23 28:1

**fact** 23:19 31:5

**fair** 16:13 43:14,16

**fairly** 19:14 44:10

**fall** 37:24

**false** 53:21

**familiar** 35:11 44:8

**female** 34:10

**figure** 20:14

**file** 22:19 30:13,16 46:21

**files** 6:19,22

**filing** 48:12

**final** 34:23

**finally** 26:14

**fine** 25:1

**finish** 5:25 6:1

**finished** 24:8 45:18

**first-in-line** 10:8

**Fisher** 27:24 28:9,11 29:3 34:23

**five-minute** 50:23

**fleeing** 41:9,13

**focused** 16:6

**follow** 37:2,13,17

**footage** 31:15

**force** 44:24

**forgotten** 37:19

**form** 18:23 20:23 30:24

**forward** 15:21

**found** 13:2 56:7

**fraudulent** 36:17

**frequently** 44:10,14

**Frey** 19:23

**frisk** 40:1

**frisked** 40:10

**fruition** 44:12

**full** 4:6

**fully** 8:24 19:15

**function** 15:5 23:17 29:21

**functions** 14:24 24:1,4,11 55:15

**G**

**gave** 29:2 55:11

**general** 30:19,21 36:4 49:14
   52:17 55:21 56:6

**generalist** 16:9

**generalists** 55:17

**geographic** 17:5

**geographical** 16:24 17:3

**girlfriend** 8:7

**give** 20:14,15 23:2 28:23 35:19
   36:6

**giving** 6:1 43:19

**good** 25:17 37:11 42:9 44:17

**goods** 10:7

**governed** 30:21

**governs** 30:20 51:16

**grade** 54:8

**graduate** 9:14

**graduated** 10:20

**grew** 12:22

**grievance** 46:21,23 47:3,7
  48:12,15

**grievances** 18:22

**group** 49:4,21

**grouped** 16:24 17:2

**guess** 19:5

**guidance** 24:2 36:6,8 37:1 43:23

**guidelines** 24:20 36:12 43:18

---

**H**

**half** 14:20

**handed** 34:1

**hands** 45:5

**happen** 30:21 45:4

**happened** 13:10

**hard** 45:9

**harris** 4:2,8 15:16 25:7 32:23
  35:20 39:4 41:25 42:20 43:2 45:4
  51:6 54:11,25 55:8 56:9,23,25

**hate** 35:17

**head** 18:16 55:12

**hear** 28:16

**high** 9:15,17,18,20

**highly** 27:12

**hired** 12:19,20 23:23

**hiring** 18:19

**hold** 13:8,18 14:12

**home** 8:4 22:10

**Homeland** 11:2,13

**Hospital** 11:1,4

**hourly** 50:5,9,11

**hours** 12:23

**house** 8:8

**HR** 16:3,9 55:11,15

**human** 10:18 14:16 15:5 16:17
  17:9,12,19 18:12 20:3 22:1 47:15
  52:8 55:16

**hypothetical** 47:18 52:20 53:16

**hypothetically** 53:18

---

**I**

**identification** 25:8 42:21 43:3

**ignore** 51:23

**Illinois** 12:21,24 14:2

**impact** 53:5

**impacting** 19:7

**implementation** 16:8

**important** 5:20 44:18

**in-operations** 4:18

**inability** 12:2

**inaudible** 30:2

**incident** 7:5,21 19:25 26:21
  56:16,20

**incorrect** 24:10 52:11,21 53:4,10

**independently** 45:5

**Indiana** 9:19,24,25 10:10 11:5
  14:8

**indicating** 16:1

**individual** 32:7

**individual's** 27:3

**individuals** 12:25

**influence** 6:4

**information** 29:5 31:11,15,25
  32:4 33:2 34:12 39:14,18 40:5,9,
  12,15,19 50:13 52:10,20 53:22

**infraction** 43:12

**Ingle** 18:23 20:10,23 28:13,18
  30:24 32:16,18 38:1,6,15 42:15
  47:4,17,21,24 48:3 50:22 53:24
  54:13 55:7 56:22 57:1

**initial** 13:5 31:22 32:6,23

**initially** 30:4

**injury** 12:2,4,7,10

**inside** 38:23 50:3

**insider** 36:11 38:17

**instance** 19:13 50:5 55:24

**intent** 36:3

**interaction** 37:6

**intern** 10:8,19

**internal** 49:21

**interruption** 15:9

**investigated** 26:21 41:16 56:20

**investigation** 31:12,14 32:1,3,
  12,14 33:7 35:25 36:10

**investigations** 36:9

**involved** 18:19,21 19:4 20:17

**involves** 16:2,5 36:14

**irrelevant** 48:3

**issue** 7:19 48:19

**issues** 23:3 56:6

**items** 41:7

---

**J**

**job** 5:20 23:1,13,17 27:13

**Johns** 8:4

**jumping** 34:6

---

**K**

**kind** 4:14 15:21 16:11 17:6 53:9

**kinds** 30:11 36:16

**Kirsten** 19:23

**knew** 29:7

**knowledge** 30:25 43:24 44:4
  47:12 50:14

---

**L**

**labeled** 24:15,25

**labor** 10:18 24:5

**large** 36:13 53:10

**larger** 17:2

**law** 4:17

**lead** 14:20 15:3,4,23 56:1

**leads** 55:20

**learn** 53:19,22

COREY J. OSBORNE vs WAL-MART EAST
HARRIS, SETH on 12/13/2021

Index: learned..operate

**learned** 52:10

**leave** 11:11 12:1 25:2 45:10

**leaving** 12:16 41:18

**led** 7:5 56:16

**left** 12:12 31:13 37:18 41:22

**legal** 6:25 7:2 54:5

**lengthy** 54:19

**level** 16:23 18:20 49:1,2 50:4 53:12,13 55:15

**limit** 8:20

**lines** 15:7 18:16 19:17 50:7 52:21

**lingering** 12:9

**list** 24:24 25:14

**listing** 27:3

**located** 8:2 22:13,15

**location** 16:25

**long** 6:8,10 11:6,24 12:16 13:8,17 14:3,12

**longer** 52:24

**looked** 41:4

**lose** 19:8

**lost** 37:14

**lot** 36:18 37:18,20,22

**Lynchburg** 21:13 29:23 56:13

**M**

**Madam** 24:13,23 42:16

**made** 17:4 27:4,5,6,16 28:12 29:4,7 30:22 31:19 33:15,18 34:15,19 39:13 40:5 44:14 47:14 52:9,11 53:5,11,21

**majority** 18:14 23:15

**make** 20:13 26:1 27:11 32:3 37:15 39:5 42:4 44:1 46:15 49:5

**makes** 53:8

**making** 22:20 32:9 35:2 52:18

**male** 34:9,11

**managed** 17:18,19

**management** 10:17 19:10

20:21,25 21:4 34:8 43:18 55:10 56:2,3

**manager** 7:19 12:25 13:1,7,25 14:4,10,17 15:2 16:18 17:9,12 19:1 20:4 21:16 22:2 26:25 27:21, 23 28:1,2,5,8,24 29:16 33:23 34:22 40:24 41:1 47:16 48:24,25 52:9 55:11 56:4,5

**managers** 43:18

**managing** 18:11

**manner** 5:12,13 38:24 41:5,6

**manual** 49:25

**marked** 25:8 42:21 43:3 44:21

**market** 14:16,20 17:4,12,16,18 18:6 19:1 20:3 21:16 22:1,11,15 49:1,2 53:12 55:14

**market all** 53:12

**market altogether** 17:24

**market-level** 16:21,22

**markets** 16:24,25 17:2,11,23 18:15

**Marshall** 12:21,24

**matter** 8:17

**means** 16:22 46:21 48:11

**media** 8:10

**medications** 6:5

**memorandum** 8:20

**merchandise** 36:18

**met** 21:7,9

**Michael** 56:9,11,15,19

**mind** 4:6

**minutes** 54:13,16

**mischaracterizes** 28:13,19 38:6

**mischaracterizing** 38:16

**misconduct** 30:17,22

**mom** 54:14

**months** 12:18 13:9 14:14

**morning** 37:11

**move** 45:18

**moved** 16:11 41:7

**moving** 25:18 26:7

**Mt** 9:18,19

**multiple** 36:8 52:13,15,16

**multiple-level** 19:9

**N**

**named** 20:20 21:4

**nature** 16:11

**navigate** 43:11

**necessarily** 23:15 30:14 51:11

**needed** 50:15

**newest** 15:20,22

**northern** 11:16

**notified** 49:8

**number** 23:8 25:7 41:9 42:18,20 43:2 55:10

**numbers** 24:25

**O**

**O-S-B-O-R-N-E** 44:22

**oath** 4:23 5:2

**Object** 18:23

**objection** 20:10,23 28:13,17,18 30:24 32:16,18 38:6,15 47:4,17, 24 53:24

**obtain** 10:12,14

**occur** 30:9 48:5 52:14 53:11

**occurred** 26:22

**offer** 24:14

**offered** 12:15 13:3

**office** 22:3,6,7,9,10,11,15 29:21, 23

**officer** 11:8,10 34:9 52:1 53:20

**official** 20:21 21:1,4 24:4

**officing** 29:18,20 30:1

**open** 52:22

**open-door** 46:25 48:10,15 49:8

**operate** 52:18

operating 29:20

operational 14:24

operational-type 16:14

operations 13:24 14:20 15:3,4, 23 19:20

operator 27:15

ops 17:13

order 5:21 24:21 25:3,15 26:6 27:3,11

ordinary 19:17

Osborne 6:21 7:3 21:7 23:19 35:14 37:2 39:15 40:6,21 41:2,13, 22 46:19 47:13 50:9 51:24 53:20, 23 56:13

Osborne's 22:17 23:1 26:23 27:17 56:17

outcome 46:23 48:21 53:22

outcomes 52:13,16 53:7

overnight 13:7

oversight 19:12

**P**

p.m. 57:6

pain 53:3

pair 54:5

parking 37:17,19,21

part 45:17,19,24,25 51:25

partial 15:13

Partner 55:24

passed 41:14

pat 40:1

paths 49:25

patrol 11:3,15,20 12:17

patted 40:7

Paul 50:22

pay 54:8

people 8:15 14:20 15:1,3,23 17:13 18:12 19:20 20:4 55:14,20, 24,25

people-focused 15:6

percent 22:4,5

perform 23:25 55:15

period 10:1,5 17:10,22 18:14 50:19

periods 17:17,18

person 7:23 19:22 29:2 30:5 31:4 33:24 41:22 55:25 56:15,19

person's 28:25

personnel 22:19 30:12 55:18

pertain 36:14 38:23

pertains 23:14

phone 8:12

phrase 5:12,13 43:15

physical 25:18,25 33:20

physically 8:2 29:18 41:7

pick 14:22

picked 14:23

place 19:25 26:15 47:10 48:7

PLAINTIFF 4:4

plaintiff's 55:9

planning 13:12,13

planning-type 16:14

point 19:8 22:25 31:10,13 39:20 41:8 44:17 48:25 49:23 55:19

points 39:17

policies 42:11 44:10,13 49:14, 15,25 50:1 55:23

policy 8:23 30:15,19,20 31:6 35:5,8,9,12,14 36:1,2,3,4,5,13 37:5,23 38:23 39:6 41:19 42:24 43:10,13,17 44:11,22,24 45:6 46:20 47:1,2,3,7,8 48:10,17 49:9, 17,19 51:12,20

popped 35:21

portion 45:11,13

position 10:4 11:11 12:1,12,15 13:4,5,8,11,18 14:13,18 15:23 16:6,20,21 17:11,15 19:8 24:1

positions 10:6 16:8,9

positive 50:18

possibilities 52:16

posted 49:10,11,12

prepare 6:18

present 34:4,18

presently 54:3

prevent 8:24

previous 28:19 38:7,16 44:15

previously 38:17

prior 4:18 6:20 7:1 16:17 31:12 35:1 45:6

priority 39:6

problem 26:12

procedure 29:10 43:13 48:15

procedures 48:17

proceedings 4:17

process 43:13 46:25 48:17

program 10:8

projects 13:16

proper 32:1

protection 7:18 11:14 23:14,16, 20 26:24 28:24 29:15 31:3 33:22 34:8,22 35:8 36:5 40:23,25 41:1 52:1 53:20

provide 46:20

provided 23:7,22 33:21 44:20,23

provisions 38:9,22 39:1

purpose 6:11

purse 37:18,19,21

purses 40:2

pursue 38:24 41:9,19,23

pursued 41:13

pursuing 37:3

pursuit 36:22 38:10 41:15

purview 21:16

pushed 27:14

put 22:25 35:18 45:5,12 51:7

**Q**

**question** 5:7,8,11,14,25 15:13,
17 32:19,22 38:20 43:15 47:6
53:16 55:8,22 56:4

**questioning** 7:20 47:25

**questions** 5:5 8:25 24:24 54:18
55:1,3,4,9 56:23

**R**

**race** 22:17

**Randall** 4:8

**rare** 56:7

**re-branded** 55:19

**reached** 13:3

**read** 24:7 25:13 26:8 39:9,11,25
44:1,6 45:11,13,17,24 46:19

**reading** 24:5,8 45:25 46:4,16,18
56:25

**ready** 5:4

**reask** 15:13

**reasonable** 45:1

**recall** 29:1 34:20 51:21

**receive** 12:6 33:17 52:22

**received** 31:15 33:20 40:5,9,12,
15,18 41:21

**receiving** 31:12 53:23

**recess** 15:10 51:2 54:23

**recognize** 51:10

**recollection** 21:8 24:20,21

**recommendation** 27:5,14,17
29:8 31:8,12,19 32:4,10 33:15,19
34:16,19,23 35:2,4 39:14 40:6
47:15 49:5 52:9,11

**Recommendations** 27:12

**record** 15:14 23:6 39:10 44:19
50:25 51:6 54:16,20

**recorded** 5:17

**redirect** 55:2 56:24

**refer** 48:11

**reference** 8:1 27:2

**referred** 49:22

**refrain** 8:14

**regard** 36:21 38:22 46:22 49:14

**region** 11:22

**regional** 16:20 17:3 19:20

**rehired** 53:1

**reinstated** 53:2,3

**related** 7:5

**relations** 10:18 49:4

**relationship** 15:1

**relay** 34:22

**release** 56:14

**relevance** 20:10 47:17

**relevant** 36:19

**remember** 28:25 30:5,10 33:10
34:9

**remodel** 13:14,15

**remote** 15:9

**rephrase** 31:21 32:21 38:19

**report** 19:18,20 26:21 41:21

**reported** 56:16

**reporter** 5:17,21 24:13,16,24
25:5 42:17

**reports** 20:6

**request** 6:12 7:2 19:2

**requested** 7:1 31:11

**required** 52:4

**requirements** 26:2,11

**research** 50:1

**RESERVED** 57:4

**resource** 14:16 17:12 49:13

**resources** 10:18 16:18 17:9,19
18:12 20:3 21:16 22:1 47:15 52:9
55:16

**resources-type** 15:5

**responsible** 20:20,25 21:4

**rest** 42:1

**resulted** 12:2 26:23

**return** 12:3 32:14

**returned** 31:14 32:11 33:6

**review** 6:23 19:1 22:19 34:3,12
44:11 48:22,25 49:4,15,18

**reviewed** 6:19 7:4,6,10 22:22
34:3

**reviewing** 31:15

**reviews** 52:23

**rid** 50:20

**rights** 49:8 57:4

**Road** 21:11 29:24 53:21 56:13

**Roanoke** 8:5

**role** 11:12,19 14:19,25 15:1 22:1
37:1 52:8

**room** 8:12

**rooms** 49:12

**roughly** 12:18 13:9 14:14 17:1

**routed** 29:5

**routine** 19:5,6

**routines** 19:11

**run** 42:3 52:15

**Ryan** 27:24

**S**

**safety** 39:5

**SAITH** 57:3

**salary** 18:20 20:7,8 50:7

**San** 11:18

**satisfied** 48:21,23 49:2

**school** 9:15,17,18,20

**scope** 53:10

**screen** 23:1,4 35:18,21 45:10

**scroll** 42:1 45:23

**search** 40:1 41:3 49:24

**searched** 40:13,16,19,22

**section** 24:10 25:12,18 46:6,16

**sector** 11:23

COREY J. OSBORNE vs WAL-MART EAST
HARRIS, SETH on 12/13/2021

Index: security..term

**security** 11:2,3,8,9,13

**Senior** 9:18

**sentence** 43:25 44:1

**sentences** 25:19 26:8,12 39:11, 16

**service** 12:3

**Seth** 4:2,8

**setup** 13:16

**seventh** 39:23

**severe** 53:4,14

**sexist** 34:7

**share** 51:5

**sharing** 42:7

**shoplifter** 37:3

**shoplifters** 36:1,10,23 38:5,11, 12,25 39:1

**shoplifting** 4:18 38:18 41:17

**show** 42:23,25

**showing** 19:14

**side** 8:7

**SIGNATURE** 57:4

**signed** 8:19

**significance** 5:1

**signing** 56:25

**single** 17:11,14

**sir** 4:6,11,13,22 5:3,6,10,15,18,23 6:3,7,13,16 8:3,16,18 9:5 10:11 11:15 13:22 14:11 15:19,24 16:4, 21 17:7,21 18:8,10 21:17,20,25 23:5,10,21 24:3,16,22 25:11,16, 21,23 26:3,6,10,13,18 28:6,10 29:9,25 33:3,9,13,16 35:7,10,13, 16,22 36:20,25 37:4,8,12,16,23 38:13 39:8 42:5,8,12 43:7,24 44:4 45:1,2,16,20,22 46:1,2,5,7,9,11, 13 47:12 48:13 50:10 51:9,19 54:7,10

**situation** 29:13 47:19,20 48:23 49:5 53:13

**situations** 52:23

**sixth** 39:23,24,25

**social** 8:10

**sort** 43:12 55:10

**sound** 45:1

**southern** 9:24 11:17,18

**speak** 28:8 48:21 49:1,3

**speaking** 48:20

**specific** 35:5 38:22

**specifically** 37:23

**specifics** 52:18

**speculation** 38:1 53:25

**spend** 22:2

**spoken** 7:12

**sporting** 10:7

**spot** 34:16

**staffing** 15:7 16:7

**standard** 29:10

**standpoint** 16:12

**stands** 38:15 44:9

**start** 9:7 15:17 39:21 45:23

**started** 10:6

**Starting** 16:23

**statement** 44:2

**statements** 7:6 22:22 31:14 33:18

**states** 36:9

**stating** 4:6 31:5

**Staunton** 22:15

**step** 14:9

**steps** 49:6

**stint** 9:10

**stop** 31:7,9 42:7

**stopping** 37:10,20

**store** 7:18,25 13:1,12,13,15,25 14:3 16:23 17:23 18:9,25 21:21, 23 22:12,13,14 26:25 28:2,4,8,24 29:16,17,23 33:23 37:14 40:23 41:1 48:8,24 49:10 50:3,12 53:12 55:15 56:1,4,12

**store's** 19:16

**stores** 16:23 17:1,5,9 22:3,5,7,9 47:10 55:17

**stranger** 4:20

**strike** 15:12

**stuff** 36:16

**sub-region** 17:6

**subject** 8:17 40:2

**subject's** 40:2

**subordinates** 20:4

**subsections** 51:13,16

**subsequent** 33:4

**substance** 31:2

**supervisor** 20:2 27:10,15,17 48:19,20

**supervisor's** 27:19

**supervisors** 18:25

**support** 13:7

**surveil** 38:24

**surveillance** 36:22 38:10

**suspect** 41:9,13,19,23

**suspect's** 40:16

**suspected** 36:23 37:3 38:5,11, 12,25 39:1

**sworn** 4:3

**synonymous** 28:4

---

**T**

**tactical** 16:11

**takes** 13:20

**taking** 37:21

**talk** 9:3

**talked** 49:17

**talking** 5:21 28:9

**team** 13:14 19:10

**technology** 23:3 50:15

**tells** 43:22

**ten** 13:9

**term** 28:4

**terminate** 27:4,20 31:20 40:6 53:19

**termination** 7:5 22:20 26:23 27:9 29:4 47:15 52:4 56:17

**testified** 4:3 38:17

**testify** 5:2 8:21 38:2 51:17,25 52:4

**testifying** 52:7

**testimony** 6:6,15 28:14,19 38:7, 16

**text** 8:10

**thing** 16:14 25:12 32:15 42:1,4 46:6 54:5 55:25

**things** 16:10 19:7 30:11 36:11, 12,18 50:6,16

**threshold** 41:14,15

**time** 6:10 7:19,21,25 9:9 12:14 15:21,22 17:22 18:1,15 20:2,8,9 21:15 22:2,4,5,14 23:16 26:25 27:25 29:1,7,11 34:18 39:13,19 40:5,10,13,16 44:12 45:14 48:16, 18,22 50:8,14,19 52:21 54:4 55:17 56:14

**times** 4:16

**title** 15:20 35:23

**today** 4:10 5:5 8:21,25 44:16

**told** 31:10,25 40:21

**top** 23:11 39:21

**totally** 17:24

**trading** 36:11 38:18

**trainee** 10:8 13:1

**training** 16:7

**transmission** 15:9

**traveled** 13:14

**truncated** 15:17

**turns** 5:21

**type** 47:2

**typical** 18:8 19:11,15

**typically** 43:12,20

## U

**ultimately** 27:6 29:4 53:8

**unacknowledged** 26:17

**underneath** 24:10

**understand** 4:9,23 5:1,8,11,16 6:14

**understanding** 8:20 21:3 27:16 29:3 34:21

**unemployed** 12:14,16

**unfamiliar** 19:10

**union** 47:10,13,22 48:4,5,7

**unionized** 47:25

**University** 9:24

**updated** 44:10,14 48:18

**Urbana** 14:2

## V

**VALOIS** 4:5 15:12,15 19:3 20:11, 24 23:6,9 24:13,18,23 25:10 28:16,20,22 31:1 32:17,20 38:3,8, 19,21 42:16,23 43:5 44:19,25 47:5 48:1,6 50:24 51:4 54:1,20,25 56:24

**vast** 23:15

**vehicle** 40:20,22 41:4,7

**verbal** 30:7,9 31:22 32:6,15,23

**verbally** 29:17

**verbatim** 24:6

**Vernon** 9:18,19

**versus** 22:3

**video** 7:8,10

**videotape** 31:16

**violated** 35:15 39:15,18

**violation** 31:6 35:5 41:19

**violations** 36:12

**Virginia** 8:5 22:16

**visual** 41:6

## W

**Wal-mart** 4:19 9:8,11,13 10:2,19, 22 12:15,19 13:11 18:3 19:19 21:5,11 23:13 28:8 29:11 30:19 35:5 36:5 37:6,10,13,20 38:23,24 42:10,24 44:21 47:23 49:20,22 51:12,17 52:1 53:21

**walk** 47:19

**walked** 28:7 37:19

**Wards** 21:11 29:23 53:21 56:13

**ways** 36:9

**weighted** 27:13

**wide** 52:19

**Wire** 49:23

**WM-OSBORNE** 23:8 44:21

**work** 11:6,24 14:22,23 19:14 26:7

**work-related** 12:4

**worked** 10:2,22,25 11:1,2,14 56:13

**working** 9:7 13:15

**worth** 36:15

## Y

**year** 10:14 14:5,19

**years** 11:7,25 13:19 52:24